IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

```
LAURA McKNIGHT, TRISHA           :
TURNER, ANDREW BAKER, RACHAEL    :
FREEDMAN, KIMBERLY McCRAY, and   :
MARGO MORENO                     :
        PLAINTIFFS,              :
V.                               :   C.A. NO. 09-3345
                                 :
D. HOUSTON, INC. D/B/A TREASURES,:
A.H.D. HOUSTON, INC. D/B/A       :
CENTERFOLDS                      :
D N.W. HOUSTON, INC. D/B/A GOLD  :
CUP, D. RANKIN, INC. D/B/A TROPHY:
CLUB, D WG FM, INC. D/B/A        :
SPLENDOR, W.L. YORK, INC. D/B/A  :
COVER GIRLS, AND, IN THEIR       :
INDIVIDUAL CAPACITIES            :
ALI DAVARI AND HASSAN DAVARI,    :
        DEFENDANTS.              :
```

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

HASSAN DAVARI

APRIL 7, 2010

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

     ORAL DEPOSITION of HASSAN DAVARI, produced as a
witness at the instance of the PLAINTIFFS, and duly
sworn, was taken in the above-styled and numbered cause
on APRIL 7, 2010, from 10:29 a.m. to 2:26 p.m., before
Stephanie M. Harper, RPR, CSR in and for the State of
Texas, recorded by machine shorthand, at the offices of
LAW OFFICES of LAUREN M. SERPER, P.C., 3405 Edloe,
Suite 200, Houston, Texas, pursuant to the Federal
Rules of Civil Procedure and the provisions stated on
the record or attached hereto; that the deposition
shall be read and signed before any notary public.

JOB NO. 90075

Page 2

```
 1            A P P E A R A N C E S
 2   FOR THE PLAINTIFFS:
 3      MR. MARTIN A. SHELLIST
        SHELLIST LAZARZ, LLP
 4      1900 West Loop South, Suite 1910
        Houston, Texas  77027
 5
 6
     FOR THE DEFENDANTS:
 7
        MS. LAUREN M. SERPER
 8      LAW OFFICES OF LAUREN M. SERPER, PC
        3405 Edloe, Suite 200
 9      Houston, Texas  77027
        - AND -
10      MR. ALBERT T. VAN HUFF
        MONSHAUGEN & VAN HUFF, P.C.
11      1225 North Loop West, Suite 640
        Houston, Texas  77008
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              INDEX
            ORAL DEPOSITION OF
 2            HASSAN DAVARI
             APRIL 5, 2010
 3
     Examination                   Page
 4
     BY MR. SHELLIST                 5
 5   BY MS. SERPER                 177
 6
 7   Further Examination
     BY MR. SHELLIST                179
 8
 9
10
11   WITNESS CORRECTIONS AND SIGNATURE    187
12   REPORTER'S CERTIFICATION             188
13
```

Page 4

```
 1              EXHIBIT INDEX
            ORAL DEPOSITION OF
 2            HASSAN DAVARI
             APRIL 5, 2010
 3
 4    Exhibit    Description         Page
 5    DAVARI 1   Treasures Credit Card  111
                 Processing Summary
 6    DAVARI 2   [Marked but not        ---
                 introduced]
 7    DAVARI 3   D. Houston, Inc dba    116
                 Treasures
 8               (Restaurant/Adult
                 Entertainment)
 9    DAVARI 4   D. Houston Inc dba     161
                 Treasures Credit Card
10               Processing Costs
```

Page 5

```
 1         MR. SHELLIST:  I -- I assume we're just
 2   going to do this by the Rules.  We'll reserve
 3   objections to form and substance until the time of the
 4   trial or we bring it to the attention of the Court?
 5         MS. SERPER:  Yes.
 6         MR. SHELLIST:  Okay.
 7         MS. SERPER:  That's fine.
 8            HASSAN DAVARI,
 9   having been first duly sworn, testified as follows:
10            E X A M I N A T I O N
11   BY MR. SHELLIST:
12      Q.  Would you please state your full name for the
13   record.
14      A.  Yes.  Hassan Davari.
15      Q.  Will you spell your name for the court
16   reporter?
17      A.  H-A-S-S-A-N D-A-V-A-R-I.
18      Q.  And are there any names that you go by or are
19   know by, other than Hassan Davari?
20      A.  Yes.
21      Q.  What is that?
22      A.  George.
23      Q.  All right.  I'm assuming on legal documents
24   and things of that nature that you -- you use Hassan;
25   is that correct?
```

