Page 38

1  what's that process for that?
2  A.  The process would be explained to you as --
3  when you work, by the end of the night --
4  Q.  Um-hmm.
5  A.  -- we charge 5 percent.  And we convert that
6  uncollected money from the customers, and we take a
7  risk.  And minus the five percent, we pay you the rest
8  of your money, which is 95 percent of your money.
9  Q.  Okay.  And tell me mechanically, Mr. Davari,
10 meaning if I'm a waitress and it's the -- my -- the end
11 of my first night, how does the 5 percent get deducted?
12     Who does it; what is the mechanics of it?
13 A.  Let's take example.  If you have $100 tips --
14 Q.  -- um-hmm.
15 A.  -- you get $95 immediately.
16 Q.  Right.  And who does that; who calculates?
17 A.  Bartenders.
18 Q.  Okay.  So if there are a few bartenders on
19 duty, the bartenders would split up the various tabs --
20 A.  Yeah.
21 Q.  -- for the waitresses?
22 A.  Each individual bartender runs the tabs.
23 Q.  Ok.
24 A.  Processes them.
25 Q.  All right.  Is there a -- some kind of a sheet

Page 39

1  for each waitress that tracks all of the charges
2  they've had that night?
3  A.  No, just they keep track on it by the tab
4  sheet, the drink sheet.
5  Q.  And is the tab sheet per customer?
6  A.  Yes.
7  Q.  Okay.  So let's say a waitress has 20
8  customers in a night, she will have 20 tab sheets?
9  A.  Yes.
10 Q.  And will the bartender make any pencil or pen
11 calculation on the tab sheet?
12 A.  They make calculation if they need to, but I
13 don't think that every one of them do that.
14 Q.  Okay.
15 A.  That's not general rule --
16 Q.  Okay.
17 A.  -- to make a calculation --
18 Q.  All right.
19 A.  -- as long as they pay 95 percent back to the
20 waitress.
21 Q.  Okay.  Where does the other 5 percent go?
22 A.  Stay inside a house.
23 Q.  Okay.  And how is that accounted for in-house?
24 A.  As a processing fee.
25 Q.  I mean is the -- does -- for example, at

Page 40

1  Treasures, does Norman have a sheet where he adds up
2  all of this 5 percent money?
3  A.  Yes.
4  Q.  What is that sheet called?
5  A.  Income -- I guess they call it -- there's a
6  sheet that shows the details --
7  Q.  Okay.
8  A.  -- of the money coming to the house and then
9  get reported to CPA.
10 Q.  Have you seen this detail sheet that shows
11 money to the house, which reflects the 5 percent income
12 to the club?
13 A.  Yes.
14 Q.  And you don't recall the name of that sheet?
15 A.  Doesn't have to have a name; it just an
16 itemized sheet.
17 Q.  Okay.  So -- the reason I ask is if I later
18 ask your lawyers, and I say, "During Mr. Davari's
19 deposition, he referenced details of money to the house
20 sheet"; is that what I would call it?
21 A.  Yeah, just call it "detail sheet."
22 Q.  "Detail sheet."  Okay.
23 A.  Or "itemized sheet" is a better name for it.
24 I -- I will call it "itemized."
25 Q.  And who creates the itemized sheets?

Page 41

1  A.  The information gets picked up by the
2  bookkeeper.
3  Q.  At each club?
4  A.  Yes.
5  Q.  You charged 5 percent at Treasures, Splendor,
6  Centerfold, and Gold Cup?
7  A.  No.  I think it's different in each club.
8  Q.  What is the amount of the credit card
9  processing fee at each club?
10 A.  I believe for Gold Cup, it's 4 percent.
11 Q.  Okay.  And how about -- Treasures is 5
12 percent, correct?
13 A.  Yes.
14 Q.  Splendor and Centerfolds?
15 A.  I assume they are between 4 or 5.  I'm not
16 sure, but one of those numbers.
17 Q.  Do you think that the -- the risk of
18 uncollected charges is greater at Treasures than at
19 Gold Cup?
20 A.  Yes, the volume is way higher.
21 Q.  Okay.  But as a percentage, though, the volume
22 is higher, you earn more...
23 A.  Yeah, the percentage of uncollected charges is
24 higher.
25 Q.  At Treasures?

Page 42

```
 1    A.  Yes.
 2    Q.  Okay.
 3    A.  It's proportional.  It's the math.
 4    Q.  Okay.  Prior to -- well, strike that.
 5        How long have your clubs been assessing a
 6  4 or 5 percent credit card fee to the wait staff or
 7  bartender?
 8    A.  As far as I know, I can go back to last three
 9  or four years it's been like that.
10    Q.  What did you do prior to that?
11    A.  It probably was -- maybe if I go a little bit
12  longer, maybe higher.
13    Q.  Okay.  So it might have been 6 or 7 percent...
14    A.  Right.  Might be.
15    Q.  Okay.  Who would know that for sure?
16    A.  Well, I can check into it.  I don't know,
17  really.
18    Q.  Okay.
19    A.  I got to maybe go to processing fee, what
20  they're charging, because I kept only four years
21  paperwork.
22    Q.  Okay.
23    A.  Maybe through the processing company.
24    Q.  Who made the decision, if you know, to lower
25  the charges, let's say three, four years ago?
```

