Page 118

1  prices, and...
2  Q.  Well, I -- I don't mean the prices. What I
3  mean is the blanks that need to be filled in talk about
4  the -- the number and name of the dancer. You have
5  that information on your cards across all of the clubs,
6  right?
7  A.  Right. Yes.
8  Q.  And then the cost of the dance is -- you want
9  to get that from each of your clubs, correct?
10 A.  I believe they're all the -- the same. They
11 could be the same for different...
12 Q.  Okay.
13 A.  Since I don't control this, the managers
14 control, they -- okay. Go ahead.
15 Q.  My question is: If -- if every dance is $25,
16 why is there a blank where it says "cost of a dance";
17 why is that open?
18 A.  Why it's open?
19 Q.  Yeah, I mean, why doesn't it -- why are you
20 asking what the dance cost if it's always 25 per your
21 policy?
22 A.  That's for something the customers see in case
23 they request it later as an itemized support document.
24 Q.  Meaning why wouldn't it be preprinted 25?
25 A.  I don't know why. We can do it. If you like

Page 119

1  it that way, we change it to that way.
2  Q.  It's not how I like it. It's --
3  A.  I know, but it's not really big issue to me.
4  Q.  Have you ever seen the cost be different than
5  25 on one of these tab sheets?
6  A.  No, they all -- it just say "cost."
7  Q.  No, no, no. What I mean is when it's filled
8  in, a completed form, have you ever seen one where the
9  dance did not cost 25?
10 A.  The -- for each price of the dance?
11 Q.  Yes.
12 A.  For each dance?
13 Q.  Yes.
14 A.  The price is $25.
15 Q.  I know you're saying that's the price. My
16 question is: Have you ever seen a completed tab sheet
17 where the cost that was written in was different than
18 25?
19 A.  Probably they put different number. Maybe
20 it's a multiple dance that they just added on. Does
21 that answer your question?
22     It could be different numbers. Maybe
23 they added them as a multiple.
24 Q.  Okay. That's one -- one way that the number
25 could be different than 25, right?

Page 120

1  A.  Yes.
2  Q.  Have you ever seen it say $20 per dance?
3  A.  Not supposed to be.
4  Q.  No, I --
5  A.  I've never seen it, no.
6  Q.  Okay. Fair enough.
7  A.  I've never seen it.
8  Q.  Okay. That's fair enough.
9     Now, this sheet, this tab sheet, is it filled
10 out whether it is credit card or cash, or is this just
11 for credit card?
12 A.  Credit card.
13 Q.  Okay. And that's why I guess it says "imprint
14 credit card on reverse"?
15 A.  Yes, sir.
16 Q.  All right. Is there a separate tab that is
17 used for a cash transaction?
18 A.  There is no tab for that, no.
19 Q.  So if a -- the waitress comes up and she says,
20 "Okay, Sam, it's $200 tonight," and he pulls out two
21 Benjamin Franklin bills, hands them to her -- or plus a
22 tip, there would be no tab sheet to reflect that?
23 A.  No.
24 Q.  How do you track, if at all, the number of
25 dances a dancer does that are cash dances?

Page 121

1  A.  They supposed to report it.
2  Q.  I know they're supposed to.
3  A.  Yes.
4  Q.  What I'm saying is how do you track it, if at
5  all?
6  A.  Again, by if -- if they say they made any
7  dance -- cash dances.
8  Q.  Is there a sheet that a dancer fills out?
9  A.  No, sir.
10 Q.  Is there a sheet --
11 A.  They're just supposed to report it.
12 Q.  Okay. Well, I understand that. I get you on
13 that.
14    My question is --
15 A.  No, there's no sheet.
16 Q.  Okay. Is there any written document or record
17 of any kind that would tell your club how many cash
18 dances were done in a given night?
19 A.  Not to my -- best of my knowledge, no.
20 Q.  If you as a business owner are supposed to be
21 getting 20 percent of cash dances, why would you not
22 track it?
23 A.  I just depended on their word, on the
24 entertainer.
25 Q.  No, I understand that you depend on their

31 (Pages 118 to 121)

Page 122

1 word. My question is: Why would you just depend on
2 their word instead of getting it written?
3    A.  Just trust them sometimes, I guess.
4    Q.  Okay.
5    A.  I'm hoping they tell me the truth.
6    Q.  Okay. Have you ever had dancers that did not
7 report cash dances?
8    A.  They might, or they may not. I don't know.
9 I'm not aware of it. I may have dancers that were
10 being honest and report all the cash, or they may not.
11 I don't know.
12   Q.  Okay. If I wanted to know what your
13 commissions were, your 20 percent from cash dances,
14 where would I go to find that?
15   A.  I guess I have to check in to see if it's been
16 reported by the entertainer first. Then I look at
17 the -- the report to CPA.
18   Q.  Okay. So there's no document at the club
19 level that would have that amount on it, correct?
20   A.  Not to best of my knowledge. I don't think
21 so.
22   Q.  Okay. So how would you know what number to
23 gave to a CPA?
24   A.  It's provided by bookkeeping. The amount of
25 money shows as a held back.

