Page 158

1  A. I assume that's a fixed price.
2  Q. I understand that you're saying that, but have
3  you ever personally negotiated with the credit card
4  processing company?
5  A. Not to my knowledge, no.
6  Q. Okay. And has any credit card processing
7  company, Mr. Davari, ever said to you, "We do not
8  negotiate on our price"?
9  A. No.
10 Q. Okay.
11 A. They usually come and say, "This is the best
12 price."
13 Q. Okay.
14 A. And you take it as the best price --
15 Q. Do your man --
16 A. -- best rate.
17 Q. Do your managers at each club have the
18 authority to sign a credit card processing contract?
19 A. I assume they do.
20 Q. Meaning they do not need to get your approval
21 before signing?
22 A. If I'm around, they probably forward it to me.
23 But if I'm not, I assume they did sign on them.
24 Q. Okay. When your managers have a question for
25 you or a document for you to review, do they typically

Page 159

1  e-mail that to you?
2  A. Basically, call me or fax it to me.
3  Q. Okay.
4  A. I'm not too much a e-mail person.
5  Q. Okay. I understand.
6  A. I'm not too much -- yeah.
7  Q. So, for example, Brenda got this document from
8  Alson, this comparison on this credit card processing
9  agreement. Would Brenda then give that to you to look
10 at?
11 A. Probably. She might put it on my desk.
12 Q. Okay.
13 A. You know, show me the paperwork, and I got a
14 chance to see it.
15 Q. Okay. But it was something -- to your
16 recollection, it was something that Alson would want
17 you to take a look at?
18 A. Probably so. And sometimes -- just some of
19 this, you can't change all the time. Because they come
20 with some special gift -- foot through the door, then
21 after that, they change immediately. As soon as you
22 turn your head around, the rate changes on you. They
23 just -- just to get inside your door.
24 Q. So they give you a teaser rate of a low level?
25 A. Right, just like the vendors.

Page 160

1  Q. Okay.
2  A. And then later on, throw all these charges on
3  it.
4  Q. Okay. And your managers are responsible for
5  ensuring that the clubs do not get ripped off with
6  these charges?
7  A. There's -- I don't think they are going to get
8  ripped off. How can they get ripped off?
9  Q. I thought you said that they come in with one
10 rate, but then they put on all these other fees later?
11 A. Right.
12 Q. So who in your organization oversees to make
13 sure that you are being treated correctly under your
14 agreement?
15 A. It's supposed to go to bookkeeping. This is
16 some kind of bookkeeping department.
17 Q. Okay. All right. This -- this exhibit has an
18 Exhibit 4 on it.
19    MR. SHELLIST: I'll show you guys another
20 document that your lawyer's provided. There's no
21 Bates -- I didn't Bates-number these after you guys
22 gave them to me, but...
23    MS. SERPER: So you didn't want to put
24 the Alson letter as an exhibit?
25    MR. SHELLIST: If you want to, I'm happy

Page 161

1  to mark it. I don't --
2     MS. SERPER: No, that's fine.
3     MR. SHELLIST: Since it's from Las Vegas,
4  I'm not really going to...
5     MS. SERPER: Worry about it.
6     MR. SHELLIST: ...look at it right now.
7     MS. SERPER: Okay.
8     MR. SHELLIST: Yeah.
9     MS. SERPER: Okay. So this is No. 4.
10    (Exhibit No. 4 was marked.)
11    MS. SERPER: Okay. And we'll get some
12 copies at the end.
13    MR. SHELLIST: That's fine, yeah.
14 Q. (BY MR. SHELLIST) And, Mr. Davari, my
15 question's simply going to be: To your knowledge what
16 is that document?
17 A. On the left corner, it says "D. Houston
18 Treasures credit card processing costs."
19 Q. Okay.
20 A. "As a percent of credit card..."
21 Q. And it shows some areas of income on there; do
22 you see that?
23 A. Right.
24 Q. So is that just supposed to show all of the
25 credit card income or all of your total income, if you

