IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

```
LAURA MCKNIGHT, TRISHA        *
TURNER, ANDREW BAKER,         *
RACHAEL FREEDMAN, KIMBERLY    *
MCCRAY, and MARGO MORENO      *
      Plaintiffs,             *
                              *
V.                            *  Civil Action No.  H-09-3345
                              *
D. HOUSTON, INC. D/B/A        *
TREASURES, A.H.D. HOUSTON,    *
INC. D/B/A CENTERFOLDS,       *
D.N.W. HOUSTON, INC. D/B/A    *
GOLD CUP, D. RANKIN, INC.     *
D/B/A TROPHY CLUB, D WG FM,   *
INC. D/B/A SPLENDOR,          *  Jury Trial Demanded
W.L. YORK, INC. D/B/A         *
COVER GIRLS, AND, IN THEIR    *
INDIVIDUAL CAPACITIES, ALI    *
DAVARI and HASSAN DAVARI      *
      Defendants.             *
```
*************************************************************
REPORTER'S CERTIFICATION
FOR THE ORAL DEPOSITION OF
LAURA MCKNIGHT
MAY 11, 2010
*************************************************************

ORAL DEPOSITION OF LAURA MCKNIGHT, produced as a

witness at the instance of the Defendants and duly sworn

was taken in the above-styled and numbered case on the

11th day of May, 2010, from 2:22 p.m. to 4:32 p.m.

before Rita Frangullie, Certified Shorthand Reporter in

and for the State of Texas, reported by machine shorthand

at the offices of SHELLIST, LAZARZ, LLP, 3D/International

Tower, 1900 West Loop South, Suite 1910, Houston, Texas

77027 pursuant to the Texas Rules of Civil Procedure and

the provisions stated on the record or attached hereto.

Page 2

1          A P P E A R A N C E S
2    FOR THE PLAINTIFF:
3       MR. MARTIN A. SHELLIST
        SHELLIST LAZARZ, LLP
4       3D/International Tower
        1900 West Loop South, Suite 1910
5       Houston, Texas 77027
        713.621.2277 - Telephone
6       713.621.0993 - Fax
        MSHELLIST@EEOC.NET
7
8    FOR THE DEFENDANTS, D. HOUSTON, INC.:
9       MR. ALBERT THOMAS VAN HUFF
        MONSHAUGEN & VAN HUFF, P.C.
10      1225 North Loop West, Ste. 640
        Houston, Texas 77008
11      713.880.2992 - Telephone
        713.880.5297 - Fax
12      al@vanhuff.com
13      MS. LAUREN M. SERPER
        ATTORNEY AT LAW
14      2405 Edloe, Ste. 200
        Houston, Texas 77027
15      LOLMS1@aol.com
16
17
18
19
20
21
22
23
24
25

Page 3

1                   INDEX
2    Appearances.................................2
3    LAURA MCNIGHT
     Examination by Mr. Al Van Huff.........................5
4
     Witness Correction and Signature Page..................71
5
     Reporter's Certificate....................................73
6
7                  EXHIBITS
8    NO.   DESCRIPTION                  PAGE
9    1     Declaration of Laura McKnight.................60
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1          THE REPORTER: Read and sign?
2          MR. SHELLIST: Read and sign and the same
3    situation just take it by the Rules.
4          MR. VAN HUFF: That's fine.
5          LAURA McKNIGHT,
6    having been duly sworn, was examined and testified as
7    follows:
8               EXAMINATION
9    QUESTIONS BY MR. VAN HUFF:
10   (2:22 p.m.)
11      Q. Good morning, Ms. McKnight, would you please
12   state your name for the record.
13      A. Laura McKnight.
14      Q. We're here to take your deposition today in this
15   case that you and several other individuals have brought
16   against Treasures, five other clubs and two individuals.
17   Have you ever given a deposition before?
18      A. No, sir.
19      Q. All right. It's pretty straightforward. You're
20   under oath today just as though you would be if we were at
21   court at trial in front of the judge and the jury; and,
22   so, it's just basically a question-and-answer session.
23   I'm going to talk to you a little bit about the
24   allegations in your lawsuit and go over your Declaration
25   with you that you made and attached to the Motion for

Page 5

1    Notice that was filed in this case. I'm going to go over
2    your interrogatory answers with you and talk to you about
3    some of that. Otherwise, before I even get into all that
4    stuff, I'm just going to go over some very quick
5    background things and a little bit about your employment
6    and your experience with the different clubs.
7          So, a couple things that are helpful because
8    the court reporter here is typing everything down, it's
9    going to get made into a booklet, a booklet of the
10   questions and answers that we can use later on down the
11   road in connection with the litigation of this case and
12   possibly at trial. So, since she's typing everything
13   down, it's important that when I ask you questions to
14   which you respond yes or no that you vocalize your
15   response, not just nod your head or shake your head or say
16   "uh-huh" or "huh-uh" because those don't transcribe very
17   well into the record.
18         And, also, it's also important that we not
19   talk over one another. Sometimes in normal conversation
20   you can kind of anticipate what the person's going to say
21   halfway through the sentence and then you answer the
22   question before it's even finished. It's important that
23   you let me ask the question and then that I, in turn, let
24   you answer without us talking over one another, okay?
25      A. Yes.

Page 6

1    Q. And finally, if you don't understand a question,
2  or you don't understand a term, please let me know and we
3  can all explain it to you or we can go over it so that
4  we're sure that you understand, okay?
5    A. Okay.
6    Q. Because if you don't do that, then we're going to
7  assume that you understand whatever questions you're
8  answering, okay?
9    A. Okay.
10   Q. Is your current address still 20015 Oak Forest
11 Drive, Damon, Texas 77430?
12   A. Yes.
13   Q. Date of birth May 20th, 1975; Driver's License
14 No. 19016857?
15   A. Yes.
16   Q. Now, there are, as I said, six clubs that are
17 defendants in this case and it's my understanding that you
18 were employed at some point as a waitress at Treasures; is
19 that correct?
20   A. Describe what you mean by just Treasures.
21   Q. Well, I'm just -- my question is -- that question
22 that I just asked is specifically about Treasures, that
23 you worked at Treasures as a waitress?
24   A. Yes.
25       MR. SHELLIST: Make sure you speak up a

Page 7

1  little bit because you're normally pretty soft; but I want
2  to make sure the court reporter gets all your words.
3       THE WITNESS: Okay.
4    Q. (By Mr. Van Huff) Okay. Did you ever do any
5  work at Centerfolds?
6    A. What do you mean by "work"?
7    Q. Did you ever work at Centerfolds as a waitress?
8    A. No.
9    Q. Okay. Did you ever do any other type of
10 employment related activities at Centerfolds?
11   A. Well, describe what you mean by "employment
12 related activities."
13   Q. Okay. Well, your allegations in this case with
14 regard to Treasures are that it violated the Fair Labor
15 Standards Act in the manner in which you were treated as
16 an employee at Treasures, okay?
17   A. Okay.
18   Q. That's what you've alleged in your lawsuit?
19   A. Yes.
20   Q. And I understand by looking at the payroll
21 records and looking at your personnel file that you were,
22 in fact, an employee of Treasures?
23   A. Yes.
24   Q. Okay. Well, Treasures is its own business entity
25 as compared to Centerfolds, Gold Cup, Trophy Club, et

Page 8

1  cetera. Each entity is its own corporation; and each
2  entity has its own liquor license, its own Tax ID number,
3  et cetera, okay. So, you've made some allegations in your
4  case that they're single business enterprises and that
5  they're joint employers. Okay. Those are some
6  allegations that you've made. Setting all that aside, my
7  question to you -- and I'm going to ask you the same
8  question for all six
9  clubs -- we've already established you worked for
10 Treasures as a waitress.
11   A. Right.
12   Q. Did you ever work at Centerfolds as a waitress?
13   A. No, I did not.
14   Q. Okay. Did you ever work at Gold Cup as a
15 waitress?
16   A. No.
17   Q. Trophy Club?
18   A. No.
19   Q. Splendor?
20   A. No.
21   Q. And finally, did you ever work at Cover Girls as
22 a waitress?
23   A. No.
24   Q. In your interrogatory answer regarding your dates
25 of employment with Treasures, you put November 7th, 2002

Page 9

1  to April 5th, 2009. Does that sound correct to you
2  sitting here today?
3    A. Yes.
4    Q. And that you were employed at Treasures as a
5  cocktail waitress?
6    A. Yes.
7    Q. What were your duties as a cocktail waitress at
8  Treasures, your job duties?
9    A. I was expected to wait on customers, serve them
10 drinks, open a credit card tab with them if they requested
11 me to do so and on that credit card tab, keep track of any
12 entertainers that were getting dances. Also part of that
13 duty would be to keep track if they ordered a bottle of
14 wine or champagne and also keep track of any food or
15 cigars, anything else that they would order and I would
16 also be responsible for completing all that paperwork and
17 also completing the dancer's paperwork and turning in
18 those.
19   Q. Okay. How were you compensated for the work that
20 you did as a waitress at Treasures?
21   A. I was paid 2.13 an hour plus any tips.
22   Q. Were you ever paid a flat rate per shift?
23   A. No.
24   Q. Were you ever employed by Treasures as a
25 bartender?

Page 10

1    A. No.
2    Q. Earlier today, I took the deposition of Andrew
3 Baker who is one of the other plaintiffs in this case and
4 during his deposition, he and I talked about a telephone
5 conversation that you had with him approximately a year
6 ago wherein you informed him about this lawsuit. Do you
7 remember that telephone conversation?
8    A. I remember having a telephone conversation with
9 him, yes.
10    Q. What did y'all talk about on your telephone
11 conversation?
12    A. I informed him that I had spoken with my lawyer
13 and --
14      MR. SHELLIST: Now be careful -- and I know,
15 Al, you would give this instruction anyway but you can say
16 whatever you guys chatted about be careful that --
17 neither Al nor I want you to trample upon any of the
18 attorney-client communications. So, if you and I talked
19 about something, that's one thing but whatever you and
20 Andy talked about, whatever you recall, I'm happy for you
21 to tell that to Al, okay?
22      THE WITNESS: Okay.
23    A. Basically I told him that I had spoken with
24 Mr. Shellist and I had decided that, you know, the
25 practices that were happening at the club were illegal and

Page 11

1 that I was pursuing a lawsuit.
2    Q. (By Mr. Van Huff) What else did the conversation
3 consist of?
4    A. I asked him how his family was.
5    Q. With regard to the lawsuit.
6    A. It was a year ago. That's pretty much all I can
7 remember.
8    Q. Okay. I imagine you probably gave him your
9 lawyer's contact information?
10    A. Yes.
11    Q. Okay. Is there anything else?
12    A. Not that I can recall.
13    Q. Do you know who Trish -- Trisha Turner is?
14    A. Yes.
15    Q. Have you had any -- let me back up.
16      Have you had any other conversations with
17 Mr. Baker about this lawsuit?
18    A. This morning I text him to ask him what the name
19 of our old manager was. I remembered his first name. I
20 did not recall his last name.
21    Q. Who was it?
22    A. John Tovar.
23    Q. Okay.
24    A. And I asked him how he was doing.
25    Q. Okay. Between the initial telephone conversation

Page 12

1 and the text you just mentioned, did you have any other
2 conversations with Mr. Baker about this lawsuit?
3    A. There was a confidential communications between
4 my lawyer and all of us that I replied to, but I don't
5 think I'm able to talk with you about that.
6    Q. Okay. I did not ask you about conversations or
7 communications with your lawyer. I'm asking you about
8 communications or communications between you and
9 Mr. Baker.
10    A. Right. And those occurred like when you
11 "reply-all" kind of thing. So, those would technically be
12 conversations if I replied "all" and Andy received that
13 communication but it also went to my lawyer.
14    Q. Okay. And so, I guess what you're saying is you
15 had some conversations that were basically in the context
16 of a conference-type conversation between all the
17 plaintiffs and your lawyer?
18    A. Yes.
19    Q. Essentially I guess that would be what you're
20 saying.
21      Any other conversations other than that with
22 Mr. Baker regarding the lawsuit?
23    A. Not that I can recall.
24    Q. What about Ms. Turner?
25    A. Also the same besides the fact that I met one

Page 13

1 time in the office with her to meet with Mr. Shellist and
2 she's my Facebook friend. So, it's all personal.
3    Q. Facebook. Have y'all ever communicated on
4 Facebook about this lawsuit?
5    A. No.
6    Q. Are you Facebook friends with any of the other
7 plaintiffs?
8    A. Margo I think. I'm not sure. I have like 500
9 people that are my friends. I can't really recall. I'm
10 pretty sure Margo but I'm not sure about the rest of them
11 but we don't talk about Treasures. We've moved on from
12 that.
13    Q. You don't talk about it anymore?
14    A. On Facebook or?
15    Q. You said that you had moved on from that --
16    A. No.
17    Q. So, y'all discussed it at some point on Facebook?
18    A. No. I'm saying we've moved. In other words
19 we're no longer employed by Treasures. We've moved on
20 with our lives.
21    Q. I see.
22    A. And so any conversations that we've had beyond
23 meeting with Mr. Shellist would be of a personal nature.
24    Q. And just so that you know in the process of me
25 asking you questions about your communications with the

Page 14

1  other plaintiffs, I'm not trying to get into whatever else
2  y'all talk about other than the stuff that has to do with
3  this lawsuit.
4      A. Okay.
5      Q. Now -- and your employment with Treasures.
6         When you were employed with Treasures, did
7  you ever have any Facebook communications with any other
8  employees of Treasures?
9      A. While I was employed, no.  I just recently got on
10 Facebook.
11     Q. Have you had any e-mail communications with any
12 of the other plaintiffs regarding Treasures?
13     A. The plaintiffs, no.  It would be the same as with
14 Andy, just, you know, reply-all communication and maybe a
15 generalized question that Marty would ask us and I'd
16 respond and maybe they would respond further but, I mean,
17 as far as the times, the dates what we talked about, I
18 don't know and if it was -- if it involved Mr. Shellist, I
19 can't talk to you about that.
20     Q. What's your e-mail address?
21     A. I prefer not to give that.  That's my husband and
22 my e-mail address.
23     Q. Well --
24        MR. VAN HUFF:  Mr. Shellist.
25        MR. SHELLIST:  I'll talk to her at a break

Page 15

1  and I'll see and then if we need to fuss about it, I'll
2  let you know but I'll write that down as a note for
3  Ms. McKnight and I to chat about.
4      Q. (By Mr. Van Huff)  Who is your e-mail service
5  provider, if you know what that means?
6      A. I don't understand why that's important.
7      Q. Okay.  So, is that another question that you're
8  not going to answer?
9         MR. SHELLIST:  If you're not comfortable
10 answering, you can tell him you're not going to answer it.
11 You and I can discuss it at a break.
12        THE WITNESS:  Okay.
13     A. I prefer not to answer.
14     Q. (By Mr. Van Huff)  Okay.  Other than Facebook are
15 you on any other social networking sites?
16     A. No.
17     Q. When did you first talk to Trisha Turner about
18 this lawsuit?
19     A. It was probably right after the time that I
20 initially spoke with Mr. Shellist.
21     Q. Did you contact Ms. Turner in the same manner
22 that you contacted Mr. Baker regarding the lawsuit?
23     A. No, I did not.  It was my last day of employment
24 at Treasures, and I spoke with her about it because she
25 had come in as a patron.

Page 16

1      Q. I see.  What did you guys talk about in
2  connection with the lawsuit at that time?
3      A. That was last April.
4         MR. SHELLIST:  If you remember, tell him
5  everything you remember.  If you don't, just be fair with
6  him and tell him you don't remember.
7      A. Okay.  I just told her that I was pursuing the
8  lawsuit and I gave her Mr. Shellist's information and I
9  don't remember anything further.
10     Q. (By Mr. Van Huff)  What other communications have
11 you had with her since then regarding this lawsuit other
12 than communications that had to do with your lawyer?
13     A. That would be it.
14     Q. When was the last time you spoke with her?
15     A. I can't recall.  I think it was the last time we
16 met at the office.
17        MR. SHELLIST:  If you remember, let him know.
18 If you don't --
19     A. Yeah.  I mean, that was the last date that I know
20 of.
21     Q. (By Mr. Van Huff)  And Rachel Freedman, do you
22 know her?
23     A. Vaguely.  I mean, I worked with her.  People told
24 her if I saw her I'd remember her.  But I was given her
25 number to contact her and let her know about the lawsuit.

Page 17

1      Q. Who gave you her number?
2      A. I can't remember if it was -- I don't remember if
3  it was one of the other plaintiffs or if it was a current
4  employee.
5      Q. What prompted you to call these other people to
6  get them involved in the lawsuit?
7      A. These were all of my coworkers who basically were
8  experiencing the same exact thing that I was experiencing
9  on a nightly basis when we would go to work and I wanted
10 to let them know that basically what we were dealing with
11 was against the law and I just wanted to let them know
12 that I was pursuing a lawsuit against it.
13     Q. Kimberly McCray, when was your first conversation
14 with her about the lawsuit?
15     A. It was around the time that I contacted Rachel
16 because I was also given her phone number.
17     Q. Do you remember who gave you the phone number?
18     A. I don't remember.
19     Q. And finally, Margaret -- excuse me -- Margo
20 Moreno?
21     A. It was around that same time.
22     Q. Back in April of '09?
23     A. Yes.
24     Q. And how did you contact Margo?
25     A. I called her.

