IN THE UNITED STATES DISTRICT COURT FOR THE
                     SOUTHERN DISTRICT OF TEXAS
                          HOUSTON DIVISION

LAURA McKNIGHT, TRISHA          *
TURNER, ANDREW BAKER,           *
RACHAEL FREEDMAN, KIMBERLY      *
McCRAY, and MARGO MORENO,       *
                                *
     Plaintiffs,                *
                                *
V.                              *  Civil Action No. H-09-3345
                                *
D. HOUSTON, INC. D/B/A          *
TREASURES, A.H.D. HOUSTON,      *
INC. D/B/A CENTERFOLDS,         *
D N.W. HOUSTON, INC. D/B/A      *
GOLD CUP, D. RANKIN, INC.       *
D/B/A TROPHY CLUB, D WG FM,     *
INC. D/B/A SPLENDOR, W.L.       *  Jury Trial Demanded
YORK, INC. D/B/A COVER          *
GIRLS, AND, IN THEIR            *
INDIVIDUAL CAPACITIES, ALI      *
DAVARI and HASSAN DAVARI,       *
                                *
     Defendants.                *
                                *

*************************************************************
                      ORAL DEPOSITION OF
                        TRISHA TURNER
                        MAY 13, 2010
                          Volume 1
*************************************************************

     ORAL DEPOSITION of TRISHA TURNER, produced as a
witness at the instance of the Defendants, and duly
sworn, was taken in the above-styled and numbered cause
on May 13, 2010, from 1:11 p.m. to 2:50 p.m., before
Connie Koenig, RPR and CSR No. 6577 in and for the State
of Texas, reported by stenographic method, at Shellist
Lazarz, L.L.P., 3/D International Building, 1900 West
Loop South, Suite 1910, Houston, Texas 77027, pursuant
to the Federal Rules of Civil Procedure and the
provisions stated on the record attached hereto.

Page 2

A P P E A R A N C E S:

FOR THE PLAINTIFFS:

MR. MARTIN A. SHELLIST
SBOT No. 00786487
Shellist Lazarz, L.L.P.
3/D International Building
1900 West Loop South, Suite 1910
Houston, Texas 77027
713/621-2277

FOR THE DEFENDANTS:

MR. ALBERT VAN HUFF
SBOT No. 24028183
Monshaugen & Van Huff, P.C.
1225 North Loop West, Suite 640
Houston, Texas 77008
713/880-2992

MS. LAUREN M. SERPER
SBOT No. 18032100
Attorney at Law
3405 Edloe, Suite 200
Houston, Texas 77027
713/278-9398

Page 3

INDEX

Appearances                                          2

Stipulations                                         4

TRISHA TURNER

    Examination by Mr. Van Huff              4
    Examination by Mr. Shellist              47
    Further Examination by Mr. Van Huff      53
    Further Examination by Mr. Shellist      55
Signature and Changes                        56
Reporter's Certificate                       58
        E X H I B I T S
1   Signed Copy of Treasures' Tipping Policy 53

Page 4

1    THE REPORTER:  Signature?
2    MR. SHELLIST:  Yeah, read and sign.
3    TRISHA TURNER,
4    having been first duly sworn, testified as follows:
5    E X A M I N A T I O N
6    BY MR. VAN HUFF:
7    Q.  Good afternoon, Ms. Turner.
8    A.  Good afternoon.
9    Q.  My name is Al Van Huff.  I'm an attorney for
10   the clubs and the individuals that are the Defendants in
11   this case.  We're here today to take your deposition.
12   It's going to be a pretty painless process.
13        Have you ever given a deposition before?
14   A.  No.
15   Q.  Okay.  The way it works is that you were just
16   sworn in and you're going to give testimony just like
17   you were testifying in court in front of the Federal
18   Judge.  So after the deposition the Court Reporter is
19   going to type up a booklet, deposition transcript,
20   that's going to have all the questions and answers.
21   We're going to be able to use that transcript as the
22   case progresses and possibly at the trial of this
23   matter, if we go to a trial.  All right?
24   A.  Okay.
25   Q.  So it's important you tell the truth since

Page 5

1    you're under oath.  And it's also important that, when
2    I -- if you say yes or no in response to a question,
3    that you actually vocalize that response instead of
4    going uh-huh or uh-uh because the Court Reporter can't
5    take responses like that down very well.
6    A.  Okay.
7    Q.  And it's also important that we try not to talk
8    over one another.  Unlike a normal conversation where
9    you can sometimes anticipate what someone's going to say
10   before they finish their question, that doesn't work out
11   too well here because she's got to actually type my
12   complete answer in and your answer.  And Ms. Koenig here
13   is really good and fast, but sometimes, if we get too
14   carried away, it will cause us a problem.
15        So we need to try to cooperate with one
16   another on that.  Okay?
17   A.  Okay.
18   Q.  And, finally, if I ask you a question, it's
19   important to everyone involved that you understand the
20   question you're answering.  So if you don't understand
21   something that I'm asking you and it could be because
22   I'm asking the question in a strange way or -- just let
23   me know.  I can rephrase the question, or I can explain
24   a term to you or whatever we need to do.  Because, if
25   you answer a question that I ask and you don't indicate

Page 6

1  to us that you don't understand it, we're going to
2  assume that you do understand it, and later on you won't
3  be able to complain that you didn't know what was going
4  on. Okay?
5      A. Okay.
6      Q. And believe me, if I get too confusing, your
7  lawyer will object to the question and say it's
8  confusing and I should ask it another way.
9          First, I'd just like you to state your
10  name for the record.
11     A. Trisha Turner.
12     Q. Trisha, what's your current address?
13     A. 12445 Brightwater Lane, Richmond, Virginia
14  23233.
15     Q. So you currently reside in Virginia?
16     A. Yes.
17     Q. And your Virginia driver's license is
18  A 63660686; is that correct?
19     A. Can I -- A 63660686?
20     Q. Right.
21     A. Yes.
22     Q. I'm reading right off your interrogatory
23  answer.
24     A. I have to do it a certain way to process it.
25     Q. That's fine.

Page 7

1          How long have you been living in Virginia?
2      A. Since June of last year.
3      Q. How did you first learn of this suit or of this
4  claim by the Plaintiffs?
5      A. Laura had given me a call and told me about it.
6      Q. When was that?
7      A. It was sometime in the beginning of 2009. I'm
8  not exactly sure when.
9      Q. That sounds about right. She said it was about
10  a year ago or so.
11         Other than Laura, have you spoken with any
12  of the other Plaintiffs in this case --
13     A. No.
14     Q. -- about the case?
15     A. No.
16     Q. What exactly did Laura tell you when she called
17  you?
18     A. That she had looked into a lawyer about some
19  things that Treasures was not doing properly and would I
20  be interested in going with her to talk with a lawyer
21  and I said yes.
22     Q. Okay. And was that the only time you spoke
23  with Laura about this lawsuit other than in the context
24  of maybe some sort of e-mail communication that involved
25  your lawyer?

Page 8

1      A. Yes.
2      Q. Who else have you spoken to regarding this
3  lawsuit?
4      A. My husband and my cousin's wife.
5      Q. We have a number of clubs that are Defendants
6  in this case. And the first thing I want to do is go
7  through the list of clubs with you so that I can
8  determine at which clubs you actually worked and during
9  what time periods you worked at such clubs.
10     A. Okay.
11     Q. So did you work at Treasures?
12     A. Yes.
13     Q. When did you work at Treasures?
14     A. I started in July of 2001, and I stayed there
15  until December of '01, and then I came back -- I don't
16  know exactly when, but it was springtime of '02 until
17  December of '08.
18     Q. Have you ever been involved in a lawsuit
19  before?
20     A. No.
21     Q. Have you ever filed for bankruptcy protection?
22     A. Yes.
23     Q. Other than the bankruptcy, any other lawsuits?
24     A. Just divorce.
25     Q. Okay. So we have one bankruptcy case, one

Page 9

1  divorce?
2      A. Yes.
3      Q. When was that?
4      A. January 1998.
5      Q. And are you currently married?
6      A. Yes.
7      Q. Have you ever worked at Centerfolds?
8      A. Yes. From December of '01 until the springtime
9  of '02.
10     Q. What was your position at Treasures? I'm
11  sorry. I'm going backwards.
12     A. I started as a waitress, and when I went back
13  in the spring, I was a bartender.
14     Q. What did you do at Centerfolds?
15     A. I started as a waitress and became a bartender.
16     Q. Have you ever worked at Gold Cup?
17     A. No.
18     Q. Have you ever worked at Trophy Club?
19     A. No.
20     Q. Have you ever worked at Splendor?
21     A. Yes.
22     Q. When did you work at Splendor?
23     A. I can't remember. It was either one or two
24  weeks during the time I was at Centerfolds. I don't
25  remember the exact date.

Page 10

1    Q. But it would have been prior to spring of '02?
2    A. Yes.
3    Q. Have you ever worked at Cover Girls?
4    A. No.
5    Q. How are you currently employed?
6    A. I work for the Dominion School for Autism.
7    Q. As a teacher?
8    A. One-on-one instructor.
9    Q. I bet that's challenging.
10   A. Very. Very rewarding.
11   Q. While you were employed as a bartender at
12   Treasures, how were you paid? I don't mean that you
13   received a paycheck. How were you compensated for your
14   time?
15       A. We got 2.13 an hour. And then in some time, I
16   believe it was January of '08, it was 5 something an
17   hour, but I don't know if it was exactly 5.
18   Q. According to the information that I have,
19   January of '08 is when Centerfolds began
20   paying -- excuse me -- Treasures began paying you what
21   was minimum wage at the time.
22       Does that sound about right to you?
23       A. It was 5 or 5-something. I don't know what
24   minimum wage was.
25   Q. Right. But whatever that amount was, it was

Page 11

1    minimum wage at the time. Is that your understanding,
2    that they brought you up to minimum wage?
3        A. I was never told. I just looked at my check
4    and it was more. I didn't know if it was minimum wage
5    or not.
6    Q. If the payroll records demonstrated they
7    started paying you minimum wage in January of '08, would
8    you have any reason to dispute that?
9        A. No.
10   Q. Without regard to the other Plaintiffs in this
11   case and in connection with your employment as a
12   bartender at Treasures only, what is it specifically
13   that you claim that Treasures did to you that was
14   improper?
15       A. The 5 percent they were taking out of credit
16   card charges.
17   Q. All right. Just to make sure we're talking
18   about the same thing, credit card tips?
19       A. Correct.
20   Q. They would deduct 5 percent from your credit
21   card tips?
22       A. Correct.
23   Q. And it's your claim in this lawsuit that that
24   was improper?
25       A. Yes.

Page 12

1    Q. Why are you claiming it was improper?
2        MR. SHELLIST: Let me just object to the
3    form of the question. It calls for a legal conclusion.
4        But when I do that -- we haven't talked
5    about this -- but when I make an objection, it's for the
6    Court Reporter and Mr. Van Huff and the Judge. You can
7    still answer the question if you're able to. Or you can
8    have him restate it if you have forgotten what it was.
9        Q. (BY MR. VAN HUFF) I'll go ahead and restate
10   it.
11       Your lawyer is going to sometimes object
12   to my questions for the record so that down the road, if
13   I try to use your answer, he may complain that's calling
14   for a legal conclusion, which is perfectly normal to
15   happen in a deposition like this.
16       But unless he instructs you to after he
17   objects for the record, you're going to answer the
18   question. It's something that goes on in every single
19   deposition almost that ever gets taken anywhere in
20   Texas.
21       So you're claiming that the 5 percent that
22   was deducted from the credit card tips was improper.
23   And my question to you is, why do you think it was
24   improper?
25       MR. SHELLIST: Same objection.

Page 13

1        But you can answer.
2        A. I believe it was improper because that is
3    not -- the club does not pay 5 percent to use the credit
4    card companies. I know it's a less percentage to be
5    used.
6    Q. (BY MR. VAN HUFF) Okay. So your complaint is
7    that the 5 percent was too high?
8        A. Yes, sir.
9    Q. Because it's not equivalent to the amount that
10   the company actually had to pay to the credit card
11   processing companies to liquidate the credit card tip?
12       A. Yes.
13   Q. Is there anything else with regard to you
14   individually in connection with your employment as a
15   bartender at Treasures that you claim Treasures was
16   doing improperly as a basis for your lawsuit?
17       A. There were times you would work and not be paid
18   to work, like if your time card was not correct.
19   Q. Okay. How often would that happen?
20       A. For me personally, not very often.
21   Q. And what would the circumstances be in
22   connection with that?
23       A. Sometimes the time clock was not working, so
24   you would write it in, and when I would look on my
25   receipt -- paycheck stub, the hours weren't always the

Page 14

1  same.
2      Q. On the few occasions that happened, did you
3  ever attempt to talk to anybody in management about
4  that?
5      A. No.
6      Q. Why not?
7      A. I don't know. I just didn't.
8      Q. Since it only happened a few times and you
9  never mentioned it to anybody, is it possible it was
10  just an error in processing your time card? Somebody
11  erred in adding it up and it was a mistake?
12      A. Possibly, yeah.
13      Q. Because it wasn't something happening on a
14  regular basis, right?
15      A. Right.
16      Q. Okay. So we have the 5 percent issue. We have
17  an issue of some unpaid hours.
18          How many hours altogether -- how many
19  hours from October of 2006 to October of 2009 do you
20  think you weren't paid for?
21      A. I have no idea.
22      Q. More than ten hours?
23      A. Yes.
24      Q. More than 20 hours?
25      A. Yes.