Page 6

1   A.  Yes.
2   Q.  Mr. Davari, you and I have never met before
3   today.  I am an attorney in Houston.  I represent six
4   individuals that have brought a wage lawsuit against
5   you, David Davari, and some corporate entities; you're
6   aware of that?
7   A.  Yes.
8   Q.  Have you given a deposition recently?
9   A.  Not recently.
10  Q.  Let -- let me go over a few ground rules if I
11  can that may help make the next few hours go more
12  smoothly for both of us.
13      This is your day to answer a few
14  questions.  There's no magic to it one way or the
15  other.  But there are some ground rules that may be
16  helpful.  If I ask you a question that you do not
17  understand and you know you do not understand it, it
18  would be important for -- for you to let me know that
19  at the time that you know you don't understand; will
20  you try to do that?
21  A.  Yes.
22  Q.  If you can answer with an audible "yes" or a
23  "no" or some other verbal, oral response, as opposed to
24  "uh-huh," "nu-huh," it will help the court reporter to
25  take down very accurately the words we are saying; will

Page 7

1   you try to do that?
2   A.  Yes.
3   Q.  And if you and I give each other the courtesy
4   of letting one another finish our question or the
5   answer, it will keep us from stepping on each other's
6   words, and it will make -- make the record that much
7   more accurate; will you try to do that?
8   A.  Yes.
9   Q.  All right.  If you can tell me succinctly how
10  it is that you are currently employed, meaning --
11  meaning from where do you derive income?
12  A.  At -- myself?
13  Q.  Just yourself.
14  A.  Yes.  I'm employed by D. Texas.
15  Q.  Okay.  And what is D. Texas?
16  A.  It's a corporation.
17  Q.  Okay.  And what does the corporation do?
18  A.  It's the holding company.
19  Q.  Okay.  And how many companies are held, if
20  any, by D. Texas?
21  A.  Six companies.
22  Q.  Do you know those names?
23  A.  Yes.
24  Q.  What are they?
25  A.  AHD Houston.

Page 8

1   Q.  Okay.
2   A.  D. Houston.
3   Q.  Okay.
4   A.  DNW and DWG.
5   Q.  Is there --
6   A.  And --
7   Q.  I'm sorry.  Go ahead.
8   A.  And Cover Girl [sic].
9   Q.  Cover Girl?
10  A.  Cover Girls, yeah.
11  Q.  Okay.  One, two, three, four -- I believe
12  that's five:  AHD, D. Houston, DNW, DWG, Cover Girls?
13  A.  And Trophy, sorry.
14  Q.  Trophy Club?
15  A.  Yes.
16  Q.  And in your own words, what kinds of
17  businesses are these?
18  A.  They are nightclub entertainment, topless.
19  Q.  Okay.
20  A.  Gentlemen clubs.
21  Q.  Okay.  And does D. Texas have any other
22  business interests besides the companies you have
23  listed?
24  A.  No.
25  Q.  Are each of the companies -- the six that you

Page 9

1   have listed, are they active companies?
2   A.  Yeah, they're active except for Cover Girl is
3   shut down right now, and Trophy.
4   Q.  All right.  So the company -- like the
5   corporation may exist, but the business, the brick and
6   mortar business, is not doing business?
7   A.  That's correct.
8   Q.  And how long -- well, strike that.
9       When did Cover Girl stop operating a
10  business?
11  A.  It's over two years.
12  Q.  And Trophy Club, when did it close?
13  A.  About six to seven months.
14  Q.  I don't need all of the details, but if you
15  can tell me for Cover Girl and Trophy Club why it shut
16  down.  The examples would be:  Slow business, fire,
17  renovations, whatever, but why did each Cover Girl and
18  Trophy Club, each of those shut down?
19  A.  Cover Girl due to fire, and Trophy lack of
20  business and negative...
21  Q.  Negative -- just...
22  A.  Just negative -- negative income --
23  Q.  Okay.
24  A.  -- lost.
25  Q.  You're spending more than you're bringing in?

3 (Pages 6 to 9)

Page 10

1   A.  Yes.
2   Q.  Okay.  As I understand it -- let me just make
3   sure I have it.  AHD is Centerfolds; is that correct?
4   A.  Yes.
5   Q.  And D. Houston is Treasures?
6   A.  Yes.
7   Q.  And DNW is Gold Cup?
8   A.  Yes.
9   Q.  And DWG is Splendor?
10  A.  Yes.
11  Q.  Okay.  Are there any other companies in which
12  you have a ownership interest?
13  A.  You talking about D. Texas?
14  Q.  Well, let's --
15  A.  D. Texas, the only -- the only interest
16  D. Texas are those.
17  Q.  Okay.  And now let's talk about George Davari.
18  A.  Yes.
19  Q.  Do you have an ownership interest in any
20  companies, other than D. Texas, which operates a --
21  gentlemen's club?
22  A.  Yes.
23  Q.  And what are those?
24  A.  Treasures.
25  Q.  Okay.  Treasures in Houston?