Page 43

```
 1    A.  I think each club manager did decide on their
 2  own.
 3    Q.  Was that something you are -- you would be
 4  notified of?
 5    A.  Not necessary.  If they are within reason, not
 6  necessary.
 7    Q.  Okay.  Ultimately, you and David have to
 8  determine it's within reason?
 9    A.  I am the one, yes, that determines within
10  reason.
11    Q.  Okay.  So when you heard about the charges of
12  4 to 5 percent, you felt that was reasonable?
13    A.  Yes.
14    Q.  You approved it?
15    A.  Yes.
16    Q.  Okay.  To your knowledge --
17    A.  I didn't dispute it, though.  Let's put it
18  this way.
19    Q.  You let it remain?
20    A.  Yes.
21    Q.  You, if you wanted to, had the authority to
22  adjust it higher or lower?
23    A.  I won't say I had the authority to adjust it
24  to higher, because I stay within a reason which is
25  beneficial to employees.
```

Page 44

```
 1    Q.  Okay.  I guess my point is if you believed
 2  that 6 percent was reasonable, as the owner, you had
 3  the authority to raise it if you want?
 4    A.  Again, no.  Because I have to stay within
 5  reason.  What does the processing fee cost me.  I
 6  wouldn't charge rate because I have authority; I
 7  wouldn't do that.  I would do it within a reason, which
 8  is in a -- within a limit.
 9    Q.  Okay.
10    A.  And benefit our tier one, which are the
11  employees.
12    Q.  Now, the charges, 4 to 5 percent, are higher
13  than the actual processing fee you're charged by the
14  company, correct?
15    A.  No, it's not.  I'm talking about the total
16  cost for us due to the processing the credit card.
17    Q.  Right.
18    A.  I mentioned it before.
19    Q.  Right.  Let me make sure my question is clear.
20  If you take away the chargeback, if you take away that,
21  and you look only at what that actual cost is for the
22  processing of the transaction from a credit card
23  service company, the amount you charge to the employee
24  is higher than that?
25    A.  It's slightly greater than that number, yes.
```

Page 45

```
 1    Q.  Okay.  So when you say "slightly greater," if
 2  the American Express processing fee is 2 percent, if
 3  that's what it is, and you charge 5 percent, it's over
 4  100 percent higher?
 5    A.  No, because all our charges are not American
 6  Express.  We're talking about Visa or MasterCard.
 7    Q.  Okay.
 8    A.  So we're not talking about one single card, so
 9  that's not correct.
10    Q.  If I told you that the documents you presented
11  to me reflect about 2.6 to 2.7 percent average
12  processing fee charge, would you have a reason to
13  dispute that?
14    A.  On which card?  On -- on --
15    Q.  On all of them by average.  All of them on
16  average.
17    A.  If you show it to me, I have to look at it.
18    Q.  Okay.
19    A.  Because that's not the information I have on
20  hand.
21    Q.  What do you believe among MasterCard, Visa,
22  Discover, and American Express, over the last three
23  years, the average actual processing fee is?
24    A.  By reviewing the last few months, I believe
25  the average cost of all the credit -- all type of
```

Page 46

1  credit cards, they are about 3 percent, maybe even a
2  little bit more, slightly more.
3      Q.  Right.  I'm not talking about the last few
4  months, though; I'm saying if you go back several
5  years.
6      A.  Well, I gave you sample.
7      Q.  Okay.
8      A.  But if you've seen it, then we may look at it
9  together.
10     Q.  My question is really, then, Mr. Davari:  If
11 you were to go back to 2008, for example, do you have
12 an understanding of what the average credit card
13 processing fee among all the cards would be?
14     A.  Yeah, the processing fee through the credit
15 card company would be around 3 -- 3 percent.
16     Q.  Okay.  So if you charged 5 percent to the
17 employee, then it is maybe 70 percent higher than the
18 actual cost of just the processing fee?
19     A.  2 percent out of 5 percent, that's a math
20 calculation, is not really 70 percent higher.  So I
21 won't -- I'm a math major; I have to be exact on that.
22     Q.  Okay.
23     A.  So when you say "2 percent," it won't be
24 70 percent.
25     Q.  Well, let me be clear, then.

Page 47

1      A.  Okay.
2      Q.  If you --
3      A.  We can say 2 percent compared to 5 percent,
4  that's a very simple calculation.
5      Q.  Well, 2 percent is 40 percent of 5 percent; is
6  that correct?
7      A.  2 percent, yes.
8      Q.  All right.
9      A.  Exactly, so it's not 70 percent higher.
10     Q.  Well, let me make sure we can do our
11 calculations then --
12     A.  Correct.
13     Q.  I'm -- I'm not a math major --
14     A.  Sure.
15     Q.  -- so I'm looking forward to see where we end
16 up.
17     A.  All right.
18     Q.  If -- if you're looking at a number, let's say
19 you say the actual is 3 percent, and you charge
20 5 percent, how much higher is 5 percent than 3 percent?
21     A.  It's 40 percent.
22     Q.  2 percent is 40 percent of 5, correct?
23     A.  Right.
24     Q.  What is 2 over 3, right, because you're saying
25 how much higher it is.