Page 123

1    Q.  It's called a -- a "held back"?
2    A.  What it is, there is a column on the bartender
3 checkout sheet, and they keep tracking on it, directly
4 from that, and doesn't call "held back."
5    Q.  Okay.
6    A.  I'm just saying it come --
7    Q.  Okay. What is the -- what is the category on
8 the bartender's sheet that says the amount of cash,
9 5 per -- 20 percent money?
10   A.  I assume -- I haven't seen any of them
11 recently. But I assume that just whatever was payout
12 and whatever was collected, the difference between
13 those two, it shows the amount of money was receipt.
14   Q.  So the process would be that -- that a dancer
15 gives the money, the 20 percent money, to who?
16   A.  The 20 -- supposed to be to -- to the
17 bartender. And I'm hoping that everybody through the
18 system honest attending that, especially when it comes
19 to the cash.
20   Q.  Have you ever seen a scenario, Mr. Davari,
21 have you ever seen one, meaning during the -- the
22 period important in this case, last three or four
23 years, where a dancer gives the 20 percent cash, the
24 commission cash, to the bartender for the dance?
25   A.  Have I ever seen it?

Page 124

1    Q.  Yeah.
2    A.  I don't stand next to the bartender.
3         What I do, we look at the bartender
4 checkout sheet or that's the information supposed to be
5 there. Whatever they collect and whatever they pay out
6 is the difference, is the commission. That's what I
7 can say.
8    Q.  My question was: Have you ever seen a dancer
9 in the last three or four years give the 20 percent
10 cash dance money to a bartender?
11   A.  No, I have not seen it myself, because I'm not
12 standing next to them. I'm not on the floor with them.
13   Q.  Have you ever asked a manager or a bartender
14 whether the dancers are giving them all of the cash 20
15 percent commission money?
16   A.  It was occasion that I told them that all
17 table dances, cash or credit card, is 25, and $5
18 belongs to the house.
19   Q.  No, I understand the policy you told them. My
20 question is: Did you ask any manager or bartender in
21 the last three or four years whether the dancers were
22 following your policy?
23   A.  No, I didn't ask.
24   Q.  If dancers -- let's say some dancers in this
25 case that worked for your clubs testified under oath --

Page 125

1    A.  Yes.
2    Q.  -- and they say, "Listen, George is a very
3 nice man. We like working with him and all of that.
4 He can say what the policy is all day long, but the
5 practice at his clubs, practice, is that we have to
6 give 20 percent of the credit card dances to the house.
7 We keep the cash." Would you say they're lying if they
8 say that's the practice?
9    A.  I am going to just listen to what they say.
10   Q.  Okay.
11   A.  I'm not in a position to decide who's lying
12 and who's not lying. I'm not really making that call.
13   Q.  Is it accurate --
14   A.  I don't see myself qualified to call anybody
15 liar or honest.
16   Q.  Okay. Let me ask it a different way that may
17 be more palatable to you.
18        Would it be accurate if the dancers testify
19 that they keep the money from cash dances and the
20 practice was on credit cards 20 percent to the house;
21 that's just the practice?
22   A.  If she testify, obviously, I listen to them.
23 Let all the people who in position to decide if she's
24 actual. Not my position, again.
25   Q.  In your position and in your mind, is that an

Page 126

1  accurate statement? That's my question.
2  A. Again, I have to rely on what she say.
3  Q. Okay.
4  A. If she say that, I haven't seen it, I cannot
5  testify on it.
6  Q. Okay.
7  A. That's just word of mouth.
8  Q. So you --
9  A. I cannot prove something I have not seen with
10 my eyes.
11        MS. SERPER: Okay. And that's -- I
12 think -- before you say anything else on this subject,
13 I think he's -- I think it's asked and answered.
14        He's -- he's answered your question three
15 different ways at this point. Same question over and
16 over and over.
17        MR. SHELLIST: Right, same question
18 answered three different ways.
19        MS. SERPER: No, same question asked
20 three different ways, answered the same way.
21        MR. SHELLIST: What was the answer?
22        MS. SERPER: I'm not testifying here,
23 Marty. It's whatever the court reporter has.
24        MR. SHELLIST: Right.
25        MS. SERPER: If you want to ask her to

Page 127

1  read it back, that's fine.
2         MR. SHELLIST: I don't.
3         MS. SERPER: But let's...
4         MR. SHELLIST: I'll ask until I'm
5  satisfied. I'm not badgering. I'm being as polite as
6  I can. But I'm entitled to make sure I understand the
7  answer. I think I'm being are respectful and
8  professional.
9         MS. SERPER: You're being respectful and
10 professional. I'm not saying you're not. But I think
11 he's answered your question, and he's answered it the
12 same way several times.
13        MR. SHELLIST: Right.
14        MS. SERPER: And I'm asking you
15 professionally and courteously to move on so we can
16 continue with the deposition.
17        MR. SHELLIST: Right. And respectfully,
18 Lauren, if you get it and I don't, it doesn't matter to
19 me. I have to get it.
20        So I understand you may be getting it,
21 but you -- you've known Mr. Davari for years, and
22 you've represented him for a while. I'm getting to
23 know him now for the very first time. So with that
24 latitude, it's not my goal to dig into every little
25 hole repeatedly, but I just want to make sure I'm