Page 162

1  know, for the period of time and for the location?
2    A.  Each -- I guess it -- mention it on the left
3  side, so I don't know how to categorize that.  I didn't
4  do this report.
5    Q.  Do you know who did make that report?
6    A.  I assume maybe came from CPA --
7    Q.  Okay.
8    A.  -- I assume.
9    Q.  Okay.
10   A.  I don't have a detailed knowledge.
11   Q.  But the question, I guess, if you know --
12  if -- if you don't have any idea, I don't want you to
13  guess.  But if you know, what is the purpose of that
14  document?
15       What does it show us?
16   A.  I don't know the purpose of someone else
17  handing you a piece of paper.  I can't -- I can't tell
18  you their purpose.  You tell me what is the purpose.
19   Q.  Well, I mean, what -- what does that document
20  tell you?  What information do you believe --
21   A.  Houston d/b/a Treasure.
22   Q.  Okay.
23   A.  A bunch of numbers.
24   Q.  Does it show -- so you don't know the purpose
25  of it, and you can't tell what it is supposed to

Page 163

1  represent?
2    A.  I don't know what you mean with the purpose of
3  this, no.
4    Q.  Now, what do -- what do the numbers represent
5  on there, if you know?
6    A.  There is four numbers under each column, and
7  there's a total right under it.
8    Q.  Okay.
9    A.  And --
10   Q.  My -- let me ask you this question:  Do you
11  see any area on that document where the amount that the
12  dancers pay the door fee to come in, where that's
13  listed on there?
14   A.  I don't see anything -- you say "door fee" on
15  this, but I don't know.  Like what I say, I don't have
16  details on these numbers.
17   Q.  Okay.  Well, if you're -- okay, if you don't
18  know sort of anything about that document, I'll save it
19  for the witness, whomever created it, okay?
20   A.  Right.
21   Q.  I'll do that.
22       MS. SERPER:  I just want to make a copy
23  of it before we --
24       MR. SHELLIST:  Sure, no.  Make a copy of
25  that.

Page 164

1    Q.  (BY MR. SHELLIST)  What happens with the door
2  fee money when that is collected; where does that go?
3    A.  That go as income.  And basically, that's used
4  for amenity that the girls use in the club.
5    Q.  Do you have any personnel that throughout the
6  night go from club to club to pick up the door money
7  from either dancers or entrance fees from customers,
8  where they pick that money up to collect it?
9    A.  From -- no.  Don't have anyone from club to
10  club.
11   Q.  Well, who collects that money?
12   A.  The hostess collect the money.
13   Q.  And what does she do with it?
14   A.  She turn it in.
15   Q.  To whom?
16   A.  To the managers.
17   Q.  Any of them on duty?
18   A.  The manager on duty, yes.
19   Q.  I mean, if there are three managers, she can
20  pick the one to give it to?
21   A.  I assume so, yes.
22   Q.  And what does the manager do with the money?
23   A.  The manager put it in a safe to be recycled.
24   Q.  Okay.  And is there any record of that as
25  income to the club?

Page 165

1    A.  Absolutely.
2    Q.  Who tracks the amount of money that is earned
3  from the door every night?
4    A.  The hostess.
5    Q.  And what -- does she write that number down?
6    A.  No, she run it through the cash register.
7    Q.  Tell me how that would work.
8    A.  Basically, ring it up.  And there's a tape
9  with it, and she put the tape --
10   Q.  Okay.
11   A.  -- with the amount of money.
12   Q.  Okay.  So there's a cash register at the front
13  entrance--
14   A.  Right --
15   Q.  -- that is -- that has the tape ability?
16   A.  Right.
17   Q.  And when dancers come in to pay, she enters
18  that into the register?
19   A.  No, that's when the customers come in.
20   Q.  Okay.  How about the dancers?
21   A.  I believe they -- they write it down.  The
22  hostess keep tracking on it, and attending to the
23  money.
24   Q.  Why do they not enter that into the cash
25  register?