Page 18

1    Q. You already had her telephone number?
2    A. I had to get it from -- I don't remember if it
3  was one of the plaintiffs or another coworker that still
4  worked there.
5    Q. So, it could have been that contacted former
6  coworkers of yours at Treasures to get telephone numbers
7  for other employees?
8    A. Yes. I spoke with a lot of my coworkers that
9  were still currently employed that did not want to leave
10 the company and did not want to pursue the lawsuit because
11 they were fearful of retaliation. So, either they gave me
12 contact numbers of people that they knew would be
13 interested that no longer worked there or people that were
14 planning on leaving that would be interested.
15   Q. And how is it that you -- that your employment
16 with Treasures ceased?
17   A. I decided that I did not want to work for them
18 anymore, so, I quit.
19   Q. On average how many hours a week did you work at
20 Treasures as a waitress during your employment there?
21   A. It varied anywhere from one shift and I can
22 recall working seven shifts in a week. It just depended.
23   Q. And how long was a shift usually about?
24   A. It depended on the day. Some days we were open
25 until 2:00 in the morning. Some days we were open until

Page 19

1  4:00 in the morning and generally the days that we were
2  opening till 4:00 in the morning, I stayed till 4:00 in
3  the morning.
4    Q. Okay. What was the range in hours of the shifts?
5    A. 6:30 to 2:00 or 6:30 to 4:30.
6    Q. Did you clock in?
7    A. I did clock in, but I wasn't always paid for the
8  hours that I was worked -- that I worked.
9    Q. Did you clock in for all the hours that you
10 worked?
11   A. Yes. However, where the timecards were located
12 was public access. Basically it was a swinging door with
13 glass on it and that's where the patrons were at. There
14 was many a time where my timecard would be gone and I
15 wouldn't know what had happened to it and there was no way
16 of, you know, locating it and/or submitting new hours and
17 when I did submit new hours, there were times that I was
18 not reimbursed.
19   Q. Okay. So, there were some issues with lost
20 timecards?
21   A. Yes.
22   Q. And approximately how many hours worth of pay
23 were you not compensated for due to lost timecards?
24   A. I don't know.
25   Q. Was it less than 24 hours of time, or was it 2000

Page 20

1  hour's worth of time? If you just can give me a range so
2  we have some idea of what we're talking about, it would be
3  helpful.
4    A. Once every few months, you know, I would notice
5  that the hours that I worked didn't match -- did not match
6  what I had actually worked and as far as contacting the
7  woman that was in charge of payroll, she did not return
8  phone calls. She did not answer phone calls. Any
9  communication that I would give to my manager to give to
10 her because she was officed out of Centerfolds, I never
11 knew where it went.
12   Q. Did you document any of this?
13   A. Yes. I wrote letters and gave them to the
14 managers.
15   Q. Did you retain copies of those letters?
16   A. No.
17   Q. Well, on the occasions that this would happen,
18 how many hours would you be shorted in a pay period?
19   A. I don't know. That was seven year's worth of
20 employment, and it just got to the point where I knew
21 nobody was going to fix it. So, I just stopped worrying
22 about it.
23   Q. So, sitting here today, you don't know how many
24 hours you were shorted?
25   A. No, I don't.

Page 21

1    Q. Okay. Where are you currently employed?
2    A. I'd rather not disclose that information.
3       MR. SHELLIST: We'll mark that down; but I
4  can tell you based on our prior discussions that if you
5  want that information, the judge will have to ask us to
6  give that to you. I just don't feel it's relevant to
7  anything.       So, I make a formal objection as to
8  the form of the question. I know we can chat about it if
9  we need to later.
10   Q. (By Mr. Van Huff) One of the allegations that
11 you've made in your lawsuit is that these six clubs are
12 joint employers. Are you aware of that?
13   A. Yes. Because it's true.
14   Q. Okay.
15      MR. VAN HUFF: Object to the portion that was
16 nonresponsive.
17   Q. (By Mr. Van Huff) On what facts do you base that
18 allegation?
19   A. When I was first given my employee orientation by
20 John Tovar which was the manager that I asked Andy about
21 his last name, he told me that Treasures and Splendor and
22 Gold Cup and all the clubs, they're the same clubs.
23 They're owned by the same owners; and, so, coming from his
24 mouth, that was true. Also, during the Super Bowl when it
25 came to Houston, we ran out of paperwork that we run our

Page 22

1  tab sheets on and that we write dances on and, so, they
2  brought over other paperwork from the other club. So, the
3  names, the tab sheet's exactly the same.
4      Q. Are there any other facts that you have in
5  support of your allegation that the clubs are joint
6  employers?
7      A. The other coworkers that I worked with, the other
8  entertainers that had worked for the other clubs also said
9  that George and David were also the owners that they would
10 see them at the club.
11     Q. Okay. Any other facts in support of joint
12 employment?
13     A. I know that several of my coworkers came from
14 other clubs and said that they were run exactly the same.
15     Q. Okay.
16     A. And some of our managers worked at both clubs,
17 which, you know, some managers would work, you know,
18 Monday through Friday at one club and weekends at another
19 club. So, it's my understanding that their employment is
20 interchangeable that they work for the same company. They
21 get the same paycheck. It just depends on which building
22 they're in.
23     Q. Which managers, what were their names?
24     A. Bill Peters. I know Joe Thomas also worked at
25 Centerfolds and I think -- I know he worked at two of the

Page 23

1  other cups -- two of the other clubs because the
2  entertainers knew him from the other clubs and also there
3  was a third manager and I cannot recall his name off the
4  top of my head but he worked for us Super Bowl time and
5  then he would just come in to fill in whenever someone was
6  sick or was taken to jail and also one of the GMs would
7  also come over and float if they were short a manager
8  because they had been taken to jail.
9      Q. Okay. Any other facts in support of your joint
10 employer allegation?
11     A. No, not that I can recall.
12     Q. Now, you've also alleged in your petition that
13 the clubs constitute something called a single integrated
14 business enterprise. And I understand that the same set
15 of facts that we just went over in support of your
16 allegation for joint employment in your mind may also
17 support your allegation for single integrated business
18 enterprise.
19     A. I don't understand what that means.
20     Q. Okay. Do you understand that you've alleged that
21 these clubs, these six clubs that are defendants in this
22 case are single integrated business enterprise, that
23 you've made that allegation in your lawsuit?
24     A. Can you define what "single integrated
25 enterprises means"?

Page 24

1      Q. Basically -- and your lawyer will correct me if
2  I'm wrong -- that the inter-relationship among the clubs
3  is such that they should all be just considered one big
4  enterprise.
5      A. Okay.
6          MR. SHELLIST: Fair enough.
7      Q. (By Mr. Van Huff) And so, you've made that
8  allegation in your lawsuit.
9      A. Okay.
10     Q. All right. Now, it sounds like some of the
11 things that we just went over in support of your joint
12 employer allegation may also relate to your allegation
13 that they're a single integrated business enterprise,
14 okay. So, are there any other facts other than the ones
15 that we've already talked about that support your
16 contention that they're a single integrated business
17 enterprise?
18     A. No, not that I can recall.
19     Q. What are you alleging that Treasures did with
20 regard to its pay practices and in connection with you
21 specifically, not other employees, what are you alleging
22 that it did incorrectly?
23     A. The credit card fee of 5 percent that
24 basically -- say, I got a hundred-dollar tip on a credit
25 card tab, when I would go get paid out by a bartender, the

Page 25

1  bartender would automatically hold 5 percent of that
2  hundred dollars. So, to start off with, I'd get $95. Out
3  of that $95, I would tip the bartender 15 percent. So,
4  subtract 15 percent from that. The remnant I was required
5  to tip my managers 10 percent of that. And after I would
6  tip them 10 percent, then I was required to tip the
7  busboys. So, when they would, you know, submit my
8  information to the IRS at the end of the year, they would
9  report my full credit card tip, that full hundred dollars
10 but I didn't get paid the full hundred dollars because the
11 house would keep the 5 percent and the managers would get
12 10 percent and plus the gratuities that I would give to
13 the bartender and the busboy. So, my understanding is,
14 that is very illegal on two different levels.
15     Q. Okay. What are the two levels?
16     A. The two levels is -- the two levels are that the
17 house is not allowed to keep 5 percent of my tips and I
18 should not be required to tip my managers to be managers.
19     Q. Okay. So, the scheme that we talked about --
20 that you talked about just now where you use the example
21 of $100, the 5 percent that I think the club refers to as
22 a credit card processing fee would be deducted from the
23 hundred dollars?
24     A. Yes.
25     Q. All right. And so, the first part of your

Page 26

1    claim -- you said there were two areas, right -- so, the
2    first thing that you're alleging is that that 5 percent of
3    the credit card tips that Treasures was deducting from
4    your paycheck was unlawful?
5        A. Yes.
6        Q. And then the second thing that you're alleging
7    was improper was the issue of an alleged requirement that
8    10 percent of your credit card tabs --
9        A. No. All tips, not just credit cards.
10       Q. Okay. So, the 5 percent that we talked about
11   just a minute ago, did that only apply to the credit
12   cards?
13       A. Yes.
14       Q. Okay. Now -- so, aside from that -- we'll put
15   that aside for now -- we've got another issue that applies
16   or that you claim applies to both your cash tips and your
17   credit card tips whereby 10 percent of all your tips got
18   paid to managers?
19       A. Yes.
20       Q. Are you claiming that that was the case during
21   the entire period of employment -- strike that.
22          Are you claiming that the 10 percent of your
23   tips being payable to management that that applied to you
24   during your entire period of employment with Treasures?
25       A. Absolutely.

Page 27

1        Q. Can you please explain the dynamic of how that
2    was done as far as if you received cash tips how those
3    were accounted for and who would take the 10 percent out
4    and how it was dispersed and the same thing for the credit
5    card tips?
6        A. Just for the manager tip out.
7        Q. Let's set the 5 percent aside. I mean, it's
8    clear to me that one of the main points of your lawsuit is
9    that the 5 percent was either not allowed at all or it was
10   too much on the credit card tips, okay. And so right now
11   all I'm asking you about is the situation with the 10
12   percent tip out to the managers. Because I don't think I
13   saw that claim in your lawsuit. I might be mistaken. So,
14   if you could explain it to me, how it worked, how the
15   money was taken out, it would probably make this go a lot
16   faster if you just explain it to me rather than me asking
17   you a hundred questions about it.
18       A. Okay. Basically every time I got a tab before I
19   was allowed to turn it into the bartender and be done with
20   it after the customers, you know, basically the customer
21   would say, "I want to close my tab," and I would total it
22   up. He would sign it, you know. Before I could give the
23   credit card and the driver's license back to the customer,
24   I was required to go to a manager and have the manager
25   sign off on it and the manager would flip the tab over,

Page 28

1    you know, he'd glance at it, flip the tab over, look at
2    the total, look at the tip, and look at the grand total
3    and then he would initial it and then if he didn't see a
4    sufficient tip like, say, I had a hundred-dollar tab and
5    he tipped me $2.50, it was a regular practice that the
6    manager would go over and speak with the customer to see
7    if, A, you know, what I had done wrong or, B, maybe he had
8    only put $2.50 on there and handed me my money in cash to
9    see how much I had really gotten.
10          So, basically the managers had a mental tally
11   of how much money, you know, I was making throughout the
12   night and who was making the most money throughout the
13   night and how much they could expect at the end of the
14   night and so, this was before I would even hand back the
15   credit card and the driver's license.
16          If we turned in a tab to the bartender
17   without a signature, we had to go to the manager and they
18   had to sign it. And we would get in trouble for not
19   getting it signed because usually the managers liked to go
20   and talk with the customer, especially if they left a
21   large tip because they wanted to know that customer. As
22   far as if we had a customer that was paying cash and he
23   was well-known to pay cash and to tip heavily, if we did
24   not tip what they thought was the quarterly, the managers
25   at the end of the night, they would call us out on it.

Page 29

1    Literally say, "Hey, you waited on so and so. This is all
2    you're going to give me." And you would either have to
3    explain it away or you would have to pony up some more
4    money.
5        Q. And was it certain managers that would do that?
6        A. Every single manager.
7        Q. What were some of the names of the managers that
8    come to mind?
9        A. Bill Peters, John Tovar, Jestin, it's
10   J-E-S-T-I-N. I don't know his last name. There was the
11   other guy that helped us out that would normally work the
12   weekends but that was the general practice and I --
13   obviously I am under oath, so, I can't say "I swear to
14   you" but if you walked into this club tonight at closing
15   time whenever everybody is kind of melandering [sic] out
16   and the lights are up, you would see a manager either
17   sitting or standing by the front door, which is the only
18   exit, sitting there waiting and when every waitress walks
19   out, they go over and they hand him money.
20       Q. Other than what people told you, what facts do
21   you have to support the fact that that was the policy at
22   the other clubs as well?
23       A. Because they came from the clubs to work at our
24   place because we were the top club out of all the clubs
25   and basically, if they were employed at the other clubs,

Page 30

1   it was them working up to being able to come to work at
2   Treasures.
3       Q. Okay. Is that all?
4       A. And, also, since the other managers also worked
5   at the other clubs, it's -- I mean, I don't know why they
6   wouldn't.
7       Q. And I understand that you would like the Court to
8   make the assumption or to agree with you and assume that
9   because it was happening at Treasures that it was also
10  happening at the other clubs, other than that and other
11  than what other people told you, what facts do you have in
12  support of your allegation that it was a policy that was
13  also done at the other clubs?
14      A. I know Bill Peters would talk frequently about
15  the other girls that would make money and make comments to
16  them about, "Well, you used to," you know, "you used to
17  kill on this night. You were my highest tipper over
18  there."
19          MR. VAN HUFF: Object as nonresponsive.
20      Q. (By Mr. Van Huff) Because what I'm asking about
21  is other than what other people told you.
22      A. But that's my manager telling me about other
23  people tipping them.
24      Q. Okay. So, is it anything else other than what
25  other people told you?

Page 31

1       A. That's reliable information to me, so, no.
2          MR. SHELLIST: Let me give you just a quick
3   instruction. Regardless of your personal feelings I guess
4   on the point and respecting Mr. Van Huff's need to -- if
5   he doesn't want to know what people told you, that's his
6   choice. Respect that wish and tell him whatever fits
7   within the confines of your answer with that but don't
8   worry about fussing about it. Just do your best to listen
9   to his question.
10      Q. (By Mr. Van Huff) I'm correct when I say that
11  you never personally never experienced any issues in
12  connection with managers taking 10 percent of tips at
13  Centerfolds, Gold Cup, Trophy Club, Splendor or Cover
14  Girls?
15      A. You're correct.
16      Q. There's an interrogatory answer -- it's
17  Interrogatory No. 5 -- and it has to do with the single
18  integrated business enterprise cause of action and I just
19  want to confirm that this is correct because I see a
20  little bit of an inconsistency and if it's not correct, I
21  just want to get it cleared up because it could be just an
22  error on the part of whoever typed this in. It's called
23  Scrivener's Error. I don't think that anyone
24  intentionally got some of the clubs mixed up but there's
25  so many clubs involved in this particular statement here

Page 32

1   that I want to make sure that we all are on the same page
2   as far as what we think happened or what the plaintiffs
3   allege happened.
4          It says here: "Plaintiff Laura McKnight
5   states that the employee who signed the paychecks or
6   nearly all the clubs employees had an office at Cover
7   Girls"; is that right?
8       A. Umm....
9       Q. Or is what you meant to say here, or did you mean
10  to say "Centerfolds"?
11      A. I'm almost positive it's Centerfolds. It's on
12  Richmond past Wild West.
13      Q. Okay. And that would jive with Rachel Freedman's
14  statement that employees were told to get paperwork for
15  taxes and payroll at Centerfolds?
16      A. Yes.
17      Q. And then I get a little bit further down into
18  this and it talks about Margo Moreno stating that: "If
19  employee had questions regarding payroll taxes, address
20  changes, et cetera, she would contact Gold Cup club"?
21      A. I don't know.
22      Q. At any rate, am I to understand that it's your
23  position that the paychecks, payroll, and matters related
24  thereto were handled out of a centralized location at or
25  near Centerfolds?