Page 15

1      Q. Less than 40 hours?
2      A. I don't know.
3      Q. Less than 50 hours?
4      A. Probably around.
5      Q. Probably around 50 hours for a three-year
6  period? You only worked two years during that
7  three-year period.
8      A. Probably.
9      Q. Now, you said January of '08 is when you
10  started getting paid minimum wage.
11          When did you stop working there?
12      A. I gave my notice in December of '08.
13      Q. So from January '08 to December '08 was the
14  period where you were getting paid 5-something an hour?
15      A. Correct.
16      Q. And it was only prior to January '08 when you
17  were getting the 2.13 per hour?
18      A. Yes.
19      Q. Okay. Other than the 5 percent and the unpaid
20  hours with regard to you individually and at Treasures
21  as a bartender, do you have any other complaints about
22  the way they were paying you?
23      A. Would that include like your W-2s and stuff
24  like that?
25      Q. Just whatever relates to you in connection with

Page 16

1  your work at Treasures as a bartender. Anything that
2  you have to complain about I want to know about right
3  now that's the basis of your lawsuit.
4      A. I know my W-2s were not correct.
5      Q. Okay. What was wrong with your W-2s?
6      A. They did not reflect the earnings that I had
7  made properly.
8      Q. In what way?
9      A. None of your cash tips were on there, and then
10  credit card amounts that were on there was not
11  anywhere -- it was more than what I had made in credit
12  cards on my personal self.
13      Q. Okay. So cash tips were unreported.
14          When you noticed that, did you ask anyone
15  about it?
16      A. No. My husband, he does the taxes, and I
17  guess -- there's a way you can put it in the taxes, I
18  guess. I don't know.
19      Q. So you had cash tips that were unreported and
20  some credit card tips that were reported that shouldn't
21  have been?
22      A. They were just higher than what I had earned in
23  credit card earnings.
24      Q. Did it approximate the amount that you had in
25  cash tips? Doesn't it just say "wages, tips and other

Page 17

1  compensation" without specifically saying it came from
2  credit cards or cash?
3      A. Yes, it does.
4      Q. So how would you be able to tell?
5      A. I kept track of what I made, and I know it was
6  not right.
7      Q. If you're saying that the cash tips were too
8  low and the credit card tips were too high but when you
9  combine them it's a 0-some gain and a figure that says
10  "wages, tips and other compensation," it wouldn't make
11  any difference, would it?
12      A. I don't understand. Sorry.
13      Q. Okay. Anything else other than your W-2 being
14  incorrect, unpaid hours, 50 unpaid hours, and the credit
15  card processing fee that relate to you directly in your
16  employment as a bartender with Treasures?
17      A. I don't think so.
18      Q. How much money do you think Treasures owes you
19  for these three issues?
20      A. I do not have an amount for that.
21      Q. It's clearly less than $5,000, isn't it?
22          MR. SHELLIST: Object to the form.
23          But if you know, you can answer.
24      A. I do not know.
25      Q. (BY MR. VAN HUFF) 50 hours times $6 an hour, I

Page 18

1    think that's $300.
2         MR. SHELLIST:  That's my fault for
3    objecting.  I thought you were referring to the case,
4    what you think you're owed in the case.  If you're
5    limiting it to this stuff you have just spoken with her
6    about, I'm okay with that.  I'll withdraw the objection
7    to that.
8         Q.  (BY MR. VAN HUFF)  You said that you are not
9    sure how much money you would be owed.
10        How many hours were you working a week?
11        A.  Anywhere from 20 to 50.
12        Q.  Is it part of your claim that you weren't
13   getting paid overtime for your overtime hours?
14        A.  Not that I know of.
15        Q.  Okay.  As far as unpaid hours, if you were
16   shorted 50 hours and you were getting paid less than $6
17   an hour, that would be approximately $300, correct?
18        A.  Correct.
19        Q.  And when you say -- if you were looking at
20   5 percent of your credit card tips -- do you recall how
21   much money you made in 2008 that you reported on your
22   W-2?
23        A.  No.
24        Q.  Do you have any idea how much 5 percent of your
25   credit card tips would reflect on a per-year basis?

Page 19

1         A.  No.
2         Q.  But we could figure that out by looking at the
3    credit card tips you were paid?
4         A.  Yes.
5         Q.  And with the issue of incorrect W-2s, do you
6    have -- what economic damage would that have caused you?
7         A.  I don't know.  I'm not sure.  I guess I don't
8    understand the question really.
9         Q.  Well, if the W-2s were incorrect and yet your
10   husband filed the correct information according to your
11   calculations with the IRS and those were the numbers
12   that the IRS based your taxes on, then you wouldn't have
13   suffered any damage due to an incorrect W-2, correct?
14        A.  Yes, I guess so.  I don't know much about
15   taxes.  Sorry.
16        Q.  I don't, either.  I'm happy about it.
17        When was your bankruptcy discharged?
18        A.  November -- you mean finished?
19        Q.  Yes.
20        A.  November of -- I believe it was 2008.
21        Q.  Was it filed in October of 2002?
22        A.  I don't remember the exact date it was filed.
23   I have the information at home.  I think it was -- I
24   thought it was November 2008 or '07.
25        Q.  And -- okay.  Do you recall approximately when

Page 20

1    you originally filed the bankruptcy proceeding?
2         A.  I think it was 2002.  October or November 2002,
3    I believe.
4         Q.  For whatever reason the bankruptcy was pending
5    for many years?
6         A.  I paid it in five years, but they said it can
7    stay on your credit for seven years.
8         Q.  I see.  And it was finally disposed of -- my
9    information is that it was disposed of in January of
10   2008.
11        Does that sound about right to you?
12        A.  I would think so.  I know I paid it in five
13   years.
14        Q.  Did you report to the bankruptcy trustee the
15   fact that you perceived that you were owed money by
16   Treasures for unpaid wages and for the 5 percent that
17   was deducted from your credit card tips in connection
18   with your bankruptcy case?
19        A.  No.
20        Q.  Why not?
21        A.  I didn't know.
22        Q.  You didn't know you had a claim until
23   Ms. McKnight told you you might?  That's why you didn't
24   report it to him?
25        A.  No.  Are you asking -- can you ask me again

Page 21

1    because maybe I don't understand?
2         Q.  Sure.  Usually in a bankruptcy you have to tell
3    the bankruptcy trustee what all your assets are,
4    including money that other people might owe you.
5         A.  No.  I didn't know at the time.  I didn't know
6    I could be owed that money.  I did not know that.
7         Q.  Okay.  When did you first perceive that you
8    might be owed money?
9         A.  When Laura told me about it.
10        Q.  Okay.  And that would have been sometime in
11   early 2009?
12        A.  Yes.
13        Q.  Which was after your bankruptcy case was
14   disposed?
15        A.  Yes.
16        Q.  Have you ever been arrested?
17        A.  No.
18        Q.  As my pile of documents gets smaller, we get
19   closer to the end of your deposition.  Basically, what
20   I'm going to be doing is going over your interrogatory
21   answers and going over the declarations you filed with
22   the -- or that your attorney filed as an attachment for
23   a motion he filed for notice of class members.
24        So I'm just giving you an idea of what's
25   going on so it might go a little bit more smoothly for

Page 22

1  you. I won't take too much time. I expect we'll be
2  going over this stuff and talking about your case for
3  probably another hour or so. At any time you feel you
4  want to take a break, just let us know and we can do
5  that.
6      A. Okay.
7      Q. Other than the allegations that we just went
8  over with regard to your claim against Treasures as a
9  bartender, in your mind, do you have a basis
10 individually for any sort of claim against the other
11 five clubs -- Centerfolds, Gold Cup, Trophy Club,
12 Splendor or Cover Girls -- considering the fact that
13 your employment by those clubs was so remote in time?
14         MR. SHELLIST: Object to the form of the
15 question.
16         But you may answer.
17     A. I don't understand what you're asking.
18     Q. (BY MR. VAN HUFF) Okay. We went over some of
19 the stuff that you have as a basis for a claim against
20 Treasures. Okay? And there is a statute of limitations
21 that applies to Fair Labor Standards Act violations.
22 All right? The longest period under the statute of
23 limitations is going to be three years. And I don't
24 think your lawyer disputes that.
25         So if we assume that the statute of

Page 23

1  limitations was three years, and we see that your
2  lawsuit was filed in October of 2009, what we're talking
3  about as far as your claims go is claims from October of
4  2006 to October of 2009. During that period, according
5  to your testimony, you worked only as a bartender at
6  Treasures.
7          So my question to you is, if we assume
8  there's a three-year limit -- I know he's going to
9  object to the question, but I want you to answer it
10 anyway, so follow me here.
11         Assuming there's a three-year limit, do
12 you perceive any basis for you individually to have a
13 claim against any of the other five clubs other than
14 Treasures?
15         MR. SHELLIST: Object to the form of the
16 question.
17         But you can answer.
18     A. Me personally, individually, no, because I was
19 not at the other clubs.
20     Q. (BY MR. VAN HUFF) Okay. Now, there's an
21 allegation in your lawsuit that these six clubs all
22 together are joint employers. As far as what you know
23 individually and personally without regard to what other
24 people have told you, what is your knowledge of the
25 factual basis for that allegation, that the clubs are

Page 24

1  joint employers?
2      A. It's true. Do you want my reasons?
3      Q. Yes.
4      A. One, because I did work at three of them within
5  my time of employment with the Davaris.
6      Q. Okay. Now, with regard to your work at the
7  three different clubs, were you -- when you worked at
8  Centerfolds, were you paid by Centerfolds?
9      A. Well, one of them was D. Houston and one was
10 A.H.D. Houston on the check.
11     Q. The names of the corporations?
12     A. Yes.
13     Q. The corporate names were different than the
14 trade names?
15     A. Yes.
16     Q. Okay. So are you claiming that, when you
17 worked at Centerfolds, you were getting paid by the
18 corporation that owned Treasures?
19     A. I don't remember which is which, but one is
20 D. Houston and one is A.H.D. Houston.
21     Q. Treasures is D. Houston and Centerfolds is
22 A.H.D. Houston.
23     A. So when I worked at Centerfolds, I got
24 A.H.D. Houston; and when I worked at Treasures, I got
25 D. Houston on my paycheck as the name.

Page 25

1      Q. Okay. So other than the fact that over the
2  years you worked at several of these clubs, what other
3  facts are there that form your basis that the clubs are
4  all joint employers?
5      A. We would borrow supplies between the clubs.
6      Q. What kind of supplies?
7      A. We'd run out of napkins, credit card tab
8  sheets, the table tents. And I know for a fact the
9  cooks were going to the other clubs to get supplies like
10 if the kitchen ran out of stuff and bringing it to the
11 other clubs.
12     Q. Okay. Now, when a club -- so you are alleging
13 that the -- or that Treasures would sometimes borrow
14 supplies and other items from other clubs?
15     A. Yes.
16     Q. Do you have any reason to know whether or not
17 Treasures remunerated those other clubs for the
18 supplies? Paid them for them.
19     A. I would not know that for a fact. No.
20     Q. Okay. What other facts do you know of that
21 demonstrate they're joint employers?
22     A. I mean, when I worked at the other clubs, the
23 owners were at the other clubs. I saw them there. I
24 had conversations with them.
25     Q. Who do you think the owners are?

Page 26

1    A.  George and David.
2    Q.  And we're talking about George Davari and David
3  Davari?
4    A.  Yes.
5    Q.  So during your employment at the three clubs
6  that you worked over the years that you worked in this
7  business or in this -- in the industry here in Houston,
8  you would see the Davaris at the various clubs while you
9  were so employed?
10   A.  Yes.
11   Q.  Okay.  What other facts do you have to support
12  your contention that the clubs are joint employers?
13   A.  I have -- my husband, for instance, worked at
14  one of the clubs, one of the ones I did not work at.
15   Q.  Which one?
16   A.  He worked at Gold Cup.  So I know from him
17  being there that it was the same.  And then at Cover
18  Girls, I had a close friend that worked there.
19   Q.  So you had a friend and a husband, two
20  different people, who worked at a couple of the other
21  clubs?
22   A.  Yes.
23   Q.  Okay.  So whatever information you garnered
24  from them was information that they told you to?
25   A.  Right.

Page 27

1    Q.  Are you aware that each of the six clubs is its
2  own corporation?
3    A.  I am now.  Yes.
4    Q.  Are you aware that each of the six clubs has
5  its own location?
6    A.  Yes.
7    Q.  You are aware that each of the six clubs has
8  its own liquor license?
9    A.  Yes.
10   Q.  Do you have any other facts which demonstrate
11  that the clubs are joint employers, the six clubs?
12   A.  I know other people that worked for -- like
13  that would be at Treasures and transfer over to another
14  club through the same thing, but I don't know if that
15  counts or not.
16   Q.  Do you know of anyone that was working at
17  Treasures but being paid by Centerfolds?
18   A.  Not that I can think of.
19   Q.  Do you know of anyone that was working at
20  Centerfolds and being paid by Treasures?
21   A.  Not that I know of.
22   Q.  You stated a minute ago that you perceived that
23  the Davari brothers are the owners of these clubs.
24      What other perceptions do you have with
25  regard to the Davari brothers' relationships with the

Page 28

1  clubs?
2    A.  I don't understand.
3    Q.  What knowledge do you have about the Davari
4  brothers' relationships with the clubs?
5    A.  I just was told that they were the owners.
6    Q.  Were you aware of any other facts that we
7  haven't talked about in support of your allegation that
8  the clubs are joint employers?
9    A.  Not that I can think of right now.
10   Q.  Why did you decide to stop working at
11  Treasures?
12   A.  My ex-husband passed away and I wanted to be
13  with my children more, and I had also been waiting for a
14  job at a day care center.
15   Q.  So just personal issues?
16   A.  Yes.
17   Q.  Now, there's another cause of action, or
18  another legal assertion, that you have made in your
19  case, and I'm going to ask you what the factual basis is
20  for that legal assertion -- that's a very badly
21  put-together sentence -- and it's related to the joint
22  employer.  It's called single integrated business
23  enterprise.  There's an allegation that these six clubs
24  are a single business enterprise based on some alleged
25  interrelation between the businesses, according to your

Page 29

1  interrogatory answer here.
2      And I'm going to -- I think that we can
3  agree that all the things we just went over with regard
4  to joint employers are probably facts that you say also
5  support your allegation of single business -- single
6  integrated business enterprise.  Correct?
7    A.  Correct.
8    Q.  So rather than going through all these things
9  again, we'll agree you also think those things support
10  that allegation, as well?
11   A.  Yes.
12   Q.  Now, are there any additional things that come
13  to mind that we haven't gone over that support your
14  allegation of a single integrated business enterprise?
15   A.  Not that I can think of.
16   Q.  The two interrogatory answers that you gave as
17  to each of those issues are basically the same, so that
18  doesn't surprise me.  But they're separate things so I
19  needed to ask.
20      When we initially talked about the
21  5 percent, you stated that in your view it's improper
22  for the company to deduct 5 percent because 5 percent
23  exceeds the amount of money that the company pays as
24  credit card processing fee to the credit card company
25  which is necessary to liquidate your tip, correct?