Page 11

1   A.  No, Las Vegas.
2   Q.  Oh, okay.
3   A.  We already mentioned D. Houston.
4   Q.  Okay.  Treasures, Las Vegas.  Are there any
5   other --
6   A.  Yes.
7   Q.  Go ahead.
8   A.  Treasures Canada.
9   Q.  And what city does that find itself in?
10  A.  It's Toronto.  Missassauga, really.
11  Q.  All right.  And -- and how long has -- has
12  Treasures Las Vegas been open?
13  A.  I will say about five to six years.
14  Q.  As I understand it, there was some initial
15  difficulty getting the licenses and things in Las Vegas
16  that occurred at the outset, and then you overcame
17  those and were able to open the club; is that true?
18  A.  I won't call -- it's just the process of
19  getting the license we went through.
20  Q.  All right.  And then how long has the
21  Treasures Toronto been opened?
22  A.  That's about -- maybe about seven years.
23  Q.  Other than the companies we have named, do you
24  have an ownership interest in any other company that
25  operates a gentlemen's club?

Page 12

1   A.  No.
2   Q.  All right.  For each of the companies that you
3   referenced, is your brother, David, also an owner?
4   A.  Yes.  The companies -- and I want to make it
5   clear.  We're not owners of the companies.  Each
6   individual, they're owned by the corporation, but, yes,
7   we have interest.  We are officer.
8   Q.  Yes, I understand that.  Okay.
9       Are there any owners of D. Texas, other
10  than you and David?
11  A.  No, sir.
12  Q.  And are there any officers of any of the
13  companies that we've referenced, the -- the six under
14  D. Texas and Treasures Las Vegas and Toronto, are there
15  any officers of those, other than you and David?
16  A.  Yes, in Toronto.
17  Q.  Yes.
18  A.  There is another gentleman named -- yeah,
19  there is another one.
20  Q.  Okay.  What is that person's name?
21  A.  Scott.
22  Q.  Scott what?
23  A.  I guess it's Kurtsman.
24  Q.  How do you spell that?
25  A.  I believe it's K-U-R-T-S-M-A-N.

Page 13

1   Q.  Okay.
2   A.  I'm guessing.
3   Q.  So other than Scott in Toronto, is there
4   anyone who is an officer of any of the companies
5   besides you and David?
6   A.  No.
7   Q.  All right.  In a general sense, when you look
8   at your role with the clubs that you've named and
9   you've looked at David's role with the clubs, what are
10  they, I mean, if you can just generally give me a
11  description of how -- how and what your duties are?
12  A.  Whose duties?
13  Q.  Yours.
14  A.  Basically, I oversee the whole operation.
15  Q.  And how about David, what are his duties, if
16  any?
17  A.  He does same, but I'm more involved than he
18  is.
19  Q.  Explain why it is or how is it that you are
20  more involved than David.
21  A.  On day-to-day operation on -- I spend more
22  time.
23  Q.  Okay.
24      (Discussion off the record.)
25  Q.  (BY MR. SHELLIST) Okay.  When you use the

Page 14

1  phrase, Mr. Davari, "oversee whole operation," give me
2  an understanding of the types of duties that you have?
3      A.  I review the financial of the company, deal
4  with the legal issue, and things as needed.
5      Q.  Let's say, for example, that you've heard that
6  a manager in a club was stealing money or skimming
7  money somewhere, would that be a -- an issue that would
8  come to your attention?
9      A.  Pretty much, yes.
10     Q.  All right.  If we were to look at the
11 corporate structure of D. Texas --
12     A.  Um-hmm.
13     Q.  -- you and David are the owners, the officers,
14 do you have a management team that helps oversee the
15 operations?
16     A.  Me and David.
17     Q.  All right.
18     A.  As far as D. Texas?
19     Q.  Yes.
20     A.  You're talking just D. Texas?
21     Q.  Yes.
22     A.  Yes, D. Texas.  But referring to each club,
23 they've got their own management.
24     Q.  Okay.  Let's -- let's talk about Treasures,
25 then, for a moment.