Page 48

1      A.  That's the ratio.
2      Q.  That's correct.
3      A.  Two-thirds is the ratio; it's not a
4  percentage.
5      Q.  Okay.  I --
6      A.  If you spend --
7      Q.  Go ahead.
8      A.  -- $10 out of your $100, the ratio is 1 to 10,
9  but you spend 10 percent of your money.  Ratio and
10 percent is two different things.
11     Q.  Well, that's understood.  But if you have an
12 actual cost of 3 percent -- actual cost 3 percent?
13     A.  Yes.
14     Q.  Okay.  And then you make it 5 percent, okay,
15 you have to look at what you're adding to the 3
16 percent.  You don't take it out of the total, you take
17 it out of 3, correct?
18     A.  Yes.  We get to -- okay.  Go ahead, please.
19     Q.  So my question is:  If you're adding 2
20 percent, how much higher is --
21     A.  2 percent higher.
22     Q.  That's right.  And -- and as a percentage of
23 the total, you're increasing from 3 percent, so you
24 have to --
25     A.  I think this is a math dispute.  I won't

Page 49

1  continue on this, because maybe --
2      Q.  You don't think that --
3      A.  All I can tell you is if you had a ratio 2 to
4  3 --
5      Q.  Yeah.
6      A.  -- and the percentage 40 percent above, if
7  it -- the whole thing is 100 percent, this is
8  40 percent, according to you -- your call.
9      Q.  What's 40 percent of 3?
10     A.  40 percent of 5.  We're talking about the
11 total percentage.
12     Q.  I'm looking at how much higher than 3 we are.
13     A.  I think -- that's all I can explain it to you.
14     Q.  Okay.
15     A.  You can put it any way you want to put it.
16     Q.  All right.  Fair enough.
17         And prior to letting these charges remain
18 three or four years ago, did you undertake -- did you
19 undertake any kind of a statistical analysis or
20 mathematical analysis to determine what would be fair
21 and reasonable?
22     A.  On what?  Under...
23     Q.  When -- I'm going back now, before our math
24 discussion.
25     A.  Yes.

13 (Pages 46 to 49)

Page 50

1  Q. When the managers of the clubs you said
2  lowered the percentages to 4 to 5 percent, and you said
3  that you permitted that to remain, you felt it was
4  within reason, correct?
5  A. Yes.
6  Q. Did you undertake any analysis of any kind to
7  determine that that was a reasonable number?
8  A. I understood the credit card company, they
9  dropped -- they dropped the charges. That's what I
10 understood.
11 Q. Okay. Did you undertake -- personally, did
12 George Davari undertake any kind of an analysis where
13 you said to Glenda or Laura or Norman or others, "Give
14 me all of the raw data on credit cards so I can
15 determine if 5 percent is reasonable"?
16 A. I reviewed some of the processing fee -- I
17 mean, the processing statement years ago --
18 Q. Um-hmm.
19 A. -- at that point, and I saw that year, that
20 was -- that was reasonable.
21 Q. What years -- when you say "years ago," how
22 long ago?
23 A. The time you referred to.
24 Q. Okay. So there was some deliberation, there
25 was some review and analysis that you undertook to make

Page 51

1  sure the percentage was reasonable in your mind?
2  A. It was reason to drop it, yes, or -- yeah,
3  that amount was reasonable, yes.
4  Q. Okay. Did you review chargeback data to
5  determine what amount should be added to the processing
6  fee?
7  A. Yes.
8  Q. Okay. And what did you look at?
9  A. That's something I really review on a regular
10 basis. That amount is -- exceed more than 2 percent.
11 Q. Okay.
12 A. It exceed more than the 2 percent we add onto.
13 Q. Okay. But my point is you reviewed the
14 chargeback data back then to make sure that the percent
15 you were charging was in line?
16 A. I said I reviewed the chargebacks
17 periodically.
18 Q. And you did back --
19 A. Yes.
20 Q. That's fine. Okay.
21     Now, did you consult a lawyer -- well, strike
22 that.
23     Did -- did you -- what did you do, if
24 anything, to determine whether it was legal to include
25 the chargeback in the processing fee charged to the

Page 52

1  employee?
2  A. My understanding is I can -- because I assume
3  the risk to liquidate that money immediately, same
4  time --
5  Q. Right.
6  A. -- to the employees, I'm allowed to take
7  2 percent to -- which not exceed the chargeback's cost
8  to me.
9  Q. Right. My question was really: Where --
10 A. That was my understanding.
11 Q. Where did you get that understanding?
12 A. That's just the knowledge I had. I can't
13 really refer to it directly.
14 Q. I'm going to give you an example.
15 A. Yes.
16 Q. So another business owner in a deposition said
17 to me, "Look at the time we agreed to 5 percent, I
18 contacted a CPA, and I made sure of the rules and
19 regulations."
20     Another business owner at a deposition
21 said he called the Department of Labor to check certain
22 things. What, if anything -- and I am not saying you
23 did anything, but what did you do at the time that the
24 5 percent was implemented to -- to verify it?
25 A. Let me make it clear.