Page 128

1  clear.
2         MS. SERPER: Well, I want to make sure we
3  keep moving, because it's not the purpose of the
4  deposition for you to get to know my client. It's the
5  purpose of the deposition to communicate answers to
6  your questions, which I believe he has done.
7         So I'm happy to let you continue asking
8  questions. I've not interrupted. I'm not trying to be
9  obstructive --
10        MR. SHELLIST: Sure.
11        MS. SERPER: -- or difficult, but, you
12 know, when an -- when an attorney is asking the same
13 question over and over again in slightly different
14 ways, and -- and the answer is the same, and he appears
15 to be saying -- you know, you want him to answer in a
16 particular way, he's answered.
17        So if you want to ask another question,
18 I'll be quiet, and if he can answer it, he will. If
19 it's -- if I believe we're still circling around in the
20 same little --
21        MR. SHELLIST: Right.
22        MS. SERPER: -- space, I'll -- I'll --
23        MR. SHELLIST: Right.
24        MS. SERPER: -- speak up. Okay. So
25 let's -- let's go ahead and keep going.

Page 129

1         MR. SHELLIST: Yeah.
2         Q. (BY MR. SHELLIST) So to make sure I'm clear,
3  then, Mr. Davari, if the dancers testify as I have
4  represented in my hypothetical, you're unable to give
5  me an opinion on whether what they would say is
6  accurate or not, because you haven't seen it?
7         A. If I have not eyewitnessed that, I cannot
8  testify on something.
9         Q. Okay. That's fair enough. I appreciate that.
10        Now, the 20 percent money that's collected
11 from the dancers, at least on the credit card dances --
12 I mean, I know what your policy is -- but that 5 out of
13 $25, what is that used for by the company?
14        A. What used for the company?
15        Q. Yeah.
16        A. It goes with all the income, just like every
17 other income used in the company.
18        Q. Okay. If -- dancers benefit by the use of the
19 credit card machines in the facility, correct?
20        A. That's not the only thing they use. The --
21 really, I don't think really that applies to what
22 dancer use, just for credit card. It used for
23 everything they use in the building.
24        Q. No, no. I understand that.
25        My question, though, was: Dancers benefit by

Page 130

1  the use of the credit card machine in the facility,
2  true?
3  A.  They do, too, yes.
4  Q.  Okay. And so you expect the dancers, just
5  like the waitresses or the bartenders, to at least
6  contribute to some of the costs of the credit card
7  machine to the club?
8  A.  Yes.
9  Q.  Okay. Now -- now, in the last, you know,
10 three years or so, have there been any legal claims
11 made against your adult clubs for wage violations that
12 are similar to the ones in this case?
13 A.  Not that I know it.
14 Q.  You know, I mean, to -- to ask it in a better
15 way: Have you had any employees directly or with their
16 lawyers communicate to your company that there's a
17 credit card processing fee problem and you had to go
18 look into it?
19 A.  Not anything I'm aware of it.
20 Q.  Okay. The CPA who does the work for the
21 corporations and does the consolidated return, does
22 that CPA also do you and your brother's taxes?
23 A.  Yes.
24 Q.  Okay. In the past four years, have you ever
25 used another CPA for your business or personal

Page 131

1  accounting?
2  A.  No.
3  Q.  Okay. So he's at least been --
4  A.  I'm talking about entities in Houston, no.
5  Q.  That's correct. Yeah.
6     I'm -- so I'm assuming that the entity in
7  Las Vegas has a different accountant?
8  A.  Yes, sir.
9  Q.  And the one in Canada, of course, must need an
10 Canadian accountant?
11 A.  Yes, sir.
12 Q.  Okay. Does the consolidated return, does it
13 include Las Vegas and Canada?
14 A.  No, sir.
15 Q.  Do you know, Mr. Davari, how many waitresses
16 have worked at each of your clubs -- present employees
17 or former employees over the last 3-1/2 years?
18 A.  Altogether?
19 Q.  Yeah.
20 A.  I'm sorry. I can't answer that. That's
21 the -- the reason I say I can't answer that, because it
22 doesn't come to my mind.
23 Q.  Okay.
24 A.  Not because I refuse.
25 Q.  No, no, no. I understand. Trust me, I

Page 132

1  understand.
2     So at some point if I needed to know the
3  number and the names of the employees, former or
4  current, over the last 3-1/2 years, who within your
5  corporation or other entities would have that
6  information?
7  A.  I would go to the bookkeeper and ask for it.
8  Q.  At each club?
9  A.  Yes.
10 Q.  I'm assuming Glenda, who did payroll, would
11 also have record of current or former employees?
12 A.  Yes.
13 Q.  Okay. Do you know how far back that
14 information goes?
15 A.  I need to check, if you allow me.
16 Q.  Sure. No, that's fine.
17    Are your employees in the payroll system,
18 meaning the employees of your company that are
19 waitresses and bartenders, are they coded with that
20 title or duty in the payroll system?
21 A.  Using Quick Set -- I mean, QuickBooks,
22 sorry --
23 Q.  That's okay.
24 A.  -- I believe so.
25 Q.  Okay. And so if I wanted to know how