Page 166

1    A.  Because the system we have is not
2    sophisticated to take all of that stuff.
3    Q.  I don't -- I don't understand what that means.
4    A.  The cash register's kind of old cash register.
5    Not sophisticated to take all those numbers.  It's not
6    like a POS or anything like that.
7    Q.  No, I know.  But you -- you do use the cash
8    register to track income from patrons?
9    A.  Right.
10   Q.  So --
11   A.  I guess, it's too many keys or something like
12   this they needed.  I don't know why they don't do it.
13   But the hostess, she write it down, and she deposit the
14   money, and she balance it herself.
15   Q.  What is the name of the form she writes down
16   the dancer entrance fee on?
17   A.  I guess the dancer sheet.
18   Q.  Okay.  So if I ever needed a copy, I would
19   call it the dancer sheet?
20   A.  Yes, but I don't think that she keep it for
21   long.  After she get balance out, the numbers get
22   reported, and we keep it for short period of time, then
23   that's it.
24   Q.  So each night the hostes has one sheet at the
25   door --

Page 167

1    A.  Right.
2    Q.  -- for the dancer --
3    A.  She balances herself, go to the manager.  The
4    manager if he wants to check it, then go to the safe.
5    Q.  When you say "balance," she's balancing the
6    register?
7    A.  Yeah.  She balance.  Make sure, I guess, she's
8    all right.  She put her -- she take her tape and her
9    money.
10   Q.  Okay.  And does -- if a dancer comes in and
11   her fee is $40 and she has a $50 bill, does the hostess
12   use the cash register to give $10 back to the dancer?
13   A.  Right, if she needed to get change.
14   Q.  And then is the dancer money put into the cash
15   register?
16   A.  I believe so, yeah.
17   Q.  Okay.  And then that form, whatever it is, I
18   guess you're saying that she would balance it on the
19   tape at the end of the night?
20   A.  Yeah, there's a -- they take a reading out of
21   it.
22   Q.  Okay.
23   A.  I don't know how often they take a reading.
24   That's something controlled, again, by manager.
25   Q.  Okay.  And so the tape would differentiate

Page 168

1    between customer and dancer?
2    A.  No, tape shows that -- how much money she
3    collect from front door.
4    Q.  Okay.
5    A.  From the customers.
6    Q.  From the customers?
7    A.  And there's a sheet that got information on
8    dancers.
9    Q.  Yeah.
10   A.  And then she -- that's the money that go with
11   that sheet.  So the -- the combination of those two is
12   the money for the door.
13   Q.  Do you know, sitting here today, for example
14   at Treasures, what it costs you to run a club on a
15   Saturday night; what it costs you to run the place?
16   A.  I won't be able to give you this number.
17   Q.  Who -- who would know that information?
18   A.  It's just a detail we have to go work on it
19   through the CPA to get it.  And we don't go -- yeah,
20   the cost, yeah, we have to calculate it.
21   Q.  Have you ever done that before?
22   A.  No, I didn't do nightly.  We do it on monthly,
23   not on daily basis.
24   Q.  Okay.  So prior to today, you and the
25   accountant would have come up with kind of a monthly

Page 169

1    cost to run a given club?
2    A.  Right.  He's got cost, income, and expenses.
3    Q.  Right.  Okay.  And do you assign some of the
4    costs to -- for example, you said the dancers who use
5    the lights and all of that, the light show, are all of
6    those costs put under the dancers' expenses?
7    A.  What costs?
8    Q.  The light show cost.  Light bulbs --
9    A.  Well, this is the way I like to explain
10   it:  The dancers -- we have dancers, you know, sales
11   commission people.  And they pay floor fee to go toward
12   the amenity that they use.  And they are sales
13   commission; they are not tip employees.  And they get
14   $25.  Just like any salesperson, $20 is theirs, $5 our
15   share.  Has nothing to do with anything else.  This is
16   the way it's set up.
17   Q.  No, no.  I'm just asking if, for example,
18   you -- the light show is so that the dancers can dance
19   on the stage, right?
20   A.  I cannot say just particularly the dance --
21   the -- the light show is there as part of the facility
22   they use.
23   Q.  Right.  So what I'm asking is whether or not
24   you and your accountant assign certain expenses to
25   different categories or not.  I don't know.