Page 33

1       A. Yes, I'm assuming so. I just cannot remember the
2   employee's name.
3       Q. I see. The employee who was in charge of it?
4       A. Right.
5       Q. Okay. But it's your allegation that it was done
6   at a central location at or near Centerfolds --
7       A. Yes.
8       Q. -- on Richmond Avenue?
9       A. Yes.
10      Q. Not at Cover Girls?
11      A. Not that I know of.
12      Q. The 5 percent deducted from the credit card tips
13  at Treasures, do you know one way or another whether it
14  was the same percentage deducted at the other five clubs
15  that are defendants in this case?
16      A. Yes.
17      Q. Other than what people told you?
18      A. No.
19      Q. I'm not going to dwell on this topic for very
20  long and I want you to know that I am not trying to pick
21  on you about it. I'm just trying to understand what was
22  happening, okay, or what you allege was happening.
23          You said that the 10 percent was taken out of
24  your tips and given to managers?
25      A. No. We physically did that. We did it

Page 34

1  ourselves.
2     Q. Okay. So, you took 10 percent out and paid it to
3  managers?
4     A. Yes.
5     Q. Was it always 10 percent, or was it just
6  approximately 10 percent?
7     A. It was 10 percent or more.
8     Q. Okay. Was it ever less than 10 percent?
9     A. Occasionally if it was -- it was not even
10 occasionally -- it would be very infrequently because you
11 would have to explain why and then you would be indebted
12 to the manager and that means the next time you tipped him
13 you owed them more.
14    Q. Who would do the calculation to determine how
15 much there was to take 10 percent of?
16    A. It would be the managers and at any point in
17 time, they could go behind the bar and request my tabs and
18 flip through them to double-check. So, if I attempted to
19 short them and not give them 10 percent, they could go
20 back behind the bar and look at my tabs and estimate what
21 they should be receiving.
22    Q. What percentage of the transactions were credit
23 cards as opposed to cash?
24    A. About 95 percent. Well, on most nights -- on
25 most nights in excess of 95 percent. Very few

Page 35

1  transactions were cash.
2     Q. Okay. So, if the vast majority were credit cards
3  and it would be very easy for a manager to keep track of
4  the credit card tips?
5     A. Oh, definitely.
6     Q. Because it's just a matter of adding up the
7  numbers, right?
8     A. Right. And the amount of cash that we would make
9  wouldn't, you know, I mean 5 bucks here or there as far as
10 the percentage, you know, if we made $20 in tips or even
11 $50 in tips, it wouldn't affect, you know, our credit card
12 tips significantly.
13    Q. During a normal shift or during a shift that went
14 until 2:00 o'clock in the morning, how much would you
15 expect to make per night in tips? What was the range?
16    A. The range was anywhere from $8 up into I think
17 the most I ever made was $2,000.
18    Q. So, you would make as much as $2,000 in one
19 night?
20    A. That was the most I ever made. It was not --
21 those were the outliers.
22    Q. Were the cash tips reported on your IRS form?
23    A. To my knowledge, what the club reported was the
24 only thing we were able to report.
25    Q. So, in other words, whatever the figure was on

Page 36

1  the paperwork you received from the club was the figure
2  that you would use on your taxes?
3     A. Yes.
4     Q. Do you know whether the paperwork that you
5  received from the club regarding your tips reflected cash
6  tips?
7     A. I do not know that. Although I do know that it
8  did not reflect the 5 percent that they took out or the 10
9  percent that they required for the managers or the 15
10 percent or the other percentage for the barbacks. So, it
11 was -- if I had a thousand dollars total tips for the
12 night, I wasn't walking out with a thousand dollars. It
13 was roughly 35 percent less than a thousand dollars but,
14 yet, they reported to the IRS that I would make that
15 thousand dollars.
16       MR. VAN HUFF: Object to the unresponsive
17 narrative.
18       MR. SHELLIST: You tried. I'm laughing a
19 little bit on the record.
20       MR. VAN HUFF: It's technical stuff. Believe
21 me. He does the same thing --
22       MR. SHELLIST: Don't blame me.
23       MR. VAN HUFF: -- when he's asking questions.
24 Oh, I will.
25    Q. (By Mr. Van Huff) One of your allegations is

Page 37

1  that any cost associated with credit card processing fees
2  was paid for out of money that the club received from
3  dancers.
4     A. Yes.
5     Q. You're aware that you have that allegation in
6  your lawsuit?
7     A. Yes.
8     Q. Other than what people told you, what facts are
9  you aware of in support of that allegation?
10    A. Well, really it's simple math. If I had a
11 hundred-dollar tip and they were taking out 5 percent for
12 their house fee, for their credit card processing fee,
13 but, yet, if there were dances on that same tab and, say,
14 there were $6,000 worth of dances divided by $25 each, the
15 dancers only get paid $20. So, there's an extra $5 for
16 each dance. And, so, I would think that that would more
17 than cover any credit card processing fee.
18    Q. Okay. Isn't it fair to say that Treasures gets
19 to make the determination as to what the $5 covers or
20 doesn't cover, the $5 per dance?
21       MR. SHELLIST: Object to the form but you can
22 answer.
23    Q. (By Mr. Van Huff) Maybe Treasures' profit from
24 the sale of alcohol should go to cover the credit card
25 processing fees under your analysis, right?

Page 38

1    A. It was just how it was explained to me. It's not
2  my analysis.
3    Q. And I'm asking you to explain it without regard
4  to what other people told you.
5    A. It was what management informed me of when I was
6  trained that that's what the fee was for and, so, because
7  there had been a large lawsuit involved with the extra $5
8  and that when a client or customer would ask, you know,
9  "Why is it $20 cash and $25 when I pay for my credit
10 card," we were instructed to tell them that it is a credit
11 card processing fee.
12   Q. Okay. So, I guess other than what other people
13 told you, you don't have any facts to support your
14 contention that the $5 would go to credit card processing
15 fee, the $5 per dance?
16   A. No.
17   Q. This allegation regarding the 10 percent for the
18 managers --
19   A. Yes.
20   Q. -- do you allege that any of that money was
21 paid -- that any of the 10 percent was paid by waitresses
22 including yourself to George or David Davari?
23   A. I don't know.
24   Q. Are you aware of any facts that demonstrate that
25 either of the Davaris were aware of the 10 percent being

Page 39

1  paid to the managers?
2    A. Absolutely.
3    Q. What facts, other than what people told you?
4    A. That David mainly — George was in there
5  sometimes -- would be at the club usually by midnight and
6  would come down either around 2:00 or around 4:00 when we
7  were closing and they would come over and talk with the
8  managers while we would be going up and giving them money.
9  So, they were fully aware because we were handing them
10 money.
11   Q. Okay. So, you would sometimes see one of the
12 Davari brothers in the vicinity when you were doing the
13 payments to the managers?
14   A. Yes.
15   Q. And based on that, you draw the conclusion that
16 they were aware of it?
17   A. They were having a conversation with managers
18 when this would occur.
19   Q. Okay. Is there anything else, other than what
20 people told you?
21   A. I'm also aware that they watched the cameras.
22 The owners both watched the cameras that are everywhere
23 and that they see everything that goes on in the club, so.
24   Q. Did either of them ever tell you that you had to
25 pay 10 percent to the managers, either of the Davari

Page 40

1  brothers?
2    A. I've only had a very brief conversation with the
3  owners, and it was not in regards to tip out.
4    Q. Okay. So, the answer to my question would be
5  "no"?
6    A. It would be "no."
7    Q. Have you ever been a plaintiff or a defendant in
8  a lawsuit before? I forgot to ask you that question
9  earlier. That's why it's out of place.
10   A. No. I got in a car accident once and I pursued
11 reimbursement for my injuries; but other than that, no.
12   Q. Was there a lawsuit, or was that just with the
13 insurance company?
14   A. It was with the -- I had a lawyer and it was with
15 the insurance company but we never got to this point or
16 anything like that.
17   Q. So, you didn't have to give a deposition?
18   A. No.
19   Q. Was it in Harris County or Galveston County?
20   A. It wasn't Galveston County. I think it was
21 Harris County.
22   Q. I'm reading a portion of your Answer to
23 Interrogatory No. 9. "Plaintiff Laura McKnight states
24 that the Defendants also required employees to pay for
25 spillage and breakage."

Page 41

1    A. Yes.
2    Q. Were you ever required to pay for spillage and
3  breakage?
4    A. Yes.
5    Q. Will you please explain that dynamic to me.
6    A. I was a waitress. We were required to carry
7  trays of drinks. If someone bumped into us, even if it
8  was an employee or a customer and the drinks either tipped
9  over and spilled or the entire tray got dropped, we were
10 not given any spill tickets or allowances to be able to
11 get a new tray of drinks without having to pay for them.
12 So, basically if I spilled a drink, I had to pay for it.
13   Q. If you had a table of customers that opened a
14 tab, who would keep track of how many drinks that they
15 were ordering?
16   A. Me myself the waitress.
17   Q. And in what way would the bartender keep track of
18 that, if at all?
19   A. They wouldn't.
20   Q. It seems curious to me the -- under that
21 scenario, could a -- and this doesn't relate to you at
22 all. I'm not trying to imply anything -- but could a
23 waitress conceivably order twice as many drinks as she
24 marked down on a customer's tab and the bartender wouldn't
25 know about it one way or another because he's not keeping

Page 42

1  track of it?
2      A. I don't -- I don't know.
3      Q. Do you see my point, though?
4      A. Yes.
5      Q. In other words, the bartender wouldn't know
6  whether or not, you know -- the bartender is not keeping
7  track of how many drinks you're getting from him.
8      A. Right.
9      Q. And he's not keeping track of what you're writing
10 down on his tab.
11     A. Right.
12     Q. Then it's the waitress is the one who is being
13 entrusted with accurately keeping track of the drinks
14 received from the bartender and served to the patrons,
15 correct?
16     A. Correct.
17     Q. So, if a waitress were to spill six drinks and
18 not write them down on the tab, then the waitress wouldn't
19 be paying for spillage or breakage, would she?
20     A. Well, don't you think as a customer you would
21 notice if your tab was $60 higher than it should be?
22 Actually, it would be --
23     Q. Well, that's a question but --
24     A. -- twice as much. I mean, it would be $120
25 rather than a 60-dollar tab.

Page 43

1      Q. Well, for example, if someone has got a zero tab
2  and a waitress goes to the bar and gets $15 worth of beers
3  and then drops the tray and then goes back to the bar and
4  gets another $15 worth of beers and only writes $15 on the
5  tab and gives the ones that aren't spilled delivers to the
6  customers, then that would absolve a waitress of spillage
7  or breakage charges, wouldn't it?
8      A. But that's dishonest.
9          THE REPORTER:  I'm sorry?
10     A. That's dishonest.
11     Q. (By Mr. Van Huff) How is it dishonest if the
12 drinks were never delivered to the customer in the first
13 place?  Wasn't this the procedure if there was spillage or
14 breakage?
15     A. No.  The procedure is if I dropped a tray of
16 drinks, I would open up my caddy and pull out money, buy a
17 new tray of drinks and I would eat the cost or I would ask
18 whoever bumped into me to reimburse me for the tray of
19 drinks that I dropped which never happened.
20     Q. Was that a written policy, or is that just the
21 way that you did it?
22     A. No.  This came down from the Davaris that there
23 were to be no more spill tickets, no more compensation
24 because the managers and entertainers were abusing the
25 privileges.

Page 44

1      Q. So, there used to be a privilege?
2      A. Before I worked there.
3      Q. Do you know when it changed?
4      A. It changed before I worked there.  Because they
5  would always talk about, "Well, we used to do it this way;
6  but now we do it this way."
7      Q. How often were you spilling and breaking things?
8      A. I would say at least once a week.  I mean, it's a
9  very busy place.
10     Q. So, just -- you know, can you just give the Court
11 an idea of how much money per month on average you were
12 paying for spillage and breakage?
13     A. Upwards of a hundred dollars.
14     Q. Do you have any documentation to support that
15 claim?
16     A. No.
17     Q. It says here:  "Neglected to pay overtime wages"?
18     A. Yes.
19     Q. Just with regard to you, what's the basis for
20 that allegation?
21     A. During Super Bowl, we worked basically from the
22 club -- the time the club opened till the time the club
23 closed the entire week and were not paid overtime, we
24 were -- if we were getting close to our hours, "You either clock
25 would pull us aside and say, you know, "You either clock

Page 45

1  out but you're not going to have over 40 hours."  And so,
2  we were asked to clock out so that we would not be over 40
3  because they were not paying us overtime.
4      Q. Okay.  If there was an occasion where your
5  documented hours are run over 40 a week, the documented
6  hours that were sent to payroll, would your check, in
7  fact, reflect the 42 hours?
8      A. No.
9      Q. Okay.  Because I'm trying to draw a distinction
10 between two different things.  What you just told me is
11 that managers would instruct you to go off the clock prior
12 to clocking 40 hours and that they would continue to
13 require you to work?
14     A. Yes.
15     Q. And that you wouldn't get paid at all for those
16 hours that you worked over 40?
17     A. Right.
18     Q. Okay.  So, that's one scenario where a manager
19 says, "Just hit 40 hours.  Clock out but keep working,"
20 right?
21     A. Yes.
22     Q. And then the other scenario is that you clocked
23 42 hours and the time clock sheet goes to payroll, and
24 then are you saying that payroll would short you the two
25 hours?

Page 46

1    A. Well, they wouldn't pay overtime. So, you'd get
2  paid for 40 hours.
3    Q. Even if you had 42 hours documented?
4    A. (Witness nods head affirmatively.)
5       MR. SHELLIST: You have to answer
6  affirmatively.
7    A. Yes.
8    Q. (By Mr. Van Huff) Do you have any documents in
9  support of that allegation?
10   A. I do not.
11   Q. To what extent were you working overtime and not
12 getting paid for it? You talked about during Super Bowl,
13 but Super Bowl is a one-day event.
14   A. No. It was about a two-week event. Not every
15 everybody could fly in about at the same time.
16   Q. You're referring to Super Bowl when the Super
17 Bowl was here?
18   A. When it was here, yes.
19   Q. Okay. Other than that period of time.
20   A. OTC, the oil convention -- I think they're still
21 currently in town -- it's an extended event that lasts for
22 about a week and a half where people are coming in and
23 there's a lot of business. And, you know, people are
24 expected to work.
25   Q. Okay. Other than the two-week period when Super

Page 47

1  Bowl was in Houston and other than the annual OTC event,
2  just regular normal week to week work at Treasures were
3  you being required to work overtime that you weren't
4  getting paid for?
5    A. I know that they discouraged overtime, so.
6    Q. I'm just talking about you.
7    A. Me personally, no, I did not.
8       MR. SHELLIST: When you're ready to take a
9  break -- you want to take a break and I'll ask my client
10 about these issues and we can come back in five or ten?
11      MR. VAN HUFF: Yeah. In fact, why don't we
12 take 15 and then I'll, you know -- we'll take a 15-minute
13 break. Let's go off the record.
14      (Break from 3:30 p.m. to 3:52 p.m.)
15      MR. VAN HUFF: Back on the record.
16   Q. (By Mr. Van Huff) During your employment with
17 Treasures, do you recall signing a form acknowledging that
18 tipping of managers was voluntary?
19   A. I do not recall.
20   Q. On a typical shift how many waitresses would be
21 on duty?
22   A. Anywhere from five to I think the most was like
23 62.
24   Q. And what would the range be as far as managers on
25 duty?

Page 48

1    A. They had to have at least two managers on duty at
2  all times in case TABC or vice came in and a manager had
3  to go to jail.
4    Q. I think earlier I heard you use the term "general
5  manager." Were there certain individuals who were during
6  your employment with Treasures who were -- who that job
7  title applied to, general manager?
8    A. The only person that carried general manager
9  would be Mitch and he was a day manager. So, I didn't
10 generally work with him unless, like I said before, a
11 manager had been taken to jail and they needed to fill in
12 and, also, if I could add, when you were describing the
13 drinks and how, you know, how would the bartender know
14 whether I had put more drinks or anybody else had put more
15 drinks on the tab and I had explained that I'd have to go
16 into my caddy and pull out more money, the only way that
17 the bar served us drinks is if we paid for them first.
18 So, basically, you know, if someone were to bring six
19 drinks to a table but dropped them on the way, they would
20 have to pay for six more drinks and basically if you did
21 not have the money, you couldn't buy them.
22   Q. I see. So, if a customer sitting at a table
23 started a tab with a credit card and then ordered a beer,
24 the waitress would go to the bartender and give him $5 for
25 the beer or whatever it cost, get the beer, and then take

Page 49

1  it to the customer and then mark it on the tab?
2    A. Yes.
3    Q. What would happen if the amount got -- what would
4  happen if someone ran a tab that was just a lot larger
5  than the amount of cash that a waitress would carry with
6  her?
7    A. We were required to fill out banks which like at
8  the beginning of the night, I'd usually start with a
9  hundred-dollar bank and it was basically an IOU form and
10 the bartenders would keep track of those but I think what
11 you were referencing to was what prevents a waitress from,
12 you know, basically tallying up a thousand dollars worth
13 of drinks when a guy had only had two drinks or three
14 drinks. Basically, at the end of the night we needed to
15 pay the money back.
16   Q. So, you weren't giving cash necessarily to the
17 bartender. You were giving the bartender an IOU form and
18 that's how he would keep track?
19   A. No. If we ran out of money, we'd give them
20 another IOU. They'd give us more money but at the end of
21 the night, they tallied up the IOUs and, you know, like if
22 I had $500 worth of banks, I would have to -- they would
23 take that out of the credit card tabs like, say, that was
24 the only money that I had made was off of credit cards,
25 you know, say, they'd pay me back $700 but they'd subtract

Page 50

```
 1   the $500 out of banks and I'd walk away with $200 after
 2   they took out all the tip out thing.  That was the process
 3   of getting paid out but basically if I, you know, if I had
 4   tallied up more drinks than I had sold, I wouldn't get
 5   that money back and I would have to go to the ATM and give
 6   them money because I wouldn't have it.
 7      Q.  I understand.
 8      A.  Okay.
 9      Q.  How much money do you think Treasures owes you
10   for the wrongful practices that you've alleged in this
11   case?
12      A.  I don't know.  I haven't sat down to think of
13   that.
14      Q.  You think it's more than $20,000?
15      A.  I don't know.
16      Q.  You think it's more than $5,000?
17      A.  I think over the course of seven years of paying
18   out 5 percent plus 10 percent to the managers, absolutely.
19      Q.  So, am I to understand that at the end of your
20   shift the bartender would look and see what your credit
21   card tips were, take out the 5 percent for the credit card
22   processing fee or the 5 percent that's in dispute I guess
23   in this case and then hand you the difference in cash?
24      A.  No.  They would tally all the tabs and also, you
25   know, reimburse us for the drinks, the cigars, the food,
```

Page 51

```
 1   anything additional that we had added on there, if we gave
 2   someone $5 to pay valet, they would reimburse for those
 3   charges and then add in the tip.  So, if somebody had,
 4   like, a 400-dollar bar tab, you know, $60 worth of cigars,
 5   $60 worth of food, valet, they would tally all that up
 6   plus the tip on all of our tabs and pay us out that amount
 7   minus the banks, minus the 5 percent to the house, minus
 8   the 15 percent and then we would tip the managers the 10
 9   percent and then the barbacks the 5 percent.
10      Q.  Okay.  So, whatever tips you were owed less the
11   deductions and the reimbursements were paid to you at the
12   end of your shift?
13      A.  Yes.
14      Q.  Did you ever have to pay the club for a walked
15   tab?
16      A.  Yes.
17      Q.  Please explain how that worked.
18      A.  There were several occasions where I had waited
19   on people and they had left and the club did not reimburse
20   me for the amount in drinks that I had bought.
21      Q.  Wouldn't there have been a credit card tab,
22   though?
23      A.  Not necessarily.  You know, as a group of people
24   comes in and they order, you know, however many shots and
25   drinks, we would go up to the bar and get it and once
```