Page 30

1     A. What do you mean by "liquidate" the tip?
2     Q. Turn it into cash --
3     A. Yes.
4     Q. -- as opposed to a credit card charge.
5     A. Yes.
6     Q. Now, are there any other details about the
7 5 percent that you think are improper?
8     A. Well, I was a waitress at a regular restaurant,
9 and when you got credit card tips, they did not take any
10 percent out for any credit card processing fees. So I
11 believe that taking a percentage out isn't correct.
12    Q. Okay. So either the 5 percent was too much in
13 that it was twice as much as it should have been, or any
14 percentage is unlawful? And that's fine because I
15 understand that that's -- so there's two prongs to that
16 claim. One, it might be that the entire 5 percent is
17 unlawful; alternatively, a portion of the 5 percent was
18 unlawful, right?
19    A. Correct.
20    Q. Okay. Anything else wrong with the 5 percent,
21 as far as you know?
22    A. Not as far as I know.
23    Q. Did you fly here from Virginia for the
24 deposition?
25    A. Yes.

Page 31

1    Q. When do you fly back?
2    A. Tomorrow morning.
3    Q. There's an allegation that any cost to
4 Treasures due to credit card charges was covered through
5 fees collected from topless dancers.
6    A. Yes.
7    Q. That's an allegation of your lawsuit?
8    A. Yes.
9    Q. What facts do you know that support that
10 allegation?
11    A. Dancers, when they did a dance on credit card,
12 the charge was $25 per dance. And when they went to get
13 paid out on their dances, the club kept 20 percent of
14 that 25. So the entertainer received 20, and the club
15 kept 5 for every 25.
16    Q. So we're talking about 80 percent and
17 20 percent?
18    A. Correct.
19    Q. Okay. So your testimony is that for dances
20 that were paid for by customers by credit card, the fee
21 would be $25 per dance, right?
22    A. To the customer, correct.
23    Q. And out of that $25, 80 percent or $20 per
24 dance would go to the dancer; and $5 or 20 percent would
25 be retained by the house?

Page 32

1    A. Yes.
2    Q. What basis do you have to allege that there is
3 some requirement that Treasures use that 20 percent from
4 the dancers' fee to cover credit card charges?
5    A. When we were hired and the managers go over the
6 details of how things are processed, we're told that the
7 20 percent from them is for processing fees and just
8 basic club access fees.
9    Q. Okay. Well, aside from what other people told
10 you, do you agree with me that Treasures, as the owner
11 and operator of this business, has the discretion to say
12 whether that $5 per dance or the money paid at the door
13 or its profit from the sale of alcohol, whether or not
14 that money goes to cover the credit card processing
15 fees?
16        MR. SHELLIST: Object to the form.
17        But you can answer it.
18    A. Are you asking me do I believe that they have
19 the right to use that money however they want?
20    Q. (BY MR. VAN HUFF) Yeah.
21    A. I do believe they have the right to use the
22 money where they see needed.
23    Q. Okay. When they said it goes to cover
24 processing fees -- when I say "it," the 20 percent
25 retained by the house off the dances -- couldn't they

Page 33

1 have been talking about the in-house administrative
2 costs of processing credit cards?
3    A. They could have. They just said "processing
4 fees."
5    Q. The clerk that they pay to sit in the back room
6 with all the credit card slips and add it all up would
7 be an administrative in-house cost, wouldn't it?
8    A. Yes, it would.
9    Q. Because the employees of Treasures don't get to
10 decide how Treasures spends the 20 percent it retains
11 from the dancers, correct?
12    A. Correct.
13    Q. With regard to the 5 percent that you allege
14 was unlawful -- I'm talking about the 5 percent of the
15 credit card tips that was retained by Treasures during
16 your employment as a bartender -- what facts do you know
17 that support your allegation that Treasures was
18 intentionally violating the law with regard to charging
19 that 5 percent? That it knew it was violating the law
20 by charging you that 5 percent but was doing it anyway?
21 What facts do you know to support that?
22        MR. SHELLIST: Whatever you know.
23    A. I don't know.
24    Q. (BY MR. VAN HUFF) Okay. So as far as you
25 know, if the 5 percent was unlawful, it could have just

Page 34

1  been a mistake, correct?
2         MR. SHELLIST:  Object to the form.
3         But you can answer it.
4      A.  I don't believe it was a mistake.
5      Q.  (BY MR. VAN HUFF)  You believe it was
6  intentional.  They were intentionally grinding the
7  waitresses out of 5 percent of their credit card tips?
8      A.  They intentionally did charge 5 percent to the
9  waitresses.
10     Q.  Obviously, they intended to do it since that's
11 what happened.
12        But do you think they were intending to
13 violate the law in so doing it?
14        MR. SHELLIST:  Object to the form.
15        But you can answer it.
16     A.  I believe, if they are aware of the law, then
17 yes, they intentionally went against the law.
18     Q.  (BY MR. VAN HUFF)  But you acknowledge that it
19 could have been ignorance?  Not that that's an excuse,
20 but it would have been ignorance of the law, that they
21 thought the 5 percent was okay.  Otherwise -- you don't
22 have any evidence or know of any facts that would
23 demonstrate otherwise, right?
24     A.  I don't have any evidence or facts to
25 demonstrate otherwise.

Page 35

1      Q.  Other than what people told you -- what facts
2  are you aware of that demonstrate that the policies that
3  you're complaining about, the unlawful acts with regard
4  to you individually, were also in place at the clubs
5  other than Treasures during the three-year period,
6  October '06 to October '09, other than what people told
7  you?
8      A.  I know for a fact at Gold Cup because my
9  husband was a bartender and did the exact same
10 practices.
11     Q.  And you would know that because he told you?
12 Other than what people told you, what facts do you know
13 during the three-year period, October '06 to October
14 '09, that the same policies and practices at Treasures
15 were going on at the other five clubs?
16     A.  I guess I would have no facts other than...
17     Q.  What people told you?  Right?  Yes?
18     A.  Yes.  Sorry.
19     Q.  Your testimony is that you were getting paid
20 2.13 an hour prior to January '08 and then 5-something
21 an hour after January of '08 as a bartender.  Yesterday
22 I took the deposition of Mr. Baker.
23        He was also a bartender?
24     A.  Yes.
25     Q.  And I think he was paid differently than you

Page 36

1  were.
2      A.  Yes, he was.
3      Q.  And so I'm not trying to make the point that
4  one of you is not telling the truth because I think that
5  you're both telling the truth and you were just paid
6  differently, but I need to establish that on the record,
7  that y'all were being paid differently.  Okay?
8         It's my understanding Mr. Baker was
9  getting paid by the shift.
10     A.  Correct.
11     Q.  Correct.
12        Now, were there other bartenders that you
13 were aware of -- it's okay if they told you about it --
14 that were being paid by the shift?
15     A.  Yes.  If you were hired as a bartender after
16 January -- I believe it was January of '02 -- then you
17 got paid hourly.  If you were hired before, I believe,
18 January '02, then you got shift pay.
19     Q.  Now, did the bartenders that were getting shift
20 pay, did they also prove to the 5-something an hour in
21 January of '08 so that all the bartenders were getting
22 paid minimum wage after that date?
23        MR. SHELLIST:  Object to the form of the
24 question.
25        But you can answer it.

Page 37

1      A.  I don't know.  I never asked.
2      Q.  (BY MR. VAN HUFF)  Okay.  During the three-year
3  period that I keep talking about, October '06 to
4  October '09, do you have any information regarding
5  whether bartenders were getting paid shift pay versus
6  hourly pay or both at the five clubs other than
7  Treasures?
8         Do you know how the bartenders were
9  getting paid at the other five clubs for the three-year
10 period?
11     A.  No.
12        MR. SHELLIST:  Like your husband.
13     A.  (Continuing.)  I just know the policy was, if
14 you were hired after January '02, then you were an
15 hourly employee, whereas before the shift pay, employees
16 stayed shift pay.  And I do not know if after January
17 '08 if that changed.  I don't know about the other
18 clubs.
19     Q.  (BY MR. VAN HUFF)  At all?
20     A.  No.
21     Q.  Yes?
22     A.  Yes.
23     Q.  You're agreeing with me you don't know about
24 the other clubs at all?
25     A.  Yes.

Page 38

1    Q. The policies of bartenders, whether they get
2  paid hourly or shift pay?
3    A. Correct.
4    Q. Now we get to talk about the difference between
5  walked tabs and tabs where you lost the customer.
6        Did you ever have to pay for walked
7  tabs --
8    A. Yes.
9    Q. -- at Treasures?
10    A. Yes.
11    Q. During the relevant three-year period --
12    A. Yes.
13    Q. -- that we talked about earlier?
14    A. Yes.
15    Q. We're doing a good job of talking over each
16  other.
17        How often would that happen during the
18  three-year period?
19    A. For myself personally I think it only happened
20  twice.
21    Q. And how much were they?
22    A. One of them was over a hundred dollars -- I
23  don't remember the exact amount -- and the other one I
24  know it was under a hundred, but I don't remember the
25  exact amount.

Page 39

1    Q. What were the circumstances of the first one?
2    A. The one over a hundred was a regular customer
3  who had given me the credit card and left that night and
4  never paid.
5    Q. So he opened a credit card tab, and then he
6  left without signing the credit card?
7    A. Correct.
8    Q. And you were held responsible for the entire
9  amount --
10    A. Correct.
11    Q. -- of the credit card tab?
12        And that's because you had to use your
13  bank to purchase the drinks for him, and then they were
14  never paid for on the credit card?
15    A. Yes.
16    Q. When I say "your bank," your cash bank, because
17  you would go to the bartender and pay him cash for
18  drinks out of your bank, take them to the customer, and
19  then at the end --
20        MR. SHELLIST: She was a bartender.
21    A. We got a bank at the beginning of the night,
22  like the bag of money at the beginning of the night.
23    Q. (BY MR. VAN HUFF) Let me back up because for a
24  moment I forgot you were a bartender and thought you
25  were a waitress, and I was asking you waitress

Page 40

1  questions.
2        So you had two instances during the
3  three-year period, October '06 to October '09, where you
4  claim that you had to pay for a walked tab?
5    A. Yes.
6    Q. And this was as a bartender?
7    A. Yes.
8    Q. The first instance a customer came to the bar,
9  opened a tab with a card, you served him over $100 worth
10  of drinks but less than $200 worth of drinks, and he
11  left without signing his credit card tab?
12    A. Yes.
13    Q. And then the customer never came back?
14    A. The customer came back a couple weeks later.
15    Q. When he came back a couple weeks later, did he
16  close his tab?
17    A. No. I paid for his tab the night he walked it,
18  and I asked him for the money back when he came back
19  several weeks later.
20    Q. Did he pay you?
21    A. He did, yes.
22    Q. Was he a regular?
23    A. Yes.
24    Q. All right. So you covered his tab, and then he
25  came in a couple weeks later and paid you back?