Page 15

1      A.  Yes.
2      Q.  What is the management structure at Treasures?
3      A.  Basically, each shift got their own manager.
4      Q.  Okay.  So there would be a shift manager?
5      A.  Shift manager, yes.
6      Q.  Okay.  Would there ever be more than one
7  manager on a shift?
8      A.  Yes.
9      Q.  Who is in charge, if anybody?
10     A.  Basically, they're all in charge.  They're all
11 in charge.
12     Q.  Okay.  So if a problem comes up, let's say
13 that a customer gets very rowdy or very drunk or tries
14 to do something bad, the managers will decide who will
15 handle that?
16     A.  The very next person available.
17     Q.  Okay.  All right.  And then is there any
18 management or supervisor at the club level at Treasures
19 below shift manager?
20     A.  I would call all the managers the same.
21     Q.  Okay.  For example, some companies might have
22 assistant manager.  Are there any people called that at
23 Treasures?
24     A.  Not really.
25     Q.  Okay.  So there are managers.  What other

Page 16

1  types of employees do you have at the club level
2  besides a shift manager?
3      A.  We have bartenders, waitresses, cooks, busboy,
4  barback.  I believe I mentioned them all.
5      Q.  Is there like a -- a hostess at the door?
6      A.  Right.  I'm sorry.  You're right.
7      Q.  Hostess?
8      A.  Yes.  And bookkeepers, also bookkeeper.
9      Q.  Who's the bookkeeper at Treasures?
10     A.  Treasure [sic], basically is Glenda and Laura.
11     Q.  Are they full-time employees?
12     A.  Yes.
13     Q.  And do they stay at Treasures all of the time;
14 they have an office there?
15     A.  No, they stay outside of Treasure.
16     Q.  Where do they office?
17     A.  They office on 6200 Richmond.
18     Q.  And what is there?
19     A.  Is Richmond.
20     Q.  No, I understand.  But it's an office space?
21     A.  Yes.
22     Q.  And who leases the office space?
23     A.  Who leases?  D. Texas.
24     Q.  Okay.  All right.  We'll go back to D. Texas
25 for a --

Page 17

1      A.  And the -- the one to -- what was the other
2  name I mentioned, Glenda?
3      Q.  Glenda and Laura.
4      A.  Yeah.  Glenda is -- yeah, okay.  Go ahead.
5      Q.  They both do bookkeeping?
6      A.  Yes.
7      Q.  All right.  Is there someone at the Treasures
8  level at the club that handles the money at the club,
9  for example, that would give the bank to -- to the
10 managers or to the waitresses at the beginning of a
11 shift?
12     A.  Right.
13     Q.  Who would that be?
14     A.  Norman.
15     Q.  And does he work just for Treasures?
16     A.  Yeah, he works at Treasure.
17     Q.  Is there anyone who does his job in addition
18 to him at Treasures?
19         So if he is not there, who would do his job?
20     A.  Basically, we didn't have any case, but one
21 occasion that hostess did it.
22     Q.  Okay.  And what is Norman's job?
23     A.  Basically, to -- in charge of money, to
24 control the money coming in and going out.
25     Q.  Okay.

Page 18

1   A. From bank to him, and bank to floor.
2   Q. Okay. Do you call him a bookkeeper, or does
3   he have another title?
4   A. I won't -- I really haven't called him any
5   name.
6   Q. Okay. But he handles the -- the money coming
7   in and money going out?
8   A. Control the money coming in and --
9   Q. Who handled --
10  A. -- verify --
11  Q. I'm sorry. Go ahead.
12  A. Verify the money in and out.
13  Q. Okay. Who handles the payroll for the club
14  employees?
15  A. Glenda and Laura.
16  Q. So tell me in a general way -- for example, on
17  a waitress, a waitress turns in her time somewhere, and
18  then that gets sent somewhere, and then it gets to
19  payroll at some point. Tell me that process.
20  A. Basically, you explain it.
21  Q. Okay.
22  A. Yeah. Um-hmm. She turn in the paperwork. It
23  gets to the bookkeeper, and the check get cut.
24  Q. Okay. So the -- in this case, one of the
25  ladies, Laura McKnight, was a waitress at Treasures.

Page 19

1   She would fill out a time sheet manually, or is it a
2   computer?
3   A. The time sheet right now is -- is a time card,
4   I believe.
5   Q. Okay. And how long has it been that way?
6   A. It's been -- I guess, for long time.
7   Q. Okay. Meaning five years, or more?
8   A. More, yeah.
9   Q. All right.
10  A. Five plus.
11  Q. So the time is tracked by computer by --
12  A. By time -- yeah, by time card.
13  Q. Okay. And do the managers at the club level,
14  do they have the ability to adjust the time clock?
15  A. Yes.
16  Q. Okay. And do they do that ever?
17  A. As needed.
18  Q. All right. So if an employee forgot to clock
19  out, the manager can come in and adjust the time?
20  A. When you say "adjusted the time," you mean at
21  what level, on the paper, in the time clock?
22  Q. In the time clock.
23  A. There's no need for time -- in time clock --
24  they adjust it unless it's off. Are you talking about
25  if she forget?