Page 53

1  Q. Yeah.
2  A. I think we had at one point audit with DOL and
3  they were okay with it.
4  Q. Okay. And when was the audit?
5  A. Several years ago.
6  Q. Can you give me a year?
7  A. About six, seven years ago.
8  Q. Okay. And do you have any documents or any
9  paperwork that would show that?
10 A. No, sir.
11 Q. Is it your testimony that the DOL looked into
12 the credit card processing fee charged to the employee?
13 A. They did not complain about it.
14 Q. The employees did not --
15 A. No --
16 Q. -- or the --
17 A. -- the DOL didn't complain.
18 Q. Did the DOL look into that specifically?
19 A. I believe he did.
20 Q. Why do you believe that?
21 A. Because I'm pretty sure all of it -- it's a
22 full balloon investigation of paperworks.
23 Q. All right. But in fairness, that -- you're
24 speculating what he looked into, then?
25     He did not tell you he looked into that, did

14 (Pages 50 to 53)

Page 54

1  he?
2  A.  He was okay with it, I assume.
3  Q.  I understand that.  I guess my question is:
4  Did the DOL auditor or anyone from the DOL tell you
5  that they investigated the credit card processing fee
6  passed along to the employee?
7  A.  At one point, I guess I consulted this and --
8  with my lawyer.
9        THE WITNESS:  Lauren, did you remember
10 that?
11       MS. SERPER:  Yeah, I'm going to -- on the
12 record, asked and answered.  He's told you everything
13 he remembers, and, you know, I -- I don't know what
14 more he can say.
15       MR. SHELLIST:  We'll find out.
16 Q.  (BY MR. SHELLIST)  I mean, I'm not going to
17 beat a dead horse.  But what was the name of the
18 auditor?
19 A.  I don't remember.
20 Q.  Okay.  And do you recall the auditor saying to
21 you, "I looked at the credit card processing fee and
22 it's okay with the DOL"?
23 A.  I do not remember auditor conversation in
24 detail at all.
25 Q.  Okay.

Page 55

1  A.  It doesn't come to my mind.
2  Q.  Okay.  Okay.  So other than the DOL audit that
3  occurred maybe six years ago, you mentioned that you
4  might have sought advice from lawyers, correct?
5  A.  Yes.
6  Q.  Okay.  Roughly, what time frame would that be?
7  A.  About what?  About the same time.
8  Q.  Okay.  Meaning --
9  A.  Maybe a few months later.
10 Q.  Okay.  So if we forget for a moment about the
11 DOL -- and I just want to make sure what, if anything,
12 did you do to verify that it was okay to charge this
13 extra percentage -- you know, this chargeback risk
14 money you're talking about -- to the employee?
15       Other than the DOL, did you seek approval or
16 advice from any other source?
17 A.  No, sir.
18 Q.  Okay.
19 A.  I believe on their FLSA --
20 Q.  Yes.
21 A.  -- you allowed to -- that is my understanding,
22 is --
23 Q.  Okay.
24 A.  -- that reasonable charges due to the fact we
25 take a risk to liquidate the tips, immediately convert

Page 56

1  it to the cash, shouldn't be a problem --
2  Q.  Okay.
3  A.  -- to exceed -- to cover portion of expenses,
4  such as chargebacks.
5  Q.  And I understand that that is your feeling and
6  opinion.  I know that.
7  A.  Yes.
8  Q.  My question is:  Where is that understanding
9  that the FLSA allows you to do that?
10       Where do you get that from?
11 A.  Some knowledges just come to you.  You don't
12 remember the source exactly.
13 Q.  Okay.
14 A.  Like every -- every bit of my day activity, I
15 can't go to the force -- nail it down to the source.
16 Q.  Right.
17 A.  Such as you cannot, really.  If I ask same
18 question, you won't be able to answer some of these
19 questions.
20 Q.  No, and please know this is not a memory test.
21 A.  Then I guess I -- I answered your question.
22 Q.  You did.  You said --
23 A.  Yes, sir.
24 Q.  It's general knowledge; you cannot remember
25 the source.

Page 57

1  A.  Business knowledge, I would call it.
2  Q.  Okay.  Meaning things you gained over the
3  years?
4  A.  Yes, sir.
5  Q.  Okay.  It was not like a book you read that
6  you recall the title of?
7  A.  I just answered that question.  I don't know
8  if I can explain it any better.
9  Q.  Okay.  Well, this area -- this lawsuit is
10 very, very, very --
11 A.  I understand.  But I told you this is my
12 business knowledge I gain over several years.
13 Q.  Okay.  In the past four years --
14 A.  I might have read a book.  I might have read
15 something.  I can't remember.  I can't make
16 recollection.
17 Q.  Okay.  That's fair enough.
18       At the time three or four years ago when
19 the percentages were lowered, did you undertake any
20 analysis at that point, specifically?
21       We've already talked about six or seven
22 years ago.  Now going back three or four years when the
23 percentage was lowered, was there any new analysis
24 undertaken to determine whether that percentage is
25 reasonable?