Page 133

1  QuickBooks --
2  A.  Because I don't do the payroll, so -- go
3  ahead, please.
4  Q.  But if I wanted to know how your QuickBooks
5  system was set up and its search capabilities for
6  different time frames for different clubs, I could ask
7  Glenda that?
8  A.  I assume so.
9  Q.  Okay. Is there anyone, in your opinion, who
10 would know more about your QuickBooks setup for
11 payroll, other than Glenda?
12 A.  Not at this point.
13 Q.  Okay. Now, on the exhibit --
14 A.  I'm sorry. Let me make it -- Sam does the
15 Gold Cup. I don't know. I never compared their
16 knowledge. I never did a test on them to see who knows
17 more, who knows less.
18 Q.  Does Sam do processing of payroll for...
19 A.  Gold Cup.
20 Q.  Okay. So -- that's fair enough.
21    Okay. And then Glenda oversees payroll for
22 the other clubs?
23 A.  Basically, she print them out on her printer,
24 just like a common printer, yes. Go ahead.
25 Q.  Even for Gold Cup?

654aefdb-1319-41d5-b0b6-457ad605a83f

Page 134

1    A.  No, no, no.  Gold Cup, it get printed out
2  at -- directly out at Gold Cup.
3    Q.  Why is it treated differently, if you know?
4    A.  I don't know.  I guess each management decide
5  to just keep -- keep it that way.
6    Q.  Okay.  It's your decision; it's your business.
7    A.  Okay.
8    Q.  You know, you run it how you want.
9       On this Exhibit 3 that we looked at, if you'll
10 look with me for a moment on the -- there's language --
11 here, let me put it in between you and your lawyer.
12 There's language towards the bottom which has verbiage
13 which the customer needs to sign off on; is that
14 correct?
15   A.  Yes, sir.
16   Q.  And it says: "I understand the value of table
17 dances is $25 processed through the club."  You see
18 that?
19   A.  Yes.
20   Q.  Okay.  "And it is possible to have 10 to 15
21 dances per hour"; do you see that?
22   A.  Um-hmm.
23   Q.  Why do you want to advise the customer of the
24 cost of the dance and how many there may be?
25   A.  Well, because at Treasures VIP, we got a

Page 135

1  different fee, and we just want to let them know that
2  the value of table dances compared to the money they
3  have spent.
4    Q.  What do you mean "at Treasures"?
5       Meaning do you make customers at every club
6  sign this?
7    A.  Yes.
8    Q.  Okay.  So why is the business owner for the
9  adult entertainment business, why is it important to
10 let all customers know?
11   A.  Just -- just acknowledge them.
12   Q.  Okay.
13   A.  And what I told you about this, just was
14 example.
15   Q.  Okay.  All right.  Now, do you make any
16 customer sign any acknowledgment for cash transactions?
17   A.  Like what?
18       What do you have in your mind?
19   Q.  Meaning, if a customer is going to be paying
20 cash for drinks, food, and dance, do you make them sign
21 any acknowledgment?
22   A.  That's something they could refuse
23 immediately.  Because me and you going to refuse, same
24 thing, someone get the receipt from us on cash, right?
25 You never give a cash -- you're never going to draw a

Page 136

1  tab on a cash.
2    Q.  Well, no, I understand that you wouldn't want
3  to run a tab on cash.  But --
4    A.  Customer refusing when he's paying cash to
5  sign one of this.  For what purpose?
6    Q.  Right.  Well, that's -- I want you to know,
7  I'm not -- I'm not --
8    A.  Yes, I understand.
9    Q.  I'm not fussing with your policy.  I
10 understand your policies.
11   A.  Yes.
12   Q.  My question is simply as a matter of fact.  Is
13 there an acknowledgment that you make a customer sign
14 when he's going to pay by cash?
15   A.  No, there's no acknowledgment.  This is what
16 it is.  If you need it, probably get presented by the
17 tab sheet to him.
18   Q.  Right.  But this is for credit cards?
19   A.  Well, they could use the language.
20   Q.  Oh, to tell the customer?
21   A.  To tell the customer.  I assume so.
22   Q.  Okay.  But I guess my point is --
23   A.  There's no restriction.  This is only can be
24 seen by credit card customer; not be seen by cash
25 customer.

Page 137

1    Q.  No, I understand that.  But the practice at
2  your -- at your facilities is that if a customer's
3  paying by cash, there is no formal acknowledgment they
4  sign?
5    A.  Yes.
6    Q.  Okay.  All right.  I asked you earlier about
7  dancers and their general duties being similar among
8  all of the clubs.  And I know you said managers might
9  have slightly different -- you know, some procedures
10 that are different, but a waitress does similar duties.
11 I'm assuming that a bartender serves drinks and
12 processes the tabs for the waitresses.  Is -- is
13 there -- are there other duties that a bartender can do
14 besides the drinks and processing the tabs at the end
15 of the shift at night?
16   A.  Complete the checkout --
17   Q.  Okay.
18   A.  -- and turn it in.
19   Q.  Anything else?
20   A.  Doesn't come to my mind anything.
21   Q.  Do bartenders at each of your clubs -- I know
22 that, again, managers can change some of the internal
23 procedures, but do they have those same general duties
24 at each of your establishments?
25   A.  They got independent duties from the other