Page 170

1  A. Like what?
2  Q. Like the operation of the lights. If you have
3  expenses for lights, do you say, "Now we know what" --
4  A. How can you operate -- how can you have a
5  meter on a light? How can you have a meter on carpet?
6  How can you have a meter on furnishings? You can't
7  really have a meter on them to...
8  Q. I'm not saying you have to. I just wondered
9  if you broke it down that way.
10 A. I don't think so.
11 Q. Okay.
12 A. I need to check into it. Not to my
13 recollection.
14 Q. Okay. So the monthly breakdown, is that a
15 report the CPA sends to you?
16 A. Yeah. Monthly -- yes.
17 Q. And what do you recall it, the report?
18 A. We call it "monthly report."
19 Q. Okay. And you get one from each club?
20 A. Yes.
21 Q. That the CPA prepares?
22 A. Yes.
23 Q. Okay. Based on data that each club gives to
24 him?
25 A. Based on information received from each club,

Page 171

1  yes.
2  Q. Okay. So there would be line items like
3  repair of carpeting, or payroll, or drinks, or whatever
4  other -- I'm sure you have a laundry list, many items
5  on there for expenses, right?
6  A. Well, whatever we have, he itemize it.
7  Q. Okay. How do the managers get compensated?
8  A. They get paid, and also they get commission.
9  Q. Okay. So how are they paid specifically; do
10 they get a salary?
11 A. Yes.
12 Q. Monthly salary?
13 A. I guess they get biweekly checks.
14 Q. Okay. So twice a month they are paid?
15 A. Right. Not twice a month, biweekly, because
16 we have 52 weeks in a year.
17 Q. Okay. And then as far as the commission, you
18 call it, are they commission salespeople?
19 A. No, we -- they just get commission.
20 They don't -- I don't know what to call them.
21 Q. How -- how do you determine --
22 A. I call them manager.
23 Q. How do you determine the commission?
24 A. Based on the liquor sale.
25 Q. Okay. And so what is that percentage that the

Page 172

1  managers get based on the liquor sale?
2  What is that amount?
3  A. It depends on the qualification of the
4  manager. It varies from one manager to another how
5  long they've been.
6  Q. Okay. So on the -- the highest level, the
7  most senior, let's say it's Bill. If he's been with
8  you a long time and is at a high level -- I'm presuming
9  that -- what commission does he get?
10 A. I don't have the calculation of percentage.
11 Again, that's something I'll have to look into for you.
12 Q. Okay. So whether it's 1 percent or 10
13 percent, you're not sure?
14 A. I can't answer that, really, at this point.
15 Q. Okay. Would that information be reflected on
16 the paycheck of the manager?
17 A. Yes. They get it on paycheck just like the
18 rest of the income to them.
19 Q. Okay. In the past five years, have you or
20 your companies been involved in other wage and hour
21 lawsuits?
22 A. Not to my knowledge.
23 Q. Okay. So, for example, if there's a
24 harassment case or something, I don't care about that.
25 All I'm asking about --

Page 173

1  A. No.
2  Q. -- is just wage and hour -- somebody who says,
3  "I was not paid right"?
4  A. No.
5  Q. Okay. Yourself, personally, have you been
6  involved in any lawsuits in the past five years,
7  meaning where you're named personally?
8  A. Personally?
9  Q. Yeah.
10 A. This one right here.
11 Q. Other -- yeah, other than this one?
12 A. Not to my recollection.
13 Q. Okay. And then are there any criminal
14 convictions in the last ten years that you have
15 suffered? I ask -- I ask this of all --
16 A. By me?
17 Q. Yes, personally, just of you?
18 A. No.
19 Q. Okay. I think that -- I think I've exhausted
20 your knowledge of the topics that I had. I think I
21 have. But before I let you go, is there any question
22 that I asked you that you felt I did not let you fairly
23 answer, meaning you're going to get to look at your
24 document, this book that the court reporter puts -- put
25 together so that you can ensure everything is correct.