Page 52

```
 1   the -- you know, once the drinks crossed the bar and hit
 2   my tray and I walked away with them, they were now my
 3   personal drinks and, so, until I found that group of
 4   people and got my money from them and handed them their
 5   drinks, I was out that money.
 6      Q.  But if you had delivered the drinks to them and
 7   they were cash customers, wouldn't they pay for their
 8   drinks as they went?
 9      A.  Yes.
10      Q.  So, you're talking about cases where you went to
11   the bar to get the drinks from the bartender and then you
12   couldn't find the customers?
13      A.  No.  They had left.
14      Q.  Or they left?
15      A.  Or they had been escorted out.
16      Q.  So, you couldn't find them?  They weren't there
17   anymore?
18      A.  They left, yes.
19      Q.  How often would that happen?
20      A.  Frequently.  It's a club.
21      Q.  Did you ever have to pay anybody cash in an
22   envelope?
23      A.  What do you mean by that?
24      Q.  Did you ever have to reimburse the club for tips
25   that you were paid at the end of the shift for credit
```

Page 53

```
 1   cards that later turned out to be uncollectible for
 2   whatever reason?
 3      A.  No, but I did have to ask clients to pay
 4   entertainers in cash because their tab was being held and
 5   any dances that they did would be kept by the club.  So,
 6   basically they would not get paid at the end of the night.
 7   So, I would have to request that the customer pay in cash
 8   so that way they could go home with money to pay their
 9   bills.
10      Q.  Okay.  What I have here are some documents that
11   your attorney produced in response to a Request for
12   Production that I sent him and it looks like what he did
13   was segregate these documents by plaintiff.  So, I've got
14   some documents with your name on them here.
15      A.  Okay.
16      Q.  And I just want to go through them so I can
17   figure out what the relevance is of these documents to the
18   lawsuit, if any, because they don't come with an
19   explanation.
20      A.  Okay.
21      Q.  So, I have documents McKnight 1 through 23.
22   McKnight No. 1 appears to be a blank tab sheet.
23      A.  Yes.
24      Q.  Is that what they would refer to these as "blank
25   tab sheets"?
```

Page 54

1    A. They were just tab sheets.
2    Q. And, so, how were these utilized by you at
3  your waitress job at Treasures?
4    A. I would -- any customer that was opening up a
5  credit card tab would basically sign here where it's X'd
6  and that meant that they agreed to the $25 to pay the
7  dancer and that the dancer would only receive $20 and we
8  would explain to them that although it's approximately 10
9  to 15 dances per hour that, you know, each dancer may
10 decide to charge more an hour and that would be something
11 that they would have to find out.
12   Q. Okay. Now, I note that it says that the value of
13 the table dance is $25 processed through the club; but
14 this form itself doesn't say anything about the club
15 retaining $5, does it?
16   A. No. It was something that we were instructed to
17 tell the client that it was the processing fee.
18   Q. Okay. For now we're just trying to talk about
19 what's on the form, okay?
20   A. Okay.
21   Q. Now, as far as the allegations you've made in
22 this case against Treasures, is there any particular
23 significance that we need to talk about with regard to
24 this blank tab sheet form?
25   A. Not that I know of, no.

Page 55

1    Q. All right. McKnight No. 2 is a document that you
2  produced, and it is a Waitress Cashier Bank. Can you
3  please tell me a little bit more about this?
4    A. This is a bank sheet or basically that was what
5  we called our bank. At the beginning of the night, we
6  wouldn't bring in our own money. We would fill out this
7  piece of paper and it was a duplicate. So, we would tear
8  off the top copy and give it to the bartender and we would
9  keep the bottom copy, which obviously this is my copy of
10 my bottom copy that I used with Bartender Chris that night
11 to give me cash so I could start buying drinks.
12   Q. Okay. McKnight No. 3, can you tell me what this
13 is, please?
14   A. We were required to purchase lockers every single
15 year. Basically it was a rental fee but if we did not pay
16 that fee, the lock would be cut off our locker and
17 anything that was inside would be thrown in the trash.
18   Q. Okay. McKnight No. 4?
19   A. Okay. This is -- basically the tabs were always
20 kept folded like this and that's the way that I made the
21 photocopy. This is the credit card voucher that the
22 customer would sign with the total, the tip and the grand
23 total. Underneath this photocopy is a dance ticket and
24 then it's on top of the tab.
25   Q. Okay. Now --

Page 56

1    A. I'm sorry. This highlighted portion is, you
2  know, what my tip was and there should be a second portion
3  that goes along with this. It should be stapled.
4    Q. McKnight No. 5?
5    A. Yes. This is the whole entire tab sheet that
6  would be that copy folded over. Basically the total of
7  the beverages was 975. The dances were $50 and the
8  subtotal would be 5975. This bartender would write our
9  grand total for our tabs over here minus the banks and
10 that would be the total we'd get paid out that night.
11       Down here was a 10-dollar tip. So, on this
12 tab I think he wrote that I got paid 950 on the tip and,
13 so, off of this total tab when you subtract out the
14 drinks -- I'm sorry when you add the drinks plus my
15 remaining tip, that's what I would get paid on that
16 specific tab but that was the grand total of my tabs for
17 that night that I got paid out.
18   Q. Okay. I got some more tabs and tab sheets
19 numbered McKnight 7 and McKnight 20 that you produced and
20 what I'd like you to do is take a look at these and go
21 through them and if they're basically just the same thing
22 as what we just went through --
23   A. Yes.
24   Q. -- then there's no point in us talking about each
25 one of them but if any of them are of particular interest

Page 57

1  as to any of your allegations in this case other than
2  what's obvious on the face of them that -- there's 5
3  percent was taken out of your tip, for example, on the
4  other one, then I'd like you to let me know about it so we
5  can talk about it.
6    A. This was the manager's signature that I was
7  telling you about that happens on every tab. He signed
8  the --
9        MR. SHELLIST: Tell him what number document
10 you're looking at.
11       THE WITNESS: Oh, I'm sorry.
12   A. It's McKnight 007. On the left-hand side by the
13 sale amount is a scribble which is actually the manager's
14 signature and on McKnight 008 there's a scribble down by
15 the charge total and the manager approval where that's
16 also signed. Also on McKnight 009 next to the tip amount,
17 that's also initialed by the manager and over where it
18 says "tab number," it's -- nevermind. On McKnight 0011
19 the manager has also signed the tab. Do I need to read
20 all of them?
21   Q. (By Mr. Van Huff) No, if they're just tabs with
22 manager's signatures on them and they were examples of
23 tabs that you would normally create on a day-to-day
24 basis --
25   A. Yes.

Page 58

1    Q. -- then if that's all they are, then that's fine.
2    A. These are all tabs from the same date which I had
3 already explained to you that they're totaled on that
4 first sheet as to how much I made that night and how much
5 I was paid by the bartender which proves that I only got
6 the money less the 5 percent that the house gets.
7    Q. Right.  And that's kind of what I'm interested in
8 knowing with regards to these documents is that none of
9 them are a document that say, "Aha, this proves that I had
10 to pay for spillage," or anything like that other than the
11 5 percent credit card issue?
12    A. Right.  Well, the spillage would not be notated
13 on here because I would have to pay for it and eat the
14 cost and the customer would not be charged for that.
15    MR. VAN HUFF:  Those three issues that we
16 talked about.
17    MR. SHELLIST:  Yeah, the deal on the job, you
18 and I can discuss later but we're going to object to that
19 and you can ask the Court if you think that's important.
20 We don't need to go over it on the record unless you want
21 to.
22    MR. VAN HUFF:  Generally can you tell me what
23 kind of work it is?  Is it in the hospitality industry or
24 is it something else?
25    THE WITNESS:  I'm pursuing a professional

Page 59

1 career that has nothing to do with the club industry
2 anymore, and I do not want to associate the two.
3    MR. VAN HUFF:  That's fine.  It's not my
4 intent to interfere with your future plans or whatever.
5 So, I'm satisfied with that answer.
6    MR. SHELLIST:  If we need to go more
7 specifically on that, I'll see what I can do.
8    On the e-mail stuff I understand the desire
9 for the information.  We're going to object to providing
10 it now, however, if you feel the need to go to the Court,
11 you and I can discuss, perhaps, a protocol that would
12 protect her family's privacy interests because it's a
13 joint e-mail used by others in the family and that
14 protocol would -- I'd have to give a little bit more
15 thought -- but it would be akin to other protocol and
16 other --
17    MR. VAN HUFF:  Stretched terminologies,
18 things like that.
19    MR. SHELLIST:  Exactly, that's it.  So, you
20 know, I'm not saying we have to fight about it at the
21 court, per se, but if you have to have it, we'll talk
22 about a protocol and if your client can live with it,
23 great and if we need the judge to talk to us about it, we
24 can do that, too.
25    MR. VAN HUFF:  That's fine.

Page 60

1    MR. SHELLIST:  So, that's where we are in
2 those two things.
3    MR. VAN HUFF:  Would you mark this as an
4 exhibit, please.
5    (L. McKnight Exhibit No. 1 was marked.)
6    Q. (By Mr. Van Huff) I'm going to hand you what's
7 been marked as Exhibit 1, and it's the Declaration that
8 you signed which was attached to your Motion for Notice to
9 Class Members.  Do you recognize that?
10    A. Yes.
11    Q. I'm going to read it over myself and stop if I
12 have particular sections that I'd like to clarify, all
13 right?
14    A. Yes.
15    Q. (By Mr. Van Huff)  In the second paragraph of the
16 part that's in quotations, it says that:  "D. Houston,
17 Inc., D/B/A Treasures is owned by Ali and Hassan Davari."
18 Would you have reason to dispute the fact that D. Houston,
19 Inc., is actually owned by another corporation?
20    A. I don't understand what you mean by that.
21    Q. D. Houston, Inc., is a corporation which is owned
22 by another corporation.
23    A. I don't know anything about that.
24    Q. Okay.  Then that's fine and, likewise, you
25 probably aren't aware of any facts with regard to the

Page 61

1 corporate ownership of the other clubs listed here?
2    A. I just -- my knowledge is that they're all clubs
3 owned by George and David Davari.
4    Q. Okay.  I guess is that knowledge solely based on
5 things that other people have told you?
6    A. Management, yes.
7    Q. You didn't go on the Secretary of State's website
8 to determine who the actual corporate owner of the
9 corporations was, correct?
10    A. No.
11    Q. So, you're not really sure of the state regarding
12 the ownership of the clubs is correct or not?
13    A. To my knowledge, it is correct.
14    Q. Here you say like the third line up from the
15 bottom the first page:  "This practice of charging more
16 than actual credit card conversion fee was standard and
17 happened the whole time I worked for the Davaris."
18    Do you acknowledge that deducting an amount
19 equivalent to the credit card conversion fee is lawful?
20    MR. SHELLIST:  Object to the form of the
21 question but you can answer it.
22    A. I don't know.  What do you mean by "conversion
23 fee"?  I mean, I didn't write this myself.
24    Q. (By Mr. Van Huff) Who wrote it?
25    A. My lawyer drew up these legal documents.

Page 62

1    Q. Credit card conversion fee would be the fee that
2  the club has to pay the credit card company to process and
3  liquidate the credit card amount, charge amount.
4    A. Okay. I've worked for many establishments in the
5  food and bar industry, and I have never had to pay a
6  credit card processing fee. Never. Only from my time
7  working for the Davaris did I ever have to pay a credit
8  card processing fee.
9    Q. Okay. And so, I guess -- well, that's fine.
10       Now you say here: "I heard from other
11  employees that this type of deduction was standard in each
12  of the clubs the Davaris owned," and this starts on the
13  first page and ends on the second page.
14    A. Yes.
15    Q. Aside from what people told you, are you
16  personally aware of any facts that independently support
17  this allegation that the deduction was standard at each of
18  the Davari clubs?
19    A. No.
20    Q. Did anyone ever instruct you to tell customers
21  that $5 of the $25 that they were being charged per dance
22  for credit card dances was then being paid to the club?
23    A. Yes. It was a processing fee that the house kept
24  the $5.
25    Q. But my question was: Did anyone ever instruct

Page 63

1  you to tell the customers that?
2    A. Yes, the managers.
3    Q. Like Mitch Cook and the other managers?
4    A. They had a manager meeting that all the staff was
5  required to attend where they said that, "This is exactly
6  what you tell the customers."
7    Q. Okay. What did they tell you?
8    A. That to tell the customers that the $5 extra was
9  for a processing fee.
10    Q. Okay. How do you know that the 5 percent that
11  they deducted from your tips, the 5 percent at issue in
12  this case, how do you know that that was reported as
13  income on your W2?
14    A. That it was not?
15    Q. That it was.
16    A. It was not.
17    Q. I thought you --
18    A. Oh, I'm sorry. I'm sorry. It was not included
19  in the W2 because the --
20    Q. Well, hold on for a second. Can we back up?
21  Because I think that there may be some confusion.
22    A. Okay.
23    Q. I'd like to clear up the confusion.
24       So, if we have 5 percent of your credit card
25  tips being deducted --

Page 64

1    A. Right.
2    Q. -- from the amount of money that you got at the
3  end of every shift, is it your allegation that that 5
4  percent was included in the amount reported to the
5  government as your income on your W-2?
6    A. Because every two weeks --
7    Q. That's just a yes or no.
8       They took 5 percent out of your credit card
9  tips. Was that 5 percent included in the income that they
10  reported on your W-2?
11    A. Yes.
12    Q. How do you know that?
13    A. Because every two weeks we would get a paycheck
14  stub and if I added up all of my credit card tips for that
15  past week, it would equal the amount that was shown on my
16  paycheck stub which was thus reported at the end of the
17  year to the IRS.
18    Q. And you were adding up your credit card tips
19  pre-5-percent deduction?
20    A. Yes.
21    Q. And do you have any documentation to support
22  that?
23    A. All my W2s. I don't keep my -- I mean, the only
24  paystubs that I have are in your exhibits.
25    Q. Okay.

Page 65

1    A. And it does not include the amount that I tipped
2  out, hence, why I consulted a lawyer because I was being
3  taxed on more money than I had received.
4    Q. And so, for us to confirm that, we would just
5  need to take your credit card tip information for a
6  particular pay period and compare it to your W-2?
7    A. It should be on that last paystub and the total
8  of the tab tip amounts that are currently in your
9  possession should equal the amount on -- for that entire
10  week, the entire two-week period of time of when those
11  tabs were written. So, all of those tabs should equal the
12  amount that is on my paystub which was reported.
13    Q. So, the paystub that I have and those tip sheet
14  documents that we were just talking about a few moments
15  ago --
16    A. Right.
17    Q. -- those tip sheet documents all relate to that
18  same paystub?
19    A. Yes.
20    Q. Got it. See, I didn't know that.
21       It says here: "As far as how waitresses and
22  bartenders got paid, we often had to wait to get paid on
23  tips on larger credit card charges."
24    A. Yes.
25    Q. Can you explain that to me, please?

Page 66

1    A. As for the instance that I mentioned before of
2  the night that I made $2,000, I wanted to get paid out at
3  the end of the night and management directed me that I was
4  not able to be paid out because the tip was so large that
5  they were afraid that it would be a charge back because
6  the tab was roughly $9,000 or so, and they said that if I
7  wanted to speak to George about -- I'm sorry -- David
8  Davari about it that I could.  So, I waited and spoke
9  personally with David about the tab and, you know,
10 respectfully requested that he release the money to me and
11 he stated that if I could get the customer to sign a
12 document saying that he would not contest the charges,
13 then he would release the money to me but I asked him --
14 you know, basically I questioned that if he signed the tab
15 sheet and all the signatures on all of the dance tickets,
16 which I think there was more than 500 dance tickets and
17 they were all full signatures and they're all valid, what
18 difference a piece of paper saying that he would not
19 contest the charges would make and especially since the
20 client was -- you know, had been consuming alcohol all
21 night long and, so, he thought that was a valid point.
22     So, he told me that I had to come back the
23 next day and secure the document and that I would be paid
24 that night but if I didn't get that document from him that
25 I would have to pay back every penny even though I would

Page 67

1  already have to tip out the managers that night and the
2  bartenders and the barbacks.
3      So, I secured the document the next day
4  because the dancer took pity on me, met me out in the
5  parking lot in the Galleria.  I had to drive an hour to
6  secure this document and I turned it in so I would not
7  have to pay back this money.  However, on a different
8  occasion --
9    Q. Hold on for one minute.
10   A. Okay.
11   Q. So, on the occasion that we just talked about,
12 you got your tip money at the end of the night?
13   A. Only because I secured the document.
14   Q. Okay.  But you got your tip money at the end of
15 the night, yes?
16   A. Yes.
17   Q. Was there ever an occasion where you didn't get
18 your tip money at the end of the night?
19   A. Yes.  It was the last month or so that I worked
20 there.  I got a tip but the client was belligerent saying
21 that he was going to -- he was going to cancel his credit
22 card and, so, they held my tip even though it was a small
23 amount.  I think it was roughly $100 or so and, so, they
24 held my -- they held the credit card tip until I think it
25 was the last night that I worked and they finally released

Page 68

1  it to me.
2      However, I had to tip out on that money that
3  I wasn't paid that night to the bartenders to the managers
4  and then the night that I was tipped out the money, I had
5  to tip those managers and the bartender because the
6  managers had to sign the paperwork and the bartender had
7  to pay me.  So, I had to tip twice on that money.
8    Q. Okay.  Anything else other than those two
9  incidents we just talked about?
10   A. And, also, I witnessed --
11   Q. I'm just talking about with regard to you.
12   A. On those two instances, no.
13   Q. I'm just talking about you.
14   A. About me?
15   Q. Yeah.
16   A. No.
17   Q. So, the two instances and that's it?
18   A. That's it.
19   Q. And how long did you work for Treasures?
20   A. Seven years.
21   Q. Okay.  So, in seven years it only occurred one
22 time that you weren't paid on a credit card because there
23 was an issue with whether or not it was going to be a
24 charge back on it?
25   A. Actually, I take that back.  There was a third