Page 41

1    A. Yes.
2    Q. Would you have covered his tab if he wasn't a
3  regular?
4    A. I would have had to.
5    Q. So you didn't suffer any damages because of
6  that instance?
7    A. On that one, no.
8    Q. Now, will you please tell me about the second
9  one.
10    A. It was a customer that had just come in and ran
11  a credit card tab. It was under $100 but he never -- I
12  never saw him again. So I paid that out of my pocket.
13    Q. Is it your testimony there was a policy that
14  required you to do that?
15    A. Yes.
16    Q. So as far as an unreimbursed walked credit card
17  tab, there's only one during the relevant three-year
18  period?
19    A. For myself, yes.
20    Q. Okay. Credit card charge-backs. Are you
21  claiming that you were a victim of credit card
22  charge-backs?
23    A. I personally was not a victim.
24    Q. As far as tips that were due to you at the end
25  of a shift, you work a shift, you accumulate some tips

Page 42

1  on credit cards.
2      Do you acknowledge that at the end of each
3  shift that you worked you were paid the tips that you
4  were due for that shift?
5      MR. SHELLIST:  Object to the form of the
6  question.
7      But you can answer.
8      A.  I don't feel I received the tips that I should
9  have received.  Is that what you mean?
10     Q.  (BY MR. VAN HUFF)  Setting aside the 5 percent
11 issue that was obviously the main claim in your lawsuit,
12 the credit card fee --
13     A.  Right.
14     Q.  -- credit card tip fee, setting that aside for
15 a second, are you claiming that Treasures would not pay
16 you your tips at the end of your shift, other than the
17 5 percent that you're complaining about?
18     A.  If it was over a certain amount, they would
19 hold your tips.
20     Q.  I'm talking about for you individually.
21     A.  For me individually, no, because I never had
22 very high tabs at the bar.
23     Q.  Okay.  So you acknowledge that, as far as you
24 go, during the relevant three-year period that we talked
25 about, October '06 to October '09, at the end of each of

Page 43

1  your shifts, you were paid all of your tips in cash,
2  setting aside the 5 percent issue that's the allegation
3  in your lawsuit?
4      A.  Yes.
5      Q.  Now, you said that there were other people who
6  were not?
7      A.  Correct.
8      Q.  You said there were other folks that didn't get
9  all their tips at the end of their shifts --
10     A.  Yes.
11     Q.  -- at Treasures --
12     A.  Yes.
13     Q.  -- during the three-year period?
14     A.  Yes.
15     Q.  Tell me all the facts you know about that,
16 including the stuff people told you.
17     A.  The bartenders paid the waitresses out at the
18 end of the night, and there were many occasions where
19 the tab was not, I guess what you would call, a "stable
20 tab," and they were afraid it might get disputed.  So we
21 were told to hold all the dance tickets on the tab and
22 the waitress tip, and they would pay them out at a later
23 time.
24     And then they made a policy -- I don't
25 remember exactly -- towards the latter part of my

Page 44

1  employment.  If it was over a thousand dollars, it was
2  held -- automatically held a thousand dollars or more --
3  if the tip was a thousand dollars or more, the tab would
4  automatically be held.
5      Q.  Now, I think -- what was the phrase you used
6  for tips that might be problematic?
7      A.  "Unstable."
8      Q.  Unstable.
9      What are some things that, in your
10 experience working at Treasures, that would cause
11 management to view a tab as unstable?
12     A.  The customer was rowdy; there was an excessive
13 amount of dances on the tab; they were there for many
14 hours; the tab was a high, high amount.
15     Q.  Like when you say a "high amount" --
16     A.  Several thousand, like 3,000 or more.  A
17 customer that possibly was complaining a little bit.
18     Q.  Okay.  Spillage and breakage.  Were you the
19 victim of unlawful spillage and breakage practices at
20 Treasures?
21     A.  Personally myself as a bartender, no.  I would
22 just remake the drink.
23     Q.  I guess you weren't in the habit of spilling or
24 breaking things.
25     A.  I was in the habit?

Page 45

1      Q.  You were not in the habit.
2      A.  If I spilled a drink or I broke a drink, being
3  as I was the bartender, I would just remake the drink
4  and give it to them.
5      Q.  Why don't we take a break, if that's okay with
6  you, since we have been going about an hour.  Then we
7  can finish up with the declaration and we'll be done.
8  The declaration covers a lot of stuff covered in your
9  interrogatory answers, so it will be quick.
10     (A recess was taken.)
11     Q.  (BY MR. VAN HUFF)  Are you alleging that you
12 ever had to share any of your tips with managers?
13     A.  As a bartender, no; as a waitress, yes.
14     Q.  During the three-year period of October '06 to
15 October '09 when you worked at Treasures as a bartender,
16 did you ever have to share any of your tips with
17 managers?
18     A.  No.
19     Q.  Earlier you talked about the fact that you
20 didn't think that Treasures had reported your cash tips
21 on your W-2.
22     Did you ever report any of your cash tips
23 to Treasures?
24     A.  No.
25     Q.  It says here in your declaration you were aware

Page 46

1   waitresses had to eat the cost of spilled drinks.
2        A.  Yes.
3        Q.  Can you explain that to me?
4        A.  If they spilled a drink or broke a glass and
5   spilled, they had to come and purchase a new drink.
6        Q.  How often would that happen?
7        A.  Every night.
8        Q.  It says here that an earlier policy was the
9   club issued spill tickets.
10       A.  Yes.
11       Q.  What was that about?
12       A.  Earlier, when I first started working, if you
13  spilled a drink or knocked something over, you could go
14  to a manager and they would write on a little memo pad
15  what the drink was and the cost, and the manager would
16  sign it, and the waitress would sign it.  And then
17  they'd give that to the bartender, and the bartender
18  could remake the drink without charging the waitress for
19  the drink.  And those were kept all together at the end
20  of the night and added up.
21       Q.  When did they stop doing that?
22       A.  I don't remember the exact date.  I want to say
23  it was somewhere in 2008, but I'm not exactly sure.
24       Q.  Somewhere in 2008?  But you never personally
25  had to pay for any spilled drinks, correct?  That's what

Page 47

1   you testified to earlier.
2        A.  Correct.
3            MR. VAN HUFF:  Pass the witness.
4            E X A M I N A T I O N
5   BY MR. SHELLIST:
6        Q.  Ms. Turner, you were talking earlier about when
7   you were trained and what your managers had said about
8   what the $5-per-credit-card dance was for.
9            What were the words that were told to you
10  the best you can recall regarding what $5 or that
11  20 percent of the $25 was used for by the club?
12       A.  The 20 percent was for credit card processing
13  fees and any --
14           MR. VAN HUFF:  Objection; calls for
15  hearsay.
16       A.  -- and any maintenance fees for the club.
17       Q.  (BY MR. SHELLIST)  Okay.  And either then or
18  thereafter who did you hear that from?  Meaning, who was
19  telling you this?
20           MR. VAN HUFF:  Running objection to --
21       A.  The managers --
22           MR. VAN HUFF:  -- calls for --
23           THE REPORTER:  Wait.  One at a time.
24           MR. VAN HUFF:  Running objection to
25  questions that call for hearsay.

Page 48

1            MR. SHELLIST:  You think it's hearsay if
2   she says what a manager says?
3            MR. VAN HUFF:  My objection is on the
4   record.
5            MR. SHELLIST:  Okay.
6        Q.  (BY MR. SHELLIST)  Go ahead.  Tell us what
7   managers -- meaning, which managers that you recall told
8   you this.
9        A.  John, Slim, Bill, Joe -- I don't remember the
10  guy that was there at the end.  I don't remember his
11  name.  And then Morris, the guy who paid out the dancers
12  typically.  He, also.
13       Q.  (BY MR. SHELLIST)  Okay.  Did anybody -- any
14  manager or anyone else, quite frankly, the whole time
15  you worked for the Davaris while you worked at
16  Treasures, did any person ever tell you that the
17  $5-per-credit-card dance was to be used to pay for some
18  person sitting in a room going through credit card
19  receipts?
20       A.  No.
21       Q.  Is it your opinion that the Davaris and the
22  clubs each have to follow the State or Federal law on
23  how to account for monies that they are receiving?
24       A.  Is it my understanding that they need to --
25  they should follow the law?

Page 49

1        Q.  Yes.
2        A.  Yes.
3        Q.  Now, to your knowledge, just based on your work
4   experience at the clubs that you worked at over the
5   years, was the 5 percent deduction on credit card tips,
6   was that something that applied to every single waitress
7   and bartender, to your knowledge?
8        A.  Yes.
9        Q.  Do you have any percentage knowledge of any
10  person having to pay back money for charge-backs?
11       A.  I have one case where I know for a fact.  It
12  was a -- my cousin's wife was a waitress there, and I
13  was the bartender that ran the tab.  And so the manager
14  came to me with questions on the tab and everything --
15       Q.  Which manager?
16       A.  Slim.
17       Q.  Okay.
18       A.  Asking me -- I don't remember the exact
19  question, but there was some mess-ups on the tab.  So
20  they -- him and I talked about the tab, and then he
21  talked with her about the tab, and then she had to pay
22  back over a thousand dollars.  And I know she paid it
23  back because she actually had me give it to him for her
24  one time.
25       Q.  What was her name?

Page 50

1    A. Miryame Jones.
2    Q. Okay. Does she still work for the Davaris?
3    A. Yes.
4    Q. At which club?
5    A. Treasures.
6    Q. Okay. And how did she give you the money, just
7  in a rubber band or in -- what form was it when she
8  gave it to you?
9    A. In an envelope.
10   Q. And what did you do with that envelope?
11   A. I handed it to Slim.
12   Q. And how did you know to do that?
13   A. Well, she told me to give it to him so I did.
14   Q. Okay. Are you aware of whether other
15 waitresses or dancers had to pay money back to the club
16 for charge-backs?
17   A. Yes.
18   Q. Okay. And in my question it's okay if it's
19 based on what you were told by people or other sources
20 in my version.
21         Tell us what you either saw or heard that
22 leads you to believe that is true.
23   A. I was friends with many of the dancers, and
24 they would come to me complaining that they had to give
25 money back, and they were to give it to Morris in an

Page 51

1  envelope.
2          And then the waitresses, of course, they
3  were -- sometimes like a tab I ran. So they
4  would come to me and ask me, "Do you remember that tab?"
5  blah, blah, blah. So they would say they had to pay the
6  money back on that.
7          And then there were times at the end of
8  the night a waitress would have a good night, and when
9  she goes to tip the bar, she would say, "I'm sorry I can
10 only tip you this much because I have to pay back a
11 bunch of charge-backs, and I already tipped you on all
12 those charge-backs. So I'm not tipping y'all the full
13 amount tonight."
14   Q. In your opinion was -- a waitress or dancer
15 paying back a charge-back, was that just a policy or
16 practice of the club, in your opinion?
17   A. Yes.
18   Q. And did you ever hear any managers reference or
19 talk about, "Yeah, I need to get that money back,"
20 including Slim, who you gave the money to?
21   A. Yes. Because sometimes they would tell us to
22 not pay the waitresses. If a waitress owed a lot of
23 money, they would want to see all of that waitress's
24 tabs that night, and then they would be instructed --
25 the waitress and them would talk about something, and

Page 52

1  then some of the money would go straight to them from
2  that night, so they made sure they got some of the money
3  back.
4    Q. Which managers by name, if you recall, talked
5  with you about holding monies or delaying monies to
6  waitresses based on charge-backs?
7    A. All of them did.
8    Q. Okay. And was this throughout your employment
9  there?
10   A. Yes.
11   Q. And then, finally, did you receive a portion of
12 tips from waitresses?
13   A. Yes.
14   Q. What percent?
15   A. It was recommended that the waitresses tip the
16 bar 15 percent.
17   Q. Was that pretty standard?
18   A. It was pretty standard. Most of them did do
19 it.
20   Q. Okay. And then did you ever have any occasion
21 where a -- where the amount you earned in an evening was
22 less because a waitress didn't get all of her tips due
23 to a charge-back?
24   A. Oh, yes, many occasions.
25   Q. Okay. But as I understand what you told

Page 53

1  Mr. Van Huff, you personally did not have ever have to
2  put money in an envelope for your own self to give it
3  back?
4    A. Correct.
5    Q. But you were indirectly affected by it?
6    A. Yes.
7    Q. Did you ever visit any of the other clubs?
8    A. Yes.
9    Q. Your husband worked where, at Centerfolds?
10   A. Gold Cup.
11   Q. And where did your sister-in-law work?
12   A. My cousin-in-law works at Treasures.
13   Q. Treasures. In your opinion, based on visiting
14 other clubs, looking at other clubs, did you -- do you
15 have an opinion on whether or not the clubs are operated
16 policywise in the same way?
17   A. Yes, they are.
18        MR. SHELLIST: We will reserve any other
19 questions until the time of trial.
20        (Turner Exhibit No. 1 was marked.)
21        F U R T H E R   E X A M I N A T I O N
22 BY MR. VAN HUFF:
23   Q. I'm going to hand you what's been marked as
24 Exhibit 1. If you would, take a look at it, please.
25        Do you recognize that?

Page 54

1    A. Yes.
2    Q. Is that your signature on that document?
3    A. Yes.
4    Q. Do you recall when you signed that?
5    A. Yes.
6    Q. What's your understanding of the substance of
7  that document?
8    A. That it's not mandatory to tip.
9    Q. And you acknowledge that, at some point during
10 your employment with Treasures, that it was explained to
11 you at the time of your employment tipping managers
12 wasn't mandatory, correct?
13    A. Correct.
14    Q. And you further acknowledge that it was the
15 policy of Treasures that tipping managers wasn't
16 mandatory, correct?
17    A. Correct. I will say, though, if you did not
18 tip the management, you were not guaranteed a job when
19 you came in the next night.
20       MR. SHELLIST: Don't put that away if it's
21 an exhibit.
22       MR. VAN HUFF: I'm sorry.
23       MR. SHELLIST: That's okay. I didn't want
24 to forget it.
25    Q. (BY MR. VAN HUFF) You do, however, acknowledge

Page 55

1  it was the policy of Treasures that it wasn't mandatory
2  to tip managers, correct?
3    A. Correct.
4       MR. VAN HUFF: Pass the witness.
5    F U R T H E R   E X A M I N A T I O N
6  BY MR. SHELLIST:
7    Q. Just real quickly, though. What I'm hearing
8  from you is -- or I'll ask it this way.
9       Number one, did you write that Exhibit 1?
10 Was that your policy that you wrote out?
11    A. I didn't write that out.
12    Q. Did the managers follow that policy?
13    A. No.
14    Q. Okay. And so in your experience at the club or
15 clubs you worked at, the practice that occurred in a
16 club didn't always match what the written policy might
17 have been.
18       Is that true?
19    A. Yes.
20       MR. SHELLIST: Pass the witness.
21       MR. VAN HUFF: Reserve for trial.
22    (The deposition concluded at 2:50 p.m.)
23
24
25

Page 56

1              ERRATA SHEET
2  DEPOSITION OF: TRISHA TURNER, MAY 13, 2010
3
4  PAGE  LINE  CHANGE      REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24
25 Signature:_____ Date:_____