Page 20

1   Q. Yes.
2   A. Yes, they can go to the manager and report it,
3   get initial on it.
4   Q. Okay. And then the managers have a code or
5   whatever they use; their card permits them to go in and
6   override?
7   A. Yeah, they're authorized to, right.
8   Q. Okay. Are the computers at Treasures on a
9   network?
10  A. No, it's directly a cash register.
11  Q. Okay. So the cash register handles the time
12  and the money?
13  A. No, no, no. The time clock --
14  Q. Okay.
15  A. -- is an old-fashioned --
16  Q. Okay. There's a card --
17  A. Right.
18  Q. -- that is punched?
19  A. Right.
20  Q. I'm sorry. I thought you meant an electronic
21  card. That's my fault.
22      So when people come in, they punch the card,
23  and when they leave, they punch the card?
24  A. Yes.
25  Q. Okay. The cash registers are electronic and

Page 21

1   they're on a network?
2   A. No.
3   Q. How do they work?
4   A. They just regular cash register, each
5   individual cash register.
6   Q. Okay. How does the data -- I'm assuming,
7   then, you have to print tapes at the end of the night?
8   A. Right. They take a reading, yes.
9   Q. All right. And who reviews the tapes to
10  see if the --
11  A. The managers.
12  Q. -- the numbers add up?
13  A. The bartender; they do their own checkout.
14  Q. Okay.
15  A. And they turn it in.
16  Q. They turn it in to whom?
17  A. They basically put it in a bag and give it to
18  the manager.
19  Q. Okay. Do you keep all of those tapes?
20  A. Yes.
21  Q. And by "tape," we're talking about a paper
22  roll?
23  A. Cash register tape.
24  Q. Yes. It's not a VHS tape; it is a paper tape?
25  A. Yes, it is not videotape; it's just a regular

Page 22

1  cash register tape.
2     Q.  Okay.  And how long do you keep those tapes
3  for?
4     A.  I believe about -- the courts require about
5  four years.
6     Q.  Okay.  So the bartender will print out the
7  tape, and will the bartender do some calculation?
8     A.  Yes, they do the calculation, balance.
9     Q.  Okay.  So they balance the register?
10    A.  Yes.
11    Q.  And then what do they do with that data?
12    A.  They put it in a bag to turn it in.
13    Q.  To whom?
14    A.  To -- they give it to the manager.
15    Q.  So if there are three managers on duty, which
16 one would they give it to?
17    A.  Basically, to -- to the next available one.
18    Q.  Okay.  And then that manager, do they give it
19 to Norman, or do they --
20    A.  No, he put it in a safe.
21    Q.  Okay.  And then where does it go from the
22 safe?
23    A.  From the safe, it gets picked up.
24    Q.  Yes?
25    A.  And then the -- the money get verified, and

Page 23

1  the paperwork turned in to bookkeeper.
2     Q.  At 6200 Richmond?
3     A.  Right.
4     Q.  Who verifies the tape and the money?
5     A.  Laura.
6     Q.  So she goes through each of these bags?
7     A.  No, no, no.  She just get the paper -- the
8  bags, Norman --
9     Q.  Yes.
10    A.  -- pick up the money, verify it.
11    Q.  Yes.
12    A.  And then the rest of the paperwork gets
13 transferred to Laura.
14    Q.  Okay.  So I'm assuming in the bag is the cash?
15    A.  No, I mentioned that.
16    Q.  What is in the bag?
17    A.  The money get verified, get picked up, put in
18 the main office.
19    Q.  Yes, in the safe?
20    A.  Yes, to recycle it --
21    Q.  Okay.
22    A.  -- inside the club.  And only paperwork --
23 everything minus the cash, get turned in to Laura.
24    Q.  All right.  So the money stays at the club to
25 be recycled?