15 (Pages 54 to 57)

Page 58

1  A. I did not -- no, I didn't take any analysis.
2  Q. Okay.
3  A. But I believe it was within reason, my
4  personal belief.
5  Q. I understand that. Okay.
6      Now, your companies, your adult
7  companies, contest the chargebacks routinely, correct?
8  A. You mean protest it?
9  Q. Yes.
10 A. It's depend.
11 Q. As a percentage of chargebacks, what
12 percentage do you protest?
13 A. I pretty much try to protest all of them.
14 Q. Okay. And what percentage of those would you
15 say you win?
16 A. I don't have that numbers.
17 Q. Can you -- if we understand, you're --
18 A. I would say --
19 Q. -- giving a reasonable guess?
20 A. I can tell you what percentage. When I
21 convert it to what is reasonable to collect from the
22 waitresses or the server, it come to 2 percent. I can
23 only talk about the conversion we do on a monthly basis
24 within a reason.
25 Q. And you actually did that specific analysis?

Page 59

1  A. Right.
2  Q. Is that written somewhere?
3  A. I did it on my own. I look at the
4  chargebacks, just sample auditing --
5  Q. Um-hmm.
6  A. -- and I realize still I'm within reason.
7  Q. When did you do that analysis?
8  A. Periodically, as needed. Just by reviewing
9  the chargebacks.
10 Q. Um-hmm.
11 A. Chargeback get picked up by the CPA.
12 Q. Right.
13 A. And I compare it to what we charge, and that's
14 within reason.
15 Q. So where is the paperwork that shows the
16 protests of chargebacks?
17 A. Basically, I don't do that on -- myself. But
18 we usually just send them a form, and they just send
19 the processing company a copy of the tabs.
20 Q. The signed tabs?
21 A. The signed tabs. And at their discretion, we
22 have a recourse with them that if they're disputed,
23 that's the end of it.
24 Q. If who disputes?
25 A. The credit card company dispute the charges,

Page 60

1  and they say "Okay, this is" -- they credit it to the
2  customer, that's the end of it; they have recourse.
3  Q. Okay.
4  A. There is not far we can go.
5  Q. Okay. So it's resolved very quickly and
6  easily, one way or the other?
7  A. I would say 90 percent in favor of the
8  customers.
9  Q. Oh, okay. So you think 90 percent of the
10 protests go against you?
11 A. It just result to the benefit of the customer.
12 I really can't give you the percentage, but I know that
13 most of the time it does.
14 Q. Okay.
15 A. I would really have to work it in numbers.
16 Q. Well, no, that's okay. Where are those
17 numbers?
18 A. Okay. What numbers? The credit card
19 chargeback --
20 Q. No, the --
21 A. Okay. What numbers?
22 Q. Here's what I'm asking: Where is the
23 paperwork that shows when a protest to a chargeback
24 occurs?
25 A. They -- if you list -- for example, tomorrow

Page 61

1  you call and you protest your credit card or you
2  dispute it, we send the copy of all your charges to the
3  credit card company through the fax. And that's it.
4  We fax all the documents, and the paperwork go back to
5  our file. Like we grab your tab -- your paperwork --
6  Q. Um-hmm.
7  A. -- we send it to credit card company, and we
8  pull it back whoever it belong to that day.
9  Q. Who is in charge of the protesting that works
10 under you?
11 A. Each club, they do it on their own.
12 Q. Okay. So when a contest, a chargeback occurs,
13 how is the club notified?
14 A. I just fax them all -- yeah, most of the time
15 they fax -- yeah, they fax them, I believe.
16 Q. To each club individually --
17 A. Yes.
18 Q. -- or to D. Texas?
19 A. No, to each club individually.
20 Q. Okay. And then who at each club is
21 responsible for protesting?
22 A. Pretty much the name I mentioned.
23 Q. The -- Norman?
24 A. Norman. And you got the names, right?
25 Q. Yeah. Ilean?

16 (Pages 58 to 61)

Page 62

1    A.   Sam.
2    Q.   And Wahid?
3    A.   Yes.
4    Q.   Okay. And if a chargeback is granted in your
5  favor, meaning if your protest is upheld, the credit
6  card company lets you keep the money --
7    A.   Yes.
8    Q.   -- do they notify you in writing?
9    A.   Yes, they do. I believe they do. But what it
10 is, we see it mostly through -- we control it through
11 the bank statement. That will not have been deducted.
12 We monitor the chargeback through the bank statements.
13   Q.   Okay. And what is the bank statement -- what
14 is that?
15       Is that from each of the card services that
16 you use?
17   A.   No, the bank -- the bank statements show how
18 much they deduct our account.
19   Q.   Okay. So if you used Well -- Wells Fargo, for
20 example --
21   A.   Yes.
22   Q.   -- you would look at that account?
23   A.   Yes, it says "chargeback," I believe, on it.
24   Q.   And if it goes in your favor, then you get
25 credited the money?