DEPOSITION OF HASSAN DAVARI - 4/7/2010

Page 138

1   club, if that's what the question is.
2       Q.  Let me make sure I'm asking it right.
3       A.  Okay.
4       Q.  At all of your clubs, do bartenders prepare
5   drinks?
6       A.  Yes.
7       Q.  At each of your clubs, do bartenders help
8   process credit card charges?
9       A.  Yes.
10      Q.  At each of your clubs, do the bartenders do a
11  closeout at the end of the shift?
12      A.  Yes.
13      Q.  Okay.  Are there any duties that a bartender
14  would do at one club that they would just never, ever
15  do at another club?
16      A.  I don't think so.
17      Q.  Okay.
18          MR. SHELLIST:  Let's do this if we can.
19  It's 1:00 o'clock.  Let's go off of the record for
20  maybe ten minutes.  What I'm going to do is go through
21  all of my notes, consolidate.
22          THE WITNESS:  Sure.
23          MR. SHELLIST:  I can tell you that I'm
24  getting close to being done.  I don't think I have
25  any -- any more than an hour, if that.  It may be far

Page 139

1   less.  I want to make sure, though.
2           MS. SERPER:  Sure.
3           MR. SHELLIST:  So with that information,
4   it'll help me if I have a few minutes, okay?
5           MS. SERPER:  Sure.
6           MR. SHELLIST:  Okay.
7           (Break from 1:05 p.m. to 1:35 p.m.)
8       Q.  (BY MR. SHELLIST)  Mr. Davari, we're back on
9   the record from a break, hopefully the last one of the
10  day.  We talked about the -- the waitresses and --
11  earlier and -- and their duties, and the bartenders and
12  their duties.  Are men allowed to be waitresses at your
13  clubs or no?
14      A.  Men allowed to be waitresses?
15      Q.  Yeah.
16      A.  We never had an applicant apply for it.
17      Q.  Makes sense; I just wondered.  We talked about
18  the job duties of those.  The dancers, we talked about
19  them in general, but their -- if you had to ask -- I'm
20  sorry.
21      If you had to answer a question I would ask
22  about what would their job duty be, meaning their
23  dancing, I know that.  But do they -- do they do
24  anything else in the club?
25      A.  Who's that, the dancers?

Page 140

1       Q.  The dancers, yeah.
2       A.  Just dancing, entertainment.
3       Q.  Okay.  They provide entertainment for the
4   customers?
5       A.  Right.
6       Q.  Okay.  Do you have a personnel handbook for
7   your business?
8       A.  Not really.
9       Q.  And what I mean is policies about sick leave
10  or time and attendance, and all of those things?
11      A.  Not really.
12      Q.  All right.  Now, when you say "not really,"
13  are you saying "no" --
14      A.  No.
15      Q.  -- or are you saying "maybe"?
16      A.  No.
17      Q.  Okay.
18      A.  I -- I haven't seen much.  Go ahead.
19      Q.  How do you communicate policies to new
20  employees if they're not in writing?
21      A.  Each club manager -- that's how they
22  communicate with them.
23      Q.  Okay.  You said earlier there might have been
24  some postings that you remembered about this -- the
25  cost of a dance.  Is that a policy that you would put

Page 141

1   up on a bulletin board or something?
2       A.  Basically, we post it in the dressing room,
3   maybe by time clock, and in a manager's office.
4       Q.  Does the time -- does the dressing room, is
5   that for the waitress and the dancer?
6       A.  Yes.
7       Q.  Okay.  I understand that some of -- that the
8   waitresses have to wear a -- a particular uniform; is
9   that right?
10      A.  They're not required.
11      Q.  They don't have to wear a uniform?
12      A.  No, they can come in what they want.
13      Q.  They could come in jeans and a T-shirt?
14      A.  Basically, just the standard things they wore,
15  you know.  But we don't request them to have a uniform
16  on.
17      Q.  To -- to your experience -- in your
18  experience, do the waitresses at Treasures dress the
19  same?
20      A.  I believe so, yes.
21      Q.  And what do they wear?
22      A.  Skirt and a top.
23      Q.  Okay.  Now, so we talked in the -- in the
24  dressing room, there might be a policy posted.  Do you
25  put other policies besides the cost of a dance, like

Page 142

1  individual policies or memos posted in the dressing
2  room?
3      A.  Right, we do.
4      Q.  Okay.  Like on what topic?
5      A.  It's different subject has come up.
6      Q.  Okay.  But that's so -- new hires get their
7  policies from either what is posted or what managers
8  tell them?
9      A.  Right.
10     Q.  Is there an orientation or training for the
11 employees?
12     A.  I think so.
13     Q.  Okay.  Who would know better than you?
14     A.  Usually the managers give them instruction --
15     Q.  Okay.
16     A.  -- when they first get hired.
17     Q.  Okay.  And that's true for all of your clubs?
18     A.  Yes.  But each one of them handle their own
19 policy different way.
20     Q.  I understand.  But the policy on the cost of a
21 dance, for example, that's the same at all the clubs?
22         Regardless of how the manager conveys it, it's
23 the same amount, right?
24     A.  Yes.  The same amount.
25     Q.  Okay.  And then the hours of operation of the