Page 174

1  But, I mean, sitting here today, is there
2  something that you want to tell me that you feel you
3  said incorrectly that you know now you want to -- you
4  want to change or correct me about? You don't have to,
5  but I'm giving you that opportunity.
6      A. I believe at one point you confused me by just
7  twisting the -- asking the question over and over. And
8  as -- at the end, just now you're going to repeat it,
9  if I know how much to allocate to expenses, this stuff.
10 I guess I made it clear. I don't have that itemized
11 number.
12      And also I guess I distinguished the
13 dancers, they are tip commission people, and they pay
14 the floor fee, which is -- go to the amenity they use
15 in the club. And the sales commission, that 5
16 percent -- that $5 we get, it just strictly sales
17 commission.
18      And on employees, waitresses, at one
19 point, you told me the number fluctuated. But I
20 just -- I want to make sure I explain it to you
21 correctly that we charge 5 percent -- 3 percent --
22 close to 3 percent, plus or minus, which to my
23 calculation I guess a little more, is what we get
24 charged from the processing company. The other 2
25 percent, because they are the tip employee, and the

Page 175

1  risk we take, we absorb -- we absorb that cost, and we
2  cash them. We convert that money immediately.
3      And, basically, that's all I want to make
4  sure you're clear, because you tried to, I guess, ask
5  these questions so many times, I want to make sure you
6  got your answer.
7      Q. Yeah. No, I think you made clear whether the
8  number on Exhibit 1, whether it's 2.43 percent or
9  closer to 3 percent, we can have number crunchers
10 verify all of those things.
11     But whatever it is, you have made very clear
12 to me that that extra money is because you liquidate
13 the charge immediately, you as a business take a risk,
14 you have some expenses that come -- that either do
15 result or might result from that?
16     A. No, it's that -- I don't have some expenses,
17 just the expenses that are a result of liquidating that
18 tip. It's not really the other expenses.
19     Q. So what is the -- when you said you take a
20 risk --
21     A. Yes.
22     Q. -- a risk means something might happen?
23     A. Yeah. Risk at -- pay that -- the money
24 immediately that night. I convert it into cash.
25     Q. Yes, sir.

Page 176

1      A. And they can go home with it.
2      Q. Right. And you're taking a risk that
3  something in the future might happen to diminish that?
4      A. Right.
5      Q. Right. And in your mind, it's legal to charge
6  the risk to the employee?
7      A. Just that to cover that -- whatever is the
8  actual -- the chargeback. Not to exceed the
9  chargeback, and I believe I've been within that
10 chargeback.
11     Q. Right. But you're charging them that money
12 before you've ever incurred a chargeback in the future?
13     A. It's not before. It is what it is, basically,
14 what we see on average what we've been paying.
15     Q. Meaning historically?
16     A. Historically.
17     Q. No, that's understood. Okay. I think you've
18 made yourself plain.
19         Is there anything else that you --
20     A. No.
21     Q. Okay.
22         MR. SHELLIST: Then having said that, I
23 wanted to thank you very, very much for your time. I
24 understand you've been busy and need to leave out of
25 town either now or in the next day or two.

Page 177

1         I will go ahead and pass you as a
2  witness.
3         THE WITNESS: Likewise, I want to say
4  thank you.
5         MR. SHELLIST: Sure.
6         THE WITNESS: To all of you for your
7  time.
8         MS. SERPER: Thank you.
9         Okay. I don't have too much. Famous
10 last words from a lawyer. But I don't have too much.
11        E X A M I N A T I O N
12 BY MS. SERPER:
13     Q. We've talked about these credit card
14 chargebacks, and I think you've given testimony about
15 when a credit card charge is uncollectible, in that
16 it -- it's not paid to -- to any of the clubs. Do you
17 ever seek that money or collect it back from the
18 waitresses?
19     A. Not on a chargeback, never.
20     Q. From a dancer?
21     A. No.
22     Q. Or from a bartender?
23     A. No. I guess I mentioned this before.
24     Q. And let me ask you: How are -- are the
25 bartenders paid minimum wage?