Page 69

1  instance that I had to write a letter because there was
2  going to be -- they were afraid that it was going to be
3  disputed because a client's friend had come back the next
4  day with the client and was disputing the charges that
5  were on the tab.  I had to write letters and basically we
6  were told -- even though we had already been paid out --
7  we were told not to spend that money, that we would more
8  than likely have to pay it back that week.
9    Q. Did you have to pay it back?
10   A. We did not have to wind up paying it back because
11 they finally resolved the issue.
12   Q. So, you got paid your tip on the tab that night
13 and you didn't have to pay it back?
14   A. No, I did not have to.
15   Q. Does that cover all of it?
16   A. Yes.
17   Q. Were you ever ordered to bring in cash in an
18 envelope and give it to Morris?
19   A. No.
20       THE REPORTER:  I'm sorry, who?
21       MR. VAN HUFF:  Morris, M-O-R-R-I-S.
22   Q. (By Mr. Van Huff)  It says here: "So, for
23 example, if I earned $100 off of a 500-dollar tab in a
24 night and had the $5 deducted which would leave me with
25 $95 out of which I had to tip out other employees and this

Page 70

1 would leave me with around $70, if the customer charged
2 back the credit card charge of $500, I had to pay back the
3 full amount even though I actually received and kept less
4 since I had paid money out to coworkers."
5     Did that ever actually happen to you?
6 Because we've been through all that and you've not
7 described a situation like that to me.
8     A. I was explaining the process of how charge backs
9 worked.
10     Q. Okay. Understood. So, this never actually
11 happened to you what I just said --
12     A. No.
13     Q. -- in this paragraph? Good.
14     MR. VAN HUFF: Do you have anything you want
15 to talk to me about before I pass the witness?
16     MS. SERPER: No.
17     MR. VAN HUFF: Okay. Pass the witness.
18     MR. SHELLIST: We will reserve our questions
19 until the time of trial.
20     (Deposition concluded at 4:32 p.m.)
21
22
23
24
25

Page 71

1     WITNESS CORRECTIONS AND SIGNATURE
2     Please indicate changes on this sheet of paper, giving
   the change, page number, line number and reason for the
3 change. Please sign each page of changes.
4 PAGE/LINE     CORRECTION     REASON FOR CHANGE
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25     LAURA MCKNIGHT

Page 72

1     I, LAURA MCKNIGHT, have read the foregoing deposition
   and hereby affix my signature that said is true and
2 correct, except as noted on the previous page(s), and that
   I am signing this before a Notary Public.
3
4
5     LAURA MCKNIGHT

   STATE OF T E X A S     *
6
   COUNTY OF HARRIS     *
7
8     Before me,          , on this day
9 personally appeared LAURA MCKNIGHT, known to me or proved
10 to me under oath or through          (description of
11 identity card or other document) to be the person whose
12 name is subscribed to the foregoing instrument and
13 acknowledged to me that they executed the same for the
14 purposes and consideration therein expressed.
15     Given under my hand and seal of office this
16     day of          ,          .
17
18
19
20     NOTARY PUBLIC IN AND FOR
   THE S
   STATE OF TEXAS
21
22
   My Commission Expires:
23
24
25

Page 73

1     IN THE UNITED STATES DISTRICT COURT FOR THE
       SOUTHERN DISTRICT OF TEXAS
2         HOUSTON DIVISION
3 LAURA MCKNIGHT, TRISHA     *
   TURNER, ANDREW BAKER,     *
4 RACHAEL FREEDMAN, KIMBERLY *
   MCCRAY, and MARGO MORENO  *
5     Plaintiffs,            *
                            *
6 V.                         * Civil Action No. H-09-3345
                            *
7 D. HOUSTON, INC. D/B/A     *
   TREASURES, A.H.D. HOUSTON, *
8 INC. D/B/A CENTERFOLDS,    *
   D.N.W. HOUSTON, INC. D/B/A *
9 GOLD CUP, D. RANKIN, INC.  *
   D/B/A TROPHY CLUB, D WG FM, *
10 INC. D/B/A SPLENDOR,       * Jury Trial Demanded
   W.L. YORK, INC. D/B/A      *
11 COVER GIRLS, AND, IN THEIR *
   INDIVIDUAL CAPACITIES, ALI *
12 DAVARI and HASSAN DAVARI   *
     Defendants.             *
13 ****************************************************
       REPORTER'S CERTIFICATION
14     FOR THE ORAL DEPOSITION
         LAURA MCKNIGHT
15        MAY 11, 2010
   ****************************************************
16     I, Rita Frangullie, Certified Shorthand Reporter in
17 and for the State of Texas, hereby certify to the
18 following:
19     That the witness, LAURA MCKNIGHT, was duly sworn by
20 the officer and that the transcript of the oral deposition
21 is a true record of the testimony given by the witness;
22     That the deposition transcript was submitted on
23        , 2010, to the witness, or to the
24 attorney for the witness for examination, signature and
25

Page 74

1   return to Q&A Reporting, Incorporated by          ,
2   2010;
3       That the amount of time used by each party at the
4   deposition is as follows:
5           MR. AL VAN HUFF - 2 hours 32 minutes
6       That pursuant to information given to the
7   deposition Officer at the time said testimony was taken,
8   The following includes counsel for all parties of record:
9           MR. MARTIN A. SHELLIST, Attorney for Plaintiffs;
10          MR. ALBERT THOMAS VAN HUFF, Attorney for
11  Defendants;
12      I further certify that I am neither counsel for,
13  related to, nor employed by any of the parties or
14  attorneys in the action in which this proceeding was
15  taken, and further that I am not financially or otherwise
16  interested in the outcome of the action.
17      Further certification requirements pursuant to Rule
18  203 TRCP will be certified to after they have occurred.
19  Certified to by me this          day of
20          , 2010.
21
22
            Rita Frangullie,
23          Certified Shorthand Reporter
            in and for the State of Texas
24          Certification No. 7847
            Expiration Date: 12-31-2011
25

Page 75

1       FURTHER CERTIFICATION UNDER RULE 203 TRCP
2       The original deposition was/was not returned to the
    deposition officer on          , 2010.
3
        If returned, the attached Changes and Signature
4   page contains any changes and the reasons therefor;
5       If returned, the original deposition was delivered
    to Mr. Albert Thomas Van Huff, custodial Attorney;
6
        That $          is the deposition officer's
7   charges to the Defendant, TBA No. 24028183 for preparing
    the original deposition transcript and any copies of
8   exhibits;
9       That the deposition was delivered in accordance with
    Rule 203.3, and that a copy of this certificate was served
10  on all parties shown herein on and filed with the Clerk.
11      Certified to by me this day of          , 2010.
12
13
14
15
            RITA FRANGULLIE, Texas CSR, 7847
16          Expiration Date: 12-31-2011
17
18
19  Q&A REPORTING, INCORPORATED
    10220 Memorial Drive, Suite 22
20  Houston, Texas 77024
    (713) 467-7900 - Telephone
21  (713) 467-7911 - Fax
    Registration Firm No. 402
22
23
24
25

**A**

**able** 12:5 30:1 35:24 41:10 66:4
**above-styled** 1:18
**absolutely** 26:25 39:2 50:18
**absolve** 43:6
**abusing** 43:24
**access** 19:12
**accident** 40:10
**accounted** 27:3
**accurately** 42:13
**acknowledge** 61:18
**acknowledged** 72:13
**acknowledging** 47:17
**Act** 7:15
**action** 1:6 31:18 73:6 74:14,16
**activities** 7:10,12
**actual** 61:8,16
**add** 48:12 51:3 56:14
**added** 51:1 64:14
**adding** 35:6 64:18
**additional** 51:1
**address** 6:10 14:20 14:22 32:19
**affect** 35:11
**affirmatively** 46:4 46:6
**affix** 72:1
**afraid** 66:5 69:2
**ago** 10:6 11:6 26:11 65:15
**agree** 30:8
**agreed** 54:6
**Aha** 58:9
**akin** 59:15
**Al** 3:3 10:15,17,21 74:5
**Albert** 2:9 74:10 75:5
**alcohol** 37:24 66:20
**Ali** 1:11 60:17 73:11
**allegation** 21:18 22:5 23:10,16,17

23:23 24:8,12,12 30:12 33:5 37:5,9 38:17 44:20 46:9 62:17 64:3
**allegations** 4:24 7:13 8:3,6 21:10 36:25 54:21 57:1
**allege** 32:3 33:22 38:20
**alleged** 7:18 23:12 23:20 26:7 50:10
**alleging** 24:19,21 26:2,6
**allowances** 41:10
**allowed** 25:17 27:9 27:19
**al@vanhuff.com** 2:12
**amount** 35:8 49:3,5 51:6,20 57:13,16 61:18 62:3,3 64:2 64:4,15 65:1,9,12 67:23 70:3 74:3
**amounts** 65:8
**analysis** 37:25 38:2
**Andrew** 1:3 10:2 73:3
**Andy** 10:20 12:12 14:14 21:20
**and/or** 19:16
**annual** 47:1
**answer** 5:21,24 8:24 15:8,10,13 20:8 31:7,16 37:22 40:4,22 46:5 59:5 61:21
**answering** 6:8 15:10
**answers** 5:2,10
**anticipate** 5:20
**anybody** 48:14 52:21
**anymore** 13:13 18:18 52:17 59:2
**anyway** 10:15
**Appearances** 3:2
**appeared** 72:9
**appears** 53:22
**applied** 26:23 48:7

**applies** 26:15,16
**apply** 26:11
**approval** 57:15
**approximately** 10:5 19:22 34:6 54:8
**April** 9:1 16:3 17:22
**areas** 26:1
**aside** 8:6 26:14,15 27:7 44:25 62:15
**asked** 6:22 11:4,24 21:20 45:2 66:13
**asking** 12:7 13:25 27:11,16 30:20 36:23 38:3
**associate** 59:2
**associated** 37:1
**assume** 6:7 30:8
**assuming** 33:1
**assumption** 30:8
**ATM** 50:5
**attached** 1:25 4:25 60:8 75:3
**attempted** 34:18
**attend** 63:5
**attorney** 2:13 53:11 73:24 74:9,10 75:5
**attorneys** 74:14
**attorney-client** 10:18
**automatically** 25:1
**Avenue** 33:8
**average** 18:19 44:11
**aware** 21:12 37:5,9 38:24,25 39:9,16 39:21 60:25 62:16
**A.H.D** 1:7 73:7

**B**

**B** 28:7
**back** 11:15 17:22 27:23 28:14 34:20 43:3 47:10,15 49:15,25 50:5 63:20 66:5,22,25 67:7 68:24,25

69:3,8,9,10,13 70:2,2
**background** 5:5
**backs** 70:8
**Baker** 1:3 10:3 11:17 12:2,9,22 15:22 73:3
**bank** 49:9 55:2,4,5
**banks** 49:7,22 50:1 51:7 56:9
**bar** 34:17,20 43:2,3 48:17 51:4,25 52:1,11 62:5
**barbacks** 36:10 51:9 67:2
**bartender** 9:25 24:25 25:1,3,13 27:19 28:16 41:17 41:24 42:5,6,14 48:13,24 49:17,17 50:20 52:11 55:8 55:10 56:8 58:5 68:5,6
**bartenders** 49:10 65:22 67:2 68:3
**base** 21:17
**based** 21:4 39:15 61:4
**basically** 4:22 10:23 12:15 17:7 17:10 19:12 24:1 24:24 27:18,20 28:10 29:25 41:12 44:21 48:18,20 49:9,12,14 50:3 53:6 54:5 55:4,15 55:19 56:6,21 66:14 69:5
**basis** 17:9 44:19 57:24
**beer** 48:23,25,25
**beers** 43:2,4
**beginning** 49:8 55:5
**Believe** 36:20
**belligerent** 67:20
**best** 31:8
**beverages** 56:7
**beyond** 13:22

**big** 24:3
**Bill** 22:24 29:9 30:14
**bills** 53:9
**birth** 6:13
**bit** 4:23 5:5 7:1 31:20 32:17 36:19 55:3 59:14
**blame** 36:22
**blank** 53:22,24 54:24
**booklet** 5:9,9
**bottle** 9:13
**bottom** 55:9,10 61:15
**bought** 51:20
**Bowl** 21:24 23:4 44:21 46:12,13,16 46:17 47:1
**break** 14:25 15:11 47:9,9,13,14
**breakage** 40:25 41:3 42:19 43:7 43:14 44:12
**breaking** 44:7
**brief** 40:2
**bring** 48:18 55:6 69:17
**brothers** 39:12 40:1
**brought** 4:15 22:2
**bucks** 35:9
**building** 22:21
**bumped** 41:7 43:18
**busboy** 25:13
**busboys** 25:7
**business** 7:24 8:4 23:14,17,22 24:13 24:16,17 31:18 46:23
**busy** 44:9
**buy** 43:16 48:21
**buying** 55:11

**C**

**C** 2:1
**caddy** 43:16 48:16
**calculation** 34:14
**call** 17:5 28:25

**called** 17:25 23:13
    31:22 55:5
**calls** 20:8,8
**cameras** 39:21,22
**cancel** 67:21
**CAPACITIES**
    1:11 73:11
**car** 40:10
**card** 9:10,11 24:23
    24:25 25:9,22
    26:3,8,17 27:5,10
    27:23 28:15 33:12
    35:4,11 37:1,12
    37:17,24 38:10,11
    38:14 48:23 49:23
    50:21,21 51:21
    54:5 55:21 58:11
    61:16,19 62:1,2,3
    62:6,8,22 63:24
    64:8,14,18 65:5
    65:23 67:22,24
    68:22 70:2 72:11
**cards** 26:9,12 34:23
    35:2 49:24 53:1
**career** 59:1
**careful** 10:14,16
**carried** 48:8
**carry** 41:6 49:5
**case** 1:18 4:15 5:1
    5:11 6:17 7:13
    8:4 10:3 23:22
    26:20 33:15 48:2
    50:11,23 54:22
    57:1 63:12
**cases** 52:10
**cash** 26:16 27:2
    28:8,22,23 34:23
    35:1,8,22 36:5
    38:9 49:5,16
    50:23 52:7,21
    53:4,7 55:11
    69:17
**Cashier** 55:2
**cause** 31:18
**ceased** 18:16
**Centerfolds** 1:8 7:5
    7:7,10,25 8:12
    20:10 22:25 31:13
    32:10,11,15,25

33:6 73:8
**central** 33:6
**centralized** 32:24
**certain** 29:5 48:5
**certificate** 3:5 75:9
**certification** 1:13
    73:13 74:17,24
    75:1
**certified** 1:20 73:16
    74:18,19,23 75:11
**certify** 73:17 74:12
**cetera** 8:1,3 32:20
**champagne** 9:14
**change** 71:2,3,4
**changed** 44:3,4
**changes** 32:20 71:2
    71:3 75:3,4
**charge** 20:7 33:3
    54:10 57:15 62:3
    66:5 68:24 70:2,8
**charged** 58:14
    62:21 70:1
**charges** 43:7 51:3
    65:23 66:12,19
    69:4 75:7
**charging** 61:15
**chat** 15:3 21:8
**chatted** 10:16
**check** 45:6
**choice** 31:6
**Chris** 55:10
**cigars** 9:15 50:25
    51:4
**Civil** 1:6,24 73:6
**claim** 26:1,16 27:13
    44:15
**claiming** 26:20,22
**clarify** 60:12
**Class** 60:9
**clear** 27:8 63:23
**cleared** 31:21
**Clerk** 75:10
**client** 38:8 47:9
    54:17 59:22 66:20
    67:20 69:4
**clients** 53:3
**client's** 69:3
**clock** 19:6,7,9
    44:25 45:2,11,19

45:23
**clocked** 45:22
**clocking** 45:12
**close** 27:21 44:24
**closed** 44:23
**closing** 29:14 39:7
**club** 1:9 7:25 8:17
    10:25 22:2,10,18
    22:19 25:21 29:14
    29:24 31:13 32:20
    35:23 36:1,5 37:2
    39:5,23 44:22,22
    44:22 51:14,19
    52:20,24 53:5
    54:13,14 59:1
    62:2,22 73:9
**clubs** 4:16 5:6 6:16
    8:9 21:11,22,22
    22:5,8,14,16 23:1
    23:2,13,21,21
    24:2 29:22,23,24
    29:25 30:5,10,13
    31:24,25 32:6
    33:14 61:1,2,12
    62:12,18
**cocktail** 9:5,7
**come** 15:25 23:5,7
    29:8 30:1 39:6,7
    47:10 53:18 66:22
    69:3
**comes** 51:24
**comfortable** 15:9
**coming** 21:23 46:22
**comments** 30:15
**Commission** 72:22
**communicated**
    13:3
**communication**
    12:13 14:14 20:9
**communications**
    10:18 12:3,7,8,8
    13:25 14:7,11
    16:10,12
**company** 18:10
    22:20 40:13,15
    62:2
**compare** 65:6
**compared** 7:25
**compensated** 9:19

19:23
**compensation**
    43:23
**completing** 9:16,17
**conceivably** 41:23
**concluded** 70:20
**conclusion** 39:15
**conference-type**
    12:16
**confidential** 12:3
**confines** 31:7
**confirm** 31:19 65:4
**confusion** 63:21,23
**connection** 5:11
    16:2 24:20 31:12
**consideration**
    72:14
**considered** 24:3
**consist** 11:3
**constitute** 23:13
**consulted** 65:2
**consuming** 66:20
**contact** 11:9 15:21
    16:25 17:24 18:12
    32:20
**contacted** 15:22
    17:15 18:5
**contacting** 20:6
**contains** 75:4
**contention** 24:16
    38:14
**contest** 66:12,19
**context** 12:15
**continue** 45:12
**convention** 46:20
**conversation** 5:19
    10:5,7,8,11 11:2
    11:25 12:16 17:13
    39:17 40:2
**conversations**
    11:16 12:2,6,12
    12:15,21 13:22
**conversion** 61:16
    61:19,22 62:1
**Cook** 63:3
**copies** 20:15 75:7
**copy** 55:8,9,9,10
    56:6 75:9
**corporate** 61:1,8