Page 57

1    I, TRISHA TURNER, have read the foregoing deposition
2  and hereby affix my signature that same is true and
3  correct, except as noted above.
4
5
6
7       _____
8         TRISHA TURNER
9  THE STATE OF _____)
10 COUNTY OF _____)
11    Before me,_____, on this day
12 personally appeared TRISHA TURNER, known to me (or
13 proved to me under oath or through _____)
14 (description of identity card or other document)) to be
15 the person whose name is subscribed to the foregoing
16 instrument and acknowledged to me that they executed the
17 same for the purposes and consideration therein
18 expressed.
19    Given under my hand and seal of office this
20 _____day of _____, _____.
21
22
23    _____
       NOTARY PUBLIC IN AND FOR
       THE STATE OF _____
24
25

Page 58

```
 1          IN THE UNITED STATES DISTRICT COURT FOR THE
                   SOUTHERN DISTRICT OF TEXAS
 2                       HOUSTON DIVISION
 3    LAURA McKNIGHT, TRISHA      *
      TURNER, ANDREW BAKER,       *
 4    RACHAEL FREEDMAN, KIMBERLY  *
      McCRAY, and MARGO MORENO,   *
 5                                *
          Plaintiffs,             *
 6                                *
      V.               * Civil Action No. H-09-3345
 7                                *
      D. HOUSTON, INC. D/B/A      *
 8    TREASURES, A.H.D. HOUSTON,  *
      INC. D/B/A CENTERFOLDS,     *
 9    D N.W. HOUSTON, INC. D/B/A  *
      GOLD CUP, D. RANKIN, INC.   *
10    D/B/A TROPHY CLUB, D WG FM, *
      INC. D/B/A SPLENDOR, W.L.   * Jury Trial Demanded
11    YORK, INC. D/B/A COVER      *
      GIRLS, AND, IN THEIR        *
12    INDIVIDUAL CAPACITIES, ALI  *
      DAVARI and HASSAN DAVARI,   *
13                                *
          Defendants.             *
14                                *
15            REPORTER'S CERTIFICATION
                  ORAL DEPOSITION OF
16                   TRISHA TURNER
                     MAY 13, 2010
17
18         I, CONNIE KOENIG, RPR, Certified Shorthand
19    Reporter in and for the State of Texas, hereby certify
20    to the following:
21         That the witness, TRISHA TURNER, was duly sworn
22    by the officer and that the transcript of the oral
23    deposition is a true record of the testimony given by
24    the witness;
25         That the deposition transcript was submitted on
```

Page 59

```
 1    _____, 2010 to the witness or to the attorney
 2    for the witness for examination, signature and return to
 3    the offices of Q & A Reporting, Inc., by
 4    _____, 2010;
 5         That pursuant to information given to the
 6    deposition officer at the time said testimony was taken,
 7    the following includes counsel for all parties of
 8    record:
 9       MARTIN A. SHELLIST, Attorney for Plaintiffs
10       ALBERT VAN HUFF, Attorney for Defendants
11         I further certify that I am neither counsel for,
12    related to, nor employed by any of the parties or
13    attorneys in the action in which this proceeding was
14    taken, and further that I am not financially or
15    otherwise interested in the outcome of the action.
16         Further certification requirements pursuant to
17    Federal Rules of Civil Procedure will be certified to
18    after they have occurred.
19         SWORN TO AND SUBSCRIBED by me in Houston, Texas,
20    on this _____day of_____, 2010.
21
22         _____
           CONNIE KOENIG, RPR, CSR
23         Expiration Date:  12/31/10
           Firm Registration No. 402
24         Q & A Reporting, Inc.
           10220 Memorial Drive
25         Suite 22
           Houston, Texas 77024
```

Page 60

```
 1          IN THE UNITED STATES DISTRICT COURT FOR THE
                   SOUTHERN DISTRICT OF TEXAS
 2                       HOUSTON DIVISION
 3    LAURA McKNIGHT, TRISHA      *
      TURNER, ANDREW BAKER,       *
 4    RACHAEL FREEDMAN, KIMBERLY  *
      McCRAY, and MARGO MORENO,   *
 5                                *
          Plaintiffs,             *
 6                                *
      V.               * Civil Action No. H-09-3345
 7                                *
      D. HOUSTON, INC. D/B/A      *
 8    TREASURES, A.H.D. HOUSTON,  *
      INC. D/B/A CENTERFOLDS,     *
 9    D N.W. HOUSTON, INC. D/B/A  *
      GOLD CUP, D. RANKIN, INC.   *
10    D/B/A TROPHY CLUB, D WG FM, *
      INC. D/B/A SPLENDOR, W.L.   * Jury Trial Demanded
11    YORK, INC. D/B/A COVER      *
      GIRLS, AND, IN THEIR        *
12    INDIVIDUAL CAPACITIES, ALI  *
      DAVARI and HASSAN DAVARI,   *
13                                *
          Defendants.             *
14                                *
15         REPORTING FIRM'S FURTHER CERTIFICATION
16
17         The original deposition was/was not returned to the
18    deposition officer on _____;
19         If returned, the attached Changes and Signature page
20    contains any changes and the reasons therefor;
21         If returned, the original deposition was delivered
22    to Albert Van Huff, Custodial Attorney, for safekeeping
23    on _____;
24         That a copy of this certificate was served on all
25    parties shown herein.
```