Page 24

1     A.  Yes.
2     Q.  And does any of the money at the club any
3  night go over to a bank account?
4     A.  If we need it, yes.
5     Q.  Okay.
6     A.  But if not, most -- most the time or the
7  majority of the time, we even need the money from the
8  banks to pay the dancers.
9     Q.  Okay.  So at Treasures, Norman is responsible
10 for --
11    A.  Verifying the money.
12    Q.  -- verifying the money at the end of the
13 night?
14    A.  For the day.
15    Q.  For the day?
16    A.  He doesn't do it at the end of the night.  He
17 do it next day.
18    Q.  Okay.  And it stays in the safe until then?
19    A.  Yes.
20    Q.  All right.  Does Norman create any paperwork
21 to verify each register's money?
22    A.  No, he just put a check mark on it.  That's
23 it.  Check it.
24    Q.  A check mark on the tape?
25    A.  Check mark on the bartender checkout.

Page 25

1     Q.  Okay.  And do you keep the bartender checkout
2  paperwork?
3     A.  It's been -- if there's no problem with it, I
4  don't think they keep it.
5     Q.  All right.
6     A.  It's not -- it's not requested, but they may
7  keep it.  But it's not requested by us after it got
8  verified.
9     Q.  All right.  So we've talked about Norman at
10 Treasures.  Who does the cash verification at the other
11 clubs that you operate?
12    A.  Each club, they've got their own person to do
13 it.
14    Q.  Right.  When you -- what are their names?
15    A.  What club are you referring to?
16    Q.  Well, let's -- let's go through.  We talked
17 about Treasures.  Let's talk about Centerfolds.
18    A.  Centerfold, we have a gentleman named Wahid.
19    Q.  V-A-H-I-D?
20    A.  W-A-H-I-D.
21    Q.  "Wahid"?  Okay.  And at Gold Cup?
22    A.  Sam.
23    Q.  All right.  And Splendor?
24    A.  Ilaen.  It's I-L-A-E-N.
25    Q.  Okay.  And those are the only four opened

Page 26

1  today --
2      A.  Yes.
3      Q.  -- in -- in Houston?
4      A.  Yes.
5      Q.  You don't -- do you own or operate any clubs
6  in Texas outside of Houston?
7      A.  No.
8      Q.  Do Wahid, Sam, Ilean, and Norman have the same
9  job at different clubs?
10     A.  No.  Norman at Treasure, due to volume, he
11 only verifies the money.
12     Q.  Okay.  And at the other clubs, what do the
13 employees Wahid, Sam, and Ilean do?
14     A.  Wahid, he balances paperwork.
15     Q.  Okay.
16     A.  Verify the money.  And Sam at Gold Cup verify
17 the money.  She does the payroll --
18     Q.  Um-hmm.
19     A.  -- and balance checkout.
20     Q.  Does D. Texas use a payroll company to help
21 process the paychecks?
22     A.  Pretty much I can say, yes, because we use
23 Glenda, which is in-house processing.
24     Q.  Okay.  But -- but you do not use, like, ADP or
25 Paychex?

Page 27

1      A.  No.
2      Q.  So Glenda is in charge of making sure that all
3  of the payroll is done correctly?
4      A.  Right.
5      Q.  Okay.  How many employees are on the payroll,
6  if any, at D. Texas?
7      A.  D. Texas?
8      Q.  Yes.
9      A.  I have to give it to you separate.
10     Q.  Okay.  Go ahead.
11     A.  Because they operate separate anyway.
12     Q.  Okay.
13     A.  I'm talking employees.  Does not include --
14 we're talking just strictly employees.  I would say
15 Treasure, around 150.
16     Q.  Okay.
17     A.  Centerfold about 75.  Gold Cup about 50 to 60.
18     Q.  Okay.
19     A.  And Splendor about 45 to 50.
20     Q.  Does D. Texas have any direct employee that it
21 issues a paycheck to?
22     A.  Direct employees?
23     Q.  Yeah.
24     A.  Yes.
25     Q.  Who?

Page 28

1      A.  To issue the paycheck?  Sorry.  No.
2      Q.  Yeah.  Meaning, for example, I know that if
3  Glenda works at the D. Texas office, is she attached to
4  a payroll with D. Texas, or is she attached to one of
5  the clubs' payroll?
6      A.  She mostly attached to Centerfold payroll.
7      Q.  Okay.  But she does work to support other
8  clubs, too?
9      A.  Well, she processes it in a printer.  I will
10 say that, the last step of it.
11     Q.  Right.
12     A.  Which is printing the checks.
13     Q.  Okay.  What type of software do you use for
14 payroll?
15     A.  I believe it's Quick Set.
16     Q.  Quick Set?
17     A.  Yes.  I mean, it's Quick -- QuickBook [sic],
18 sorry.
19     Q.  And Glenda operates the QuickBooks?
20     A.  Yes.
21     Q.  So the clubs provide data to Glenda, Glenda
22 makes sure it's all accurate in QuickBooks, and then
23 prints the checks?
24     A.  Right.
25     Q.  Okay.  Who at Treasures is in charge of