Page 63

1    A.   Basically, when we look at the chargeback,
2  it's what we didn't get paid. If it's in our favor, it
3  has nothing to do with the chargeback.
4        For example, if all of the chargebacks,
5  parts of it got granted, the portion that they didn't
6  get paid, shows as a chargeback. And that's what we
7  take as a chargeback, if that answers your question.
8    Q.   It does. And that is reflected on the Wells
9  Fargo paperwork?
10   A.   Bank statement. Yeah, it should.
11   Q.   Okay. What credit card processing company do
12 you use?
13   A.   I can provide a name to you.
14   Q.   Okay. There are some names. I want to see --
15 I know that you may have used a few different ones over
16 the years?
17   A.   Yes, sir.
18   Q.   Let me see. There was one called "United Bank
19 Card"?
20   A.   That's correct. I'm familiar with that name.
21   Q.   Do you still use them?
22   A.   I won't be able to answer that question.
23   Q.   Okay. Who would know which processing company
24 you use?
25   A.   I can provide that information to you through

Page 64

1  my counselor.
2    Q.   Okay. All right. Other than United Bank
3  Card, can you recall any other names?
4    A.   I think -- some of these company have gone
5  through the changes. Maybe SunTrust.
6    Q.   Okay.
7    A.   Brown-Forman.
8    Q.   Have you ever heard of Successful Data
9  Systems?
10   A.   Successful Data Systems?
11   Q.   Yeah.
12   A.   Not to my recollection right now.
13   Q.   Okay. Now, do you only use one credit card
14 processing company at a time?
15   A.   Yes, at a time.
16   Q.   Okay. And who chooses the credit card
17 processing company?
18   A.   Basically, discuss it with the managers.
19   Q.   Um-hmm.
20   A.   And if they're okay with the rates, then I'll
21 approve it.
22   Q.   Okay. And is there any negotiation with the
23 credit card processing company, as far as the rate and
24 how to handle chargebacks and all of that?
25   A.   They pretty much make up their mind what they

Page 65

1  offer you, and it would be better if you go with the
2  rate, because they've already evaluated your business.
3    Q.   Okay. And I assume that -- that as a business
4  owner, you look over time to make sure you're getting
5  the best deal you can?
6    A.   Sometimes, yes.
7    Q.   Okay. Is there anyone like Brenda who -- and
8  I'm not saying it is Brenda, but is there anyone below
9  you like Brenda who is responsible for interacting with
10 the credit card processing company?
11   A.   At what level?
12   Q.   At the company level. At the -- at your
13 level, meaning the --
14   A.   There's not so much interacting, because after
15 the account is set, the charges get processed on
16 automatic basis. We get our money, and the chargeback
17 is deducted. That's about -- there's not that much
18 interact. I don't recall that interact required. It's
19 not like daily --
20   Q.   Right.
21   A.   -- things you get on the phone and talk to
22 them.
23   Q.   Okay. So if you changed a card processing
24 company, it would occur maybe every few years; it's
25 nothing that would happen monthly?

17 (Pages 62 to 65)

Page 66

1  A. Exactly.
2  Q. Okay. Now I understand.
3     And are all of the clubs' nightly accounts
4  processed -- the credit card accounts -- processed
5  through -- if you're -- at the time, if you're using
6  United Bank Card, are they all processed through United
7  Bank Card?
8  A. Not necessary. Each one of them could have
9  their own processing company. It depends who they
10 choose -- chose.
11 Q. Well, that's what I'm asking, then, is: Do
12 your clubs use different credit card processing
13 companies?
14 A. Yes, different clubs, I believe, use different
15 processing company, yes.
16 Q. Why would they do that if one is better than
17 the other?
18    Why would you allow that?
19 A. Some of them, I guess, they already got --
20 No. 1, it's very difficult to switch from one to
21 another one, because you have to go through all the
22 bank things like this. And that's what I can tell you.
23 Q. So today, do you use one credit card
24 processing company or many different ones?
25 A. I probably say more than one.

Page 67

1  Q. All right. And I understand. Listen --
2  A. And to answer your question...
3  Q. Yes. Go ahead.
4  A. You have any good offer with the credit card
5  company, I may talk to you.
6  Q. Right. No, I understand. You want to try to
7  save as much money as possible.
8  A. Right.
9  Q. But -- and -- and, again, I don't -- I'm not
10 expecting you to guess. I understand some of this you
11 know, some of it you have to check on. But sitting
12 there today, do you know whether you use more than one
13 credit card processing company for sure?
14 A. I need to check on that.
15 Q. Okay. That's fine.
16    MR. SHELLIST: Do you guys want to take a
17 two-minute break or do you want to --
18    MS. SERPER: Sure.
19    (Break from 11:33 a.m. to 11:48 a.m.)
20 Q. (BY MR. SHELLIST) Mr. Davari, at the break,
21 we had -- we're back. Are you ready to proceed?
22 A. Yes.
23 Q. You understand you're still testifying under
24 oath?
25 A. Yes.