Page 143

1  clubs, are they similar, or are they all different?
2      A.  A little bit different.
3      Q.  So tell me what the hours are.
4      A.  Like, on the weekend, they have different
5  operation.  And some -- toward the weekend, they have
6  different hour shift.
7      Q.  Meaning one may stay open until 2:00, and one
8  may close at 1:00, or something like that?
9      A.  Different time, yeah.  They don't stay same
10 time, yeah.
11     Q.  So what time do the clubs close usually on the
12 weekends?
13     A.  Usually 11:00 to 2:00.  And some of them open
14 Saturday at noon -- Saturday, Sunday at noon.  Some of
15 them open at 6:00 o'clock.
16     Q.  Okay.  Who -- between you and David, who is
17 more responsible for overseeing the policies and
18 procedures of each club?
19     A.  I am.
20     Q.  Okay.  You were saying earlier the Trophy
21 Club, it was losing money for some time, and,
22 ultimately, you shut it down, correct?
23     A.  Correct.
24     Q.  When it was struggling, when its income was
25 less than its expenses, who paid that difference?

Page 144

1      A.  Who paid different?
2      Q.  Yeah.
3      A.  It was a form of loan, and we immediately shut
4  it down.
5      Q.  Say that first part again.
6      A.  It was a loan, but as soon as we find out it's
7  going down, you know, not meeting the expenses, we
8  didn't allow it to go too far.  We shut it down.
9      Q.  All right.  So who loaned the money to Trophy
10 Club?
11     A.  Basically, myself.
12     Q.  Okay.  You and David, or just you?
13     A.  It depends.  But as far as I know, to my
14 knowledge, I did.
15     Q.  Okay.  And so as it is bleeding money, you
16 would have to infuse some of either yours or yours and
17 David's money to help keep it afloat, and after a
18 little while, you decided that is enough, "We're going
19 to shut it down"?
20     A.  We gave some loan to it, and then we decided
21 to shut it down, yes.
22     Q.  Okay.  Did you ever get paid back?
23     A.  No.
24     Q.  Okay.  Do your clubs have lines of credit with
25 banks to help with fluctuation of income?

Page 145

1      A.  No.
2      Q.  Okay.  So they are self-sustaining, the ones
3  that make money are -- they -- they are able to operate
4  and have a cash flow that is self-sustaining?
5      A.  Yes.
6      Q.  How does D. Texas get paid money from the
7  clubs?
8      A.  It get management fee or what -- what is this?
9  They just get a fee.
10     Q.  Okay.  Is it called a "management fee"?
11     A.  No, it's called basically to -- percentage of
12 commission earned on income.
13     Q.  So if the calculation is that they have a
14 certain amount of revenue --
15     A.  Right.
16     Q.  -- then there's a certain percentage that
17 would go to D. Texas?
18     A.  Right.
19     Q.  Okay.  And then you and David are paid from
20 D. Texas?
21     A.  Correct.
22     Q.  And are there written contracts, to your
23 knowledge, between the clubs and D. Texas for the
24 commission?
25     A.  I can't make a recall on that.

Page 146

1  Q.  Who -- who would know that, if not you?
2  A.  I have to check into it.  See if there is one.
3  Q.  Okay.  That's fine.
4      And if you -- by the time you read this
5  transcript in the next several weeks, if you can think
6  of that, that's great.
7      All right.  Do you -- do your clubs
8  charge a breakage fee?  So if a waitress drops a tray
9  and breaks ten glasses --
10 A.  No.
11 Q.  They do not have to pay it back?
12 A.  They don't have to pay it back.  We don't
13 charge them.
14 Q.  Was -- was there ever a time when they did
15 have to pay it back?
16 A.  No.
17 Q.  What about for spilled drinks?
18 A.  No, they don't -- we won't charge them.
19 Q.  And to your recollection, there's never been a
20 time --
21 A.  Never been.
22 Q.  -- where they were required to pay pack for
23 spilled drinks?
24 A.  They never -- we never charge them.  They
25 never pay.

Page 147

1  Q.  Okay.  The policies that are posted at each of
2  the clubs for different issues that come up --
3  A.  Right.
4  Q.  -- that's -- you gave discretion to the club
5  managers to make their own policies?
6  A.  Basically, they are experienced managers.
7  They're aware of how to run the club.
8  Q.  Right.  But just so I have a flavor.  I
9  understand that you're an owner.  I understand that you
10 oversee operations.  I understand that you have
11 different type of day-to-day interaction with each club
12 as needed.  But what I want to find out is what
13 authority do the club managers have to make policy.
14 A.  Basically, whatever comes under management.  I
15 don't know how to describe it.  A manager's a manager.
16 Q.  So, for example, if the club manager wanted to
17 change the hourly pay of a waitress from 2.13 an hour
18 to $10 an hour, if they wanted to, they have the
19 authority to make that change?
20 A.  They make a recommendation and get approval on
21 it, yes.
22 Q.  Who has to approve it?
23 A.  I have to approve it.
24 Q.  Okay.  So you take serious consider -- into
25 serious consideration managers' guidance and