Page 178

1  A. Yes.
2  Q. And how long has -- has that been in place?
3  A. That's been -- that's been in place for years.
4  Q. For years? Okay.
5  A. Right.
6  Q. And if -- if you know, what percentage of
7  transactions at Treasures are credit card transactions
8  versus cash transaction?
9  A. I would say more than 95 percent of our
10 transaction at Treasures, they are credit card, if not
11 more. I know around that number.
12 Q. And what about the other clubs?
13 A. They're all pretty much the same.
14 Q. Okay.
15 A. Mostly credit card. You hardly see cash.
16 Q. Okay.
17     MS. SERPER: Before I pass the witness, I
18 want to take 30 seconds and ask Al if he has anything.
19 So we'll step out for one minute.
20     MR. SHELLIST: I tell you what -- I tell
21 you what, let me step out, and you guys can sit here.
22     MS. SERPER: Oh, okay.
23     (Break from 2:17 p.m. to 2:20 p.m.)
24     MS. SERPER: Okay. Just so that I -- I
25 didn't overlook --

Page 179

1  Q. (BY MS. SERPER) When we talked about the
2  bartenders getting minimum wage, is that at all the
3  clubs or just --
4  A. Yeah, all the clubs.
5  Q. All the clubs. Okay. Just to clarify that.
6     And my last question. We've talked a lot
7  about the commission that the dancers get and the $5 or
8  the 20 percent that's kept by the club. Does any of
9  that amount, that $5, go toward credit card processing
10 fees --
11 A. No.
12 Q. -- or to cover any chargebacks?
13 A. No.
14 Q. Okay.
15     MS. SERPER: I pass the witness.
16     FURTHER EXAMINATION
17 BY MR. SHELLIST:
18 Q. I just want to make sure I'm clear,
19 Mr. Davari. How do you know where that -- when you say
20 that money doesn't go to credit card fees, how do you
21 know that?
22 A. The structure of it. They are sale commission
23 versus tip employees.
24 Q. Okay.
25 A. They are two different things.

Page 180

1  Q. I thought you told me earlier quite plainly, I
2  thought you did, that the money that you got from the
3  dancers was used to cover the facilities that you
4  offered for the dancers?
5  A. No, sir. What happened is when you asked me,
6  immediately you asked me another question. You told
7  me. You asked me that if I process dancers through the
8  credit card machine. My answer to that was yes. That
9  means yes, we process all the credit card through the
10 same machine.
11 Q. Right.
12 A. That's what my understanding was.
13 Q. Right.
14 A. Because immediately, if I'm not mistaken, you
15 asked two questions same time.
16 Q. Well, I asked you that. But then I said,
17 "Isn't it true that the dancers benefit from the
18 presence of a credit card machine there?"
19 A. My -- my understanding was the way you asked
20 the question -- again, my understanding that time was
21 you asked me that question immediately if they use the
22 credit card machine. I say "yes."
23 Q. And my question now, though, is: Isn't it
24 true that the dancers benefit to some degree by there
25 being a credit card processing machine there?