**corporation** 8:1
    60:19,21,22
**corporations** 61:9
**correct** 6:19 9:1
    24:1 31:10,15,19
    31:20 42:15,16
    61:9,12,13 72:2
**Correction** 3:4
    71:4
**CORRECTIONS**
    71:1
**cost** 37:1 43:17
    48:25 58:14
**counsel** 74:8,12
**County** 40:19,19
    40:20,21 72:6
**couple** 5:7
**course** 50:17
**court** 1:1 4:21 5:8
    7:2 30:7 44:10
    58:19 59:10,21
    73:1
**cover** 1:11 8:21
    31:13 32:6 33:10
    37:17,20,24 69:15
    73:11
**covers** 37:19
**coworker** 18:3
**coworkers** 17:7
    18:6,8 22:7,13
    70:4
**create** 57:23
**credit** 9:10,11
    24:23,24 25:9,22
    26:3,8,9,11,17
    27:4,10,23 28:15
    33:12 34:22 35:2
    35:4,11 37:1,12
    37:17,24 38:9,10
    38:14 48:23 49:23
    49:24 50:20,21
    51:21 52:25 54:5
    55:21 58:11 61:16
    61:19 62:1,2,3,6,7
    62:22 63:24 64:8
    64:14,18 65:5,23
    67:21,24 68:22
    70:2
**crossed** 52:1

CSR 75:15
Cup 1:9 7:25 8:14
  21:22 31:13 32:20
  73:9
cups 23:1
curious 41:20
current 6:10 17:3
currently 18:9 21:1
  46:21 65:8
custodial 75:5
customer 27:20,23
  28:6,20,21,22
  38:8 41:8 42:20
  43:12 48:22 49:1
  53:7 54:4 55:22
  58:14 66:11 70:1
customers 9:9
  27:20 41:13 43:6
  52:7,12 62:20
  63:1,6,8
customer's 41:24
cut 55:16

**D**

D 1:7,9,9 2:8 60:16
  60:18,21 73:7,9,9
Damon 6:11
dance 37:16,20
  38:15 54:13 55:23
  62:21 66:15,16
dancer 54:7,7,9
  67:4
dancers 37:3,15
dancer's 9:17
dances 9:12 22:1
  37:13,14 53:5
  54:9 56:7 62:22
date 6:13 16:19
  58:2 74:24 75:16
dates 8:24 14:17
Davari 1:12,12
  38:22 39:12,25
  60:17 61:3 62:18
  66:8 73:12,12
Davaris 38:25
  43:22 61:17 62:7
  62:12
David 22:9 38:22
  39:4 61:3 66:7,9

day 1:19 15:23
  18:24 48:9 66:23
  67:3 69:4 72:8,16
  74:19 75:11
days 18:24,25 19:1
day-to-day 57:23
deal 58:17
dealing 17:10
decide 54:10
decided 10:24
  18:17
Declaration 3:9
  4:24 60:7
deducted 25:22
  33:12,14 63:11,25
  69:24
deducting 26:3
  61:18
deduction 62:11,17
  64:19
deductions 51:11
defendant 40:7
  75:7
defendants 1:12,17
  2:8 6:17 23:21
  33:15 40:24 73:12
  74:11
define 23:24
definitely 35:5
delivered 43:12
  52:6 75:5,9
delivers 43:5
Demanded 1:10
  73:10
demonstrate 38:24
depended 18:22,24
depends 22:21
deposition 1:14,16
  4:14,17 10:2,4
  40:17 70:20 72:1
  73:14,20,22 74:4
  74:7 75:2,2,5,6,7
  75:9
describe 6:20 7:11
described 70:7
describing 48:12
description 3:8
  72:10
desire 59:8

determination
  37:19
determine 34:14
  61:8
difference 50:23
  66:18
different 5:6 25:14
  45:10 67:7
directed 66:3
disclose 21:2
discouraged 47:5
discuss 15:11 58:18
  59:11
discussed 13:17
discussions 21:4
dishonest 43:8,10
  43:11
dispersed 27:4
dispute 50:22 60:18
disputed 69:3
disputing 69:4
distinction 45:9
DISTRICT 1:1,1
  73:1,1
divided 37:14
DIVISION 1:2
  73:2
document 20:12
  55:1 57:9 58:9
  66:12,23,24 67:3
  67:6,13 72:11
documentation
  44:14 64:21
documented 45:5,5
  46:3
documents 46:8
  53:10,13,14,17,21
  58:8 61:25 65:14
  65:17
doing 11:24 39:12
dollars 25:2,9,10
  25:23 36:11,12,13
  36:15 44:13 49:12
door 19:12 29:17
double-check
  34:18
draw 39:15 45:9
drew 61:25
drink 41:12

drinks 9:10 41:7,8
  41:11,14,23 42:7
  42:13,17 43:12,16
  43:17,19 48:13,14
  48:15,17,19,20
  49:13,13,14 50:4
  50:25 51:20,25
  52:1,3,5,6,8,11
  55:11 56:14,14
drive 6:11 67:5
  75:19
driver's 6:13 27:23
  28:15
dropped 41:9 43:15
  43:19 48:19
drops 43:3
due 19:23
duly 1:17 4:6 73:19
duplicate 55:7
duties 9:7,8
duty 9:13 47:21,25
  48:1
dwell 33:19
dynamic 27:1 41:5
D.N.W 1:8 73:8
D/B/A 1:7,8,8,9,10
  1:10 60:17 73:7,8
  73:8,9,10,10

**E**

E 2:1,1 72:5
earlier 10:2 40:9
  48:4
earned 69:23
easy 35:3
eat 43:17 58:13
Edloe 2:14
either 18:11 27:9
  29:2,16 38:25
  39:6,24,25 41:8
  44:25
employed 6:18 9:4
  9:24 13:19 14:6,9
  18:9 21:1 29:25
  74:13
employee 7:16,22
  17:4 21:19 32:5
  32:19 33:3 41:8
employees 14:8

18:7 24:21 32:6
  32:14 40:24 62:11
  69:25
employee's 33:2
employer 23:10
  24:12
employers 8:5
  21:12 22:6
employment 5:5
  7:10,11 8:25 14:5
  15:23 18:15,20
  20:20 22:12,19
  23:16 26:21,24
  47:16 48:6
ends 62:13
enterprise 23:14,18
  23:22 24:4,13,16
  24:17 31:18
enterprises 8:4
  23:25
entertainers 9:12
  22:8 23:2 43:24
  53:4
entire 26:21,24
  41:9 44:23 56:5
  65:9,10
entity 7:24 8:1,2
entrusted 42:13
envelope 52:22
  69:18
equal 64:15 65:9,11
equivalent 61:19
error 31:22,23
escorted 52:15
especially 28:20
  66:19
Essentially 12:19
established 8:9
establishments
  62:4
estimate 34:20
et 7:25 8:3 32:20
event 46:13,14,21
  47:1
everybody 29:15
  46:15
exact 17:8
exactly 22:3,14
  59:19 63:5

examination 3:3
    4:8 73:24
examined 4:6
example 25:20 43:1
    57:3 69:23
examples 57:22
excess 34:25
excuse 17:19
executed 72:13
exhibit 60:4,5,7
exhibits 3:7 64:24
    75:8
exit 29:18
expect 28:13 35:15
expected 9:9 46:24
experience 5:6
experienced 31:11
experiencing 17:8
    17:8
Expiration 74:24
    75:16
Expires 72:22
explain 6:3 27:1,14
    27:16 29:3 34:11
    38:3 41:5 51:17
    54:8 65:25
explained 38:1
    48:15 58:3
explaining 70:8
explanation 53:19
expressed 72:14
extended 46:21
extent 46:11
extra 37:15 38:7
    63:8
e-mail 14:11,20,22
    15:4 59:8,13

F
face 57:2
Facebook 13:2,3,4
    13:6,14,17 14:7
    14:10 15:14
fact 7:22 12:25
    29:21 45:7 47:11
    60:18
facts 21:17 22:4,11
    23:9,15 24:14
    29:20 30:11 37:8

38:13,24 39:3
    60:25 62:16
fair 7:14 16:5 24:6
    37:18
family 11:4 59:13
family's 59:12
far 14:17 20:6 27:2
    28:22 32:2 35:9
    47:24 54:21 65:21
faster 27:16
Fax 2:6,11 75:21
fearful 18:11
fee 24:23 25:22
    37:12,12,17 38:6
    38:11,15 50:22
    54:17 55:15,16
    61:16,19,23 62:1
    62:1,6,8,23 63:9
feel 21:6 59:10
feelings 31:3
fees 37:1,25
fight 59:20
figure 35:25 36:1
    53:17
file 7:21
filed 5:1 75:10
fill 23:5 48:11 49:7
    55:6
finally 6:1 8:21
    17:19 67:25 69:11
financially 74:15
find 52:12,16 54:11
fine 4:4 58:11 59:3
    59:25 60:24 62:9
finished 5:22
Firm 75:21
first 11:19 15:17
    17:13 21:19 25:25
    26:2 43:12 48:17
    58:4 61:15 62:13
fits 31:6
five 4:16 33:14
    47:10,22
fix 20:21
flat 9:22
flip 27:25 28:1
    34:18
float 23:7
fly 46:15

FM 1:9 73:9
folded 55:20 56:6
following 73:18
    74:8
follows 4:7 74:4
food 9:14 50:25
    51:5 62:5
foregoing 72:1,12
Forest 6:10
forgot 40:8
form 21:8 35:22
    37:21 47:17 49:9
    49:17 54:14,19,24
    61:20
formal 21:7
former 18:5
found 52:3
Frangullie 1:20
    73:16 74:22 75:15
Freedman 1:4
    16:21 73:4
Freedman's 32:13
frequently 30:14
    52:20
Friday 22:18
friend 13:2 69:3
friends 13:6,9
front 4:21 29:17
full 25:9,9,10 66:17
    70:3
fully 39:9
further 14:16 16:9
    32:17 74:12,15,17
    75:1
fuss 15:1
fussing 31:8
future 59:4

G
Galleria 67:5
Galveston 40:19,20
general 29:12 48:4
    48:7,8
generalized 14:15
generally 19:1
    48:10 58:22
George 22:9 38:22
    39:4 61:3 66:7
getting 9:12 28:19

42:7 44:24 46:12
    47:4 50:3
girls 1:11 8:21
    30:15 31:14 32:7
    33:10 73:11
give 10:15 14:21
    20:1,9,9 21:6
    25:12 27:22 29:2
    31:2 34:19 40:17
    44:10 48:24 49:19
    49:20 50:5 55:8
    55:11 59:14 69:18
given 4:17 16:24
    17:16 21:19 33:24
    41:10 72:15 73:21
    74:6
gives 43:5
giving 39:8 49:16
    49:17 71:2
glance 28:1
glass 19:13
GMs 23:6
go 4:24 5:1,4 6:3
    17:9 24:25 27:15
    27:24 28:6,17,19
    29:19 34:17,19
    37:24 38:14 45:11
    47:13 48:3,15,24
    50:5 51:25 53:8
    53:16 56:20 58:20
    59:6,10 61:7
goes 39:23 43:2,3
    45:23 56:3
going 4:23 5:1,4,9
    5:20 6:6 8:7 15:8
    15:10 20:21 29:2
    33:19 39:8 45:1
    58:18 59:9 60:6
    60:11 67:21,21
    68:23 69:2,2
Gold 1:9 7:25 8:14
    21:22 31:13 32:20
    73:9
Good 4:11 70:13
gotten 28:9
government 64:5
grand 28:2 55:22
    56:9,16
gratuities 25:12

great 59:23
group 51:23 52:3
guess 12:14,19 31:3
    38:12 50:22 61:4
    62:9
guy 29:11 49:13
guys 10:16 16:1

H
half 46:22
halfway 5:21
hand 28:14 29:19
    50:23 60:6 72:15
handed 28:8 52:4
handing 39:9
handled 32:24
happen 20:17 49:3
    49:4 52:19 70:5
happened 19:15
    32:2,3 43:19
    61:17 70:11
happening 10:25
    30:9,10 33:22,22
happens 57:7
happy 10:20
Harris 40:19,21
    72:6
Hassan 1:12 60:17
    73:12
head 5:15,15 23:4
    46:4
heard 48:4 62:10
heavily 28:23
held 53:4 67:22,24
    67:24
helped 29:11
helpful 5:7 20:3
hereto 1:25
Hey 29:1
higher 42:21
highest 30:17
highlighted 56:1
hit 45:19 52:1
hold 25:1 63:20
    67:9
home 53:8
hospitality 58:23
hour 9:21 54:9,10
    67:5

**hours** 18:19 19:4,8
  19:9,16,17,22,25
  20:5,18,24 44:24
  45:1,5,6,7,12,16
  45:19,23,25 46:2
  46:3 74:5
**hour's** 20:1
**house** 25:11,17
  37:12 51:7 58:6
  62:23
**Houston** 1:2,7,7,8
  1:23 2:5,8,10,14
  21:25 47:1 60:16
  60:18,21 73:2,7,7
  73:8 75:20
**Huff** 2:9,9 3:3 4:4,9
  7:4 11:2 14:24
  15:4,14 16:10,21
  21:10,15,17 24:7
  30:19,20 31:10
  36:16,20,23,25
  37:23 43:11 46:8
  47:11,15,16 57:21
  58:15,22 59:3,17
  59:25 60:3,6,15
  61:24 69:21,22
  70:14,17 74:5,10
  75:5
**Huff's** 31:4
**huh-uh** 5:16
**hundred** 25:2,9,10
  25:23 27:17 44:13
**hundred-dollar**
  24:24 28:4 37:11
  49:9
**husband** 14:21
**H-09-3345** 1:6 73:6

**I**

**ID** 8:2
**idea** 20:2 44:11
**identity** 72:11
**illegal** 10:25 25:14
**imagine** 11:8
**imply** 41:22
**important** 5:13,18
  5:22 15:6 58:19
**improper** 26:7
**incidents** 68:9

**include** 65:1
**included** 63:18
  64:4,9
**includes** 74:8
**including** 38:22
**income** 63:13 64:5
  64:9
**inconsistency**
  31:20
**Incorporated** 74:1
  75:19
**incorrectly** 24:22
**indebted** 34:11
**independently**
  62:16
**INDEX** 3:1
**indicate** 71:2
**INDIVIDUAL**
  1:11 73:11
**individuals** 4:15,16
  48:5
**industry** 58:23 59:1
  62:5
**information** 11:9
  16:8 21:2,5 25:8
  31:1 59:9 65:5
  74:6
**informed** 10:6,12
  38:5
**infrequently** 34:10
**initial** 11:25 28:3
**initialed** 57:17
**initially** 15:20
**injuries** 40:11
**inside** 55:17
**instance** 1:17 66:1
  69:1
**instances** 68:12,17
**instruct** 45:11
  62:20,25
**instructed** 38:10
  54:16
**instruction** 10:15
  31:3
**instrument** 72:12
**insurance** 40:13,15
**integrated** 23:13,17
  23:22,24 24:13,17
  31:18

**intent** 59:4
**intentionally** 31:24
**interchangeable**
  22:20
**interest** 56:25
**interested** 18:13,14
  58:7 74:16
**interests** 59:12
**interfere** 59:4
**interrogatory** 5:2
  8:24 31:16,17
  40:23
**inter-relationship**
  24:2
**involved** 14:18 17:6
  31:25 38:7
**IOU** 49:9,17,20
**IOUs** 49:21
**IRS** 25:8 35:22
  36:14 64:17
**issue** 26:7,15 58:11
  63:11 68:23 69:11
**issues** 19:19 31:11
  47:10 58:15

**J**

**jail** 23:6,8 48:3,11
**Jestin** 29:9
**jive** 32:13
**job** 9:8 48:6 54:3
  58:17
**Joe** 22:24
**John** 11:22 21:20
  29:9
**joint** 8:5 21:12 22:5
  22:11 23:9,16
  24:11 59:13
**judge** 4:21 21:5
  59:23
**jury** 1:10 4:21
  73:10
**J-E-S-T-I-N** 29:10

**K**

**keep** 9:11,13,14
  25:11,17 35:3
  41:14,17 45:19
  49:10,18 55:9
  64:23
**keeping** 41:25 42:6

42:9,13
**kept** 53:5 55:20
  62:23 70:3
**kill** 30:17
**Kimberly** 1:4 17:13
  73:4
**kind** 5:20 12:11
  29:15 58:7,23
**knew** 18:12 20:11
  20:20 23:2
**know** 6:2 10:14,24
  11:13 13:24 14:14
  14:18 15:2,5
  16:17,19,22,25
  17:10,11 19:15,16
  19:24 20:4,19,23
  21:8 22:13,17,17
  22:24,25 25:7
  27:20,22 28:1,7
  28:11,21 29:10
  30:5,14,16 31:5
  32:21 33:11,13,20
  35:9,10,11 36:4,7
  36:7 38:8,23
  41:25 42:2,5,6
  44:3,10,25 46:23
  47:5,12 48:13,13
  48:18 49:12,21,25
  50:3,12,15,25
  51:4,23,24 52:1
  54:9,25 56:2 57:4
  59:20 60:23 61:22
  63:10,12 64:12
  65:20 66:9,14,20
**knowing** 58:8
**knowledge** 35:23
  61:2,4,13
**known** 72:9

**L**

**L** 60:5
**Labor** 7:14
**large** 28:21 38:7
  66:4
**larger** 49:4 65:23
**lasts** 46:21
**laughing** 36:18
**Laura** 1:3,14,16
  3:3,9 4:5,13 32:4