Page 61

```
 1    Certified to by me this _____,2010.
 2
 3
 4
 5
 6
 7         _____
           CONNIE KOENIG, RPR, CSR
 8         Expiration Date:  12/31/10
           Firm Registration No. 402
 9         Q & A Reporting, Inc.
           10220 Memorial Drive
10         Suite 22
           Houston, Texas 77024
11         (713) 467-7900 / Fax (713) 467-7911
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**A**

**able** 4:21 6:3 12:7 17:4

**above-styled** 1:19

**access** 32:8

**account** 48:23

**accumulate** 41:25

**acknowledge** 34:18 42:2,23 54:9,14 54:25

**acknowledged** 57:16

**Act** 22:21

**action** 1:6 28:17 58:6 59:13,15 60:6

**acts** 35:3

**add** 33:6

**added** 46:20

**adding** 14:11

**additional** 29:12

**address** 6:12

**administrative** 33:1,7

**affix** 57:2

**afraid** 43:20

**afternoon** 4:7,8

**ago** 7:10 27:22

**agree** 29:3,9 32:10

**agreeing** 37:23

**ahead** 12:9 48:6

**Al** 4:9

**Albert** 2:9 59:10 60:22

**alcohol** 32:13

**ALI** 1:12 58:12 60:12

**allegation** 23:21,25 28:7,23 29:5,10 29:14 31:3,7,10 33:17 43:2

**allegations** 22:7

**allege** 32:2 33:13

**alleged** 28:24

**alleging** 25:12 45:11

**alternatively** 30:17

**altogether** 14:18

**amount** 10:25 13:9

16:24 17:20 29:23 38:23,25 39:9 42:18 44:13,14,15 51:13 52:21

**amounts** 16:10

**ANDREW** 1:3 58:3 60:3

**answer** 5:12,12,25 6:23 12:7,13,17 13:1 17:23 22:16 23:9,17 29:1 32:17 34:3,15 36:25 42:7

**answering** 5:20

**answers** 4:20 21:21 29:16 45:9

**anticipate** 5:9

**anybody** 14:3,9 48:13

**anyway** 23:10 33:20

**Appearances** 3:2

**appeared** 57:12

**applied** 49:6

**applies** 22:21

**approximate** 16:24

**approximately** 18:17 19:25

**arrested** 21:16

**aside** 32:9 42:10,14 43:2

**asked** 37:1 40:18

**asking** 5:21,22 20:25 22:17 32:18 39:25 49:18

**assertion** 28:18,20

**assets** 21:3

**assume** 6:2 22:25 23:7

**Assuming** 23:11

**attached** 1:23 60:19

**attachment** 21:22

**attempt** 14:3

**attorney** 2:14 4:9 21:22 59:1,9,10 60:22

**attorneys** 59:13

**Autism** 10:6

**automatically** 44:2 44:4

**aware** 27:1,4,7 28:6 34:16 35:2 36:13 45:25 50:14

**A.H.D** 1:8 24:10,20 24:22,24 58:8 60:8

**B**

**B** 3:10

**back** 8:15 9:12 31:1 33:5 39:23 40:13 40:14,15,18,18,25 49:10,22,23 50:15 50:25 51:6,10,15 51:19 52:3 53:3

**backwards** 9:11

**badly** 28:20

**bag** 39:22

**Baker** 1:3 35:22 36:8 58:3 60:3

**band** 50:7

**bank** 39:13,16,16 39:18,21

**bankruptcy** 8:21 8:23,25 19:17 20:1,4,14,18 21:2 21:3,13

**bar** 40:8 42:22 51:9 52:16

**bartender** 9:13,15 10:11 11:12 13:15 15:21 16:1 17:16 22:9 23:5 33:16 35:9,21,23 36:15 39:17,20,24 40:6 44:21 45:3,13,15 46:17,17 49:7,13

**bartenders** 36:12 36:19,21 37:5,8 38:1 43:17

**based** 19:12 28:24 49:3 50:19 52:6 53:13

**basic** 32:8

**basically** 21:19 29:17

**basis** 13:16 14:14

16:3 18:25 22:9 22:19 23:12,25 25:3 28:19 32:2

**began** 10:19,20

**beginning** 7:7 39:21,22

**believe** 6:6 10:16 13:2 19:20 20:3 30:11 32:18,21 34:4,5,16 36:16 36:17 50:22

**best** 47:10

**bet** 10:9

**Bill** 48:9

**bit** 21:25 44:17

**blah** 51:5,5,5

**booklet** 4:19

**borrow** 25:5,13

**break** 22:4 45:5

**breakage** 44:18,19

**breaking** 44:24

**Brightwater** 6:13

**bringing** 25:10

**broke** 45:2 46:4

**brothers** 27:23,25 28:4

**brought** 11:2

**Building** 1:21 2:5

**bunch** 51:11

**business** 26:7 28:22 28:24 29:5,6,14 32:11

**businesses** 28:25

**C**

**C** 2:1

**calculations** 19:11

**call** 7:5 43:19 47:25

**called** 7:16 28:22

**calling** 12:13

**calls** 12:3 47:14,22

**CAPACITIES** 1:12 58:12 60:12

**card** 11:16,18,21 12:22 13:4,10,11 13:18 14:10 16:10 16:20,23 17:8,15 18:20,25 19:3 20:17 25:7 29:24

29:24 30:4,9,10 31:4,11,20 32:4 32:14 33:6,15 34:7 39:3,5,6,11 39:14 40:9,11 41:11,16,20,21 42:12,14 47:12 48:18 49:5 57:14

**cards** 16:12 17:2 33:2 42:1

**care** 28:14

**carried** 5:14

**case** 4:11,22 7:12 7:14 8:6,25 11:11 18:3,4 20:18 21:13 22:2 28:19 49:11

**cash** 16:9,13,19,25 17:2,7 30:2 39:16 39:17 43:1 45:20 45:22

**cause** 1:19 5:14 28:17 44:10

**caused** 19:6

**center** 28:14

**Centerfolds** 1:8 9:7 9:14,24 10:19 22:11 24:8,8,17 24:21,23 27:17,20 53:9 58:8 60:8

**certain** 6:24 42:18

**certificate** 3:9 60:24

**certification** 58:15 59:16 60:15

**certified** 58:18 59:17 61:1

**certify** 58:19 59:11

**challenging** 10:9

**change** 36:20 56:4

**changed** 37:17

**changes** 3:8 60:19 60:20

**charge** 30:4 31:12 34:8

**charges** 11:16 31:4 32:4

**charge-back** 51:15 52:23

**charge-backs**
41:20,22 49:10
50:16 51:11,12
52:6
**charging** 33:18,20
46:18
**check** 11:3 24:10
**children** 28:13
**circumstances**
13:21 39:1
**Civil** 1:6,22 58:6
59:17 60:6
**claim** 7:4 11:13,23
13:15 18:12 20:22
22:8,10,19 23:13
30:16 40:4 42:11
**claiming** 12:1,21
24:16 41:21 42:15
**claims** 23:3,3
**class** 21:23
**clearly** 17:21
**clerk** 33:5
**clock** 13:23
**close** 26:18 40:16
**closer** 21:19
**club** 1:10 9:18 13:3
22:11 25:12 27:14
31:13,14 32:8
46:9 47:11,16
50:4,15 51:16
55:14,16 58:10
60:10
**clubs** 4:10 8:5,7,8,9
22:11,13 23:13,19
23:21,25 24:7
25:2,3,5,9,11,14
25:17,22,23 26:5
26:8,12,14,21
27:1,4,7,11,11,23
28:1,4,8,23 35:4
35:15 37:6,9,18
37:24 48:22 49:4
53:7,14,14,15
55:15
**collected** 31:5
**combine** 17:9
**come** 29:12 41:10
46:5 50:24 51:4
**communication**

7:24
**companies** 13:4,11
**company** 13:10
29:22,23,24
**compensated** 10:13
**compensation** 17:1
17:10
**complain** 6:3 12:13
16:2
**complaining** 35:3
42:17 44:17 50:24
**complaint** 13:6
**complaints** 15:21
**complete** 5:12
**concluded** 55:22
**conclusion** 12:3,14
**confusing** 6:6,8
**connection** 11:11
13:14,22 15:25
20:17
**Connie** 1:20 58:18
59:22 61:7
**consideration**
57:17
**considering** 22:12
**contains** 60:20
**contention** 26:12
**context** 7:23
**Continuing** 37:13
**conversation** 5:8
**conversations**
25:24
**cooks** 25:9
**cooperate** 5:15
**copy** 3:11 60:24
**corporate** 24:13
**corporation** 24:18
27:2
**corporations** 24:11
**correct** 6:18 11:19
11:22 13:18 15:15
16:4 18:17,18
19:10,13 29:6,7
29:25 30:11,19
31:18,22 33:11,12
34:1 36:10,11
38:3 39:7,10 43:7
46:25 47:2 53:4
54:12,13,16,17

55:2,3 57:3
**cost** 31:3 33:7 46:1
46:15
**costs** 33:2
**counsel** 59:7,11
**counts** 27:15
**COUNTY** 57:10
**couple** 26:20 40:14
40:15,25
**course** 51:2
**court** 1:1 4:17,18
5:4 12:6 58:1
60:1
**cousin's** 8:4 49:12
**cousin-in-law**
53:12
**cover** 1:11 10:3
22:12 26:17 32:4
32:14,23 58:11
60:11
**covered** 31:4 40:24
41:2 45:8
**covers** 45:8
**credit** 11:15,18,20
12:22 13:3,10,11
16:10,11,20,23
17:2,8,14 18:20
18:25 19:3 20:7
20:17 25:7 29:24
29:24 30:4,9,10
31:4,11,20 32:4
32:14 33:2,6,15
34:7 39:3,5,6,11
39:14 40:11 41:11
41:16,20,21 42:1
42:12,14 47:12
48:18 49:5
**CSR** 1:20 59:22
61:7
**Cup** 1:9 9:16 22:11
26:16 35:8 53:10
58:9 60:9
**current** 6:12
**currently** 6:15 9:5
10:5
**Custodial** 60:22
**customer** 31:22
38:5 39:2,18 40:8
40:13,14 41:10

44:12,17
**customers** 31:20

**D**

**D** 1:7,9,9,10 3:1
24:9,20,21,25
58:7,9,9,10 60:7,9
60:9,10
**damage** 19:6,13
**damages** 41:5
**dance** 31:11,12,21
31:24 32:12 43:21
47:8 48:17
**dancer** 31:24 51:14
**dancers** 31:5,11
32:4 33:11 48:11
50:15,23
**dances** 31:13,19
32:25 44:13
**date** 9:25 19:22
36:22 46:22 56:25
59:22 61:7
**Davari** 1:12,12
26:2,3 27:23,25
28:3 58:12,12
60:12,12
**Davaris** 24:5 26:8
48:15,21 50:2
**David** 26:1,2
**day** 28:14 57:11,20
59:20
**December** 8:15,17
9:8 15:12,13
**decide** 28:10 33:10
**declaration** 45:7,8
45:25
**declarations** 21:21
**deduct** 11:20 29:22
**deducted** 12:22
20:17
**deduction** 49:5
**Defendants** 1:13,19
2:8 4:10 8:5
58:13 59:10 60:13
**delaying** 52:5
**delivered** 60:21
**Demanded** 1:10
58:10 60:10
**demonstrate** 25:21

27:10 34:23,25
35:2
**demonstrated** 11:6
**deposition** 1:15,18
4:11,13,18,19
12:15,19 21:19
30:24 35:22 55:22
56:2 57:1 58:15
58:23,25 59:6
60:17,18,21
**description** 57:14
**details** 30:6 32:6
**determine** 8:8
**difference** 17:11
38:4
**different** 24:7,13
26:20
**differently** 35:25
36:6,7
**directly** 17:15
**discharged** 19:17
**discretion** 32:11
**disposed** 20:8,9
21:14
**dispute** 11:8
**disputed** 43:20
**disputes** 22:24
**DISTRICT** 1:1,1
58:1,1 60:1,1
**DIVISION** 1:2
58:2 60:2
**divorce** 8:24 9:1
**document** 54:2,7
57:14
**documents** 21:18
**doing** 7:19 13:16
21:20 33:20 34:13
38:15 46:21
**dollars** 38:22 44:1
44:2,3 49:22
**Dominion** 10:6
**door** 32:12
**drink** 44:22 45:2,2
45:3 46:4,5,13,15
46:18,19
**drinks** 39:13,18
40:10,10 46:1,25
**Drive** 59:24 61:9
**driver's** 6:17

**due** 19:13 31:4
  41:24 42:4 52:22
**duly** 1:19 4:4 58:21
**D/B/A** 1:7,8,9,10
  1:10,11 58:7,8,9
  58:10,10,11 60:7
  60:8,9,10,10,11

**E**

**E** 2:1,1 3:1,10 4:5
  47:4 53:21,21
  55:5,5
**earlier** 38:13 45:19
  46:8,12 47:1,6
**early** 21:11
**earned** 16:22 52:21
**earnings** 16:6,23
**eat** 46:1
**economic** 19:6
**Edloe** 2:14
**either** 9:23 19:16
  30:12 47:17 50:21
**employed** 10:5,11
  26:9 59:12
**employee** 37:15
**employees** 33:9
  37:15
**employer** 28:22
**employers** 23:22
  24:1 25:4,21
  26:12 27:11 28:8
  29:4
**employment** 11:11
  13:14 17:16 22:13
  24:5 26:5 33:16
  44:1 52:8 54:10
  54:11
**enterprise** 28:23,24
  29:6,14
**entertainer** 31:14
**entire** 30:16 39:8
**envelope** 50:9,10
  51:1 53:2
**equivalent** 13:9
**ERRATA** 56:1
**erred** 14:11
**error** 14:10
**establish** 36:6
**evening** 52:21

**evidence** 34:22,24
**exact** 9:25 19:22
  35:9 38:23,25
  46:22 49:18
**exactly** 7:8,16 8:16
  10:17 43:25 46:23
**examination** 3:5,6
  3:6,7 59:2
**exceeds** 29:23
**excessive** 44:12
**excuse** 10:20 34:19
**executed** 57:16
**exhibit** 53:20,24
  54:21 55:9
**expect** 22:1
**experience** 44:10
  49:4 55:14
**Expiration** 59:22
  61:7
**explain** 5:23 46:3
**explained** 54:10
**expressed** 57:18
**ex-husband** 28:12
**e-mail** 7:24

**F**

**F** 53:21 55:5
**fact** 20:15 22:12
  25:1,8,19 35:8
  45:19 49:11
**facts** 25:3,20 26:11
  27:10 28:6 29:4
  31:9 33:16,21
  34:22,24 35:1,12
  35:16 43:15
**factual** 23:25 28:19
**Fair** 22:21
**far** 18:15 23:3,22
  30:21,22 33:24
  41:16,24 42:23
**fast** 5:13
**fault** 18:2
**Fax** 61:10
**Federal** 1:22 4:17
  48:22 59:17
**fee** 17:15 29:24
  31:20 32:4 42:12
  42:14
**feel** 22:3 42:8

**fees** 30:10 31:5
  32:7,8,15,24 33:4
  47:13,16
**figure** 17:9 19:2
**filed** 8:21 19:10,21
  19:22 20:1 21:21
  21:22,23 23:2
**finally** 5:18 20:8
  52:11
**financially** 59:14
**fine** 6:25 30:14
**finish** 5:10 45:7
**finished** 19:18
**Firm** 59:23 61:8
**FIRM'S** 60:15
**first** 4:4 6:9 7:3 8:6
  21:7 39:1 40:8
  46:12
**five** 20:6,12 22:11
  23:13 35:15 37:6
  37:9
**fly** 30:23 31:1
**FM** 1:10 58:10
  60:10
**folks** 43:8
**follow** 23:10 48:22
  48:25 55:12
**following** 58:20
  59:7