Page 29

1  payroll?
2      A.  Laura.
3      Q.  Okay.  What work does Laura do, if any, that
4  helps any of the other clubs?
5      A.  Basically, she handle the bookkeeping for
6  Treasure.
7      Q.  Okay.  What else does she do?
8      A.  That's good enough work for her.
9      Q.  Huh?
10     A.  That's enough work for her.
11     Q.  No, I -- listen, I believe it.  I understand.
12         But Laura offices at 6200 Richmond --
13     A.  Yes.
14     Q.  -- and not at Treasures?
15     A.  Yes.
16     Q.  So I'm assuming if Glenda needs her help or
17 there's other work to do, she'll do other work?
18     A.  Not necessary.  I'm not aware of it, but it
19 could be.
20     Q.  Okay.  All right.  And what payroll is Laura
21 on?
22     A.  Laura?
23     Q.  Yes.
24     A.  I guess she's on Treasure.
25     Q.  Well -- yeah.  And to be -- are -- are you

Page 30

1 sure of that, or are you sort of speculating?
2   A.  To the best of my knowledge, she is.
3   Q.  I'm assuming it would be easy to find out?
4   A.  Right. Simple.
5   Q.  So when Glenda is looking at QuickBooks, she
6 has a separate payroll account for each of the clubs?
7   A.  Payroll account, I believe so, because they've
8 got their own tax ID number.
9   Q.  Again, we could find out if we needed to --
10  A.  Yes.
11  Q.  -- down the road from Glenda how it is all set
12 up?
13  A.  Yes.
14  Q.  All right. Who does the D. Texas accounting?
15  A.  Brenda.
16  Q.  And who is Brenda?
17  A.  Brenda, she is a employee of D. Texas.
18  Q.  Okay. Does she get a paycheck from D. Texas?
19  A.  Yes.
20  Q.  And what is Brenda's last name?
21  A.  Roberts.
22  Q.  So her duties include accounting for D. Texas.
23 What else, if anything?
24  A.  Basically, dealing with D. Texas.
25  Q.  Okay. Does Brenda receive information from

Page 31

1 other clubs like Glenda might?
2   A.  Not really. No need it.
3   Q.  Well --
4   A.  What kind of information?
5   Q.  Well, accounting information?
6   A.  No.
7   Q.  What information does Brenda work with?
8   A.  She's assistant to me.
9   Q.  Okay.
10  A.  She's assistant to me.
11  Q.  Okay. So if you need assistance with a
12 particular club, she's able to support or help with
13 that?
14  A.  Yes.
15  Q.  Are there accountants -- in-house accountants
16 like Brenda for each club?
17  A.  I guess I mentioned it, yes.
18  Q.  Meaning not a bookkeeper, but I mean someone
19 who does all of the tax forms?
20  A.  No, it is out -- outside person.
21  Q.  Who is that?
22  A.  Luther Henderson. He's a -- yeah, Luther
23 Henderson.
24  Q.  Luther Henderson is in Houston?
25  A.  Yes.

Page 32

1   Q.  Is he a CPA?
2   A.  Yes, a CPA firm.
3   Q.  And I'm assuming he does the returns for
4 D. Texas and your other business interests?
5   A.  Correct.
6   Q.  When and if there -- well, when and if there
7 is money to distribute to you and your brother out of
8 either for -- well, strike that.
9       Do you -- do you earn a salary from the clubs?
10  A.  I earn salary.
11  Q.  Okay. And tell me about that. I mean,
12 what -- do you get a paycheck or a direct deposit?
13  A.  I get paycheck.
14  Q.  Okay. And what is the name on the paycheck?
15  A.  Hassan Davari.
16  Q.  No, no, no. I mean the company issuing it.
17  A.  D. Texas.
18  Q.  Do you get a paycheck directly from any of the
19 specific clubs?
20  A.  No, just from D. Texas.
21  Q.  Okay. And is it a predetermined amount every
22 single two weeks or month?
23  A.  Monthly basis.
24  Q.  Okay.
25  A.  Salary.