Page 68

1  Q. All right. I understand you made a call or so
2  during the break to help answer a question or two.
3  What did you find?
4  A. For the processing company, you mentioned --
5  Q. Yes.
6  A. The name of the processing company, we use
7  SunTrust, which is, I guess, merged with First Data --
8  Q. Okay.
9  A. -- for some of the clubs, like Splendor, and
10 Centerfolds. And Cover Girl, and Treasures, we use
11 United.
12 Q. Now, I don't need you to make other calls, but
13 if you know, what are the -- what is the difference in
14 the rates that you get from each one?
15 A. I don't know that.
16 Q. Okay.
17 A. Sometimes it's not just rate; it's a service.
18 Q. Okay. I'm presuming that one company is
19 better than another company, so who made the decision
20 to use different -- two different companies currently?
21 A. By each club manager, their own manager.
22 Q. Okay. Do you have --
23 A. Sometime they go there --
24 Q. Okay.
25 A. -- and talk to the manager, and then refer it

Page 69

1  to me --
2  Q. Okay.
3  A. -- if they approve it.
4  Q. And if it looks reasonable, you will approve
5  it?
6  A. Yes, sir.
7  Q. Do you have a company e-mail system?
8  A. Yes.
9  Q. And, for example, you have a company e-mail
10 address?
11 A. What do you mean?
12 Q. Like, would I look up "hdavari@dtexas.com" or
13 do you have a -- an e-mail address for business?
14 A. I have e-mail address for business.
15 Q. What is that?
16 A. It's "georged@birch.net."
17 Q. Okay. Is Birch the company that you use for
18 all of your employees in the e-mail?
19 A. That's -- I would say that's the one I use.
20 Q. Okay. So, for example, does Brenda have an
21 e-mail address with Birch?
22 A. I believe she does, yeah.
23 Q. Okay. So if -- if at some point down the road
24 if I needed access to see different e-mail between you
25 and Brenda or someone else on a topic, you could search

Page 70

1   the birch.net e-mail account to see?
2   A.  I can tell you I have an e-mail account there,
3   so if you look at it, you can see me.
4   Q.  Okay.  Do you --
5   A.  And that's what we use for company.
6   Q.  Okay.  So do you delete your own e-mail?
7   A.  Sometimes I do, yes.
8   Q.  And when you are going to your work computer
9   to look at the e-mail or at home to check your e-mail,
10  do you use Outlook?
11  A.  Yes.
12  Q.  Okay.  And do you retain a lot of your e-mail
13  based on -- you know, from different business
14  activities?
15  A.  If the -- if it's important, yeah, maintain
16  it.
17  Q.  Okay.  And does your company computer have any
18  kind of a backup system?
19         MS. SERPER:  If you know.
20         (Phone ringing.)
21         THE WITNESS:  Sorry.
22  A.  Okay.  Go ahead.
23  Q.  (BY MR. SHELLIST)  Yeah, only if you know.  Do
24  you know whether or not your company e-mail --
25  A.  I'm not sure.

Page 71

1   Q.  -- is backed up?
2   A.  I'm not sure.
3   Q.  Do you have an IT person that works for you?
4   A.  Not as a -- just -- just for me, yeah.
5   Q.  Who do you use for IT work?
6   A.  You mean the technical support?
7   Q.  Yeah, for the computer repair, Internet
8   support, those things?
9   A.  I use individual.
10  Q.  What is his name?
11  A.  Jason.
12  Q.  Last name is?
13  A.  I can't remember.  It's Goco...
14  Q.  Does he have a company name?
15  A.  No.  I know him by his name, Jason.
16  Q.  Does he do work for D. Texas?
17  A.  No, he's individual.
18  Q.  No, no, no.  What I mean is when he helps out,
19  does he help do work at the 6200 Richmond office?
20  A.  No, he work for any place that they need him.
21  He doesn't work for D. Texas.
22  Q.  Okay.  So if one of the clubs needs help with
23  a computer, he can help?
24  A.  He can help them directly, yes.
25  Q.  Okay.  And has he ever done work with the

Page 72

1   D. Texas computers?
2   A.  Yes, he done work.  He set up computer for me.
3   Q.  Okay.  So if I had questions about the backup
4   system or whatever you have as a setup, Jason would
5   know?
6   A.  Yes.
7   Q.  All right.  I'll leave a blank in the
8   deposition for his last name.
9   A.  Um-hmm.
10  Q.  If you remember it, when you review it, you
11  can fill it in.  If you do not know it, I'll try to get
12  it from your lawyers if I need it, okay?
13  A.  Sure.
14     (Information Requested)_____.
15  Q.  Who is -- if you know, who is Chuck Saden?
16  A.  Chuck Saden, I guess he's one of the person --
17  he's the agent for one of the processing companies.
18  Q.  How about Robert Steele?
19  A.  Robert Steele, he's the one that -- he does
20  work for us.
21  Q.  In what way; what does he do?
22  A.  He pretty much -- miscellaneous item.
23  Q.  Okay.  So if you were going to describe to me
24  or a jury so I would know what he does within your
25  organization, what would you tell me?