Page 148

1  suggestion?
2  A.  On time to time, yes.
3  Q.  Okay.  Are there any decisions that a club
4  manager can make that you do not need to sign off on or
5  approve?
6  A.  Basically, the majority of the decision they
7  made is stay.
8  Q.  What do you mean?
9  A.  They make a good decision, I would say.
10 Q.  Understood.  I mean, I know for most you agree
11 with the decision, but are there any decisions where
12 they never even have to tell George about it?
13     They just get to say "yes" or "no," and you
14 never hear one way or the other?
15 A.  That's true, yes.
16 Q.  What types of things does that happen?
17 A.  It's just different things.
18 Q.  Like a liquor vendor or --
19 A.  Yeah, like if they want to change the person
20 that -- or the company they buy the food from, they can
21 change it.
22 Q.  Okay.  What types of things do they usually
23 get your approval from?
24 A.  Again, it's depend.
25 Q.  Okay.

Page 149

1  A.  Basically, they -- I would say they can make
2  changes by themselves.
3  Q.  Right.  But -- but what are the -- if you can
4  give me even a couple of examples of things where they
5  make recommendation to you, you have to approve.  What
6  kinds of things?
7  A.  Doesn't one -- doesn't come into my mind, you
8  know.
9  Q.  So, for example, this 5 percent credit card
10 fee that is assessed --
11 A.  Yeah, that's one example.
12 Q.  Of what?
13 A.  That, you know, they find a company, they
14 suggest it to me, I put my input to it.
15 Q.  Okay.  So they -- that's something that they
16 can't just raise it up and down by themselves, they
17 would make a recommendation to you?
18 A.  Right.
19 Q.  Okay.
20 A.  But what it is --
21 Q.  Yeah.
22 A.  They make a recommendation, and I review it.
23 Q.  Yes, sir.  And if you disagree, it does not
24 change; if you do agree, it does change?
25 A.  As long as it's benefiting employees or not,

Page 150

1  you know, because the other not want, so I approve it.
2     Q.  Right.  And -- and you get to make the
3  decision based on what is fair on how you assess the
4  situation?
5     A.  Exactly, to employee.
6     Q.  Yes.
7     Okay.  Who handles most of the club day-to-day
8  operations; is it -- would it be you or the managers on
9  duty on-site?
10    A.  Manager duty on-site.
11    Q.  I wanted to make sure that I had this correct
12 from the beginning of the deposition, sir.  The -- the
13 people who draw a paycheck or income from D. Texas, I
14 know, you said that you and David will get some income
15 from D. Texas.  Who else, by name, can you tell me gets
16 some pay from D. Texas?
17    A.  I have to look at the payroll.  That's
18 something I can provide.
19    Q.  All right.  Glenda would prepare that one
20 also?
21    A.  Yes.
22    Q.  Okay.  How many employees --
23    A.  Not Glenda.  I'm sorry, Brenda.
24    Q.  Brenda, okay.
25       How many employees do you think D. Texas

Page 151

1  has?
2     A.  Again -- again, I've got to look at the number
3  and give it to you.  When you get information, I give
4  it.
5     Q.  Okay.  That's fair enough.
6        MR. SHELLIST:  Okay.  I don't know if I'm
7  going to take this apart or not, per se.  I'm going to
8  show it to you.  I may make it an exhibit; I may not.
9  I've highlighted a part of it for you guys to share and
10 to look at.
11       MS. SERPER:  Do you want to look at this
12 with me?  I've never seen this before.
13       Do you know what this is?  This is Las
14 Vegas.
15       MR. VAN HUFF:  Right.
16       MS. SERPER:  I'll show it to my client.
17       MR. SHELLIST:  It was produced in
18 discovery, so I -- I'm just trying to find out what it
19 is.  And if he knows, he can tell me.  If not, I'll go
20 on to someone else or some other document.
21       MS. SERPER:  Yeah.  I -- all I know is
22 that Alson is the Las Vegas guy, so that's -- I don't
23 know anything else about it.
24       Why don't you read it, and we'll see what
25 you have to say about it.

Page 152

1     Q.  (BY MR. SHELLIST)  Whenever you're done, you
2  let me know, Mr. Davari.
3     A.  All right.
4        THE WITNESS:  Am I a slow reader?
5        MS. SERPER:  No, no.  You're fine.
6        Okay.  First, before you answer any
7  questions, have you -- well, I'll let Marty ask the
8  question.
9     Q.  (BY MR. SHELLIST)  Yeah, my -- my question is
10 simply:  Have you ever seen that document before?
11       MS. SERPER:  Yeah.  I was going to let
12 you ask that question.
13    A.  No.
14    Q.  (BY MR. SHELLIST)  You have not?
15    A.  No.
16    Q.  Okay.  So who is Alson?
17    A.  Alson, he is the manager at Las Vegas.
18    Q.  Las Vegas Treasures?
19    A.  Right.
20    Q.  What's his full name?
21    A.  The date -- I'm sorry.
22    Q.  April 17, '08?
23    A.  Okay.  Go ahead.
24    Q.  So what is Alson's first -- full name?
25    A.  Lee.