Page 181

1  A. The dancers, they are sale commission, and we
2  get 20 -- what is it, $5; they get $20.
3  Q. I didn't ask you what the split was, sir. I
4  want to be clear.
5     Isn't it true --
6  A. No.
7  Q. -- that the dancers --
8  A. I would say no.
9  Q. Let me make sure I'm finished, though, so that
10 the record's clear.
11     Isn't it true that the dancers benefit even to
12 some small degree by there being a credit card
13 processing machine in your club?
14 A. To my call, no. They don't use that. Because
15 they just -- that same position I have. You're sale --
16 they're sale commission person.
17 Q. No, I understand that. But didn't you just
18 tell Ms. Serper that almost every single transaction in
19 your club is credit card?
20 A. The majority of my credit, single -- yes.
21 Q. So if there is no machine there, no processing
22 machine, the dancers wouldn't get paid, right?
23 A. If there's no credit card machine?
24 Q. Right.
25 A. Then everybody's going to pay cash, and still

Page 182

1    they get paid.
2        Q.  I thought you said --
3        A.  I can't --
4        Q.  I thought --
5        A.  Well, it's credit card that I process it
6    through there.
7        Q.  Okay.
8        A.  So they get paid through what they -- they've
9    been processed.  If -- if it wasn't, obviously they
10   would get cash.
11       Q.  Do you benefit by there being a credit card
12   machine in the club?
13       A.  It would be hard for me to say, because right
14   now I have it.  I don't know anything -- I never had --
15   never experienced of it not having the machine in my
16   club.
17       Q.  Do you think it's good to have the credit card
18   process in the --
19       A.  I can't guess something I didn't experience.
20       Q.  So you're paying a lot of money to have a
21   machine that you have no idea if it's a benefit to you?
22       A.  (Pauses.)
23       Q.  That's what you want --
24       A.  I didn't say I don't have a benefit.  That's
25   just like I told you in your equipment -- I mean,

Page 183

1    that's equipment in your establishment.
2        Q.  Right.  Do you benefit by there being lights
3    in your club?
4        A.  That's part of -- I tell you what, that -- I
5    don't know how to explain it, but I guess I say that
6    machine is in the club.
7        Q.  Right.
8        A.  If I didn't have it, I would be collecting
9    cash.  I can't -- I can't really explain you something
10   I didn't experience.
11       Q.  Meaning --
12       A.  You tell me.
13       Q.  All I want to know is this, then I'll be done.
14           Do you think that your clubs benefit by
15   there being a credit card machine -- processing machine
16   in the club?
17           Do you think you make more money because
18   you have that machine versus not?
19       A.  If I have a business with no credit card
20   machine and I run it for a few months, I would be able
21   to answer that correct -- correctly.  Because exactly
22   what I say, I never run that place just between cash.
23       Q.  But did you tell me a moment ago that the
24   dancers do not benefit from the credit card machine?
25       A.  Everybody benefit from that.  But what I'm

Page 184

1    saying, that's part of the structure of the business.
2        Q.  It's just part of the overhead; it's part of
3    the facilities, right?
4        A.  It's right there.  I don't know how to
5    categorize it.  I'm really not expert --
6        Q.  Okay.
7        A.  -- to categorize things that I don't know how
8    to really.
9        Q.  So I think --
10       A.  You may use your own judgment and however you
11   want to categorize it.
12       Q.  I think you just said everybody benefits from
13   it.  When I said "do the dancers."  And I want to make
14   sure.  Is what you meant?
15       A.  What I'm saying is I'm not expert to explain
16   to you something that exists or doesn't exist.  And I
17   guess you ask the same question.
18       Q.  The only reason I'm asking you, Mr. Davari, is
19   because at one point I thought you said, yes, there was
20   a benefit.  At another point, I thought you said, no.
21   And at the end now --
22       A.  No, I -- I never said that -- what -- I'm
23   saying that when you asked me that question, you asked
24   me another question immediately.  You asked me if the
25   credit card get process through the machine.  I say yes

Page 185

1    to that.
2        Q.  No, I understand that.  I'm asking if it is a
3    benefit.  Does it help your club and the dancers and
4    the wait staff make more money?
5        A.  We leave it up to expert in a business to
6    answer that question.
7        Q.  But that's not you?
8        A.  I leave it up to expert.
9        Q.  Right.  And I'm asking:  Is that you?
10       A.  I can't answer that question, because I don't
11   know really without it or with, how it would be.
12       Q.  Okay.
13           MR. SHELLIST:  I don't have any other
14   questions.
15           MS. SERPER:  Nothing further.
16           MR. SHELLIST:  Yeah.
17           (The deposition concluded at 2:26 p.m.)