40:23 71:25 72:1
  72:4,9 73:3,14,19
**LAUREN** 2:13
**law** 2:13 17:11
**lawful** 61:19
**lawsuit** 4:24 7:18
  10:6 11:1,5,17
  12:2,22 13:4 14:3
  15:18,22 16:2,8
  16:11,25 17:6,12
  17:14 18:10 21:11
  23:23 24:8 27:8
  27:13 37:6 38:7
  40:8,12 53:18
**lawyer** 10:12 12:4
  12:7,13,17 16:12
  24:1 40:14 61:25
  65:2
**lawyer's** 11:9
**LAZARZ** 1:22 2:3
**leave** 18:9 69:24
  70:1
**leaving** 18:14
**left** 28:20 51:19
  52:13,14,18
**left-hand** 57:12
**legal** 61:25
**letter** 69:1
**letters** 20:13,15
  69:5
**Let's** 27:7 47:13
**levels** 25:14,15,16
  25:16
**license** 6:13 8:2
  27:23 28:15
**lights** 29:16
**liked** 28:19
**likewise** 60:24
**line** 61:14 71:2
**liquidate** 62:3
**liquor** 8:2
**listed** 61:1
**listen** 31:8
**Literally** 29:1
**litigation** 5:11
**little** 4:23 5:5 7:1
  31:20 32:17 36:19
  55:3 59:14
**live** 59:22

lives 13:20
LLP 1:22 2:3
located 19:11
locating 19:16
location 32:24 33:6
lock 55:16
locker 55:16
lockers 55:14
LOLMS1@aol.c...
  2:15
long 18:23 33:20
  66:21 68:19
longer 13:19 18:13
look 28:1,2,2 34:20
  50:20 56:20
looking 7:20,21
  57:10
looks 53:12
Loop 1:23 2:4,10
  lost 19:19,23
lot 18:8 27:15
  46:23 49:4 67:5

**M**
M 2:13
machine 1:21
main 27:8
majority 35:2
making 28:11,12
management 26:23
  38:5 61:6 66:3
manager 11:19
  20:9 21:20 23:3,7
  27:6,24,24,25
  28:6,17 29:6,16
  30:22 34:12 35:3
  45:18 48:2,5,7,8,9
  48:11 57:15,17,19
  63:4
managers 20:14
  22:16,17,23 25:5
  25:11,18,18 26:18
  27:12 28:10,19,24
  29:5,7 30:4 31:12
  33:24 34:3,16
  36:9 38:18 39:1,8
  39:13,17,25 43:24
  44:24 45:11 47:18
  47:24 48:1 50:18

51:8 63:2,3 67:1
  68:3,5,6
manager's 57:6,13
  57:22
manner 7:15 15:21
Margaret 17:19
Margo 1:4 13:8,10
  17:19,24 32:18
  73:4
mark 21:3 49:1
  60:3
marked 41:24 60:5
  60:7
MARTIN 2:3 74:9
Marty 14:15
match 20:5,5
math 37:10
matter 35:6
matters 32:23
McCray 1:4 17:13
  73:4
McKnight 1:3,14
  1:16 3:9 4:5,11,13
  15:3 32:4 40:23
  53:21,22 55:1,12
  55:18 56:4,19,19
  57:12,14,16,18
  60:5 71:25 72:1,4
  72:9 73:3,14,19
MCNIGHT 3:3
mean 6:20 7:6,11
  14:16 16:19,23
  27:7 30:5 32:9
  35:9 42:24 44:8
  52:23 60:20 61:22
  61:23 64:23
means 15:5 23:19
  23:25 34:12
meant 32:9 54:6
meet 13:1
meeting 13:23 63:4
melandering 29:15
Members 60:9
Memorial 75:19
mental 28:10
mentioned 12:1
  66:1
met 12:25 16:16
  67:4

midnight 39:5
mind 23:16 29:8
minus 51:7,7,7 56:9
minute 26:11 67:9
minutes 74:5
mistaken 27:13
Mitch 48:9 63:3
mixed 31:24
moments 65:14
Monday 22:18
money 27:15 28:8
  28:11,12 29:4,19
  30:15 37:2 38:20
  39:8,10 43:16
  44:11 48:16,21
  49:15,19,20,24
  50:5,6,9 52:4,5
  53:8 55:6 58:6
  64:2 65:3 66:10
  66:13 67:7,12,14
  67:18 68:2,4,7
  69:7 70:4
MONSHAUGEN
  2:9
month 44:11 67:19
months 20:4
Moreno 1:4 17:20
  32:18 73:4
morning 4:11
  11:18 18:25 19:1
  19:2,3 35:14
Morris 69:18,21
Motion 4:25 60:8
mouth 21:24
moved 13:11,15,18
  13:19
MSHELLIST@...
  2:6
M-O-R-R-I-S
  69:21

**N**
N 2:1
name 4:12 11:18,19
  11:20 21:21 23:3
  29:10 33:2 53:14
  72:12
names 22:3,23 29:7
narrative 36:17

nature 13:23
near 32:25 33:6
nearly 32:6
necessarily 49:16
  51:23
need 15:1 21:9 31:4
  54:23 57:19 58:20
  59:6,10,23 65:5
needed 48:11 49:14
Neglected 44:17
neither 10:17 74:12
networking 15:15
never 20:10 31:11
  31:11 40:15 43:12
  43:19 62:5,6
  70:10
nevermind 57:18
new 19:16,17 41:11
  43:17
night 28:12,13,14
  28:25 30:17 35:15
  35:19 36:12 49:8
  49:14,21 53:6
  55:5,10 56:10,17
  58:4 66:2,3,21,24
  67:1,12,15,18,25
  68:3,4 69:12,24
nightly 17:9
nights 34:24,25
nod 5:15
nods 46:4
nonresponsive
  21:16 30:19
normal 5:19 35:13
  47:2
normally 7:1 29:11
  57:23
North 2:10
Notary 72:2,19
notated 58:12
note 15:2 54:12
noted 72:2
notice 5:1 20:4
  42:21 60:8
November 8:25
number 8:2 16:25
  17:1,16,17 18:1
  57:9,18 71:2,2
numbered 1:18

56:19
numbers 18:6,12
  35:7

**O**
Oak 6:10
oath 4:20 29:13
  72:10
object 21:15 30:19
  36:16 37:21 58:18
  59:9 61:20
objection 21:7
obvious 57:2
obviously 29:13
  55:9
occasion 45:4 67:8
  67:11,17
occasionally 34:9
  34:10
occasions 20:17
  51:18
occur 39:18
occurred 12:10
  68:21 74:18
office 13:1 16:16
  32:6 72:15
officed 20:10
officer 73:20 74:7
  75:2
officer's 75:6
offices 1:22
Oh 35:5 36:24
  57:11 63:18
oil 46:20
okay 5:24 6:4,5,8,9
  7:3,4,9,13,16,17
  7:24 8:3,5,14 9:19
  10:21,22 11:8,11
  11:23,25 12:6,14
  14:4 15:7,12,14
  16:7 19:4,19 21:1
  21:14 22:11,15
  23:9,20 24:5,9,14
  25:15,19 26:10,14
  27:10,18 30:3,24
  32:13 33:5,22
  34:2,8 35:2 37:18
  38:12 39:11,19
  40:4 45:4,9,18

46:19,25 50:8
51:10 53:10,15,20
54:2,12,18,19,20
55:12,18,19,25
56:18 60:24 61:4
62:4,9 63:7,10,22
64:25 67:10,14
68:8,21 70:10,17
**old** 11:19
**once** 20:4 40:10
44:8 51:25 52:1
**ones** 24:14 43:5
**one-day** 46:13
**open** 9:10 18:24,25
43:16
**opened** 41:13 44:22
**opening** 19:2 54:4
**opposed** 34:23
**oral** 1:14,16 73:14
73:20
**order** 9:15 41:23
51:24
**ordered** 9:13 48:23
69:17
**ordering** 41:15
**orientation** 21:19
**original** 75:2,5,7
**OTC** 46:20 47:1
**outcome** 74:16
**outliers** 35:21
**overtime** 44:17,23
45:3 46:1,11 47:3
47:5
**owed** 34:13 51:10
**owes** 50:9
**owned** 21:23 60:17
60:19,21 61:3
62:12
**owner** 61:8
**owners** 21:23 22:9
39:22 40:3
**ownership** 61:1,12
**o'clock** 35:14

**P**

**P** 2:1,1
**page** 3:4,8 32:1
61:15 62:13,13
71:2,3 75:4

**page(s)** 72:2
**PAGE/LINE** 71:4
**paid** 9:21,22 19:7
24:25 25:10 26:18
34:2 37:2,15
38:21,21 39:1
44:23 45:15 46:2
46:12 47:4 48:17
50:3 51:11 52:25
53:6 56:10,12,15
56:17 58:5 62:22
65:22,22 66:2,4
66:23 68:3,22
69:6,12 70:4
**paper** 55:7 66:18
71:2
**paperwork** 9:16,17
21:25 22:2 32:14
36:1,4 68:6
**paragraph** 60:15
70:13
**parking** 67:5
**part** 9:12 25:25
31:22 60:16
**particular** 31:25
54:22 56:25 60:12
65:6
**parties** 74:8,13
75:10
**party** 74:3
**pass** 70:15,17
**patron** 15:25
**patrons** 19:13
42:14
**pay** 19:22 20:18
24:20 28:23 38:9
39:25 40:24 41:2
41:11,12 44:17
46:1 48:20 49:15
49:25 51:2,6,14
52:7,21 53:3,7,8
54:6 55:15 58:10
58:13 62:2,5,7
65:6 66:25 67:7
68:7 69:8,9,13
70:2
**payable** 26:23
**paycheck** 22:21
26:4 64:13,16

**paychecks** 32:5,23
**paying** 28:22 42:19
44:12 45:3 50:17
69:10
**payments** 39:13
**payroll** 7:20 20:7
32:15,19,23 45:6
45:23,24
**paystub** 65:7,12,13
65:18
**paystubs** 64:24
**penny** 66:25
**people** 13:9 16:23
17:5 18:12,13
29:20 30:11,21,23
30:25 31:5 33:17
37:8 38:4,12 39:3
39:20 46:22,23
51:19,23 52:4
61:5 62:15
**percent** 24:23 25:1
25:3,4,5,6,11,12
25:17,21 26:2,8
26:10,17,22 27:3
27:7,9,12 31:12
33:12,23 34:2,5,6
34:7,8,15,19,24
34:25 36:8,9,10
36:13 37:11 38:17
38:21,25 39:25
50:18,18,21,22
51:7,8,9,9 57:3
58:6,11 63:10,11
63:24 64:4,8,9
**percentage** 33:14
34:22 35:10 36:10
**period** 20:18 26:21
26:24 46:19,25
65:6,10
**person** 48:8 72:11
**personal** 13:2,23
31:3 52:3
**personally** 31:11
47:7 62:16 66:9
72:9
**personnel** 7:21
**person's** 5:20
**Peters** 22:24 29:9
30:14

**petition** 23:12
**phone** 17:16,17
20:8,8
**photocopy** 55:21
55:23
**physically** 33:25
**pick** 33:20
**piece** 55:7 66:18
**pity** 67:4
**place** 29:24 40:9
43:13 44:9
**plaintiff** 2:2 32:4
40:7,23 53:13
**plaintiffs** 1:5 10:3
12:17 13:7 14:1
14:12,13 17:3
18:3 32:2 73:5
74:9
**planning** 18:14
**plans** 59:4
**please** 4:11 6:2
27:1 41:5 51:17
55:3,13 60:4
65:25 71:2,3
**plus** 9:21 25:12
50:18 51:6 56:14
**point** 6:18 13:17
20:20 31:4 34:16
40:15 42:3 56:24
66:21
**points** 27:8
**policy** 29:21 30:12
43:20
**pony** 29:3
**portion** 21:15
40:22 56:1,2
**position** 32:23
**positive** 32:11
**possession** 65:9
**possibly** 5:12
**practice** 28:5 29:12
61:15
**practices** 10:25
24:20 50:10
**prefer** 14:21 15:13
**preparing** 75:7
**pretty** 4:19 7:1
11:6 13:10
**prevents** 49:11

**previous** 72:2
**pre-5-percent**
64:19
**prior** 21:4 45:11
**privacy** 59:12
**privilege** 44:1
**privileges** 43:25
**probably** 11:8
15:19 27:15 60:25
**procedure** 1:24
43:13,15
**proceeding** 74:14
**process** 13:24 50:2
62:2 70:8
**processed** 54:13
**processing** 25:22
37:1,12,17,25
38:11,14 50:22
54:17 62:6,8,23
63:9
**produced** 1:16
53:11 55:2 56:19
**Production** 53:12
**professional** 58:25
**profit** 37:23
**prompted** 17:5
**protect** 59:12
**protocol** 59:11,14
59:15,22
**proved** 72:9
**proves** 58:5,9
**provider** 15:5
**providing** 59:9
**provisions** 1:25
**public** 19:12 72:2
72:19
**pull** 43:16 44:25
48:16
**purchase** 55:14
**purposes** 72:14
**pursuant** 1:24 74:6
74:17
**pursue** 18:10
**pursued** 40:10
**pursuing** 11:1 16:7
17:12 58:25
**put** 8:25 26:14 28:8
48:14,14
**P.C** 2:9

**p.m** 1:19,19 4:10
47:14,14 70:20

**Q**

**quarterly** 28:24
**question** 5:22,23
6:1,21,21 8:7,8
14:15 15:7 21:8
31:9 40:4,8 42:23
61:21 62:25
**questioned** 66:14
**questions** 4:9 5:10
5:13 6:7 13:25
27:17 32:19 36:23
70:18
**question-and-ans...**
4:22
**quick** 5:4 31:2
**quit** 18:18
**quotations** 60:16
**Q&A** 74:1 75:19

**R**

**R** 2:1
**RACHAEL** 1:4
73:4
**Rachel** 16:21 17:15
32:13
**ran** 21:25 49:4,19
**range** 19:4 20:1
35:15,16 47:24
**RANKIN** 1:9 73:9
**rate** 9:22 32:22
**read** 4:1,2 57:19
60:11 72:1
**reading** 40:22
**ready** 47:8
**really** 13:9 28:9
37:10 61:11
**reason** 53:2 60:18
71:2,4
**reasons** 75:4
**recall** 10:20 11:12
11:20 12:23 13:9
16:15 18:22 23:3
23:11 24:18 47:17
47:19
**receive** 54:7
**received** 12:12 27:2
36:1,5 37:2 42:14

65:3 70:3
**receiving** 34:21
**recognize** 60:9
**record** 1:25 4:12
5:17 36:19 47:13
47:15 58:20 73:21
74:8
**records** 7:21
**refer** 53:24
**referencing** 49:11
**referring** 46:16
**refers** 25:21
**reflect** 36:8 45:7
**reflected** 36:5
**regard** 7:14 11:5
24:20 38:3 44:19
54:23 60:25 68:11
**regarding** 8:24
12:22 14:12 15:22
16:11 32:19 36:5
38:17 61:11
**Regardless** 31:3
**regards** 40:3 58:8
**Registration** 75:21
**regular** 28:5 47:2
**reimburse** 43:18
50:25 51:2,19
52:24
**reimbursed** 19:18
**reimbursement**
40:11
**reimbursements**
51:11
**relate** 24:12 41:21
65:17
**related** 7:10,12
32:23 74:13
**release** 66:10,13
**released** 67:25
**relevance** 53:17
**relevant** 21:6
**reliable** 31:1
**remaining** 56:15
**remember** 10:7,8
11:7 16:4,5,6,9,17
16:24 17:2,2,17
17:18 18:2 33:1
**remembered** 11:19
**remnant** 25:4

**rental** 55:15
**replied** 12:4,12
**reply-all** 12:11
**report** 25:9 35:24
**reported** 1:21
35:22,23 36:14
63:12 64:4,10,16
65:12
**reporter** 1:20 4:1
5:8 7:2 43:9
69:20 73:16 74:23
**Reporter's** 1:13 3:5
73:13
**Reporting** 74:1
75:19
**request** 34:17 53:7
53:11
**requested** 9:10
66:10
**require** 45:13
**required** 25:4,6,18
27:24 36:9 40:24
41:2,6 47:3 49:7
55:14 63:5
**requirement** 26:7
**requirements**
74:17
**reserve** 70:18
**resolved** 69:11
**Respect** 31:6
**respectfully** 66:10
**respecting** 31:4
**respond** 5:14 14:16
14:16
**response** 5:15
53:11
**responsible** 9:16
**rest** 13:10
**retain** 20:15
**retaining** 54:15
**retaliation** 18:11
**return** 20:7 74:1
**returned** 75:2,3,5
**Richmond** 32:12
33:8
**right** 4:19 8:11
12:10 15:19 24:10
25:25 26:1 27:10

32:7 33:4 35:7,8
37:25 42:8,11
45:17,20 55:1
58:7,12 60:13
64:1 65:16
**Rita** 1:20 73:16
74:22 75:15
**road** 5:11
**roughly** 36:13 66:6
67:23
**Rule** 74:17 75:1,9
**Rules** 1:24 4:3
**run** 21:25 22:14
45:5

**S**

**S** 2:1 72:5,20
**sale** 37:24 57:13
**sat** 50:12
**satisfied** 59:5
**saw** 16:24 27:13
**saying** 12:14,20
13:18 45:24 59:20
66:12,18 67:20
**says** 32:4 44:17
45:19 54:12 57:18
60:16 65:21 69:22
**scenario** 41:21
45:18,22
**scheme** 25:19
**scribble** 57:13,14
**Scrivener's** 31:23
**se** 59:21
**seal** 72:15
**second** 26:6 56:2
60:15 62:13 63:20
**Secretary** 61:7
**sections** 60:12
**secure** 66:23 67:6
**secured** 67:3,13
**see** 13:21 15:1 16:1
22:10 28:3,6,9
29:16 31:19 33:3
39:11,23 42:3
48:22 50:20 59:7
65:20
**segregate** 53:13
**sent** 45:6 53:12
**sentence** 5:21