**follows** 4:4
**foregoing** 57:1,15
**forget** 54:24
**forgot** 39:24
**forgotten** 12:8
**form** 12:3 17:22
  22:14 23:15 25:3
  32:16 34:2,14
  36:23 42:5 50:7
**frankly** 48:14
**FREEDMAN** 1:4
  58:4 60:4
**friend** 26:18,19
**friends** 50:23
**front** 4:17
**full** 51:12
**further** 3:6,7 54:14
  59:11,14,16 60:15

**G**

**gain** 17:9
**garnered** 26:23
**George** 26:1,2
**getting** 15:10,14,17
  18:13,16 24:17
  35:19 36:9,19,21
  37:5,9
**Girls** 1:11 10:3
  22:12 26:18 58:11
  60:11
**give** 4:16 45:4
  46:17 49:23 50:6
  50:13,24,25 53:2
**given** 4:13 7:5 39:3
  57:19 58:23 59:5
**giving** 21:24
**glass** 46:4
**go** 4:23 8:6 12:9
  21:25 23:3 31:24
  32:5 39:17 42:24
  46:13 48:6 52:1
**goes** 12:18 32:14,23
  51:9
**going** 4:12,16,19,20
  4:21 5:4,9 6:1,3
  7:20 9:11 12:11
  12:17 21:20,20,21
  21:25 22:2,23
  23:8 25:9 28:19
  29:2,8 35:15 45:6
  48:18 53:23
**Gold** 1:9 9:16
  22:11 26:16 35:8
  53:10 58:9 60:9
**good** 4:7,8 5:13
  38:15 51:8
**grinding** 34:6
**guaranteed** 54:18
**guess** 16:17,18 19:7
  19:14 35:16 43:19
  44:23
**guy** 48:10,11

**H**

**H** 3:10 53:21 55:5
**habit** 44:23,25 45:1
**hand** 53:23 57:19
**handed** 50:11
**happen** 12:15

  13:19 38:17 46:6
**happened** 14:2,8
  34:11 38:19
**happening** 14:13
**happy** 19:16
**HASSAN** 1:12
  58:12 60:12
**hear** 47:18 51:18
**heard** 50:21
**hearing** 55:7
**hearsay** 47:15,25
  48:1
**held** 39:8 44:2,2,4
**hereto** 1:23
**high** 13:7 17:8
  42:22 44:14,14,15
**higher** 16:22
**hired** 32:5 36:15,17
  37:14
**hold** 42:19 43:21
**holding** 52:5
**home** 19:23
**hour** 10:15,17
  15:14,17 17:25
  18:17 22:3 35:20
  35:21 36:20 45:6
**hourly** 36:17 37:6
  37:15 38:2
**hours** 13:25 14:17
  14:18,19,22,24
  15:1,3,5,20 17:14
  17:14,25 18:10,13
  18:15,16 44:14
**house** 31:25 32:25
**Houston** 1:2,7,8,9
  1:22 2:6,11,15
  24:9,10,20,20,21
  24:22,24,25 26:7
  58:2,7,8,9 59:19
  59:25 60:2,7,8,9
  61:10
**Huff** 2:9,10 3:5,6
  4:6,9 12:6,9 13:6
  17:25 18:8 22:18
  23:20 32:20 33:24
  34:5,18 37:2,19
  39:23 42:10 45:11
  47:3,14,20,22,24
  48:3 53:1,22

54:22,25 55:4,21
59:10 60:22
**hundred** 38:22,24
39:2
**husband** 8:4 16:16
19:10 26:13,19
35:9 37:12 53:9
**H-09-3345** 1:6 58:6
60:6

**I**

**idea** 14:21 18:24
21:24
**identity** 57:14
**ignorance** 34:19,20
**important** 4:25 5:1
5:7,19
**improper** 11:14,24
12:1,22,24 13:2
29:21 30:7
**improperly** 13:16
**include** 15:23
**includes** 59:7
**including** 21:4
43:16 51:20
**incorrect** 17:14
19:5,9,13
**indicate** 5:25
**indirectly** 53:5
**INDIVIDUAL**
1:12 58:12 60:12
**individually** 13:14
15:20 22:10 23:12
23:18,23 35:4
42:20,21
**individuals** 4:10
**industry** 26:7
**information** 10:18
19:10,23 20:9
26:23,24 37:4
59:5
**initially** 29:20
**instance** 1:19 26:13
40:8 41:6
**instances** 40:2
**instructed** 51:24
**instructor** 10:8
**instructs** 12:16
**instrument** 57:16

**integrated** 28:22
29:6,14
**intended** 34:10
**intending** 34:12
**intentional** 34:6
**intentionally** 33:18
34:6,8,17
**interested** 7:20
59:15
**International** 1:21
2:5
**interrelation** 28:25
**interrogatory** 6:22
21:20 29:1,16
45:9
**involved** 5:19 7:24
8:18
**in-house** 33:1,7
**IRS** 19:11,12
**issue** 14:16,17 19:5
42:11 43:2
**issued** 46:9
**issues** 17:19 28:15
29:17
**items** 25:14

**J**

**January** 9:4 10:16
10:19 11:7 15:9
15:13,16 20:9
35:20,21 36:16,16
36:18,21 37:14,16
**job** 28:14 38:15
54:18
**Joe** 48:9
**John** 48:9
**joint** 23:22 24:1
25:4,21 26:12
27:11 28:8,21
29:4
**Jones** 50:1
**Judge** 4:18 12:6
**July** 8:14
**June** 7:2
**Jury** 1:10 58:10
60:10

**K**

**keep** 37:3
**kept** 17:5 31:13,15

46:19
**KIMBERLY** 1:4
58:4 60:4
**kind** 25:6
**kitchen** 25:10
**knew** 33:19
**knocked** 46:13
**know** 5:23 6:3 8:16
10:17,23 11:4
13:4 14:7 15:2
16:2,4,18 17:5,23
17:24 18:14 19:7
19:14 20:12,21,22
21:5,5,6 22:4 23:8
23:22 25:8,16,19
25:20 26:16 27:12
27:14,16,19,21
30:21,22 31:9
33:16,21,22,23,25
34:22 35:8,11,12
37:1,8,13,16,17
37:23 38:24 43:15
49:11,22 50:12
**knowledge** 23:24
28:3 49:3,7,9
**known** 57:12
**Koenig** 1:20 5:12
58:18 59:22 61:7

**L**

**Labor** 22:21
**Lane** 6:13
**Laura** 1:3 7:5,11
7:16,23 21:9 58:3
60:3
**LAUREN** 2:13
**law** 2:14 33:18,19
34:13,16,17,20
48:22,25
**lawsuit** 7:23 8:3,18
11:23 13:16 16:3
23:2,21 31:7
42:11 43:3
**lawsuits** 8:23
**lawyer** 6:7 7:18,20
7:25 12:11 22:24
**Lazarz** 1:21 2:4
**leads** 50:22
**learn** 7:3

**left** 39:3,6 40:11
**legal** 12:3,14 28:18
28:20
**license** 6:17 27:8
**limit** 23:8,11
**limitations** 22:20
22:23 23:1
**limiting** 18:5
**LINE** 56:4
**liquidate** 13:11
29:25 30:1
**liquor** 27:8
**list** 8:7
**little** 21:25 44:17
46:14
**living** 7:1
**location** 27:5
**long** 7:1
**longest** 22:22
**look** 13:24 53:24
**looked** 7:18 11:3
**looking** 18:19 19:2
53:14
**Loop** 1:22 2:5,10
**lost** 38:5
**lot** 45:8 51:22
**low** 17:8
**L.L.P** 1:21 2:4

**M**

**M** 2:13 4:5 47:4
53:21 55:5
**main** 42:11
**maintenance** 47:16
**management** 14:3
44:11 54:18
**manager** 46:14,15
48:2,14 49:13,15
**managers** 32:5
45:12,17 47:7,21
48:7,7 51:18 52:4
54:11,15 55:2,12
**mandatory** 54:8,12
54:16 55:1
**MARGO** 1:4 58:4
60:4
**marked** 53:20,23
**married** 9:5
**MARTIN** 2:3 59:9

**match** 55:16
**matter** 4:23
**McCRAY** 1:4 58:4
60:4
**McKNIGHT** 1:3
20:23 58:3 60:3
**mean** 10:12 19:18
25:22 30:1 42:9
**meaning** 47:18
48:7
**members** 21:23
**memo** 46:14
**Memorial** 59:24
61:9
**mentioned** 14:9
**mess-ups** 49:19
**method** 1:21
**mind** 22:9 29:13
**minimum** 10:21,24
11:1,2,4,7 15:10
36:22
**minute** 27:22
**Miryame** 50:1
**mistake** 14:11 34:1
34:4
**moment** 39:24
**money** 17:18 18:9
18:21 20:15 21:4
21:6,8 29:23
32:12,14,19,22
39:22 40:18 49:10
50:6,15,25 51:6
51:19,20,23 52:1
52:2 53:2
**monies** 48:23 52:5
52:5
**Monshaugen** 2:10
**MORENO** 1:4 58:4
60:4
**morning** 31:2
**Morris** 48:11 50:25
**motion** 21:23

**N**

**N** 2:1 3:1 4:5,5 47:4
47:4 53:21,21
55:5,5
**name** 4:9 6:10
24:25 48:11 49:25

52:4 57:15
**names** 24:11,13,14
**napkins** 25:7
**necessary** 29:25
**need** 5:15,24 36:6
  48:24 51:19
**needed** 29:19 32:22
**neither** 59:11
**never** 11:3 14:9
  37:1 39:4,14
  40:13 41:11,12
  42:21 46:24
**new** 46:5
**night** 39:3,21,22
  40:17 43:18 46:7
  46:20 51:8,8,24
  52:2 54:19
**normal** 5:8 12:14
**North** 2:10
**NOTARY** 57:23
**noted** 57:3
**notice** 15:12 21:23
**noticed** 16:14
**November** 19:18
  19:20,24 20:2
**number** 8:5 55:9
**numbered** 1:19
**numbers** 19:11
**N.W** 1:9 58:9 60:9

**O**

**O** 4:5 47:4 53:21
  55:5
**oath** 5:1 57:13
**object** 6:7 12:2,11
  17:22 22:14 23:9
  23:15 32:16 34:2
  34:14 36:23 42:5
**objecting** 18:3
**objection** 12:5,25
  18:6 47:14,20,24
  48:3
**objects** 12:17
**obviously** 34:10
  42:11
**occasion** 52:20
**occasions** 14:2
  43:18 52:24
**occurred** 55:15

59:18
**October** 14:19,19
  19:21 20:2 23:2,3
  23:4 35:6,6,13,13
  37:3,4 40:3,3
  42:25,25 45:14,15
**office** 57:19
**officer** 58:22 59:6
  60:18
**offices** 59:3
**Oh** 52:24
**okay** 4:15,24 5:6,16
  5:17 6:4,5 7:22
  8:10,25 13:6,19
  14:16 15:19 16:5
  16:13 17:13 18:6
  18:15 19:25 21:7
  21:10 22:6,18,20
  23:20 24:6,16
  25:1,12,20 26:11
  26:23 30:12,20
  31:19 32:9,23
  33:24 34:21 36:7
  36:13 37:2 41:20
  42:23 44:18 45:5
  47:17 48:5,13
  49:17 50:2,6,14
  50:18,18 52:8,20
  52:25 54:23 55:14
**ones** 26:14
**One-on-one** 10:8
**opened** 39:5 40:9
**operated** 53:15
**operator** 32:11
**opinion** 48:21
  51:14,16 53:13,15
**opposed** 30:4
**oral** 1:15,18 58:15
  58:22
**original** 60:17,21
**originally** 20:1
**outcome** 59:15
**overtime** 18:13,13
**owe** 21:4
**owed** 18:4,9 20:15
  21:6,8 51:22
**owes** 17:18
**owned** 24:18
**owner** 32:10

**owners** 25:23,25
  27:23 28:5

**P**

**P** 2:1,1
**pad** 46:14
**page** 56:4 60:19
**paid** 10:12 13:17
  14:20 15:10,14
  18:13,16 19:3
  20:6,12 24:8,17
  25:18 27:17,20
  31:13,20 32:12
  35:19,25 36:5,7,9
  36:14,17,22 37:5
  37:9 38:2 39:4,14
  40:17,25 41:12
  42:3 43:1,17
  48:11 49:22
**painless** 4:12
**part** 18:12 43:25
**parties** 59:7,12
  60:25
**Pass** 47:3 55:4,20
**passed** 28:12
**pay** 13:3,10 33:5
  36:18,20 37:5,6
  37:15,16 38:2,6
  39:17 40:4,20
  42:15 43:22 46:25
  48:17 49:10,21
  50:15 51:5,10,22
**paycheck** 10:13
  13:25 24:25
**paying** 10:20,20
  11:7 15:22 51:15
**payroll** 11:6
**pays** 29:23
**pending** 20:4
**people** 21:4 23:24
  26:20 27:12 32:9
  35:1,6,12,17 43:5
  43:16 50:19
**perceive** 21:7 23:12
**perceived** 20:15
  27:22
**percent** 11:15,20
  12:21 13:3,7
  14:16 15:19 18:20

18:24 20:16 29:21
  29:22,22 30:7,10
  30:12,16,17,20
  31:13,16,17,23,24
  32:3,7,24 33:10
  33:13,14,19,20,25
  34:7,8,21 42:10
  42:17 43:2 47:11
  47:12 49:5 52:14
  52:16
**percentage** 13:4
  30:11,14 49:9
**perceptions** 27:24
**perfectly** 12:14
**period** 15:6,7,14
  22:22 23:4 35:5
  35:13 37:3,10
  38:11,18 40:3
  41:18 42:24 43:13
  45:14
**periods** 8:9
**person** 48:16,18
  49:10 57:15
**personal** 16:12
  28:15
**personally** 13:20
  23:18,23 38:19
  41:23 44:21 46:24
  53:1 57:12
**per-year** 18:25
**phrase** 44:5
**pile** 21:18
**place** 35:4
**Plaintiffs** 1:5 2:2
  7:4,12 11:10 58:5
  59:9 60:5
**please** 41:8 53:24
**pocket** 41:12
**point** 36:3 54:9
**policies** 35:2,14
  38:1
**policy** 3:11 37:13
  41:13 43:24 46:8
  51:15 54:15 55:1
  55:10,12,16
**policywise** 53:16
**portion** 30:17
  52:11
**position** 9:10

**possible** 14:9
**possibly** 4:22 14:12
  44:17
**practice** 51:16
  55:15
**practices** 35:10,14
  44:19
**pretty** 4:12 52:17
  52:18
**prior** 10:1 15:16
  35:20
**probably** 15:4,5,8
  22:3 29:4
**problem** 5:14
**problematic** 44:6
**Procedure** 1:22
  59:17
**proceeding** 20:1
  59:13
**process** 4:12 6:24
**processed** 32:6
**processing** 13:11
  14:10 17:15 29:24
  30:10 32:7,14,24
  33:2,3 47:12
**produced** 1:18
**profit** 32:13
**progresses** 4:22
**prongs** 30:15
**properly** 7:19 16:7
**protection** 8:21
**proved** 57:13
**provisions** 1:23
**PUBLIC** 57:23
**purchase** 39:13
  46:5
**purposes** 57:17
**pursuant** 1:22 59:5
  59:16
**put** 16:17 53:2
  54:20
**put-together** 28:21
**P.C** 2:10
**p.m** 1:20,20 55:22

**Q**

**question** 5:2,10,18
  5:20,22,23,25 6:7
  12:3,7,18,23 19:8

22:15 23:7,9,16
36:24 42:6 49:19
50:18
**questions** 4:20
12:12 40:1 47:25
49:14 53:19
**quick** 45:9
**quickly** 55:7
**quite** 48:14

**R**

**R** 2:1 53:21,21 55:5
55:5
**RACHAEL** 1:4
58:4 60:4
**ran** 25:10 41:10
49:13 51:3
**RANKIN** 1:9 58:9
60:9
**read** 4:2 57:1
**reading** 6:22
**real** 55:7
**really** 5:13 19:8
**reason** 11:8 20:4
25:16 56:4
**reasons** 24:2 60:20
**recall** 18:20 19:25
47:10 48:7 52:4
54:4
**receipt** 13:25
**receipts** 48:19
**receive** 52:11
**received** 10:13
31:14 42:8,9
**receiving** 48:23
**recess** 45:10
**recognize** 53:25
**recommended**
52:15
**record** 1:23 6:10
12:12,17 36:6
48:4 58:23 59:8