Page 33

1   Q.  All right. And then if there is money
2 available throughout the year, do you take also a bonus
3 with your brother?
4   A.  That's something that my CPA decide.
5   Q.  Right. So if there is a need for financial
6 reasons, tax reasons, or whatever, there might be extra
7 money paid to you and your brother on top of salary?
8   A.  In a form of salary, I guess at one -- one or
9 two occasion, dividend, we did it.
10  Q.  A dividend. Okay. Otherwise, you just get
11 the monthly payment?
12  A.  That's it.
13  Q.  Okay. And do you and your brother get the
14 same amount?
15  A.  Yes.
16  Q.  All right. Now, have you ever seen the tax
17 return for D. Texas?
18  A.  Yes.
19  Q.  And does it include data from the entities
20 that -- that we have named, the -- the six clubs, the
21 corporate entities that we have named?
22  A.  It is one tax return. Consolidated report.
23  Q.  Okay. Is there one club -- I could guess, but
24 is there one club that you spend much more time
25 overseeing than the others?

Page 34

1  A. No.
2  Q. You are an equal -- you share time equally
3  with all of the clubs?
4  A. As needed.
5  Q. Okay. Have you and David in the last three
6  years been involved with hiring or firing people?
7  A. Not really. I don't hire and fire directly.
8  It's a management decision, hiring employees under
9  them.
10 Q. Let's say you're going to hire a manager, have
11 you done that in the last three years?
12 A. Yes, we do that.
13 Q. Okay. And if you had to let a manager go,
14 would you or David -- have you been involved in that in
15 the last three years?
16 A. Yes.
17 Q. Okay. As I understand it, you give the
18 managers also discretion at the club level if they're
19 going to hire busboys, or cooks, or even waitresses,
20 right?
21 A. Correct.
22 Q. But I'm sure that sometimes with your
23 longer-term employees, some employees feel that they
24 can -- if there's an employment problem, they can come
25 to talk to you and David about those issues; has that

Page 35

1  happened?
2  A. That's correct.
3  Q. Okay. How long have you and David operated
4  these clubs?
5  A. Different years, each one of them. They're
6  not the same age.
7  Q. Tell me for the four that are currently
8  operating, how long you've operated those four.
9  A. Treasures, since 1997 -- 1996; Centerfold,
10 '89; Gold Cup, '93; and the Splendor, early 2000.
11 Q. And had you had experience in operating adult
12 clubs prior to 1989?
13 A. Yes.
14 Q. Okay. And what was that experience?
15 A. I was experience.
16 Q. Oh, okay. No, meaning did you own any clubs
17 prior to them?
18 A. Yes.
19 Q. You did? Okay.
20    So you'd had some -- give me the time frame
21 when you and David started operating adult clubs?
22 A. Time frame?
23 Q. Yeah, like a year?
24 A. It would be a few years prior to opening
25 Centerfold.

Page 36

1  Q. Okay. So somewhere in the late '80s?
2  A. I would say about mid-'80s, late '80s, yes.
3  Q. All right. In this case, there is an issue
4  about this 5 percent charge. I'm assuming you're
5  generally familiar with the allegations that we make?
6  A. Go ahead, please.
7  Q. Okay. Do your clubs, whether it's D. Texas or
8  any of the named clubs, do they have a written policy
9  about the 5 percent credit card processing fee?
10 A. Not to my knowledge. About the amount, you
11 say?
12 Q. Well, about the fact that there will be a -- a
13 charge assessed to the waitresses or bartenders?
14 A. I cannot recall that.
15 Q. Okay. And to make sure I'm clear, I'm just
16 wanting to know now, are there written documents,
17 e-mails, policy manuals, which talk about the credit
18 card processing fee?
19 A. I can't -- again, I cannot recall that --
20 Q. Okay. So --
21 A. -- sitting here.
22 Q. -- there may be one, but if there is one, you
23 can't recall it sitting here?
24 A. I will say there's not really policy.
25 Q. Okay. It's just sort of a practice?

Page 37

1  A. Right.
2  Q. Explain to me how that practice works.
3  A. (Pauses.)
4  Q. Meaning, how does the club assess to the
5  waitress and the bartender the 5 percent credit card
6  processing fee?
7  A. We charge 5 percent processing fee, because
8  3 percent of that is coming from direct charge for the
9  processing company, maybe even more, slightly more.
10 And the other 2 percent we charge, which is -- could be
11 more, is uncollected. And that's the charge that we
12 run a risk to absorb the cost, and we charge the other
13 2 percent for uncollected charges.
14 Q. Okay. We sometimes --
15 A. It benefits the employees; they are tip
16 employees.
17 Q. Okay. Sometimes we call those chargebacks; is
18 that what you're referring to?
19 A. Right. Uncollected charges. Chargebacks,
20 yes.
21 Q. Okay. We'll get into that in a moment.
22    My initial question really is: If I'm
23 coming in to work for one of your clubs and I ask you,
24 "Do you charge a credit card processing fee," and I
25 want to know how it will be deducted from my pay,