Page 73

1   A.  He could be supervising construction at one
2   point.  He could be to set up account for a charge --
3   for the processing company.
4   Q.  Okay.
5   A.  And, basically, this category.
6   Q.  So it could be overseeing construction or
7   credit card processing?
8   A.  It could be assistant to me on any of those
9   cases, or just as needed, again.
10  Q.  When he gets paid, what company or companies
11  pay him?
12  A.  I believe he is -- I have to check into that.
13  Q.  Okay.  Now, is he a -- an employee or a con --
14  independent contractor?
15  A.  No, right now he's a -- recently he's an
16  employee.
17  Q.  Okay.  For what entity?
18  A.  For D. Houston.
19  Q.  Okay.  And does he do work for D. Texas or
20  other clubs if you need?
21  A.  He basically work for that entities.
22  Q.  I understand maybe he spends a lot of time
23  with that entity, but if you need him to do help at --
24  with D. Texas or the other entities, can he do that?
25  A.  If I have a question and ask him, he

Page 74

1   definitely answers.
2       Q.  Okay.  So he is -- currently acts as an
3   assistant for you?
4       A.  I wouldn't call it so much assistant.  I would
5   say he's more active in D. Houston, Treasure.
6       Q.  Is he a manager?
7       A.  No, he's basically to -- assistant to me,
8   maybe, on that level only at Treasure.
9       Q.  Okay.  So if you need help with setting up a
10  credit card processing company, let's say at Splendor,
11  you're not allowed to ask him that; you -- you would
12  only keep him doing things at D. Houston?
13      A.  I'm allowed to ask even you.
14      Q.  Yeah.
15      A.  So I -- I can ask him.  I may ask him.
16      Q.  Okay.
17      A.  There's no restriction on who I can ask.
18      Q.  Does he have an office at D. Houston?
19      A.  He has -- not -- not office.  No, not really.
20      Q.  Does he --
21      A.  But he -- there's an office he can go there
22  most of the time when he wants to spend time.
23      Q.  Does he also do some work at 6200 Richmond?
24      A.  He come there to visit with me, yes.
25      Q.  Okay.  How about Mitch Cook.  Who is that?

Page 75

1       A.  Mitch Cook is the day manager at Treasures.
2       Q.  Okay.  Now, when we're talking a moment ago
3   before the break about the chargebacks, if I wanted to
4   see --
5       A.  And I'm sorry.  I need to go back.
6       Q.  Go ahead.
7       A.  On Mitch Cook --
8       Q.  Yes.
9       A.  I would call him lead manager, too.
10      Q.  So he is in charge even of other managers?
11      A.  He -- he's lead manager.  He can communicate
12  between me and night manager, if I don't get to see him
13  or someone I cannot see him.
14      Q.  I assume Mitch has been with you for a while?
15      A.  Yes.
16      Q.  Okay.  Is there anyone else at Treasures as
17  well named Bill?
18      A.  Yes.
19      Q.  What is his last name?
20      A.  Bill Peter.  William Peter.
21      Q.  And how long has he been with you?
22      A.  Many years.
23      Q.  Okay.  Do any -- to your knowledge, do any of
24  the waitresses give any tips to the managers?
25      A.  No.

Page 76

1       Q.  Okay.  Is that -- why is there a policy
2   against that?
3       A.  I'm strongly against that.  They know that.
4       Q.  Okay.  Okay.  All right.  So a moment ago, we
5   were talking about the chargebacks.  If -- if I wanted
6   to see the successful protests, I think you said we
7   could look at the -- bank records would show when you
8   get the credited money back; is that right?
9       A.  I don't know it for sure.  I'd have to look at
10  the bank statement.  They go to CPA.  But what it is,
11  the chargeback, they mark as chargeback.  And that's
12  how we -- the way we pay because the money we don't get
13  collected.
14      Q.  So let's say that a charge goes through one
15  might, as an example, for $500.  And the week -- two
16  weeks later, the man gets the bill.  He contests the
17  charge.  You get notified of that by the credit card
18  company, correct?
19      A.  Yes.
20      Q.  And then most of the time, you or one of your
21  employees will protest the chargeback?
22      A.  I don't protest it.  Each club, they do
23  protest their own charge backs.  So it's not me,
24  really, the one protesting.  Each club, they've got
25  their own account, and they're dealing with their own

Page 77

1   chargebacks.
2       Q.  The bookkeeper would deal with it?
3       A.  Yes.
4       Q.  Okay.  And if that is successful, your protest
5   is successful, how does the club learn of it?
6       A.  Well, I guess the -- if they retain, I believe
7   so.
8       Q.  The money gets credited?
9       A.  What it is --
10      Q.  Yeah.
11      A.  In my recollection, they put a chargeback,
12  what -- by meaning of that, when the account get
13  protested, it don't get really charged back
14  immediately, they send us their support paperwork.
15      Q.  Okay.
16      A.  Then we send it in to satisfy them.  Then
17  there's no obviously chargeback.  So it's not like they
18  go back and forth credit, as far as I know.
19      Q.  Okay.
20      A.  If it's chargeback, it's charged back.  But if
21  they prove the charge, I believe what it is, then we
22  don't get deducted for it.  So they've got some period
23  of time to respond to the charge back.
24      Q.  Okay.  And --
25      A.  So that, I guess, eliminate that return you're

20 (Pages 74 to 77)