Page 153

1     Q.  Lee Alson?
2     A.  Alson Lee.
3     Q.  Oh, Alson Lee.  Okay.  And how long has
4  Mr. Lee worked for you?
5     A.  I guess about five, six years.
6     Q.  Always in Las Vegas?
7     A.  Right.
8     Q.  Okay.  And I'm sorry.  Go ahead.
9     A.  (Nonverbal response.)
10    Q.  So Brenda -- Alson is e-mailing to Brenda
11 Roberts.  Where does Brenda work?
12    A.  At -- in Houston.
13    Q.  Okay.  Does Brenda work for D. Texas?
14    A.  Right.
15    Q.  Okay.  And it says "forward Treasures'
16 analysis."  Now, my question is:  The page I was
17 pointing to initially, the last page, is -- it's a
18 letter from Tony Lee to Alson from Successful Data
19 Systems.  Do you know who that is?
20    A.  No.
21    Q.  Okay.  In the letter -- I'm just going to read
22 a sentence.  It says:  "You pay nothing for all
23 chargebacks.  Anything related to chargebacks or
24 retrievals, you will not pay a penny towards."
25       My question is:  Do you know whether or

Page 154

1  not the Las Vegas Treasures currently has that deal?
2     A.  I don't know.
3     Q.  Okay.  Do you currently know whether D. Texas
4  or any of the clubs in the holding company, any of the
5  defendants in the case, do you know whether any of them
6  have a deal with the credit card processing companies
7  that says that your clubs will not pay anything for
8  chargebacks?
9     A.  Not to my knowledge.  But I want it to be
10 explained on that charge, no -- "not pay for
11 chargeback."
12    Q.  Yes, sir.
13    A.  How do you interpret that?
14    Q.  I don't know.
15    A.  This is not just -- this is not the actual
16 chargeback; is that what you mean?
17        I'm looking at that.  That's what I don't
18 understand from that piece of paper.  That means you're
19 still responsible for the chargeback, but additional to
20 chargeback, there is additional fee.  I guess every
21 time they charge you a chargeback, like, 15, $20
22 chargeback, it varies.  I believe they're talking about
23 that.  It's not about you just get away with the
24 chargeback.
25    Q.  Now, you're saying this based on how --

Page 155

1     A.  I assume that's what it --
2     Q.  Yeah.  You never talked with Tony Lee?
3     A.  Right, but it's not really you can get away
4  with the charge back.
5     Q.  Well --
6     A.  You are still responsible on the chargeback,
7  the deduction.
8     Q.  Where does it say that you're still
9  responsible for the chargeback?
10    A.  Because it's the -- if they're going to
11 cover -- this is my own assumption.  If they're
12 going -- eat up the chargeback, then bank going to lose
13 money and processing company.
14    Q.  Okay.
15        THE WITNESS:  Did you see a word on the
16 fee?
17        MR. SHELLIST:  Yeah.
18    Q.  (BY MR. SHELLIST)  Your lawyer's pointing you
19 to a very special part, I guess.
20        MS. SERPER:  Well, it's highlighted.
21 That's why I'm pointing at --
22    A.  Yeah.  Our chargeback fee.  Because every time
23 you charge back, not only do lose the money, there's
24 additional charge on top of that.
25    Q.  (BY MR. SHELLIST)  Okay.  So your

Page 156

1  interpretation of this is that the fees are all waived?
2     A.  As I see it, because it mentions fee next to
3  it.
4     Q.  Okay.
5     A.  It's highlighted.  Don't you see it?
6     Q.  Yeah.  But...
7     A.  Right.
8     Q.  I understand.  This is your reading.  I've
9  never seen this before this case.  I've never talked to
10 Mr. Lee.  I'm assuming you have not either?
11    A.  Right.  But you see it right now that it say
12 "fee" -- "chargeback fee"?
13    Q.  Right.  Okay.  So do you pay a chargeback fee
14 in any of your Houston operations?
15    A.  I believe we -- I have to check into that.  I
16 believe I do.
17    Q.  Okay.  And what is that based on?
18    A.  I have to check into it.
19    Q.  Okay.  So if --
20    A.  That's a bookkeeping issue.
21    Q.  Do you have contracts with each of the credit
22 card processing companies?
23    A.  I believe so.
24    Q.  Okay.  Who is -- who's in charge of
25 maintaining or keeping those?

Page 157

1     A.  They usually notify us.
2     Q.  Okay.
3     A.  And prior to -- I guess, the expiration, I
4  assume.
5     Q.  Okay.
6     A.  They send us notice or fax something.
7     Q.  Okay.  But I mean --
8     A.  I'm not aware of that at this point.
9     Q.  I guess my question is:  If you, Mr. Davari,
10 wanted copies of the contracts with credit card
11 processing companies, whom in your organization would
12 you ask?
13    A.  We should go to that bookkeeping and ask --
14 see if they have a copy of it in the file.
15    Q.  Okay.  Who would negotiate -- to your
16 knowledge, who negotiates the credit card processing
17 contract for each club?
18    A.  They usually come with the suggestion price to
19 the manager, and they call that -- I guess that's the
20 end of it.
21    Q.  So if --
22    A.  Because they have a fixed rate.  You can't
23 really negotiate with them.
24    Q.  When you say "you can't," have you ever
25 negotiated with a credit card processing company?

40 (Pages 154 to 157)