Page 186

1    WITNESS CORRECTIONS AND SIGNATURE
2    Please indicate changes on this sheet of paper,
     giving the change, page number, line number and reason
3    for the change. Please sign each page of changes.
4    PAGE/LINE    CORRECTION    REASON FOR CHANGE
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
        HASSAN DAVARI
25

Page 187

1         SIGNATURE OF WITNESS
2
3        I, HASSAN DAVARI, solemnly swear or
4    affirm under the pains and penalties of perjury that
5    the foregoing pages contain a true and correct
6    transcript of the testimony given by me at the time and
7    place stated with the corrections, if any, and the
8    reasons therefor noted on the foregoing correction
9    page(s), and that I am signing this before a Notary
10   Public.
11
12
13   _____
        HASSAN DAVARI
14
15   STATE OF T E X A S    *
16   COUNTY OF _____   *
17      SUBSCRIBED AND SWORN TO BEFORE ME BY
18   HASSAN DAVARI on this, the _____ day of
19   _____, 2010.
20
21
22   _____
        Notary Public, State of Texas
23
     My Commission Expires: _____
24
25   JOB NO. 90075

Page 188

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF TEXAS
2              HOUSTON DIVISION
3    LAURA McKNIGHT, TRISHA       :
     TURNER, ANDREW BAKER, RACHAEL :
4    FREEDMAN, KIMBERLY McCRAY, and :
     MARGO MORENO                  :
5         PLAINTIFFS,              :
     V.                           : C.A. NO. 09-3345
6                                  :
     D. HOUSTON, INC. D/B/A TREASURES, :
7    A.H.D. HOUSTON, INC. D/B/A    :
     CENTERFOLDS                   :
8    D N.W. HOUSTON, INC. D/B/A GOLD :
     CUP, D. RANKIN, INC. D/B/A TROPHY :
9    CLUB, D WG FM, INC. D/B/A     :
     SPLENDOR, W.L. YORK, INC. D/B/A :
10   COVER GIRLS, AND, IN THEIR    :
     INDIVIDUAL CAPACITIES         :
11   ALI DAVARI AND HASSAN DAVARI, :
          DEFENDANTS.              :
12   ****************************************************
13   THE STATE OF TEXAS :
14   COUNTY OF HARRIS :
15
16      I, Stephanie M. Harper, a Certified Shorthand
17   Reporter in and for the State of Texas, hereby certify
18   to the following:
19      That the witness, HASSAN DAVARI, was duly
20   sworn by the officer and that the transcript of the
21   oral deposition is a true record of the testimony given
22   by the witness;
23      That the deposition transcript was submitted
24   on _____, 2010, to the witness, or to the
25   attorney for the witness, for examination, signature,

Page 189

1    and return to U.S. Legal Support, Inc., by
2    _____, 2010;
3        That the amount of time used by each party at
4    the deposition is as follows:
5        MR. MARTIN A. SHELLIST - 3:00
6        MS. LAUREN M. SERPER - 00:05
7        MR. ALBERT T. VAN HUFF - 00:00
8        I further certify that I am neither counsel
9    for, related to, nor employed by any of the parties or
10   attorneys in the action in which this proceeding was
11   taken, and further that I am not financially or
12   otherwise interested in the outcome of the action.
13       GIVEN UNDER MY HAND AND SEAL OF OFFICE, on
14   this, the 21ST day of APRIL, 2010.
15
16
17
18   _____
     STEPHANIE M. HARPER, CSR
19   Certification No.: 7433
     Expiration Date: 12-31-10
20
21   U.S. Legal Support, Inc.
     Firm Registration No. 122
22   363 North Sam Houston Parkway East
     Suite 900
23   Houston, Texas 77060
     713/653-7100
24
25

48 (Pages 186 to 189)