**SERPER** 2:13
70:16
**serve** 9:9
**served** 42:14 48:17
75:9
**service** 15:4
**session** 4:22
**set** 23:14 27:7
**Setting** 8:6
**seven** 18:22 20:19
50:17 68:20,21
**shake** 5:15
**sheet** 45:23 53:22
54:24 55:4 56:5
58:4 65:13,17
66:15 71:2
**sheets** 22:1 53:25
54:1 56:18
**sheet's** 22:3
**Shellist** 1:22 2:3,3
4:2 6:25 10:14,24
13:1,23 14:18,24
14:25 15:9,20
16:4,17 21:3 24:6
31:2 36:18,22
37:21 46:5 47:8
57:9 58:17 59:6
59:19 60:1 61:20
70:18 74:9
**Shellist's** 16:8
**shift** 9:22 18:21,23
35:13,13 47:20
50:20 51:12 52:25
64:3
**shifts** 18:22 19:4
**short** 23:7 34:19
45:24
**shorted** 20:18,24
**shorthand** 1:20,21
73:16 74:23
**shots** 51:24
**shown** 64:15 75:10
**sic** 29:15
**sick** 23:6
**side** 57:12
**sign** 4:1,2 27:22,25
28:18 54:5 55:22
66:11 68:6 71:3
**signature** 3:4 28:17

57:6,14 71:1 72:1
73:24 75:3
**signatures** 57:22
66:15,17
**signed** 28:19 32:5
57:7,16,19 60:8
66:14
**significance** 54:23
**significantly** 35:12
**signing** 47:17 72:2
**simple** 37:10
**single** 8:4 23:13,17
23:22,24 24:13,16
24:17 29:6 31:17
55:14
**sir** 4:18
**sites** 15:15
**sitting** 9:2 20:23
29:17,18 48:22
**situation** 4:3 27:11
70:7
**six** 6:16 8:8 21:11
23:21 42:17 48:18
48:20
**small** 67:22
**social** 15:15
**soft** 7:1
**sold** 50:4
**solely** 61:4
**somebody** 51:3
**sorry** 43:9 56:1,14
57:11 63:18,18
66:7 69:20
**sound** 9:1
**sounds** 24:10
**South** 1:23 2:4
**SOUTHERN** 1:1
73:1
**speak** 6:25 28:6
66:7
**specific** 56:16
**specifically** 6:22
24:21 59:7
**spend** 69:7
**spill** 41:10 42:17
43:23
**spillage** 40:25 41:2
42:19 43:6,13
44:12 58:10,12

**spilled** 41:9,12 43:5
**spilling** 44:7
**Splendor** 1:10 8:19
21:21 31:13 73:10
**spoke** 15:20,24
16:14 18:8 66:8
**spoken** 10:12,23
**staff** 63:4
**standard** 61:16
62:11,17
**Standards** 7:15
**standing** 29:17
**stapled** 56:3
**start** 25:2 49:8
55:11
**started** 48:23
**starts** 62:12
**state** 1:21 4:12
61:11 72:5,20
73:1,14 74:23
**stated** 1:25 66:11
**statement** 31:25
32:14
**states** 1:1 32:5
40:23 73:1
**State's** 61:7
**stating** 32:18
**stayed** 19:2
**Ste** 2:10,14
**stop** 60:11
**stopped** 20:21
**straightforward**
4:19
**Stretched** 59:17
**strike** 26:21
**stub** 64:14,16
**stuff** 5:4 14:2 36:20
59:8
**submit** 19:17 25:7
**submitted** 73:22
**submitting** 19:16
**subscribed** 72:12
**subtotal** 56:8
**subtract** 25:4 49:25
56:13
**sufficient** 28:4
**Suite** 1:23 2:4
75:19
**Super** 21:24 23:4

44:21 46:12,13,16
46:16,25
**support** 22:5,11
23:9,15,17 24:11
24:15 29:21 30:12
37:9 38:13 44:14
46:9 62:16 64:21
**sure** 6:4,25 7:2 13:8
13:10,10 32:1
61:11
**swear** 29:13
**swinging** 19:12
**sworn** 1:17 4:6
73:19

**T**

**T** 72:5
**tab** 9:10,11 22:1,3
24:25 27:18,21,25
28:1,4,16 37:13
41:14,24 42:10,18
42:21,25 43:1,5
48:15,23 49:1,4
51:4,15,21 53:4
53:22,25 54:1,5
54:24 55:24 56:5
56:12,13,16,18
57:7,18,19 65:8
66:6,9,14 69:5,12
69:23
**TABC** 48:2
**table** 41:13 48:19
48:22 54:13
**tabs** 26:8 34:17,20
49:23 50:24 51:6
55:19 56:9,16,18
57:21,23 58:2
65:11,11
**take** 4:3,14 27:3
34:15 47:8,9,12
47:12 48:25 49:23
50:21 56:20 65:5
68:25
**taken** 1:18 23:6,8
27:15 33:23 48:11
57:3 74:7,15
**talk** 4:23 5:2,19
10:10 12:5 13:11
13:13 14:2,19,25

15:17 16:1 28:20
30:14 39:7 44:5
54:18,23 57:5
59:21,23 70:15
**talked** 10:4,18,20
14:17 24:15 25:19
25:20 26:10 46:12
58:16 67:11 68:9
**talking** 5:24 20:2
47:6 52:10 56:24
65:14 68:11,13
**talks** 32:18
**tallied** 49:21 50:4
**tally** 28:10 50:24
51:5
**tallying** 49:12
**Tax** 8:2
**taxed** 65:3
**taxes** 32:15,19 36:2
**TBA** 75:7
**tear** 55:7
**technical** 36:20
**technically** 12:11
**telephone** 2:5,11
10:4,7,8,10 11:25
18:1,6 75:20
**tell** 10:21 15:10
16:4,6 21:4 31:6
38:10 39:24 54:17
55:3,12 57:9
58:22 62:20 63:1
63:6,7,8
**telling** 30:22 57:7
**ten** 47:10
**term** 6:2 48:4
**terminologies**
59:17
**testified** 4:6
**testimony** 73:21
74:7
**Texas** 1:1,21,23,24
2:5,10,14 6:11
72:20 73:1,17
74:23 75:15,20
**text** 11:18 12:1
**therefor** 75:4
**thereto** 32:24
**they'd** 49:20,25,25
**thing** 10:19 12:11

17:8 26:2,6 27:4
35:24 36:21 50:2
56:21
**things** 5:5,7 24:11
44:7 45:10 59:18
60:2 61:5
**think** 12:5 13:8
16:15 22:25 25:21
27:12 31:23 32:2
35:16 37:16 40:20
42:20 46:20 47:22
48:4 49:10 50:9
50:12,14,16,17
56:12 58:19 63:21
66:16 67:23,24
**third** 23:3 61:14
68:25
**Thomas** 2:9 22:24
74:10 75:5
**thought** 28:24
59:15 63:17 66:21
**thousand** 36:11,12
36:13,15 49:12
**three** 49:13 58:15
**thrown** 55:17
**ticket** 55:23
**tickets** 41:10 43:23
66:15,16
**till** 19:2,2 44:22
**time** 13:1 15:19
16:2,14,15 17:15
17:21 19:14,25
20:1 23:4 27:18
29:15 34:12,17
44:22,22 45:23
46:15,19 61:17
62:6 65:10 68:22
70:19 74:3,7
**timecard** 19:14
**timecards** 19:11,20
19:23
**times** 14:17 19:17
48:2
**tip** 24:24 25:3,5,6,6
25:9,18 27:6,12
28:2,4,21,23,24
37:11 40:3 50:2
51:3,6,8 55:22
56:2,11,12,15

57:3,16 65:5,8,13
65:17 66:4 67:1
67:12,14,18,20,22
67:24 68:2,5,7
69:12,25
**tipped** 28:5 34:12
41:8 65:1 68:4
**tipper** 30:17
**tipping** 30:23 47:18
**tips** 9:21 25:17 26:3
26:9,16,17,17,23
27:2,5,10 31:5
33:12,24 35:4,10
35:11,12,15,22
36:5,6,11 50:21
51:10 52:24 63:11
63:25 64:9,14,18
65:23
**title** 48:7
**today** 4:14,20 9:2
10:2 20:23
**told** 10:23 16:7,23
21:21 29:20 30:11
30:21,25 31:5
32:14 33:17 37:8
38:4,13 39:3,20
45:10 61:5 62:15
66:22 69:6,7
**tonight** 29:14
**top** 23:4 29:24 55:8
55:24
**topic** 33:19
**total** 27:21 28:2,2
36:11 55:22,23
56:6,9,10,13,16
57:15 65:7
**totaled** 58:3
**Tovar** 11:22 21:20
29:9
**Tower** 1:23 2:4
**town** 46:21
**track** 9:11,13,14
35:3 41:14,17
42:1,7,9,13 49:10
49:18
**trained** 38:6
**trample** 10:17
**transactions** 34:22
35:1

**transcribe** 5:16
**transcript** 73:20,22
75:7
**trash** 55:17
**tray** 41:9,11 43:3
43:15,17,18 52:2
**trays** 41:7
**TRCP** 74:18 75:1
**Treasures** 1:7 4:16
6:18,20,22,23
7:14,16,22,24
8:10,25 9:4,8,20
9:24 13:11,19
14:5,6,8,12 15:24
18:6,16,20 21:21
24:19 26:3,24
30:2,9 33:13
37:18,23 47:2,17
48:6 50:9 54:3,22
60:17 68:19 73:7
**treated** 7:15
**trial** 1:10 4:21 5:12
70:19 73:10
**tried** 36:18
**Trish** 11:13
**Trisha** 1:3 11:13
15:17 73:3
**Trophy** 1:9 7:25
8:17 31:13 73:9
**trouble** 28:18
**true** 21:13,24 72:1
73:21
**trying** 14:1 33:20
33:21 41:22 45:9
54:18
**turn** 5:23 27:19
**turned** 28:16 53:1
67:6
**Turner** 1:3 11:13
12:24 15:17,21
73:3
**turning** 9:17
**twice** 41:23 42:24
68:7
**two** 4:16 22:25 23:1
25:14,15,16,16
26:1 45:10,24
48:1 49:13 59:2
60:2 64:6,13 68:8

68:12,17
**two-week** 46:14,25
65:10
**type** 7:9 62:11
**typed** 31:22
**typical** 47:20
**typing** 5:8,12

---
**U**
---
**uh-huh** 5:16
**Umm** 32:8
**uncollectible** 53:1
**Underneath** 55:23
**understand** 6:1,2,4
6:7 7:20 15:6
23:14,19,20 30:7
32:22 33:21 50:7
50:19 59:8 60:20
**understanding**
6:17 22:19 25:13
**Understood** 70:10
**UNITED** 1:1 73:1
**unlawful** 26:4
**unresponsive** 36:16
**Upwards** 44:13
**use** 5:10 25:20 36:2
48:4
**usually** 18:23 28:19
39:5 49:8
**utilized** 54:2

---
**V**
---
**V** 1:6 73:6
**Vaguely** 16:23
**valet** 51:2,5
**valid** 66:17,21
**value** 54:12
**Van** 2:9,9 3:3 4:4,9
7:4 11:2 14:24
15:4,14 16:10,21
21:10,15,17 24:7
30:19,20 31:4,10
36:16,20,23,25
37:23 43:11 46:8
47:11,15,16 57:21
58:15,22 59:3,17
59:25 60:3,6,15
61:24 69:21,22
70:14,17 74:5,10
75:5

**varied** 18:21
**vast** 35:2
**vice** 48:2
**vicinity** 39:12
**violated** 7:14
**vocalize** 5:14
**voluntary** 47:18
**voucher** 55:21

---
**W**
---
**wages** 44:17
**wait** 9:9 65:22
**waited** 29:1 51:18
66:8
**waiting** 29:18
**waitress** 6:18,23
7:7 8:10,12,15,22
9:5,7,20 18:20
29:18 41:6,16,23
42:12,17,18 43:2
43:6 48:24 49:5
49:11 54:3 55:2
**waitresses** 38:21
47:20 65:21
**walk** 50:1
**walked** 29:14 51:14
52:2
**walking** 36:12
**walks** 29:18
**want** 7:1 10:17
18:9,10,17 21:5
27:21 31:5,19,21
32:1 33:20 47:9
53:16 58:20 59:2
70:14
**wanted** 17:9,11
28:21 66:2,7
**wasn't** 19:7 36:12
40:20 43:13 68:3
**was/was** 75:2
**watched** 39:21,22
**way** 19:15 33:13
41:17,25 43:21
44:5,6 48:16,19
53:8 55:20
**website** 61:7
**week** 18:19,22 44:8
44:23 45:5 46:22
47:2,2 64:15

65:10 69:8
**weekends** 22:18
29:12
**weeks** 64:6,13
**well-known** 28:23
**went** 12:13 20:11
23:15 24:11 35:13
52:8,10 56:22
**weren't** 47:3 49:16
52:16 68:22
**West** 1:23 2:4,10
32:12
**we'll** 21:3 26:14
47:12 59:21
**we're** 4:14 6:4,6
13:19 20:2 54:18
58:18 59:9
**we've** 8:9 13:11,18
13:19,22 24:15
26:15 70:6
**WG** 1:9 73:9
**Wild** 32:12
**wind** 69:10
**wine** 9:14
**wish** 31:6
**witness** 1:17 3:4
7:3 10:22 15:12
46:4 57:11 58:25
70:15,17 71:1
73:19,21,23,24
**witnessed** 68:10
**woman** 20:7
**words** 7:2 13:18
35:25 42:5
**work** 7:5,6,7 8:12
8:14,21 9:19 17:9
18:17,19 22:17,20
29:11,23 30:1
45:13 46:24 47:2
47:3 48:10 58:23
68:19
**worked** 6:23 8:9
16:23 18:4,13
19:8,8,10 20:5,6
22:7,8,16,24,25
23:4 27:14 30:4
44:2,4,21 45:16
51:17 61:17 62:4
67:19,25 70:9

**working** 18:22 30:1
45:19 46:11 62:7
**worry** 31:8
**worrying** 20:21
**worth** 19:22 20:1
20:19 37:14 43:2
43:4 49:12,22
51:4,5
**wouldn't** 19:15
30:6 35:9,11
41:19,24 42:5,18
43:7 45:15 46:1
50:4,6 51:21 52:7
55:6
**write** 15:2 22:1
42:18 56:8 61:23
69:1,5
**writes** 43:4
**writing** 42:9
**written** 43:20 65:11
**wrong** 24:2 28:7
**wrongful** 50:10
**wrote** 20:13 56:12
61:24
**W-2** 64:5,10 65:6
**W.L** 1:10 73:10
**W2** 63:13,19
**W2s** 64:23

**X**

**X** 72:5
**X'd** 54:5

**Y**

**Yeah** 16:19 47:11
58:17 68:15
**year** 10:5 11:6 25:8
55:15 64:17
**years** 50:17 68:20
68:21
**year's** 20:19
**YORK** 1:10 73:10
**y'all** 10:10 13:3,17
14:2

**Z**

**zero** 43:1

**$**

**$100** 25:21 67:23

69:23
**$120** 42:24
**$15** 43:2,4,4
**$2,000** 35:17,18
66:2
**$2.50** 28:5,8
**$20** 35:10 37:15
38:9 54:7
**$20,000** 50:14
**$200** 50:1
**$25** 37:14 38:9 54:6
54:13 62:21
**$5** 37:15,19,20 38:7
38:14,15 48:24
51:2 54:15 62:21
62:24 63:8 69:24
**$5,000** 50:16
**$50** 35:11 56:7
**$500** 49:22 50:1
70:2
**$6,000** 37:14
**$60** 42:21 51:4,5
**$70** 70:1
**$700** 49:25
**$8** 35:16
**$9,000** 66:6
**$95** 25:2,3 69:25

**0**

**0011** 57:18
**007** 57:12
**008** 57:14
**009** 57:16
**09** 17:22

**1**

**1** 3:9 53:21,22 60:5
60:7
**10** 25:5,6,12 26:8
26:17,22 27:3,11
31:12 33:23 34:2
34:5,6,7,8,15,19
36:8 38:17,21,25
39:25 50:18 51:8
54:8
**10-dollar** 56:11
**10220** 75:19
**11** 1:15 73:15
**11th** 1:19
**12-31-2011** 74:24

75:16
**1225** 2:10
**15** 25:3,4 36:9
47:12 51:8 54:9
**15-minute** 47:12
**1900** 1:23 2:4
**19016857** 6:14
**1910** 1:23 2:4
**1975** 6:13

**2**

**2** 3:2 55:1 74:5
**2.13** 9:21
**2:00** 18:25 19:5
35:14 39:6
**2:22** 1:19 4:10
**20** 56:19
**20th** 6:13
**200** 2:14
**2000** 19:25
**20015** 6:10
**2002** 8:25
**2009** 9:1
**2010** 1:15,19 73:15
73:23 74:2,20
75:2,11
**203** 74:18 75:1
**203.3** 75:9
**22** 75:19
**23** 53:21
**24** 19:25
**24028183** 75:7
**2405** 2:14

**3**

**3** 55:12
**3D/International**
1:22 2:4
**3:30** 47:14
**3:52** 47:14
**32** 74:5
**35** 36:13

**4**

**4** 55:18
**4:00** 19:1,2,2 39:6
**4:30** 19:5
**4:32** 1:19 70:20
**40** 45:1,2,5,12,16
45:19 46:2

**400-dollar** 51:4
**402** 75:21
**42** 45:7,23 46:3
**467-7900** 75:20
**467-7911** 75:21

**5**

**5** 3:3 24:23 25:1,11
25:17,21 26:2,10
27:7,9 31:17
33:12 35:9 36:8
37:11 50:18,21,22
51:7,9 56:4 57:2
58:6,11 63:10,11
63:24 64:3,8,9
**5th** 9:1
**50** 66:16
**500** 13:8
**500-dollar** 69:23
**5975** 56:8

**6**

**6:30** 19:5,5
**60** 3:9
**60-dollar** 42:25
**62** 47:23
**640** 2:10

**7**

**7** 56:19
**7th** 8:25
**71** 3:4
**713** 75:20,21
**713.621.0993** 2:6
**713.621.2277** 2:5
**713.880.2992** 2:11
**713.880.5297** 2:11
**73** 3:5
**77008** 2:10
**77024** 75:20
**77027** 1:24 2:5,14
**77430** 6:11
**7847** 74:24 75:15

**9**

**9** 40:23
**95** 34:24,25
**950** 56:12
**975** 56:7