**records** 11:6
**reference** 51:18
**referring** 18:3
**reflect** 16:6 18:25
**regard** 11:10 13:13
15:20 22:8 23:23
24:6 27:25 29:3

33:13,18 35:3
**regarding** 8:2 37:4
47:10
**Registration** 59:23
61:8
**regular** 14:14 30:8
39:2 40:22 41:3
**relate** 17:15
**related** 28:21 59:12
**relates** 15:25
**relationships** 27:25
28:4
**relevant** 38:11
41:17 42:24
**remake** 44:22 45:3
46:18
**remember** 9:23,25
19:22 24:19 38:23
38:24 43:25 46:22
48:9,10 49:18
51:4
**remote** 22:13
**remunerated** 25:17
**rephrase** 5:23
**report** 20:14,24
45:22
**reported** 1:21
16:20 18:21 45:20
**Reporter** 4:1,18 5:4
12:6 47:23 58:19
**Reporter's** 3:9
58:15
**Reporting** 59:3,23
60:15 61:8
**required** 41:14
**requirement** 32:3
**requirements**
59:16
**reserve** 53:18 55:21
**reside** 6:15
**response** 5:2,3
**responses** 5:5
**responsible** 39:8
**restate** 12:8,9
**restaurant** 30:8
**retained** 31:25
32:25 33:15
**retains** 33:10
**return** 59:2

**returned** 60:17,19
60:21
**rewarding** 10:10
**Richmond** 6:13
**right** 4:23 6:20,22
7:9 10:22,25
11:17 14:14,15
16:2 17:6 20:11
22:22 26:25 28:9
30:18 31:21 32:19
32:21 34:23 35:17
40:24 42:13
**road** 12:12
**room** 33:5 48:18
**rowdy** 44:12
**RPR** 1:20 58:18
59:22 61:7
**rubber** 50:7
**Rules** 1:22 59:17
**run** 25:7
**Running** 47:20,24

**S**

**S** 2:1 3:10
**safekeeping** 60:22
**sale** 32:13
**saw** 25:23 41:12
50:21
**saying** 17:1,7
**says** 17:9 45:25
46:8 48:2,2
**SBOT** 2:4,9,13
**School** 10:6
**seal** 57:19
**second** 41:8 42:15
**see** 20:8 23:1 26:8
32:22 51:23
**self** 16:12 53:2
**sentence** 28:21
**separate** 29:18
**SERPER** 2:13
**served** 40:9 60:24
**setting** 42:10,14
43:2
**seven** 20:7
**share** 45:12,16
**SHEET** 56:1
**sheets** 25:8
**Shellist** 1:21 2:3,4

3:6,7 4:2 12:2,25
17:22 18:2 22:14
23:15 32:16 33:22
34:2,14 36:23
37:12 39:20 42:5
47:5,17 48:1,5,6
48:13 53:18 54:20
54:23 55:6,20
59:9
**shift** 36:9,14,18,19
37:5,15,16 38:2
41:25,25 42:3,4
42:16
**shifts** 43:1,9
**shorted** 18:16
**Shorthand** 58:18
**shown** 60:25
**sign** 4:2 46:16,16
**signature** 3:8 4:1
54:2 56:25 57:2
59:2 60:19
**signed** 3:11 54:4
**signing** 39:6 40:11
**single** 12:18 28:22
28:24 29:5,5,14
49:6
**sir** 13:8
**sister-in-law** 53:11
**sit** 33:5
**sitting** 48:18
**six** 23:21 27:1,4,7
27:11 28:23
**Slim** 48:9 49:16
50:11 51:20
**slips** 33:6
**smaller** 21:18
**smoothly** 21:25
**Somebody** 14:10
**someone's** 5:9
**sorry** 9:11 17:12
19:15 35:18 51:9
54:22
**sort** 7:24 22:10
**sound** 10:22 20:11
**sounds** 7:9
**sources** 50:19
**South** 1:22 2:5
**SOUTHERN** 1:1
58:1 60:1

**specifically** 11:12
17:1
**spends** 33:10
**spill** 46:9
**spillage** 44:18,19
**spilled** 45:2 46:1,4
46:5,13,25
**spilling** 44:23
**Splendor** 1:10 9:20
9:22 22:12 58:10
60:10
**spoke** 7:22
**spoken** 7:11 8:2
18:5
**spring** 9:13 10:1
**springtime** 8:16 9:8
**stable** 43:19
**standard** 52:17,18
**Standards** 22:21
**started** 8:14 9:12
9:15 11:7 15:10
46:12
**state** 1:20 6:9 48:22
57:9,23 58:19
**stated** 1:23 27:22
29:21
**STATES** 1:1 58:1
60:1
**statute** 22:20,22,25
**stay** 20:7
**stayed** 8:14 37:16
**stenographic** 1:21
**Stipulations** 3:3
**stop** 15:11 28:10
46:21
**straight** 52:1
**strange** 5:22
**stub** 13:25
**stuff** 15:23 18:5
22:2,19 25:10
43:16 45:8
**submitted** 58:25
**subscribed** 57:15
59:19
**substance** 54:6
**suffer** 41:5
**suffered** 19:13
**suit** 7:3
**Suite** 1:22 2:5,10

2:14 59:24 61:9
**supplies** 25:5,6,9
  25:14,18
**support** 26:11 28:7
  29:5,9,13 31:9
  33:17,21
**sure** 7:8 11:17 18:9
  19:7 21:2 46:23
  52:2
**surprise** 29:18
**sworn** 1:19 4:4,16
  58:21 59:19

**T**

**T** 3:10 4:5 47:4
  53:21,21 55:5,5
**tab** 25:7 39:5,11
  40:4,9,11,16,17
  40:24 41:2,11,17
  43:19,20,21 44:3
  44:11,13,14 49:13
  49:14,19,20,21
  51:3,4
**table** 25:8
**tabs** 38:5,5,7 42:22
  51:24
**take** 4:11 5:5 22:1,4
  30:9 39:18 45:5
  53:24
**taken** 1:19 12:19
  45:10 59:6,14
**talk** 5:7 7:20 14:3
  38:4 51:19,25
**talked** 12:4 28:7
  29:20 38:13 42:24
  45:19 49:20,21
  52:4
**talking** 11:17 22:2
  23:2 26:2 31:16
  33:1,14 37:3
  38:15 42:20 47:6
**taxes** 16:16,17
  19:12,15
**teacher** 10:7
**tell** 4:25 7:16 17:4
  21:2 41:8 43:15
  48:6,16 50:21
  51:21
**telling** 36:4,5 47:19

**ten** 14:22
**tents** 25:8
**term** 5:24
**testified** 4:4 47:1
**testifying** 4:17
**testimony** 4:16
  23:5 31:19 35:19
  41:13 58:23 59:6
**Texas** 1:1,21,22 2:6
  2:11,15 12:20
  58:1,19 59:19,25
  60:1 61:10
**therefor** 60:20
**they'd** 46:17
**thing** 8:6 11:18
  27:14
**things** 7:19 29:3,8,9
  29:12,18 32:6
  44:9,24
**think** 12:23 14:20
  17:17,18 18:1,4
  19:23 20:2,12
  22:24 25:25 27:18
  28:9 29:2,9,15
  30:7 34:12 35:25
  36:4 38:19 44:5
  45:20 48:1
**thought** 18:3 19:24
  34:21 39:24
**thousand** 44:1,2,3
  44:16 49:22
**three** 17:19 22:23
  23:1 24:4,7 26:5
**three-year** 15:5,7
  23:8,11 35:5,13
  37:2,9 38:11,18
  40:3 41:17 42:24
  43:13 45:14
**tickets** 43:21 46:9
**time** 7:22 8:9 9:24
  10:14,15,21 11:1
  13:18,23 14:10
  21:5 22:1,3,13
  24:5 43:23 47:23
  48:14 49:24 53:19
  54:11 59:6
**times** 13:17 14:8
  17:25 51:7
**tip** 13:11 29:25

30:1 42:14 43:22
  44:3 51:9,10
  52:15 54:8,18
  55:2
**tipped** 51:11
**tipping** 3:11 51:12
  54:11,15
**tips** 11:18,21 12:22
  16:9,13,19,20,25
  16:25 17:7,8,10
  18:20,25 19:3
  20:17 30:9 33:15
  34:7 41:24,25
  42:3,8,16,19 43:1
  43:9 44:6 45:12
  45:16,20,22 49:5
  52:12,22
**today** 4:11
**told** 7:5 11:3 20:23
  21:9 23:24 26:24
  28:5 32:6,9 35:1,6
  35:11,12,17 36:13
  43:16,21 47:9
  48:7 50:13,19
  52:25
**Tomorrow** 31:2
**tonight** 51:13
**topless** 31:5
**track** 17:5
**trade** 24:14
**trained** 47:7
**transcript** 4:19,21
  58:22,25
**transfer** 27:13
**Treasures** 1:8 3:11
  7:19 8:11,13 9:10
  10:12,20 11:12,13
  13:15,15 15:20
  16:1 17:16,18
  20:16 22:8,20
  23:6,14 24:18,21
  24:24 25:13,17
  27:13,17,20 28:11
  31:4 32:3,10 33:9
  33:10,15,17 35:5
  35:14 37:7 38:9
  42:15 43:11 44:10
  44:20 45:15,20,23
  48:16 50:5 53:12

53:13 54:10,15
  55:1 58:8 60:8
**trial** 1:10 4:22,23
  53:19 55:21 58:10
  60:10
**Trisha** 1:3,16,18
  3:4 4:3 6:11,12
  56:2 57:1,8,12
  58:3,16,21 60:3
**Trophy** 1:10 9:18
  22:11 58:10 60:10
**true** 4:2 50:22
  55:18 57:2 58:23
**trustee** 20:14 21:3
**truth** 4:25 36:4,5
  try 5:7,15 12:13
  **trying** 36:3
**Turn** 30:2
**Turner** 1:3,16,18
  3:4 4:3,7 6:11
  47:6 53:20 56:2
  57:1,8,12 58:3,16
  58:21 60:3
**twice** 30:13 38:20
**two** 9:23 15:6 26:19
  29:16 30:15 40:2
**type** 4:19 5:11
**typically** 48:12

**U**

**U** 53:21 55:5
**uh-huh** 5:4
**uh-uh** 5:4
**understand** 5:19,20
  6:1,2 17:12 19:8
  21:1 22:17 28:2
  30:15 52:25
**understanding**
  11:1 36:8 48:24
  54:6
**UNITED** 1:1 58:1
  60:1
**unlawful** 30:14,17
  30:18 33:14,25
  35:3 44:19
**unpaid** 14:17 15:19
  17:14,14 18:15
  20:16
**unreimbursed**

41:16
**unreported** 16:13
  16:19
**unstable** 44:7,8,11
**use** 4:21 12:13 13:3
  32:3,19,21 39:12
**Usually** 21:2

**V**

**V** 1:6 58:6 60:6
**Van** 2:9,10 3:5,6
  4:6,9 12:6,9 13:6
  17:25 18:8 22:18
  23:20 32:20 33:24
  34:5,18 37:2,19
  39:23 42:10 45:11
  47:3,14,20,22,24
  48:3 53:1,22
  54:22,25 55:4,21
  59:10 60:22
**various** 26:8
**version** 50:20
**versus** 37:5
**victim** 41:21,23
  44:19
**view** 29:21 44:11
**violate** 34:13
**violating** 33:18,19
**violations** 22:21
**Virginia** 6:13,15,17
  7:1 30:23
**visit** 53:7
**visiting** 53:13
**vocalize** 5:3
**Volume** 1:17

**W**

**wage** 10:21,24 11:1
  11:2,4,7 15:10
  36:22
**wages** 16:25 17:10
  20:16
**Wait** 47:23
**waiting** 28:13
**waitress** 9:12,15
  30:8 39:25,25
  43:22 45:13 46:16
  46:18 49:6,12
  51:8,14,22,25
  52:22

**waitresses** 34:7,9
43:17 46:1 50:15
51:2,22 52:6,12
52:15
**waitress's** 51:23
**walked** 38:5,6 40:4
40:17 41:16
**want** 8:6 16:2 22:4
23:9 24:2 32:19
46:22 51:23 54:23
**wanted** 28:12
**wasn't** 14:13 41:2
54:12,15 55:1
**was/was** 60:17
**way** 4:15 5:22 6:8
6:24 15:22 16:8
16:17 53:16 55:8
**week** 18:10
**weeks** 9:24 40:14
40:15,19,25
**went** 9:12 22:7,18
29:3 31:12 34:17
**weren't** 13:25
14:20 18:12 44:23
**West** 1:21 2:5,10
**we'll** 22:1 29:9 45:7
**we're** 4:11,21 6:1
11:17 23:2 26:2
31:16 32:6 38:15
**WG** 1:10 58:10
60:10
**wife** 8:4 49:12
**withdraw** 18:6
**witness** 1:19 47:3
55:4,20 58:21,24
59:1,2
**words** 47:9
**work** 5:10 8:11,13
9:22 10:6 13:17
13:18 16:1 24:4,6
26:14 41:25 49:3
50:2 53:11
**worked** 8:8,9 9:7
9:16,18,20 10:3
15:6 23:5 24:7,17
24:23,24 25:2,22
26:6,6,13,16,18
26:20 27:12 42:3
45:15 48:15,15

49:4 53:9 55:15
**working** 13:23
15:11 18:10 27:16
27:19 28:10 44:10
46:12
**works** 4:15 53:12
**worth** 40:9,10
**wouldn't** 17:10
19:12 33:7
**write** 13:24 46:14
55:9,11
**written** 55:16
**wrong** 16:5 30:20
**wrote** 55:10
**W-2** 17:13 18:22
19:13 45:21
**W-2s** 15:23 16:4,5
19:5,9
**W.L** 1:10 58:10
60:10

— **X** —

**X** 3:1,10 4:5 47:4
53:21 55:5

— **Y** —

**yeah** 4:2 14:12
32:20 51:19
**year** 7:2,10
**years** 15:6 20:5,6,7
20:13 22:23 23:1
25:2 26:6 49:5
**Yesterday** 35:21
**YORK** 1:11 58:11
60:11
**y'all** 36:7 51:12

— **$** —

**$100** 40:9 41:11
**$20** 31:23
**$200** 40:10
**$25** 31:12,21,23
47:11
**$300** 18:1,17
**$5** 31:24 32:12
47:10
**$5,000** 17:21
**$5-per-credit-card**
47:8 48:17
**$6** 17:25 18:16

— **0** —

**0-some** 17:9
**00786487** 2:4
**01** 8:15 9:8
**02** 8:16 9:9 10:1
36:16,18 37:14
**06** 35:6,13 37:3
40:3 42:25 45:14
**07** 19:24
**08** 8:17 10:16,19
11:7 15:9,12,13
15:13,16 35:20,21
36:21 37:17
**09** 35:6,14 37:4
40:3 42:25 45:15

— **1** —

**1** 1:17 3:11 53:20
53:24 55:9
**1:11** 1:20
**10220** 59:24 61:9
**12/31/10** 59:22 61:7
**1225** 2:10
**12445** 6:13
**13** 1:16,20 56:2
58:16
**15** 52:16
**18032100** 2:13
**1900** 1:21 2:5
**1910** 1:22 2:5
**1998** 9:4

— **2** —

**2** 3:2
**2.13** 10:15 15:17
35:20
**2:50** 1:20 55:22
**20** 14:24 18:11
31:13,14,17,24
32:3,7,24 33:10
47:11,12
**200** 2:14
**2001** 8:14
**2002** 19:21 20:2,2
**2006** 14:19 23:4
**2008** 18:21 19:20
19:24 20:10 46:23
46:24
**2009** 7:7 14:19

21:11 23:2,4
**2010** 1:16,20 56:2
58:16 59:1,4,20
61:1
**22** 59:24 61:9
**23233** 6:14
**24028183** 2:9
**25** 31:14,15

— **3** —

**3,000** 44:16
**3/D** 1:21 2:5
**3405** 2:14

— **4** —

**4** 3:3,5
**40** 15:1
**402** 59:23 61:8
**467-7900** 61:10
**467-7911** 61:10
**47** 3:6

— **5** —

**5** 10:16,17,23 11:15
11:20 12:21 13:3
13:7 14:16 15:19
18:20,24 20:16
29:21,22,22 30:7
30:12,16,17,20
31:15 33:13,14,19
33:20,25 34:7,8
34:21 42:10,17
43:2 49:5
**5-something** 10:23
15:14 35:20 36:20
**50** 15:3,5 17:14,25
18:11,16
**53** 3:6,11
**55** 3:7
**56** 3:8
**58** 3:9

— **6** —

**63660686** 6:18,19
**640** 2:10
**6577** 1:20

— **7** —

**713** 61:10,10
**713/278-9398** 2:15

**713/621-2277** 2:6
**713/880-2992** 2:11
**77008** 2:11
**77024** 59:25 61:10
**77027** 1:22 2:6,15

— **8** —

**80** 31:16,23