IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

LAURA MCKNIGHT, TRISHA          *
TURNER, ANDREW BAKER,           *
RACHAEL FREEDMAN, KIMBERLY      *
MCCRAY, and MARGO MORENO        *
     Plaintiffs,              *
                    *
V.                              *  Civil Action No.  H-09-3345
                    *
D. HOUSTON, INC. D/B/A          *
TREASURES, A.H.D. HOUSTON,      *
INC. D/B/A CENTERFOLDS,         *
D.N.W. HOUSTON, INC. D/B/A      *
GOLD CUP, D. RANKIN, INC.       *
D/B/A TROPHY CLUB, D WG FM,     *
INC. D/B/A SPLENDOR,            *  Jury Trial Demanded
W.L. YORK, INC. D/B/A           *
COVER GIRLS, AND, IN THEIR      *
INDIVIDUAL CAPACITIES, ALI      *
DAVARI and HASSAN DAVARI        *
     Defendants.              *
*********************************************************

REPORTER'S CERTIFICATION
FOR THE ORAL DEPOSITION OF
ANDREW BAKER
MAY 11, 2010
*********************************************************

    ORAL DEPOSITION OF ANDREW BAKER, produced as a witness

at the instance of the Defendants and duly sworn was taken

in the above-styled and numbered case on the 11th day of

May, 2010, from 10:09 a.m. to 11:52 a.m., before Rita

Frangullie, Certified Shorthand Reporter in and for the

State of Texas, reported by machine shorthand at the

offices of SHELLIST, LAZARZ, LLP, 3D/International Tower,

1900 West Loop South, Suite 1910, Houston, Texas 77027

pursuant to the Texas Rules of Civil Procedure and the

provisions stated on the record or attached hereto.

## Page 2

```
1          A P P E A R A N C E S
2  FOR THE PLAINTIFF:
3     MR. MARTIN A. SHELLIST
         SHELLIST LAZARZ, LLP
4      3D/International Tower
         1900 West Loop South, Suite 1910
5      Houston, Texas 77027
         713.621.2277 - Telephone
6      713.621.0993 - Fax
         MSHELLIST@EEOC.NET
7
8  FOR THE DEFENDANTS, D. HOUSTON, INC.:
9     MR. ALBERT THOMAS VAN HUFF
         MONSHAUGEN & VAN HUFF, P.C.
10     1225 North Loop West, Ste. 640
         Houston, Texas 77008
11     713.880.2992 - Telephone
         713.880.5297 - Fax
12     al@vanhuff.com
13
14    MS. LAUREN M. SERPER
         ATTORNEY AT LAW
15     2405 Edloe, Ste. 200
         Houston, Texas 77027
16     LOLMS1@aol.com
17
18
19
20
21
22
23
24
25
```

## Page 3

```
1                INDEX
2  Appearances..............................................2
3  ANDREW BAKER
    Examination by Mr. Albert Thomas Van Huff...............5
4  Examination by Mr. Martin A. Shellist..................46
    Further Examination by Mr. Albert Thomas Van Huff.......52
5
    Witness Correction and Signature Page..................56
6
    Reporter's Certificate..................................58
7
8              EXHIBITS
9  NO.    DESCRIPTION              PAGE
10  1    Declaration of Andrew Baker...................35
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
1              ANDREW BAKER,
2  having been duly sworn, was examined and testified as
3  follows:
4              EXAMINATION
5  QUESTIONS BY MR. VAN HUFF:
6  (10:09 a.m.)
7     Q.  Good morning, Mr. Baker.  Would you please state
8  your name for the record?
9     A.  Andrew Wayne Baker.
10         MR. SHELLIST:  Before we start, do you want
11  to do to stipulations or the agreements?
12         MR. VAN HUFF:  What would you like to
13  stipulate to?
14         MR. SHELLIST:  That per the Rules the
15  deposition is being taken and that we're going to reserve
16  all objections except to the form and responsiveness till
17  the time of trial.
18         MR. VAN HUFF:  So stipulated.
19     Q.  (By Mr. Van Huff)  Have you ever given a
20  deposition before?
21     A.  No, sir.
22     Q.  Okay.  What we have here is a situation where
23  you're under oath to tell the truth.  We got a court
24  reporter who is going to type down all the questions that
25  I ask and your answers to the questions, and the questions
```

## Page 5

```
1  and answers can be used in court as though you were giving
2  testimony in front of a jury.  I don't expect that we're
3  going to be here for very long today, and it's a fairly
4  straightforward process.  It's important, however, since
5  she's typing in our questions and answers that when you
6  answer "yes" or "no" that you actually say yes or no
7  rather than go "uh-huh" or "huh-uh" or nod your head.
8     A.  Yes, sir.
9     Q.  Okay.  And it's also important that we not talk
10  over each other.  This isn't quite like a normal
11  conversation since she's taking everything down and, so,
12  I'd appreciate it if you would let me complete my question
13  before you give your answer and sometimes it's a little
14  bit awkward because you can anticipate the end of my
15  question but we still need to let the court reporter type
16  it in and then type in your answer without us talking over
17  one another, okay?
18     A.  Yeah, no problem.
19     Q.  All right.  And one other sort of introductory
20  issue.  If I ask you a question, I'm going to assume that
21  you understand it and the Court will assume that you
22  understand it unless you indicate to me otherwise, okay?
23     A.  That's agreed, yeah.
24     Q.  And if you need me to explain something or you
25  have a question about the question that I asked, just ask
```

Page 6

1   away, okay. You know, I'm not here today to be
2   Mr. Difficult lawyer. I just have some questions to ask
3   you about your lawsuit and then we can complete the
4   deposition, okay?
5       A. I agree.
6       Q. Now, I'm here on behalf and represent all the
7   defendants in this case of which there are eight, all
8   right, six different clubs and two individuals and I've
9   got your answers to interrogatories here and I've got your
10  Declaration here that you signed and attached to something
11  called a Motion for Notice To Class Members, all right?
12          Initially what's your current address?
13      A. It's 565 South Mason Road No. 178, Katy, Texas
14  77450.
15      Q. And your driver's license number?
16      A. 11247890, Texas.
17      Q. Where are you currently employed?
18      A. I work for Physicians Mutual.
19      Q. What's your position with them?
20      A. Insurance agent.
21      Q. How long have you worked for them?
22      A. About three months.
23      Q. Do you have some kind of license from the state
24  of Texas to do insurance work?
25      A. Yes, sir.

Page 7

1       Q. What kind of license is that?
2       A. It's a -- I forget the name of it -- but it's
3   their insurance license. Group One I think it's called.
4       Q. Is that the type of license you need to sell
5   property and casualty insurance?
6       A. No. It's health and life.
7       Q. Health and life. Okay.
8          And how long have you had that license?
9       A. About three months.
10      Q. Do you have any other licenses or certifications
11  through the state of Texas?
12      A. No.
13      Q. Were you ever server trained in connection with
14  your employment as a bartender?
15      A. Oh, yes, I have server training, TABC training.
16      Q. Any others besides the insurance and the server
17  training?
18      A. No, sir.
19      Q. Have you ever been involved in a lawsuit before
20  as a plaintiff or a defendant?
21      A. Yes, sir.
22      Q. How many times?
23      A. Maybe two or three.
24      Q. Okay. What was the most recent one?
25      A. I'm going through a divorce right now.

Page 8

1       Q. Okay. Is that here in Harris County?
2       A. Yes, sir.
3       Q. And the one before that?
4       A. It was my previous divorce.
5       Q. Okay. Where was that?
6       A. Harris County.
7       Q. The one before that?
8       A. I had a DUI.
9       Q. Okay. Other than your DUI, have you ever been
10  arrested?
11      A. No, sir.
12      Q. Now, I'm going to talk to you a little bit about
13  your employment with some of the different clubs that are
14  involved as defendants in this case, okay?
15      A. Yes, sir.
16      Q. Now, I see in your interrogatory answers that you
17  claim that you were employed by Treasures; and it says
18  here that your dates of employment were approximately
19  June, 1995 to April of 2006; is that correct?
20      A. Yes, sir.
21      Q. Now, I noticed that in your interrogatory answers
22  you say that it was April of 2006, was the end of your --
23  approximate end of your employment with Treasures but in
24  your Declaration you say that it was April of 2007 and I
25  recognize that this is probably something we call a

Page 9

1   Scrivener's Error but I need to clear it up so that I know
2   once and for all for the record when you stopped working
3   for Treasures. Was it in 2007, or was it in 2006?
4       A. '07.
5       Q. April of 2007?
6       A. Yes, sir.
7       Q. You're sure?
8       A. (Witness nods head affirmatively.)
9       Q. So, your answer to Interrogatory No. 2 needs to
10  be amended and your answer to Interrogatory No. 3 needs to
11  be amended. Okay. I thought we would straighten that up.
12          What was your job at Treasures?
13      A. I was a bartender.
14      Q. What were your job duties as a bartender at
15  Treasures?
16      A. Basically, you know, obviously making all the
17  drinks and handling all the cash for the club, processing
18  credit cards and all the paperwork assorted with that.
19      Q. Okay. Can you explain to me the
20  interrelationship between the bartender at Treasures and
21  the waitresses at Treasures as far as the tabs and
22  handling of cash that you mentioned?
23      A. Yeah. They just -- I mean, our relationship was,
24  you know, they had to come to us to have anything, you
25  know, to make the drinks and to run the credit cards.

Page 10

1   Q. Okay. Can you -- assume that I know nothing
2  about it; and explain it to me, please.
3      A. Well, their customer would give them a credit
4  card for the purchases; and they would fill out all the
5  paperwork, bring it to me. I would actually run it
6  through the machine itself and give her back any of the,
7  you know, the slips for the customer to sign.
8      Q. Okay. Now, if it was -- so, a customer that's
9  seated away from the bar who is being served by a waiter
10 or waitress, are they -- who keeps track of the number of
11 drinks that that person served?
12     A. The waitress.
13     Q. Okay. And so when the waitress comes to the bar
14 in order to get a drink refill, does the bar also keep
15 track of how many drinks that waitress has given for that
16 particular customer?
17     A. No, sir.
18     Q. So, the bartender completely relies upon the
19 waitresses to keep track of the number of drinks that a
20 particular customer is consuming at a table?
21     A. Yes, sir.
22     Q. All right. How were you paid at Treasures?
23         Were you paid an hourly wage?
24     A. I specifically was paid a shift pay.
25     Q. Okay. Can you explain that to me?

Page 11

1      A. It was $30 a shift.
2      Q. All right. And how many hours was a shift?
3      A. Anywhere from eight, eight and a half to ten, ten
4  and a half.
5      Q. Okay. And how many shifts would you work per
6  week?
7      A. Five.
8      Q. Were you ever employed by Centerfolds?
9      A. Yes, sir.
10     Q. When was the last date of your employment with
11 Centerfolds?
12     A. It was in the beginning of 2000 and the end of
13 1999.
14     Q. Okay. So, the last time you did any work at
15 Centerfolds was either 1999 or 2000?
16     A. Right. I think it was December -- it was right
17 at the turn of the Millennium there. It was right at
18 December of '99 I believe.
19     Q. Many years ago?
20     A. Many years ago.
21     Q. Were you ever employed by Gold Cup?
22     A. No, sir.
23     Q. Were you ever employed by Trophy Club?
24     A. No, sir.
25     Q. Were you ever employed by Splendor?

Page 12

1      A. I filled in over there one day.
2      Q. When?
3      A. I'm not sure of the particular day. I don't know
4  the exact day. Somebody called in sick, and I had to go
5  in over there.
6      Q. Would that have been prior to 2005?
7      A. I think it was in 2005.
8      Q. Were you ever employed by Cover Girls?
9      A. No, sir.
10     Q. Back to Splendor for a moment. That one day in
11 2005 that you filled in for a bartender that called in
12 sick, was that the only time that you were employed by
13 Splendor?
14     A. Yes.
15     Q. Now, I notice that in your interrogatory answer
16 you state that you had occasion to work at Centerfolds in
17 addition to Treasures and that in your Declaration you
18 state that you had occasion to work for Centerfolds and
19 for Splendor in addition to working for Treasures. So,
20 the fact that Splendor is not mentioned in your
21 interrogatory answers is another oversight, right?
22     A. Correct.
23     Q. Okay. And this issue of having worked at
24 Centerfolds in both your Declaration and your
25 interrogatory answer, that's also incorrect, yes?

Page 13

1      A. I'm not sure exactly what you're asking.
2      Q. Well, you just told me under oath that you were
3  never employed by Centerfolds; but it says in your
4  interrogatory answers and in your Declaration that you
5  worked at Centerfolds. So --
6      A. Did it say "Centerfolds"?
7      Q. Centerfolds.
8      A. Did I say I was not employed there?
9      Q. I asked you if you were employed by Centerfolds
10 and you said no.
11     A. That's incorrect. I did --
12     Q. That's okay. We can fix it up.
13     A. Yeah.
14     Q. I'm just trying to figure out --
15     A. That's incorrect. --
16     Q. -- the truth?
17     A. I did work at Centerfolds. I was thinking Cover
18 Girls.
19     Q. Okay. So, you worked at Treasures until April of
20 2007?
21     A. Yes, sir.
22     Q. You had one occasion to work at Splendor back in
23 2005 to fill in for a bartender, yes?
24     A. Yes, sir.
25     Q. And you also had occasion to work for

Page 14

1  Centerfolds?
2      A.  Well, I worked at Centerfolds prior to Treasures.
3      Q.  I see.  When was that?
4      A.  I started in '95 all the way up until '99 of --
5  December of '99.
6      Q.  Okay.  Did you ever have occasion to work at
7  Centerfolds after 1999?
8      A.  No, sir.
9      Q.  When you worked at Centerfolds, you worked there
10 as a bartender, correct?
11     A.  Correct.
12     Q.  And were you also paid shift pay?
13     A.  Correct.
14     Q.  You are one of six plaintiffs listed thus far in
15 this lawsuit.  Are you aware of that?
16     A.  Yes, sir.
17     Q.  Do you know Laura McKnight?  Do you know her, I
18 mean?
19     A.  Yes, sir.
20     Q.  How do you know her?
21     A.  She was a waitress, and I was a bartender.  We
22 were coworkers.
23     Q.  Do you know Trisha Turner?
24     A.  I do.
25     Q.  How do you know her?

Page 15

1      A.  She was a fellow bartender.
2      Q.  Rachel Friedman?
3      A.  I'm not -- she might have been an entertainer.
4  I'm not familiar with that...
5      Q.  Kimberly McCray?
6      A.  I'm not sure of her name.
7      Q.  Margo Moreno?
8      A.  Yeah, she was a waitress.
9      Q.  Have you ever talked to Ms. McKnight about this
10 lawsuit?
11     A.  Yes, sir.
12     Q.  When was the first time you talked to her about
13 it?
14     A.  A little over a year ago when -- before we
15 started doing this.
16     Q.  Okay.  I'm going to ask you some questions about
17 conversations between you and McKnight, you and Trisha
18 Turner and you Margo Moreno about this lawsuit but during
19 the course of me asking you those questions, I don't want
20 you to get into anything that you talked about with your
21 lawyer directly, okay?
22     A.  Okay.
23     Q.  I just want to throw that caveat in there because
24 I don't want you to accidentally start telling me about
25 conversations you had with your lawyer because that's

Page 16

1  confidential.  Under the Rules I'm not supposed to ask
2  about it, and I don't want to hear about it anyway.
3      So, a year ago when you and Ms. McKnight
4  first talked about this lawsuit, what exactly did y'all
5  talk about?
6      A.  She just asked me if I was interested in pursuing
7  this.
8      Q.  Okay.  Did she contact you, or did you contact
9  her?
10     A.  She contacted me.
11     Q.  How did she contact you?
12     A.  Telephone.
13     Q.  Prior to that conversation, when was the last
14 time that you had talked to her?
15     A.  One of the nights that we worked together.
16     Q.  Which would have been at least a year beforehand?
17     A.  Right.
18     Q.  All right.  So, she just reached out to you and
19 told you -- what did she tell you about the lawsuit?
20     A.  She just asked me if I'd be interested in getting
21 involved.
22     Q.  Did she tell you what the lawsuit was about?
23     A.  Not exactly.  She just was pursuing it.
24     Q.  She just said --
25     A.  Can I talk to my lawyer?

Page 17

1      Q.  -- "I'm going to pursue a lawsuit against
2  Treasures and would you like to call my lawyer and talk to
3  him about it?"
4      A.  Exactly.
5      Q.  Okay.  Since then, have you had any other
6  conversations with Ms. McKnight?
7      A.  Just couple telephone, you know, just, "How's it
8  going," stuff like that.
9      Q.  Have you talked about the lawsuit?
10     A.  No.
11     Q.  What about Trish Turner?
12     A.  I haven't talked to her.
13     Q.  You just know who she was because y'all worked
14 together?
15     A.  Right.
16     Q.  Margo Moreno?
17     A.  I haven't talked to her either.
18     Q.  So, is it safe to say that if Ms. McKnight hadn't
19 reached out to you about this lawsuit you probably
20 wouldn't know about it?
21         MR. SHELLIST:  I'm going to object to the
22 form, but you can answer it to the extent you can.
23     A.  It's safe to say that, yeah.
24     Q.  (By Mr. Van Huff)  Why did you decide to pursue a
25 lawsuit against these clubs and individuals?

Page 18

1    A. I was asked if I could help a friend out, and I
2   agreed.
3    Q. What's the basis for your claim against these
4   nightclubs?
5       MR. SHELLIST: Object to the form, but you
6   can answer the question.
7    A. It's my wage discrepancy and my...
8       MR. SHELLIST: However you can explain it,
9   you can explain.
10    Q. (By Mr. Van Huff) Just in your own mind. It's
11   not meant to be a trick question. I'm going to go over
12   what the lawsuit says shortly. I'm just wondering, you
13   know, as we sit here without going over the paperwork, you
14   know, what was it about your employment with these clubs
15   that causes you to think you have a claim against them?
16    A. The money they took out of our credit card tips
17   and our wage discrepancies.
18    Q. Is that all?
19    A. Yeah.
20    Q. What do you mean by "wage discrepancy"?
21    A. No overtime pay, less than minimum wage.
22    Q. In addition to your shift pay, were you also paid
23   tips?
24    A. Yes.
25    Q. When you combine your shift pay with the tips

Page 19

1   that you received, would the aggregate be above what
2   minimum wage was at that time?
3    A. Yes.
4    Q. In fact, would it also be above time and a half
5   or 2.17 an hour?
6    A. It's possible. I'm not sure; but, yes.
7    Q. On an average shift how much would you make in
8   tips?
9    A. Anywhere from 150, 175.
10    Q. And what percentage of that would be cash?
11    A. A hundred percent of it.
12    Q. Did you report those cash tips to the IRS as
13   income?
14    A. Yes.
15    Q. A hundred percent of it?
16    A. I did, yes, sir.
17    Q. When you say it was paid to you a hundred percent
18   in cash, is that because the credit card tips were
19   converted to cash and then paid to you on a per shift
20   basis?
21    A. Yes.
22    Q. What percentage of the transactions that
23   customers actually made with the club for drinks were cash
24   transactions as compared to credit card transactions?
25    A. I'm not sure of the exact percentage ;but I would

Page 20

1   guess around 90 percent, 85 to 90 percent.
2    Q. You acknowledge that you were paid a hundred
3   percent of the tips due you in cash at the end of each of
4   your shifts, correct?
5    A. Well, all of my tips were paid in cash a hundred
6   percent.
7    Q. At the end of your shift?
8    A. At the end of my shift.
9    Q. Okay. The day that you worked for Splendor in
10   2005, do you allege that you were subjected to any
11   improper employment practices at Splendor on that day?
12    A. It was just business as usual. It's the same
13   thing I did at Treasures.
14    Q. So, that day you bartended for one day, how long
15   was the shift, do you remember?
16    A. It was about eight and a half hours.
17    Q. Okay. You got paid $30 shift pay, yes?
18    A. Yes, sir.
19    Q. And then at the end of the shift, 100 percent of
20   the tips that you were entitled to were paid to you in
21   cash?
22       MR. SHELLIST: Object to the form.
23       You can answer.
24    Q. (By Mr. Van Huff) Correct?
25    A. All of my tips were a hundred percent cash, yeah.

Page 21

1    Q. No, I'm just talking about the day that you
2   worked at Splendor.
3    A. Right.
4    Q. At the end of the shift, the tips that you were
5   entitled to for that day at Splendor were paid to you in
6   cash, right?
7    A. Right.
8    Q. Okay. So, am I correct in thinking that the
9   employment practices that you individually are complaining
10   about in this lawsuit are employment practices regarding
11   your work at Treasures?
12    A. Correct.
13    Q. Because Centerfolds was a long, long time ago?
14    A. Right.
15    Q. Never worked at Gold Cup, right?
16    A. No, sir.
17    Q. I mean, I'm correct when I say that you never
18   worked at Gold Cup?
19    A. Yeah, that's correct.
20    Q. And you never worked at Trophy Club?
21    A. I never worked at Trophy Club.
22    Q. Never worked at Cover Girls?
23    A. Never worked at Cover Girls.
24    Q. Splendor in addition to being a long time ago was
25   one day, and you don't perceive anything improper as

Page 22

1    happening?
2        A.  Right.
3        Q.  All right.  Now, other than the wage discrepancy
4    issue that we've covered, you also talked about money that
5    was -- you said "money taken out of credit card tips."
6        A.  Yes, sir.
7        Q.  Can you explain that, please, why you're
8    complaining about that?
9        A.  5 percent out of every credit card tip was kept
10   by the house.
11       Q.  Okay.  And so, am I to understand the heart of
12   your claim is that something was unlawful about that 5
13   percent?
14       A.  You'd have to ask my lawyer about that because
15   that's a legal issue.
16       Q.  Okay.  What is it about the facts that actually
17   happened other than they took out 5 percent that you think
18   was unlawful?
19       MR. SHELLIST:  Object to the form but you can
20   answer it to the extent you can.
21       Q.  (By Mr. Van Huff)  If you don't understand it or
22   you can't answer it, that's an acceptable answer, too.
23       A.  Yeah, I don't understand.
24       Q.  Okay.  There's an allegation in this lawsuit that
25   these six clubs are called or are joint employers.  What

Page 23

1    facts are you aware of that support that allegation?
2        MR. SHELLIST:  Object to the form but you can
3    answer it.
4        A.  They're all owned by the same person or persons.
5        Q.  (By Mr. Van Huff)  So, your testimony is that
6    it's your understanding that these six clubs are all owned
7    by the same person or persons?
8        A.  Yes, sir.
9        Q.  What is your understanding of the ownership of
10   these clubs?  Who owns them?
11       A.  George and David Davari.
12       Q.  Other than that what other facts are you aware of
13   that support your allegation that these clubs are joint
14   employers?
15       MR. SHELLIST:  Same objection.  But you can
16   answer and by the way, when I object, it's just for the
17   record.  I didn't tell you this beforehand but it's not
18   meant to interfere with the process but I need to do that
19   just for the record but you can answer the question.
20       A.  Repeat the question again.
21       Q.  (By Mr. Van Huff)  There's an allegation in this
22   lawsuit that these six clubs are joint employers.
23       A.  Right.
24       Q.  And the question presented to you is:  What facts
25   are you aware of in support of that allegation and you

Page 24

1    said common ownership.
2        A.  Right.  Common -- and the way you do things there
3    is they're exactly the same in all the different clubs.
4        Q.  Okay.  Anything else?
5        A.  Not that I can think of.
6        Q.  So, sitting here today, those are all the facts
7    that you're aware of in support of your contention that
8    these clubs are joint employers, correct?
9        A.  Yes, sir, correct.
10       Q.  In your experience were all the bartenders at
11   Treasures paid shift pay?
12       A.  Not all of them.
13       Q.  Okay.  Other than shift pay how were bartenders
14   paid?
15       A.  2.13 an hour.
16       Q.  Okay.  And approximately what percentage were
17   shift pay versus 2.13 an hour?
18       A.  I don't know that answer.  I just know that at
19   some point they quit doing the shift pay and started doing
20   the hourly wage.
21       Q.  Okay.
22       A.  So, I don't know who was -- I can't remember
23   exactly who was before or after.
24       Q.  Is there really any difference between 2.13 an
25   hour and $30 for an eight-hour shift?

Page 25

1        A.  It's -- yeah.
2        Q.  Six and one and a half dozen of another, isn't
3    it?
4        A.  Right.
5        Q.  So, am I to understand that all the bartenders
6    are getting shift pay and then at some point it changed
7    and the bartenders began getting paid the hourly rate?
8        A.  Yes, sir.
9        Q.  But it was -- when it was shift pay, was it a
10   hundred percent of the bartenders got shift pay or some
11   got shift pay and some got hourly?
12       A.  When I began my employment, everybody got shift
13   pay.
14       Q.  And then when they changed it to hourly,
15   everybody got hourly?
16       A.  Right, but everybody -- everybody previously
17   employed was grandfathered in or whatever.
18       Q.  "Everybody" meaning the bartenders?
19       A.  Right.
20       Q.  To your knowledge, were the waitresses ever paid
21   shift pay?
22       A.  Not to my knowledge.
23       Q.  And when did Treasures go from paying its
24   bartenders shift pay to hourly?
25       A.  I don't know.  I just know it happened and I

Page 26

1    didn't...
2        Q. You said that some bartenders were grandfathered
3    in. Did that mean that they continued to get shift pay?
4        A. I believe so.
5        Q. Because you got shift pay the entire time you
6    worked there, right?
7        A. Right. So, I didn't change over. I just stayed
8    the same.
9        Q. Okay. So, while you were getting paid shift pay
10   for your duties as a bartender, the waitresses were
11   getting paid 2.13 an hour?
12       A. Correct.
13       Q. Do you have -- okay. And that's how -- that was
14   your experience with Treasures, correct?
15       A. Correct.
16       Q. Do you have any knowledge at all, personal
17   knowledge, on how shift pay versus 2.13 an hour for
18   bartenders was handled at the other five clubs that are
19   defendants in this lawsuit?
20       A. No.
21       Q. A moment ago we talked about joint employer.
22   Another allegation you've made in your lawsuit is that
23   these clubs are all a single integrated business
24   enterprise. What facts are you aware of in support of
25   that allegation?

Page 27

1        A. Actually, I don't know that. You'd have to ask
2    my lawyer. I'm not sure exactly.
3        Q. Okay. So, sitting here today, you're unsure of
4    any facts in support of your allegation that these clubs
5    are a single integrated business enterprise?
6            MR. SHELLIST: Object to the form but you can
7    answer it to the extent you're able to.
8        Q. (By Mr. Van Huff) Correct?
9        A. Correct.
10       Q. You allege in your lawsuit that any cost at
11   Treasures due to credit card charges was covered through
12   fees collected by or collected from topless entertainers.
13   Are you aware that you make that allegation in your
14   lawsuit?
15       A. I'm aware.
16       Q. Okay. That the credit card transaction costs are
17   covered through fees paid by topless dancers, that's the
18   allegation. What facts are you personally aware of that
19   support that allegation?
20       A. Other than I was told that.
21       Q. Told that by who?
22       A. By the employer. That's the reason for the
23   charge.
24       Q. Would you explain what you just said, please.
25       A. "The reason that we charge extra on the credit

Page 28

1    card is to pay for the credit cards, the processing fee."
2        Q. Who exactly told you that?
3        A. Several people told me that.
4        Q. What were their names?
5        A. George Davari was one.
6        Q. When did he tell you that?
7        A. When I first became employed.
8        Q. Back in 1995?
9        A. Yes, sir.
10       Q. Who else told you that?
11       A. The managers.
12       Q. Names, please.
13       A. Mitch Cook.
14       Q. When did Mitch Cook tell you that?
15       A. Several times throughout my whole working career
16   there.
17       Q. What did he tell you exactly?
18       A. Exactly what I said. "This extra charge goes to
19   pay the processing fees."
20       Q. That the 5 percent that's withheld from your
21   credit card tips pays the processing fees, correct?
22       A. Yes, sir, correct.
23       Q. Which would be the cost of liquidating the credit
24   card tips, correct?
25           MR. SHELLIST: Object to the form but you can

Page 29

1    answer.
2        A. Correct.
3        Q. (By Mr. Van Huff) Now, the legal basis for your
4    lawsuit against Treasures is under something called the
5    Fair Labor Standards Act. It's Federal law about wage
6    practices. Is it your position that Treasures has
7    intentionally violated the FLSA in connection with its
8    wage practices towards you, in other words, that they set
9    out to violate the wage and hour laws and to call issues
10   or that they did it just -- that they didn't really
11   understand what they were doing and maybe they made a few
12   mistakes?
13           MR. SHELLIST: Object to the form of the
14   question but you can answer it.
15       A. I don't know the answer to that.
16       Q. (By Mr. Van Huff) Okay. I mean, are you aware
17   of any facts which demonstrate that Treasures was
18   intentionally violating the wage and hour loss?
19       A. I guess I don't know -- I don't know.
20       Q. Are you aware of the fact that at some point
21   several years ago the Department of Labor audited
22   Treasures and gave Treasures a clean bill of health with
23   regard to its wage and hour practices?
24       A. I'm not aware of that.
25       Q. Aside from what other people have told you, do

Page 30

1  you have any personal knowledge regarding the manner in
2  which Centerfolds, Gold Cup, Trophy Club, Splendor or
3  Cover Girls have handled their credit cards transactions
4  since 2005?
5      A. I only know about Treasures.
6      Q. How much money do you think Treasure owes you for
7  the wage and hour violations that you've alleged in your
8  lawsuit?
9      A. I have no way of knowing that. I mean, you'd
10 have to ask my lawyer.
11     Q. Are you aware of the fact that the lawsuit was
12 filed over two years after your last of employment with
13 Treasures?
14     A. I'm aware.
15     Q. Are you aware of the fact that your consent to
16 join the lawsuit wasn't filed until three years after the
17 last date of your employment with Treasures?
18     A. I'm aware.
19     Q. Does that cause you to have any statute of
20 limitations or concerns about your claims against
21 Treasures?
22         MR. SHELLIST: Object to the form of the
23 question.
24         You can answer the facts if you know the
25 facts but don't answer legal questions.

Page 31

1      A. I don't -- I don't know.
2      Q. (By Mr. Van Huff) In your answer to
3  Interrogatory 13 -- well, what I have here is an answer to
4  Interrogatory 13 and it talks about some of the plaintiffs
5  specifically but it doesn't mean you individually. So,
6  you may or may not have information in connection with
7  this interrogatory. Are you alleging that Treasures
8  required you to pay for walked tabs?
9      A. Yes.
10     Q. What is the factual basis for that claim?
11     A. Meaning somebody walked their tab you had to pay
12 for it.
13     Q. As a bartender, if a customer being served by a
14 waitress walked a tab, would you have to pay for it?
15     A. Can you say that again?
16     Q. You got a customer seated at the table away from
17 the bar who is being served by a waitress. Waitress is
18 coming to get drinks from you. Waitress is keeping track
19 of how many drinks a customer is drinking. If that
20 customer disappears, who is responsible -- you're claiming
21 that if that customer walks, that under that scenario
22 would the waitress be the one to pay for the walked tab or
23 would you be the one to pay for the walked tab?
24     A. The waitress would be.
25     Q. Okay. So, what walk tabs would you be

Page 32

1  responsible for?
2      A. Any tab that I was personally running myself, I
3  mean, at the bar.
4      Q. Okay. So, for customers seated at the bar who
5  are ordering from you directly and running a tab?
6      A. Right. They go to the bathroom and then not come
7  back. I would be responsible to pay for that.
8      Q. Wouldn't the customer need to give you a credit
9  card to open a tab in the first place?
10     A. Correct. Sometimes -- sometimes you wouldn't
11 take -- he wouldn't take a credit card. Maybe one round
12 of drinks or maybe it was a regular customer that you
13 know, but I'd still have to pay the tab.
14     Q. What's the largest amount of a walk tab that you
15 claim you have had to pay for?
16     A. Well over a hundred dollars.
17     Q. What would the average be? One or two days?
18     A. Yeah, not -- you know, 25, $30.
19     Q. So, the majority of the time --
20     A. For me personally, yeah.
21     Q. So, it's your testimony that the majority of the
22 time that you would have to cover a walk tab it would be a
23 tab that was under $25?
24     A. For me personally, yes, sir.
25     Q. Are you also alleging that you had to pay for

Page 33

1  credit card chargebacks?
2      A. Correct.
3      Q. What is a credit card chargeback?
4      A. That's when the customer disputes the credit card
5  charge with the credit card company.
6      Q. How often would that happen with a tab that was
7  being run with the bartender?
8      A. You know, it's not -- it wasn't very common but
9  it happened.
10     Q. How many times per year?
11     A. Per year?
12     Q. For bartenders. In your experience.
13     A. Are you talking about the whole -- all the ones
14 that I did as a bartender or the ones --
15     Q. Just for you.
16     A. Just for me?
17     Q. Uh-huh. Yes.
18     A. Very rarely, one -- if one per year.
19     Q. And what about walk tabs per year?
20     A. Maybe four or five.
21     Q. And so, we're talking about an aggregate of
22 between 1 and $200 in walk tabs per year that you would
23 have to pay for?
24     A. Right.
25     Q. Are you aware of any other fact personally, aware

Page 34

1 of any other facts as they relate to you as an individual
2 regarding walk tabs or credit card chargebacks that we
3 haven't talked about?
4     A. No, sir.
5     Q. We talked about your DUI.  Do you recall that?
6     A. Earlier.
7     Q. In the case we talked about that you got arrested
8 and got a DUI at some point?
9     A. Right.
10     Q. Driving while intoxicated?
11     A. Correct.
12     Q. And in Interrogatory No. 15 I asked you about
13 criminal arrests and you said that you've never been
14 arrested and then you swore to that answer.  Is that just
15 an error on the part of someone --
16     A. Could be an error, yes.
17     Q. -- other than you?
18         Are you alleging that Treasures required you
19 to pay for spillage or breakage?
20     A. I'm not aware of that.
21     Q. Did Treasures ever require you to pay for
22 spillage or breakage?
23     A. Not me personally, no.
24     Q. Do you have any personal knowledge of the
25 policies at Centerfolds, Gold Cup, Trophy Club, Splendor

Page 35

1 or Cover Girls from 2005 to the present regarding walk
2 tabs or credit card chargebacks?
3     A. No, sir.
4         MR. VAN HUFF: Mark this as Exhibit 1,
5 please.
6         (A. Baker Exhibit No. 1 was marked.)
7     Q. (By Mr. Van Huff) I'm handing you a document
8 that's been marked by the court reporter as Exhibit 1.
9 The title of this document is Declaration of Andrew Baker.
10 Do you recognize that?
11     A. Yes, sir.
12     Q. On the third page, is that your signature there?
13     A. Yes, sir.
14     Q. Underneath where it says: "I swear under penalty
15 of perjury that the foregoing is true and correct"?
16     A. That's correct.
17     Q. I see here in the second paragraph on the first
18 page: "From January, 1999, to April, 2007, I worked for
19 D. Houston, Inc. D/B/A Treasures, which is owned and
20 operated by Ali and Hassan Davari."  You see that?
21     A. Yes, sir.
22     Q. All right.  Did you know that D. Houston, Inc.,
23 is actually owned by another corporation?
24     A. Another corporation?
25     Q. Yes.

Page 36

1     A. No, I did not.
2     Q. So, if D. Houston, Inc., was owned by another
3 corporation, then this first sentence here would be
4 incorrect, yes?
5         MR. SHELLIST:  Object to the form of the
6 question.  Calls for a legal conclusion but you can answer
7 it.
8     A. I'm not sure.
9     Q. (By Mr. Van Huff)  Would it also surprise you to
10 hear that the other five clubs are also owned by a
11 corporation?
12     A. It wouldn't surprise me.
13     Q. But you swore under oath that they were owned by
14 Ali and Hassan Davari.
15     A. That was what I was led to believe when I was
16 employed there.
17     Q. It says here that you weren't always paid for
18 every hour that you worked.  What's the basis for that?
19     A. I'm not sure.  I'd have to talk to my lawyer
20 about that.
21     Q. Because you were paid shift pay?
22     A. Right.
23     Q. Now, it says here you performed work for
24 Centerfolds and Splendor and that you're familiar with how
25 those clubs operated.  I guess you're familiar with how

Page 37

1 Centerfolds operated during the time period 1995 and 1999,
2 correct, because that's when you worked there?
3     A. That's correct.
4     Q. But you testified earlier that you don't have any
5 personal knowledge of how it's operated post 1999 because
6 you haven't been there since then, right?
7         MR. SHELLIST:  Object to the form of the
8 question but you can answer it.
9     A. That's correct.
10     Q. (By Mr. Van Huff)  You say here that the 5
11 percent that was deducted from the amount that you paid on
12 tabs were paid by credit card, that the 5 percent was more
13 than the actual credit card conversion fee?
14     A. I mean, you'd have to talk to my lawyer about
15 that.  I'm not sure.
16     Q. Well, the basis of your lawsuit and I think that
17 you'll agree with me is that the 5 percent that they were
18 deducting from your credit card tips to cover the cost of
19 converting those tips to cash was too high, right?  The 5
20 percent was too much?
21     A. Okay.
22     Q. What's the factual basis for your claim that that
23 amount is too high?
24     A. Once again, I'd have to refer you to my lawyer.
25     Q. Okay.  You say here that the dancers had to pay a

Page 38

1  door entrance fee upon first entering the club at night?
2      A. Yes, sir.
3      Q. Other than what other people told you, how do you
4  know that to be true?
5      A. I actually saw it happen.
6      Q. Explain to me what your understanding was with
7  what was happening.
8      A. The girl had to pay an entrance fee to come in
9  and work at the club.
10     Q. Are you alleging that you suffer-- that you
11  personally suffered some sort of harm as a result of that?
12     A. No.
13     Q. Are you alleging that it was unlawful for
14  Treasures to charge the dancers an entrance fee?
15     A. I'm not sure of the answer to that.
16     Q. It says here: "As for how waitresses and
17  bartenders got paid, we often had to wait to get paid our
18  tips on larger credit card charges." You see that here?
19     A. I see.
20     Q. Can you explain that to me, please?
21     A. Yeah. If a credit card came in and was over,
22  say, $5,000, the club would hold it until the charge
23  actually went through before they would pay anybody out on
24  it.
25     Q. Okay. But once the charge did, in fact, go

Page 39

1  through, you'd get paid?
2      A. Correct.
3      Q. And when you say "charge go through," what do you
4  mean, like the credit card machine accept the credit card
5  and print out the receipt?
6      A. No, there wouldn't be no charge back.
7      Q. Was there ever an instance where there was a
8  charge back on a credit card that you say wasn't paid to
9  you at the end of your shift?
10     A. Me personally, no.
11     Q. So, in your experience you individually were paid
12  all of your credit card tips?
13     A. Correct.
14     Q. Less the 5 percent that you're claiming that was
15  unlawful?
16     A. Right.
17     Q. It says here that you would be ordered to bring
18  cash in an envelope and give it to the club via "Norman."
19  Did you ever give any cash in an envelope to Norman?
20     A. I did not.
21     Q. Then why does it say that in your Declaration?
22     A. If I was subjected to the -- if I was -- had the
23  charge back and was paid out on it, I would have to bring
24  the cash back.
25     Q. But you just told me that you never had to bring

Page 40

1  any cash back.
2      A. Right.
3      Q. So, you're saying theoretically if it ever
4  happened, which it didn't, you would have to bring it in
5  an envelope?
6      A. Right.
7      Q. But you never had to?
8      A. I personally did not.
9      Q. Okay. It says here you saw other people bring
10  cash in envelopes.
11     A. Yes, sir.
12     Q. Yes?
13         How many times did you see people bring cash
14  in envelopes to Norman?
15     A. I'm not sure of the actual number.
16     Q. Was it about five times?
17     A. It was more than ten.
18     Q. More than 20?
19     A. I'm not sure. I know it was more than ten.
20         MR. SHELLIST: Al, are you talking during his
21  whole employment, just the end or everything combined?
22         MR. VAN HUFF: There wasn't really a limit on
23  it.
24         MR. SHELLIST: Understood. I just wanted to
25  make sure that you guys were on the same page but it is as

Page 41

1  it is.
2      Q. (By Mr. Van Huff) When was the last time you saw
3  anybody bring, a waitress or a dancer, bring cash in an
4  envelope to Norman?
5      A. It had to -- it would have to have been four
6  years ago.
7      Q. And other than what people told you, how would
8  you know what the cash in the envelope was for?
9      A. Because that was the standard practice. They
10  would tell me about it.
11     Q. Well, other than what people told you --
12     A. Right. I mean --
13     Q. -- if nobody told you what the envelope situation
14  was all about, you wouldn't know, correct?
15     A. Correct.
16     Q. Do you know how much money was in the envelopes?
17     A. No, sir.
18     Q. Do you know if any of the cash envelopes were
19  repayment of loans?
20     A. I can't answer that.
21     Q. Because you don't know?
22     A. I don't know.
23     Q. They could have all by been repayment of loans
24  then, correct?
25     A. Not to my experience. There were no loans.

Page 42

1    Q. I see here that all the bartenders and waitresses
2  who worked for the Davaris did the same job.
3    A. Correct.
4    Q. Well, y'all weren't always paid the same way
5  because the waitresses always got 2.13 an hour and many of
6  the bartenders such as yourself were getting shift pay,
7  correct?
8    A. Correct.
9    Q. Yeah. And waitresses' duties are clearly
10 different than bartenders' duties?
11   A. I think we do the same jobs per bartender per
12 waitress.
13   Q. Okay. So, you're not saying that bartenders and
14 waitresses did the same job?
15   A. Right.
16   Q. You're saying that all the bartenders did the
17 same job and all the waitresses did the same job?
18   A. Correct.
19   Q. Okay. And it was also your testimony that as a
20 bartender you were paid a hundred percent of tips that you
21 were due?
22       MR. SHELLIST: Object to the form of the
23 question.
24   Q. (By Mr. Van Huff) Correct?
25       Other than the 5 percent that was -- that

Page 43

1  you're claiming about in your lawsuit? You just said that
2  a few moments ago.
3    A. Yeah, a hundred percent, right.
4    Q. Okay. Now, however, unlike you, the waitresses
5  in this lawsuit are claiming that they did not receive a
6  hundred percent of their tips, correct?
7    A. Well, I'm not sure. You'd have to refer to my
8  lawyer for what they said.
9    Q. Well, you say here in your Declaration, your
10 sworn Declaration, that: "If we didn't get paid on a
11 credit card transaction which was later contested, one of
12 the managers would make us or the waitress and the dancer
13 pay back the money we got."
14       Now, we already established that that didn't
15 apply to you personally but that this has to do with the
16 waitresses, correct?
17   A. Correct.
18   Q. So, that would -- that's an example of how the
19 waitress's claims are different than the claims that
20 you're making as a bartender, correct?
21   A. Okay.
22   Q. Yes?
23   A. Yes.
24   Q. And, also, as a bartender it's your testimony
25 that you were never required to bring cash in an envelope

Page 44

1  to give to Norman whereas this Declaration reflects the
2  fact that certain waitresses involved in this lawsuit were
3  required to do so which would be another example of a
4  difference between the way you were treated as a bartender
5  and the waitresses involved in this lawsuit were treated,
6  correct?
7    A. Correct. I was required to do it as well,
8  though.
9    Q. Well, you never had to do it.
10   A. But I never had to do it.
11       MR. VAN HUFF: Well, we been going for about
12 an hour and 20 minutes. You ready for a little break then
13 we can finish up?
14       MR. SHELLIST: Sure.
15       (Break from 11:16 a.m. to 11:36 a.m.)
16       MR. VAN HUFF: I just have a few more
17 questions. I'm not going to be here very much longer.
18       THE WITNESS: Okay.
19   Q. (By Mr. Van Huff) I've got a set of documents
20 here that were produced in response to Request for
21 Production that I sent to your lawyer and the documents
22 seem to be broken down by plaintiff. So, under Andrew
23 Baker we've got documents that were labeled McKnight 24 to
24 McKnight 28. What I'd like you to do is just take a look
25 at these and let me know if you've ever seen these before.

Page 45

1    A. Yeah, correct, I've seen them before.
2    Q. What are they?
3    A. These were the actual check out sheets that we
4  use as bartenders.
5    Q. Okay. I notice that these check out sheets are
6  dated in 2008 during which time you no longer worked
7  there, correct?
8    A. Right.
9    Q. Or worked at Treasures, correct?
10   A. Correct.
11   Q. What is the significance of those documents?
12       MR. SHELLIST: Object to the form but you can
13 answer.
14   Q. (By Mr. Van Huff) If any.
15   A. I had a business that I was doing, and I used the
16 same format.
17   Q. Okay. Is there anything about those documents
18 that demonstrate in any way that Treasures was doing
19 something unlawful?
20       MR. SHELLIST: Object to the form but you can
21 answer it.
22   A. I don't know.
23   Q. (By Mr. Van Huff) I don't know either.
24   A. All right.
25   Q. Do you know which Request for Production these

Page 46

1    documents were produced in response to?
2        A. No, sir.
3        Q. Why did your employment with Treasures end?
4        A. I just -- I quit. I decided to move on to
5    something else.
6        Q. Did you quit, or were you terminated?
7        A. I quit.
8            MR. VAN HUFF: Pass the witness.
9            MR. SHELLIST: I have a few questions for
10   you, sir.
11           EXAMINATION
12   QUESTIONS BY MR. SHELLIST:
13   (11:40 a.m.)
14       Q. Did you receive any of your compensation as tip
15   outs for money that was earned by waitresses?
16       A. Yes, I did.
17       Q. If a waitress did not receive all of her income
18   for whatever reason but if she did not receive all of her
19   tipped income, would that affect your income?
20       A. Correct.
21       Q. What percent would you typically get as a tip out
22   from the waitresses at the end of a shift?
23       A. 15 percent.
24       Q. Did any employees of any of the clubs ever tell
25   you -- strike that.

Page 47

1            You talked a little awhile ago with
2    Mr. Van Huff about the white envelopes that you saw and he
3    had asked you some information about personal knowledge
4    and et cetera. Did any of the waitresses ever tell you
5    that they had to return cash monies in a white envelope?
6            MR. VAN HUFF: Object to the extent it calls
7    for hearsay.
8        A. Correct.
9        Q. (By Mr. Shellist) And give me an example of what
10   you were told by -- well, strike that.
11           Based on what you were told, do you know what
12   was in the envelope and what it was for?
13           MR. VAN HUFF: Running objection to hearsay.
14           MR. SHELLIST: Yeah, that's fine.
15       A. They would come in and complain to me about what
16   they just had to turn in, you know.
17       Q. (By Mr. Shellist) What would they say?
18       A. "Man, I just had to pay $500 on a charge back
19   credit card."
20       Q. Did you ever hear from any managers in any of the
21   clubs that if there were charge backs the club was going
22   to get their money back?
23       A. Yes.
24       Q. And in your opinion was this something that was,
25   this occurrence was it just a random occurrence; or was it

Page 48

1    something that you would have observed on a more regular
2    basis?
3        A. Well, it was a standard set for this type of
4    occurrence.
5        Q. Okay. And so, if it did occur, then, there was a
6    protocol in place in your opinion?
7        A. Right. Correct.
8        Q. Now, I believe and I didn't --
9            MR. VAN HUFF: Object to speculation for the
10   last question.
11       Q. (By Mr. Shellist) I didn't hear the entire
12   exchange I don't think but Mr. Van Huff asked you I think
13   earlier about whether you were aware that dancers -- that
14   there was a 25-dollar per credit card dance charge. Are
15   you aware of that?
16       A. I'm aware of that.
17       Q. And how much of that money, if any, did the
18   dancers have to pay to the house?
19       A. $5.
20       Q. And in your experience was that at all of the
21   clubs or only at Treasures?
22       A. That's everywhere.
23       Q. And what do you base that on?
24       A. Just talking with people, you know, my everyday
25   business. If it's the same somewhere, it's always -- you

Page 49

1    know, if it was different somewhere else, everybody would
2    go there as well. It was always the same standard
3    everywhere you went.
4        Q. I want to make sure -- let me focus on what you
5    were told.
6            Did you ever talk with any dancers who danced
7    at other clubs?
8        A. Sure.
9        Q. And did you ever talk about the 5-dollar pay to
10   the house with managers?
11       A. Sure.
12       Q. And did you ever talk with patrons or waitresses
13   about $5 being paid to the house?
14       A. We talked to -- I talked to everybody about it,
15   sure.
16       Q. And you have your ex-wife. How was she employed
17   while you were employed at Treasures?
18       A. She was a waitress at Centerfolds.
19       Q. Did you ever talk with her about the business
20   practices at Centerfold?
21       A. Of course, we did.
22       Q. And were the practices, the business practices,
23   of the 5-dollar charge paid to the house per credit card
24   dance the same there as it was at Treasures?
25       A. Yes, correct.

Page 50

1    Q. The 5 percent being withheld for the alleged
2  credit card liquidation fee, was it the same at
3  Centerfolds as it was at Treasures, to your knowledge?
4    A. It was the same as.
5    Q. Have you read George Davari's deposition?
6    A. I read it, yes, sir.
7    Q. And did you read a part in there where George
8  Davari said that some clubs were 4 percent credit card fee
9  and some were 5 percent?
10   A. I read that.
11   Q. Do you know which clubs were which, meaning which
12 clubs charged 4 percent and which clubs charged 5 percent?
13   A. No.  Everybody charged 5 percent as far as I
14 know.
15   Q. As far as you know?
16   A. (Witness nods head affirmatively.)
17   Q. Okay.  Did anybody ever tell you what the $5 per
18 credit card dance was used for?
19   A. Probably the processing --
20   Q. Follow me on the question.
21       Did any -- and I don't mean to interrupt you
22 but did anybody ever tell you what the 5-dollar credit
23 card surcharge was used for?
24   A. Yes.
25   Q. Who?

Page 51

1    A. The managers would tell me.  The owner of the
2  club told me.  The dancers would even tell you.
3    Q. Now, was this -- I want to focus with you on the
4  last, let's say, year of your employment with the Davaris
5  and while you worked at Treasures.
6       Were any of the comments from managers or
7  owners about what the 5-dollar credit card charge was used
8  for, were any of the comments made during that time, the
9  last term of your employment?
10   A. Sure.
11   Q. Did you ever hear patrons complain about how high
12 their tab was?
13   A. I heard that.
14   Q. Okay.  And what was a potential solution for
15 somebody if their credit card tab was so high, if any?
16   A. To come in and pay it cash.
17   Q. Why was that?
18   A. So they wouldn't have to pay the extra 5-dollar
19 per dance fee.
20   Q. To your knowledge, did dancers ever have to pay
21 any money that they received in cash for dances to the
22 house?
23   A. None whatsoever.
24   Q. Now, Mr. Van Huff asked you about an
25 interrogatory and you talked about a DUI.  Do you remember

Page 52

1  talking about that?
2    A. Yes, sir.
3    Q. Now, sitting here today, can you tell us why you
4  did not list that on the interrogatory?
5    A. Because it said "other than traffic violation."
6  I took that to mean DUI.
7    Q. All right.  Now, when Mr. Van Huff did ask you
8  about being arrested or involved in legal proceedings,
9  you've told him the truth today, correct?
10   A. Correct.
11   Q. During your entire employment with the Davaris
12 and for the clubs you talked to Mr. Van Huff about up
13 until the day that you stopped working there, did any
14 owner or manager of the club tell you that any percent of
15 that 5 percent that was held back from your tips, that any
16 part of that was going to pay for chargebacks?
17   A. No.
18       MR. SHELLIST:  I'll pass the witness.
19            FURTHER EXAMINATION
20 QUESTIONS BY MR. VAN HUFF:
21 (11:48 a.m.)
22   Q. The ex-wife that worked at Centerfolds --
23   A. Yes, sir.
24   Q. -- is that ex-wife No. 1 or soon-to-be-ex-wife
25 No. 2?

Page 53

1    A. No. 2.
2    Q. Is that Allison?
3    A. That's right.  That's correct.
4    Q. What is Allison's telephone number?
5    A. I have to take it out of here for a second.  It's
6  281-748-7786.
7    Q. And where would I find Allison and serve her with
8  a deposition subpoena?
9    A. 22530 Heatherway Court, Katy, 77449.
10   Q. Do you know when Allison stopped working for
11 Centerfolds?
12   A. Right around the same time I quit working at
13 Treasures, maybe a little bit before.
14   Q. Did she know about this lawsuit?
15   A. Yes.
16   Q. Have you listed this lawsuit as a potential asset
17 in the divorce proceeding?
18   A. No.
19   Q. Why not?
20   A. Because I haven't -- I'm going to be divorced
21 here in about a week and this lawsuit hadn't materialized
22 yet.
23   Q. Is there a division of assets that will result
24 because of the divorce?
25   A. I'm not sure what you're asking.

Page 54

1    Q.  Normally in a divorce situation there are assets
2  and liabilities --
3    A.  Oh, yes.  Yeah.
4    Q.  -- assets meaning property and liabilities
5  meaning debt.
6    A.  Correct.
7    Q.  And is there going to be a division of assets and
8  liabilities in connection with the divorce proceeding?
9    A.  Sure.
10   Q.  Okay.  And how is the -- is this lawsuit being
11  dealt with specifically in connection with the divorce
12  proceeding?
13   A.  No.
14   Q.  Why not?
15   A.  You'd have to ask my lawyer.
16   Q.  Is your divorce lawyer aware of this lawsuit?
17   A.  Yes.
18   Q.  And you say that Allison is also aware of the
19  lawsuit?
20   A.  Right.
21   Q.  What is the status of the divorce proceeding.
22       MR. SHELLIST:  Object to the form.  I don't
23  want to get into that unless you can tell me why you think
24  it's important.
25       MR. VAN HUFF:  He just said it was about to

Page 55

1  finish next week.
2       MR. SHELLIST:  No, I understand.
3       MR. VAN HUFF:  I just asked.
4    Q.  (By Mr. Van Huff)  I mean, are y'all for entry of
5  judgment next week?
6    A.  Yeah, I've got mediation on Thursday and the
7  judge Monday.
8    Q.  Okay.
9    A.  It's going to be done.
10       MR. VAN HUFF:  No further questions.  Pass
11  the witness.
12       MR. SHELLIST:  We'll pass the witness.
13       Thank you for your time.
14
15       (Deposition concluded at 11:52 a.m.)
16
17
18
19
20
21
22
23
24
25

Page 56

1         WITNESS CORRECTIONS AND SIGNATURE
2     Please indicate changes on this sheet of paper, giving
   the change, page number, line number and reason for the
3  change.  Please sign each page of changes.
4  PAGE/LINE      CORRECTION      REASON FOR CHANG
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25         ANDREW BAKER

Page 57

1     I, ANDREW BAKER, have read the foregoing deposition
   and hereby affix my signature that said is true and
2  correct, except as noted on the previous page(s), and that
   I am signing this before a Notary Public.
3
4
5         ANDREW BAKER
6  STATE OF T E X A S      *
6  COUNTY OF HARRIS        *
7
8     Before me,          , on this day
9  personally appeared ANDREW BAKER, known to me or proved to
10  me under oath or through        (description of
11  identity card or other document) to be the person whose
12  name is subscribed to the foregoing instrument and
13  acknowledged to me that they executed the same for the
14  purposes and consideration therein expressed.
15     Given under my hand and seal of office this
16     day of          ,          .
17
18
19
20         NOTARY PUBLIC IN AND FOR
            THE STATE OF TEXAS
21
22  My Commission Expires:
23
24
25

Page 58

```
1        IN THE UNITED STATES DISTRICT COURT FOR THE
               SOUTHERN DISTRICT OF TEXAS
2                   HOUSTON DIVISION
3    LAURA MCKNIGHT, TRISHA     *
     TURNER, ANDREW BAKER,      *
4    RACHAEL FREEDMAN, KIMBERLY *
     MCCRAY, and MARGO MORENO   *
5         Plaintiffs,           *
                                *
6    V.               * Civil Action No.  H-09-3345
                                *
7    D. HOUSTON, INC. D/B/A     *
     TREASURES, A.H.D. HOUSTON, *
8    INC. D/B/A CENTERFOLDS,    *
     D.N.W. HOUSTON, INC. D/B/A *
9    GOLD CUP, D. RANKIN, INC.  *
     D/B/A TROPHY CLUB, D WG FM,*
10   INC. D/B/A SPLENDOR,    * Jury Trial Demanded
     W.L. YORK, INC. D/B/A      *
11   COVER GIRLS, AND, IN THEIR *
     INDIVIDUAL CAPACITIES, ALI *
12   DAVARI and HASSAN DAVARI   *
          Defendants.           *
13   ***************************************************
             REPORTER'S CERTIFICATION
14          FOR THE ORAL DEPOSITION
                  ANDREW BAKER
15                 MAY 11, 2010
     ***************************************************
16        I, Rita Frangullie, Certified Shorthand Reporter in
17   and for the State of Texas, hereby certify to the
18   following:
19        That the witness, ANDREW BAKER, was duly sworn by the
20   officer and that the transcript of the oral deposition is
21   a true record of the testimony given by the witness;
22        That the deposition transcript was submitted on
23        , 2010, to the witness, or to the
24   attorney for the witness for examination, signature and
25
```

Page 59

```
1    return to Q&A Reporting, Incorporated by         ,
2    2010;
3        That the amount of time used by each party at the
4    deposition is as follows:
5         MR. ALBERT THOMAS VAN HUFF - 1 hour 25 minutes
6         MR. MARTIN A. SHELLIST - 8 minutes
7        That pursuant to information given to the
8    deposition Officer at the time said testimony was taken,
9    The following includes counsel for all parties of record:
10        MR. MARTIN A. SHELLIST, Attorney for plaintiffs;
11        MR. ALBERT THOMAS VAN HUFF, Attorney for
12   Defendants;
13       I further certify that I am neither counsel for,
14   related to, nor employed by any of the parties or
15   attorneys in the action in which this proceeding was
16   taken, and further that I am not financially or otherwise
17   interested in the outcome of the action.
18       Further certification requirements pursuant to Rule
19   203 TRCP will be certified to after they have occurred.
20   Certified to by me this         day of
21        , 2010.
22
23        Rita Frangullie,
          Certified Shorthand Reporter
24        in and for the State of Texas
          Certification No. 7847
25        Expiration Date: 12-31-2011
26
```

Page 60

```
1        FURTHER CERTIFICATION UNDER RULE 203 TRCP
2        The original deposition was/was not returned to the
     deposition officer on          , 2010.
3
4        If returned, the attached Changes and Signature
     page contains any changes and the reasons therefor;
5        If returned, the original deposition was delivered
     to Mr. Albert Thomas Van Huff, custodial Attorney;
6
7        That $       is the deposition officer's
     charges to the Defendant, TBA No. 24028183 for preparing
8    the original deposition transcript and any copies of
     exhibits;
9        That the deposition was delivered in accordance with
     Rule 203.3, and that a copy of this certificate was served
10   on all parties shown herein on and filed with the Clerk.
11       Certified to by me this day of         , 2010.
12
13
14
15
16              RITA FRANGULLIE, Texas CSR, 7847
                Expiration Date: 12-31-2011
17
18
19   Q&A REPORTING, INCORPORATED
     10220 Memorial Drive, Suite 22
20   Houston, Texas 77024
     (713) 467-7900 - Telephone
21   (713) 467-7911 - Fax
     Registration Firm No. 402
22
23
24
25
```



**A**

able 27:7
above-styled 1:18
accept 39:4
acceptable 22:22
accidentally 15:24
acknowledge 20:2
acknowledged
  57:13
Act 29:5
action 1:6 58:6
  59:15,17
actual 37:13 40:15
  45:3
addition 12:17,19
  18:22 21:24
address 6:12
affect 46:19
affirmatively 9:8
  50:16
affix 57:1
agent 6:20
aggregate 19:1
  33:21
ago 11:19,20 15:14
  16:3 21:13,24
  26:21 29:21 41:6
  43:2 47:1
agree 6:5 37:17
agreed 5:23 18:2
agreements 4:11
Al 40:20
Albert 2:9 3:3,4
  59:5,11 60:5
Ali 1:11 35:20
  36:14 58:11
allegation 22:24
  23:1,13,21,25
  26:22,25 27:4,13
  27:18,19
allege 20:10 27:10
alleged 30:7 50:1
alleging 31:7 32:25
  34:18 38:10,13
Allison 53:2,7,10
  54:18
Allison's 53:4
al@vanhuff.com
  2:12

amended 9:10,11
amount 32:14
  37:11,23 59:3
Andrew 1:3,14,16
  3:3,10 4:1,9 35:9
  44:22 56:25 57:1
  57:4,9 58:3,14,19
answer 5:6,13,16
  9:9,10 12:15,25
  17:22 18:6 20:23
  22:20,22,22 23:3
  23:16,19 24:18
  27:7 29:1,14,15
  30:24,25 31:2,3
  34:14 36:6 37:8
  38:15 41:20 45:13
  45:21
answers 4:25 5:1,5
  6:9 8:16,21 12:21
  13:4
anticipate 5:14
anybody 38:23
  41:3 50:17,22
anyway 16:2
Appearances 3:2
appeared 57:9
apply 43:15
appreciate 5:12
approximate 8:23
approximately
  8:18 24:16
April 8:19,22,24
  9:5 13:19 35:18
arrested 8:10 34:7
  34:14 52:8
arrests 34:13
Aside 29:25
asked 5:25 13:9
  16:6,20 18:1
  34:12 47:3 48:12
  51:24 55:3
asking 13:1 15:19
  53:25
asset 53:16
assets 53:23 54:1,4
  54:7
assorted 9:18
assume 5:20,21
  10:1

attached 1:25 6:10
  60:3
attorney 2:14 58:24
  59:10,11 60:5
attorneys 59:15
audited 29:21
average 19:7 32:17
aware 14:15 23:1
  23:12,25 24:7
  26:24 27:13,15,18
  29:16,20,24 30:11
  30:14,15,18 33:25
  33:25 34:20 48:13
  48:15,16 54:16,18
awhile 47:1
awkward 5:14
A.H.D 1:7 58:7
a.m 1:19,19 4:6
  44:15,15 46:13
  52:21 55:15

**B**

back 10:6 12:10
  13:22 28:8 32:7
  39:6,8,23,24 40:1
  43:13 47:18,22
  52:15
backs 47:21
Baker 1:3,14,16 3:3
  3:10 4:1,7,9 35:6
  35:9 44:23 56:25
  57:1,4,9 58:3,14
  58:19
bar 10:9,13,14
  31:17 32:3,4
bartended 20:14
bartender 7:14
  9:13,14,20 10:18
  12:11 13:23 14:10
  14:21 15:1 26:10
  31:13 33:7,14
  42:11,20 43:20,24
  44:4
bartenders 24:10
  24:13 25:5,7,10
  25:18,24 26:2,18
  33:12 38:17 42:1
  42:6,10,13,16
  45:4

base 48:23
Based 47:11
Basically 9:16
basis 18:3 19:20
  29:3 31:10 36:18
  37:16,22 48:2
bathroom 32:6
began 25:7,12
beginning 11:12
behalf 6:6
believe 11:18 26:4
  36:15 48:8
bill 29:22
bit 5:14 8:12 53:13
break 44:12,15
breakage 34:19,22
bring 10:5 39:17,23
  39:25 40:4,9,13
  41:3,3 43:25
broken 44:22
business 20:12
  26:23 27:5 45:15
  48:25 49:19,22

**C**

C 2:1
call 8:25 17:2 29:9
called 6:11 7:3 12:4
  12:11 22:25 29:4
calls 36:6 47:6
CAPACITIES
  1:11 58:11
card 10:4 18:16
  19:18,24 22:5,9
  27:11,16 28:1,21
  28:24 32:9,11
  33:1,3,4,5 34:2
  35:2 37:12,13,18
  38:18,21 39:4,4,8
  39:12 43:11 47:19
  48:14 49:23 50:2
  50:8,18,23 51:7
  51:15 57:11
cards 9:18,25 28:1
  30:3
career 28:15
case 1:18 6:7 8:14
  34:7
cash 9:17,22 19:10

  19:12,18,19,23
  20:3,5,21,25 21:6
  37:19 39:18,19,24
  40:1,10,13 41:3,8
  41:18 43:25 47:5
  51:16,21
casualty 7:5
cause 30:19
causes 18:15
caveat 15:23
Centerfold 49:20
Centerfolds 1:8
  11:8,11,15 12:16
  12:18,24 13:3,5,6
  13:7,9,17 14:1,2,7
  14:9 21:13 30:2
  34:25 36:24 37:1
  49:18 50:3 52:22
  53:11 58:8
certain 44:2
certificate 3:6 60:9
certification 1:13
  58:13 59:18,24
  60:1
certifications 7:10
certified 1:20 58:16
  59:19,20,23 60:11
certify 58:17 59:13
cetera 47:4
change 26:7 56:2,3
  56:4
changed 25:6,14
changes 56:2,3
  60:3,4
charge 27:23,25
  28:18 33:5 38:14
  38:22,25 39:3,6,8
  39:23 47:18,21
  48:14 49:23 51:7
chargeback 33:3
chargebacks 33:1
  34:2 35:2 52:16
charged 50:12,12
  50:13
charges 27:11
  38:18 60:7
check 45:3,5
Civil 1:6,24 58:6
claim 8:17 18:3,15

22:12 31:10 32:15
37:22
**claiming** 31:20
39:14 43:1,5
**claims** 30:20 43:19
43:19
**Class** 6:11
**clean** 29:22
**clear** 9:1
**clearly** 42:9
**Clerk** 60:10
**club** 1:9 9:17 11:23
19:23 21:20,21
30:2 34:25 38:1,9
38:22 39:18 47:21
51:2 52:14 58:9
**clubs** 6:8 8:13
17:25 18:14 22:25
23:6,10,13,22
24:3,8 26:18,23
27:4 36:10,25
46:24 47:21 48:21
49:7 50:8,11,12
50:12 52:12
**collected** 27:12,12
**combine** 18:25
**combined** 40:21
**come** 9:24 32:6
38:8 47:15 51:16
**comes** 10:13
**coming** 31:18
**comments** 51:6,8
**Commission** 57:22
**common** 24:1,2
33:8
**company** 33:5
**compared** 19:24
**compensation**
46:14
**complain** 47:15
51:11
**complaining** 21:9
22:8
**complete** 5:12 6:3
**completely** 10:18
**concerns** 30:20
**concluded** 55:15
**conclusion** 36:6
**confidential** 16:1

**connection** 7:13
29:7 31:6 54:8,11
**consent** 30:15
**consideration**
57:14
**consuming** 10:20
**contact** 16:8,8,11
**contacted** 16:10
**contains** 60:4
**contention** 24:7
**contested** 43:11
**continued** 26:3
**conversation** 5:11
16:13
**conversations**
15:17,25 17:6
**conversion** 37:13
**converted** 19:19
**converting** 37:19
**Cook** 28:13,14
**copies** 60:7
**copy** 60:9
**corporation** 35:23
35:24 36:3,11
**correct** 8:19 12:22
14:10,11,13 20:4
20:24 21:8,12,17
21:19 24:8,9
26:12,14,15 27:8
27:9 28:21,22,24
29:2 32:10 33:2
34:11 35:15,16
37:2,3,9 39:2,13
41:14,15,24 42:3
42:7,8,18,24 43:6
43:16,17,20 44:6
44:7 45:1,7,9,10
46:20 47:8 48:7
49:25 52:9,10
53:3 54:6 57:2
**Correction** 3:5
56:4
**CORRECTIONS**
56:1
**cost** 27:10 28:23
37:18
**costs** 27:16
**counsel** 59:9,13
**County** 8:1,6 57:6

**couple** 17:7
**course** 15:19 49:21
**court** 1:1 4:23 5:1
5:15,21 35:8 53:9
58:1
**cover** 1:11 12:8
13:17 21:22,23
30:3 32:22 35:1
37:18 58:11
**covered** 22:4 27:11
27:17
**coworkers** 14:22
**credit** 9:18,25 10:3
18:16 19:18,24
22:5,9 27:11,16
27:25 28:1,21,23
30:3 32:8,11 33:1
33:3,4,5 34:2 35:2
37:12,13,18 38:18
38:21 39:4,4,8,12
43:11 47:19 48:14
49:23 50:2,8,18
50:22 51:7,15
**criminal** 34:13
**CSR** 60:15
**Cup** 1:9 11:21
21:15,18 30:2
34:25 58:9
**current** 6:12
**currently** 6:17
**custodial** 60:5
**customer** 10:3,7,8
10:16,20 31:13,16
31:19,20,21 32:8
32:12 33:4
**customers** 19:23
32:4

**D**

**D** 1:7,9,9 2:8 35:19
35:22 36:2 58:7,9
58:9
**dance** 48:14 49:24
50:18 51:19
**danced** 49:6
**dancer** 41:3 43:12
**dancers** 27:17
37:25 38:14 48:13
48:18 49:6 51:2

51:20
**dances** 51:21
**date** 11:10 30:17
59:25 60:16
**dated** 45:6
**dates** 8:18
**Davari** 1:12,12
23:11 28:5 35:20
36:14 50:8 58:12
58:12
**Davaris** 42:2 51:4
52:11
**Davari's** 50:5
**David** 23:11
**day** 1:18 12:1,3,4
12:10 20:9,11,14
20:14 21:1,5,25
52:13 57:8,16
59:20 60:11
**days** 32:17
**dealt** 54:11
**debt** 54:5
**December** 11:16,18
14:5
**decide** 17:24
**decided** 46:4
**Declaration** 3:10
6:10 8:24 12:17
12:24 13:4 35:9
39:21 43:9,10
44:1
**deducted** 37:11
**deducting** 37:18
**defendant** 7:20
60:7
**defendants** 1:12,17
2:8 6:7 8:14
26:19 58:12 59:12
**delivered** 60:5,9
**Demanded** 1:10
58:10
**demonstrate** 29:17
45:18
**Department** 29:21
**deposition** 1:14,16
4:15,20 6:4 50:5
53:8 55:15 57:1
58:14,20,22 59:4
59:8 60:2,2,5,6,7

60:9
**description** 3:9
57:10
**difference** 24:24
44:4
**different** 6:8 8:13
24:3 42:10 43:19
49:1
**Difficult** 6:2
**directly** 15:21 32:5
**disappears** 31:20
**discrepancies**
18:17
**discrepancy** 18:7
18:20 22:3
**disputes** 33:4
**DISTRICT** 1:1,1
58:1,1
**division** 1:2 53:23
54:7 58:2
**divorce** 7:25 8:4
53:17,24 54:1,8
54:11,16,21
**divorced** 53:20
**document** 35:7,9
57:11
**documents** 44:19
44:21,23 45:11,17
46:1
**doing** 15:15 24:19
24:19 29:11 45:15
45:18
**dollars** 32:16
**door** 38:1
**dozen** 25:2
**drink** 10:14
**drinking** 31:19
**drinks** 9:17,25
10:11,15,19 19:23
31:18,19 32:12
**Drive** 60:19
**driver's** 6:15
**Driving** 34:10
**due** 20:3 27:11
42:21
**DUI** 8:8,9 34:5,8
51:25 52:6
**duly** 1:17 4:2 58:19
**duties** 9:14 26:10

42:9,10
**D.N.W** 1:8 58:8
**D/B/A** 1:7,8,8,9,10
1:10 35:19 58:7,8
58:8,9,10,10

**E**

**E** 2:1,1 57:5
**earlier** 34:6 37:4
48:13
**earned** 46:15
**Edloe** 2:15
**eight** 6:7 11:3,3
20:16
**eight-hour** 24:25
**either** 11:15 17:17
45:23
**employed** 6:17 8:17
11:8,21,23,25
12:8,12 13:3,8,9
25:17 28:7 36:16
49:16,17 59:14
**employees** 46:24
**employer** 26:21
27:22
**employers** 22:25
23:14,22 24:8
**employment** 7:14
8:13,18,23 11:10
18:14 20:11 21:9
21:10 25:12 30:12
30:17 40:21 46:3
51:4,9 52:11
**entering** 38:1
**enterprise** 26:24
27:5
**entertainer** 15:3
**entertainers** 27:12
**entire** 26:5 48:11
52:11
**entitled** 20:20 21:5
**entrance** 38:1,8,14
**entry** 55:4
**envelope** 39:18,19
40:5 41:4,8,13
43:25 47:5,12
**envelopes** 40:10,14
41:16,18 47:2
**error** 9:1 34:15,16

**established** 43:14
**et** 47:4
**everybody** 25:12
25:15,16,16,18
49:1,14 50:13
**everyday** 48:24
**exact** 12:4 19:25
**exactly** 13:1 16:4
16:23 17:4 24:3
24:23 27:2 28:2
28:17,18
**examination** 3:3,4
3:4 4:4 46:11
52:19 58:24
**examined** 4:2
**example** 43:18 44:3
47:9
**exchange** 48:12
**executed** 57:13
**Exhibit** 35:4,6,8
**exhibits** 3:8 60:8
**expect** 5:2
**experience** 24:10
26:14 33:12 39:11
41:25 48:20
**Expiration** 59:25
60:16
**Expires** 57:22
**explain** 5:24 9:19
10:2,25 18:8,9
22:7 27:24 38:6
38:20
**expressed** 57:14
**extent** 17:22 22:20
27:7 47:6
**extra** 27:25 28:18
51:18
**ex-wife** 49:16 52:22
52:24

**F**

**fact** 12:20 19:4
29:20 30:11,15
33:25 38:25 44:2
**facts** 22:16 23:1,12
23:24 24:6 26:24
27:4,18 29:17
30:24,25 34:1
**factual** 31:10 37:22

**Fair** 29:5
**fairly** 5:3
**familiar** 15:4 36:24
36:25
**far** 9:21 14:14
50:13,15
**Fax** 2:6,11 60:21
**Federal** 29:5
**fee** 28:1 37:13 38:1
38:8,14 50:2,8
51:19
**fees** 27:12,17 28:19
28:21
**fellow** 15:1
**figure** 13:14
**filed** 30:12,16
60:10
**fill** 10:4 13:23
**filled** 12:1,11
**financially** 59:16
**find** 53:7
**fine** 47:14
**finish** 44:13 55:1
**Firm** 60:21
**first** 15:12 16:4
28:7 32:9 35:17
36:3 38:1
**five** 11:7 26:18
33:20 36:10 40:16
**fix** 13:12
**FLSA** 29:7
**FM** 1:9 58:9
**focus** 49:4 51:3
**Follow** 50:20
**following** 58:18
59:9
**follows** 4:3 59:4
**foregoing** 35:15
57:1,12
**forget** 7:2
**form** 4:16 17:22
18:5 20:22 22:19
23:2 27:6 28:25
29:13 30:22 36:5
37:7 42:22 45:12
45:20 54:22
**format** 45:16
**four** 33:20 41:5
**Frangullie** 1:20

58:16 59:23 60:15
**FREEDMAN** 1:4
58:4
**Friedman** 15:2
**friend** 18:1
**front** 5:2
**further** 3:4 52:19
55:10 59:13,16,18
60:1

**G**

**George** 23:11 28:5
50:5,7
**getting** 16:20 25:6
25:7 26:9,11 42:6
**girl** 38:8
**Girls** 1:11 12:8
13:18 21:22,23
30:3 35:1 58:11
**give** 5:13 10:3,6
32:8 39:18,19
44:1 47:9
**given** 4:19 10:15
57:15 58:21 59:7
**giving** 5:1 56:2
**go** 5:7 12:4 18:11
25:23 32:6 38:25
39:3 49:2
**goes** 28:18
**going** 4:15,24 5:3
5:20 7:25 8:12
15:16 17:1,8,21
18:11,13 44:11,17
47:21 52:16 53:20
54:7 55:9
**Gold** 1:9 11:21
21:15,18 30:2
34:25 58:9
**Good** 4:7
**grandfathered**
25:17 26:2
**Group** 7:3
**guess** 20:1 29:19
36:25
**guys** 40:25

**H**

**half** 11:3,4 19:4
20:16 25:2
**hand** 57:15

**handing** 35:7
**handled** 26:18 30:3
**handling** 9:17,22
**happen** 33:6 38:5
**happened** 22:17
25:25 33:9 40:4
**happening** 22:1
38:7
**harm** 38:11
**Harris** 8:1,6 57:6
**Hassan** 1:12 35:20
36:14 58:12
**head** 5:7 9:8 50:16
**health** 7:6,7 29:22
**hear** 16:2 36:10
47:20 48:11 51:11
**heard** 51:13
**hearsay** 47:7,13
**heart** 22:11
**Heatherway** 53:9
**held** 52:15
**help** 18:1
**hereto** 1:25
**high** 37:19,23
51:11,15
**hold** 38:22
**hour** 19:5 24:15,17
24:25 26:11,17
29:9,18,23 30:7
36:18 42:5 44:12
59:5
**hourly** 10:23 24:20
25:7,11,14,15,24
**hours** 11:2 20:16
**house** 22:10 48:18
49:10,13,23 51:22
**Houston** 1:2,7,7,8
1:23 2:5,8,10,15
35:19,22 36:2
58:2,7,7,8 60:20
**How's** 17:7
**Huff** 2:9,9 3:3,4 4:5
4:12,18,19 17:24
18:10 20:24 22:21
23:5,21 27:8 29:3
29:16 31:2 35:4,7
36:9 37:10 40:22
41:2 42:24 44:11
44:16,19 45:14,23

46:8 47:2,6,13
48:9,12 51:24
52:7,12,20 54:25
55:3,4,10 59:5,11
60:5
**huh-uh** 5:7
**hundred** 19:11,15
19:17 20:2,5,25
25:10 32:16 42:20
43:3,6
**H-09-3345** 1:6 58:6

**I**

**identity** 57:11
**important** 5:4,9
54:24
**improper** 20:11
21:25
**includes** 59:9
**income** 19:13 46:17
46:19,19
**Incorporated** 59:1
60:19
**incorrect** 12:25
13:11,15 36:4
**INDEX** 3:1
**indicate** 5:22 56:2
**individual** 1:11
34:1 58:11
**individually** 21:9
31:5 39:11
**individuals** 6:8
17:25
**information** 31:6
47:3 59:7
**Initially** 6:12
**instance** 1:17 39:7
**instrument** 57:12
**insurance** 6:20,24
7:3,5,16
**integrated** 26:23
27:5
**intentionally** 29:7
29:18
**interested** 16:6,20
59:17
**interfere** 23:18
**interrelationship**
9:20

**interrogatories** 6:9
**interrogatory** 8:16
8:21 9:9,10 12:15
12:21,25 13:4
31:3,4,7 34:12
51:25 52:4
**interrupt** 50:21
**intoxicated** 34:10
**introductory** 5:19
**involved** 7:19 8:14
16:21 44:2,5 52:8
**IRS** 19:12
**issue** 5:20 12:23
22:4,15
**issues** 29:9

**J**

**January** 35:18
**job** 9:12,14 42:2,14
42:17,17
**jobs** 42:11
**join** 30:16
**joint** 22:25 23:13
23:22 24:8 26:21
**judge** 55:7
**judgment** 55:5
**June** 8:19
**jury** 1:10 5:2 58:10

**K**

**Katy** 6:13 53:9
**keep** 10:14,19
**keeping** 31:18
**keeps** 10:10
**kept** 22:9
**Kimberly** 1:4 15:5
58:4
**kind** 6:23 7:1
**know** 6:1 9:1,16,24
9:25 10:1,7 12:3
14:17,17,20,23,25
17:7,13,20 18:13
18:14 24:18,18,22
25:25,25 27:1
29:15,19,19 30:5
30:24 31:1 32:13
32:18 33:8 35:22
38:4 40:19 41:8
41:14,16,18,21,22
44:25 45:22,23,25

47:11,16 48:24
49:1 50:11,14,15
53:10,14
**knowing** 30:9
**knowledge** 25:20
25:22 26:16,17
30:1 34:24 37:5
47:3 50:3 51:20
**known** 57:9

**L**

**labeled** 44:23
**Labor** 29:5,21
**larger** 38:18
**largest** 32:14
**Laura** 1:3 14:17
58:3
**LAUREN** 2:14
**law** 2:14 29:5
**laws** 29:9
**lawsuit** 6:3 7:19
14:15 15:10,18
16:4,19,22 17:1,9
17:19,25 18:12
21:10 22:24 23:22
26:19,22 27:10,14
29:4 30:8,11,16
37:16 43:1,5 44:2
44:5 53:14,16,21
54:10,16,19
**lawyer** 6:2 15:21
15:25 16:25 17:2
22:14 27:2 30:10
36:19 37:14,24
43:8 44:21 54:15
54:16
**LAZARZ** 1:22 2:3
**led** 36:15
**legal** 22:15 29:3
30:25 36:6 52:8
**let's** 51:4
**liabilities** 54:2,4,8
**license** 6:15,23 7:1
7:3,4,8
**licenses** 7:10
**life** 7:6,7
**limit** 40:22
**limitations** 30:20
**line** 56:2

**liquidating** 28:23
**liquidation** 50:2
**list** 52:4
**listed** 14:14 53:16
**little** 5:13 8:12
15:14 44:12 47:1
53:13
**LLP** 1:22 2:3
**loans** 41:19,23,25
**LOLMS1@aol.c...**
2:16
**long** 5:3 6:21 7:8
20:14 21:13,13,24
**longer** 44:17 45:6
**look** 44:24
**Loop** 1:23 2:4,10
**loss** 29:18

**M**

**M** 2:14
**machine** 1:21 10:6
39:4
**majority** 32:19,21
**making** 9:16 43:20
**Man** 47:18
**manager** 52:14
**managers** 28:11
43:12 47:20 49:10
51:1,6
**manner** 30:1
**Margo** 1:4 15:7,18
17:16 58:4
**Mark** 35:4
**marked** 35:6,8
**Martin** 2:3 3:4 59:6
59:10
**Mason** 6:13
**materialized** 53:21
**McCray** 1:4 15:5
58:4
**McKnight** 1:3
14:17 15:9,17
16:3 17:6,18
44:23,24 58:3
**mean** 9:23 14:18
18:20 21:17 26:3
29:16 30:9 31:5
32:3 37:14 39:4
41:12 50:21 52:6

55:4
**meaning** 25:18
31:11 50:11 54:4
54:5
**meant** 18:11 23:18
**mediation** 55:6
**Members** 6:11
**Memorial** 60:19
**mentioned** 9:22
12:20
**Millennium** 11:17
**mind** 18:10
**minimum** 18:21
19:2
**minutes** 44:12 59:5
59:6
**mistakes** 29:12
**Mitch** 28:13,14
**moment** 12:10
26:21
**moments** 43:2
**Monday** 55:7
**money** 18:16 22:4,5
30:6 41:16 43:13
46:15 47:22 48:17
51:21
**monies** 47:5
**MONSHAUGEN**
2:9
**months** 6:22 7:9
**Moreno** 1:4 15:7
15:18 17:16 58:4
**morning** 4:7
**Motion** 6:11
**move** 46:4
**MSHELLIST@...**
2:6
**Mutual** 6:18

**N**

**N** 2:1
**name** 4:8 7:2 15:6
57:12
**names** 28:4,12
**need** 5:15,24 7:4
9:1 23:18 32:8
**needs** 9:9,10
**neither** 59:13
**never** 13:3 21:15

21:17,20,21,22,23
34:13 39:25 40:7
43:25 44:9,10
**night** 38:1
**nightclubs** 18:4
**nights** 16:15
**nod** 5:7
**nods** 9:8 50:16
**normal** 5:10
**Normally** 54:1
**Norman** 39:18,19
40:14 41:4 44:1
**North** 2:10
**Notary** 57:2,19
**noted** 57:2
**notice** 6:11 12:15
45:5
**noticed** 8:21
**number** 6:15 10:10
10:19 40:15 53:4
56:2,2
**numbered** 1:18

**O**
**oath** 4:23 13:2
36:13 57:10
**object** 17:21 18:5
20:22 22:19 23:2
23:16 27:6 28:25
29:13 30:22 36:5
37:7 42:22 45:12
45:20 47:6 48:9
54:22
**objection** 23:15
47:13
**objections** 4:16
**observed** 48:1
**obviously** 9:16
**occasion** 12:16,18
13:22,25 14:6
**occur** 48:5
**occurred** 59:19
**occurrence** 47:25
47:25 48:4
**office** 57:15
**officer** 58:20 59:8
60:2
**officer's** 60:6
**offices** 1:22

**Oh** 7:15 54:3
**okay** 4:22 5:9,17,22
6:1,4 7:7,24 8:1,5
8:9,14 9:11,19
10:1,8,13,25 11:5
11:14 12:23 13:12
13:19 14:6 15:16
15:21,22 16:8
17:5 20:9,17 21:8
22:11,16,24 24:4
24:13,16,21 26:9
26:13 27:3,16
29:16 31:25 32:4
37:21,25 38:25
40:9 42:13,19
43:4,21 44:18
45:5,17 48:5
50:17 51:14 54:10
55:8
**once** 9:2 37:24
38:25
**ones** 33:13,14
**open** 32:9
**operated** 35:20
36:25 37:1,5
**opinion** 47:24 48:6
**oral** 1:14,16 58:14
58:20
**order** 10:14
**ordered** 39:17
**ordering** 32:5
**original** 60:2,5,7
**outcome** 59:17
**outs** 46:15
**oversight** 12:21
**overtime** 18:21
**owes** 30:6
**owned** 23:4,6 35:19
35:23 36:2,10,13
**owner** 51:1 52:14
**owners** 51:7
**ownership** 23:9
24:1
**owns** 23:10

**P**
**P** 2:1,1
**page** 3:5,9 35:12,18
40:25 56:2,3 60:4

**page(s)** 57:2
**PAGE/LINE** 56:4
**paid** 10:22,23,24
14:12 18:22 19:17
19:19 20:2,5,17
20:20 21:5 24:11
24:14 25:7,20
26:9,11 27:17
36:17,21 37:11,12
38:17,17 39:1,8
39:11,23 42:4,20
43:10 49:13,23
**paper** 56:2
**paperwork** 9:18
10:5 18:13
**paragraph** 35:17
**part** 34:15 50:7
52:16
**particular** 10:16,20
12:3
**parties** 59:9,14
60:10
**party** 59:3
**pass** 46:8 52:18
55:10,12
**patrons** 49:12
51:11
**pay** 10:24 14:12
18:21,22,25 20:17
24:11,13,17,19
25:6,9,10,11,13
25:21,24 26:3,5,9
26:17 28:1,19
31:8,11,14,22,23
32:7,13,15,25
33:23 34:19,21
36:21 37:25 38:8
38:23 42:6 43:13
47:18 48:18 49:9
51:16,18,20 52:16
**paying** 25:23
**pays** 28:21
**penalty** 35:14
**people** 28:3 29:25
38:3 40:9,13 41:7
41:11 48:24
**perceive** 21:25
**percent** 19:11,15
19:17 20:1,1,3,6

20:19,25 22:9,13
22:17 25:10 28:20
37:11,12,17,20
39:14 42:20,25
43:3,6 46:21,23
50:1,8,9,12,12,13
52:14,15
**percentage** 19:10
19:22,25 24:16
**performed** 36:23
**period** 37:1
**perjury** 35:15
**person** 10:11 23:4
23:7 57:11
**personal** 26:16
30:1 34:24 37:5
47:3
**personally** 27:18
32:2,20,24 33:25
34:23 38:11 39:10
40:8 43:15 57:9
**persons** 23:4,7
**Physicians** 6:18
**place** 32:9 48:6
**plaintiff** 2:7 7:20
44:22
**plaintiffs** 1:5 14:14
31:4 58:5 59:10
**please** 4:7 10:2
22:7 27:24 28:12
35:5 38:20 56:2,3
**point** 24:19 25:6
29:20 34:8
**policies** 34:25
**position** 6:19 29:6
**possible** 19:6
**post** 37:5
**potential** 51:14
53:16
**practice** 41:9
**practices** 20:11
21:9,10 29:6,8,23
49:20,22,22
**preparing** 60:7
**present** 35:1
**presented** 23:24
**previous** 8:4 57:2
**previously** 25:16
**print** 39:5

**prior** 12:6 14:2
16:13
**probably** 8:25
17:19 50:19
**problem** 5:18
**Procedure** 1:24
54:8,12,21 59:15
**proceeding** 53:17
**proceedings** 52:8
**process** 5:4 23:18
**processing** 9:17
28:1,19,21 50:19
**produced** 1:16
44:20 46:1
**Production** 44:21
45:25
**property** 7:5 54:4
**protocol** 48:6
**proved** 57:9
**provisions** 1:25
**Public** 57:2,19
**purchases** 10:4
**purposes** 57:14
**pursuant** 1:24 59:7
59:18
**pursue** 17:1,24
**pursuing** 16:6,23
**P.C** 2:9

**Q**
**question** 5:12,15,20
5:25,25 18:6,11
23:19,20,24 29:14
30:23 36:6 37:8
42:23 48:10 50:20
**questions** 4:5,24,25
4:25 5:6,2
15:16,19 30:25
44:17 46:9,12
52:20 55:10
**quit** 24:19 46:4,6,7
53:12
**quite** 5:10
**Q&A** 59:1 60:19

**R**
**R** 2:1
**RACHAEL** 1:4
58:4
**Rachel** 15:2

**random** 47:25
**RANKIN** 1:9 58:9
**rarely** 33:18
**rate** 25:7
**reached** 16:18
    17:19
**read** 50:5,6,7,10
    57:1
**ready** 44:12
**really** 24:24 29:10
    40:22
**reason** 27:22,25
    46:18 56:2,4
**reasons** 60:4
**recall** 34:5
**receipt** 39:5
**receive** 43:5 46:14
    46:17,18
**received** 19:1 51:21
**recognize** 8:25
    35:10
**record** 1:25 4:8 9:2
    23:17,19 58:21
    59:9
**refer** 37:24 43:7
**refill** 10:14
**reflects** 44:1
**regard** 29:23
**regarding** 21:10
    30:1 34:2 35:1
**Registration** 60:21
**regular** 32:12 48:1
**relate** 34:1
**related** 59:1
**relationship** 9:23
**relies** 10:18
**remember** 20:15
    24:22 51:25
**repayment** 41:19
    41:23
**Repeat** 23:20
**report** 19:12
**reported** 1:21
**reporter** 1:20 4:24
    5:15 35:8 58:16
    59:23
**Reporter's** 1:13 3:6
    58:13
**Reporting** 59:1

60:19
**represent** 6:6
**Request** 44:20
    45:25
**require** 34:21
**required** 31:8
    34:18 43:25 44:3
    44:7
**requirements**
    59:18
**reserve** 4:15
**response** 44:20
    46:1
**responsible** 31:20
    32:1,7
**responsiveness**
    4:16
**result** 38:11 53:23
**return** 47:5 59:1
**returned** 60:2,3,5
**right** 5:19 6:8,11
    7:25 10:22 11:2
    11:16,16,17 12:21
    16:17,18 17:15
    21:3,6,7,14,15
    22:2,3 23:23 24:2
    25:4,16,19 26:6,7
    32:6 33:24 34:9
    35:22 36:22 37:6
    37:19 39:16 40:2
    40:6 41:12 42:15
    43:3 45:8,24 48:7
    52:7 53:3,12
    54:20
**Rita** 1:19 58:16
    59:23 60:15
**Road** 6:13
**round** 32:11
**Rule** 59:18 60:1,9
**Rules** 1:24 4:14
    16:1
**run** 9:25 10:5 33:7
**running** 32:2,5
    47:13

**S**

**S** 2:1 57:5
**safe** 17:18,23
**saw** 38:5 40:9 41:2

47:2
**saying** 40:3 42:13
    42:16
**says** 8:17 13:3
    18:12 35:14 36:17
    36:23 38:16 39:17
    40:9
**scenario** 31:21
**Scrivener's** 9:1
**seal** 57:15
**seated** 10:9 31:16
    32:4
**second** 35:17 53:5
**see** 8:16 14:3 35:17
    35:20 38:18,19
    40:13 42:1
**seen** 44:25 45:1
**sell** 7:4
**sent** 44:21
**sentence** 36:3
**SERPER** 2:14
**serve** 53:7
**served** 10:9,11
    31:13,17 60:9
**server** 7:13,15,16
**set** 29:8 44:19 48:3
**sheet** 56:2
**sheets** 45:3,5
**Shellist** 1:22 2:3,3
    3:4 4:10,14 17:21
    18:5,8 20:22
    22:19 23:2,15
    27:6 28:25 29:13
    30:22 36:5 37:7
    40:20,24 42:22
    44:14 45:12,20
    46:9,12 47:9,14
    47:17 48:11 52:18
    54:22 55:2,12
    59:6,10
**shift** 10:24 11:1,2
    14:12 18:22,25
    19:7,19 20:7,8,15
    20:17,19 21:4
    24:11,13,17,19,25
    25:6,9,10,11,12
    25:21,24 26:3,5,9
    26:17 36:21 39:9
    42:6 46:22

**shifts** 11:5 20:4
**shorthand** 1:20,21
    58:16 59:23
**shortly** 18:12
**shown** 60:10
**sick** 12:4,12
**sign** 10:7 56:3
**signature** 3:5 35:12
    56:1 57:1 58:24
    60:3
**signed** 6:10
**significance** 45:11
**signing** 57:2
**single** 26:23 27:5
**sir** 4:21 5:8 6:25
    7:18,21 8:2,11,15
    8:20 9:6 10:17,21
    11:9,22,24 12:9
    13:21,24 14:8,16
    14:19 15:11 19:16
    20:18 21:16 22:6
    23:8 24:9 25:8
    28:9,22 32:24
    34:4 35:3,11,13
    35:21 38:2 40:11
    41:17 46:2,10
    50:6 52:2,23
**sit** 18:13
**sitting** 24:6 27:3
    52:3
**situation** 4:22
    41:13 54:1
**six** 6:8 14:14 22:25
    23:6,22 25:2
**slips** 10:7
**solution** 51:14
**somebody** 12:4
    31:11 51:15
**soon-to-be-ex-wife**
    52:24
**sort** 5:19 38:11
**South** 1:23 2:4 6:13
**SOUTHERN** 1:1
    58:1
**specifically** 10:24
    31:5 54:11
**speculation** 48:9
**spillage** 34:19,22
**Splendor** 1:10

11:25 12:10,13,19
    12:20 13:22 20:9
    20:11 21:2,5,24
    30:2 34:25 36:24
    58:10
**standard** 41:9 48:3
    49:2
**Standards** 29:5
**start** 4:10 15:24
    24:19
**started** 14:4 15:15
    24:19
**state** 1:21 4:7 6:23
    7:11 12:16,18
    57:5,20 58:17
    59:24
**stated** 1:25
**STATES** 1:1 58:1
**status** 54:21
**statute** 30:19
**stayed** 26:7
**Ste** 2:10,15
**stipulate** 4:13
**stipulated** 4:18
**stipulations** 4:11
**stopped** 9:2 52:13
    53:10
**straighten** 9:11
**straightforward**
    5:4
**strike** 46:25 47:10
**stuff** 17:8
**subjected** 20:10
    39:22
**submitted** 58:22
**subpoena** 53:8
**subscribed** 57:12
**suffer** 38:10
**suffered** 38:11
**Suite** 1:23 2:4
    60:19
**support** 23:1,13,25
    24:7 26:24 27:4
    27:19
**supposed** 16:1
**surcharge** 50:23
**sure** 9:7 12:3 13:1
    15:6 19:6,25 27:2
    36:8,19 37:15
    38:15 40:15,19,25

43:7 44:14 49:4,8
49:11,15 51:10
53:25 54:9
**surprise** 36:9,12
**swear** 35:14
**swore** 34:14 36:13
**sworn** 1:17 4:2
43:10 58:19

**T**

**T** 57:5
**tab** 31:11,14,22,23
32:2,5,9,13,14,22
32:23 33:6 51:12
51:15
**TABC** 7:15
**table** 10:20 31:16
**tabs** 9:21 31:8,25
33:19,22 34:2
35:2 37:12
**take** 32:11,11 44:24
53:5
**taken** 1:17 4:15
22:5 59:8,16
**talk** 5:9 8:12 16:5
16:25 17:2 36:19
37:14 49:6,9,12
49:19
**talked** 15:9,12,20
16:4,14 17:9,12
17:17 22:4 26:21
34:3,5,7 47:1
49:14,14 51:25
52:12
**talking** 5:16 21:1
33:13,21 40:20
48:24 52:1
**talks** 31:4
**TBA** 60:7
**telephone** 2:5,11
16:12 17:7 53:4
60:20
**tell** 4:23 16:19,22
23:17 28:6,14,17
41:10 46:24 47:4
50:17,22 51:1,2
52:3,14 54:23
**telling** 15:24
**ten** 11:3,3 40:17,19

**term** 51:9
**terminated** 46:6
**testified** 4:2 37:4
**testimony** 5:2 23:5
32:21 42:19 43:24
58:21 59:8
**Texas** 1:1,21,23,24
2:5,10,15 6:13,16
6:24 7:11 57:20
58:1,17 59:24
60:15,20
**Thank** 55:13
**theoretically** 40:3
**therefor** 60:4
**thing** 20:13
**things** 24:2
**think** 7:3 11:16
12:7 18:15 22:17
24:5 30:6 37:16
42:11 48:12,12
54:23
**thinking** 13:17
21:8
**third** 35:12
**Thomas** 2:9 3:3,4
59:5,11 60:5
**thought** 9:11
**three** 6:22 7:9,23
30:16
**throw** 15:23
**Thursday** 55:6
**till** 4:16
**time** 4:17 11:14
12:12 15:12 16:14
19:2,4 21:13,24
26:5 32:19,22
37:1 41:2 45:6
51:8 53:12 55:13
59:3,8
**times** 7:22 28:15
33:10 40:13,16
**tip** 22:9 46:14,21
**tipped** 46:19
**tips** 18:16,23,25
19:8,12,18 20:3,5
20:20,25 21:4
22:5 28:21,24
37:18,19 38:18
39:12 42:20 43:6

52:15
**title** 35:9
**today** 5:3 6:1 24:6
27:3 52:3,9
**told** 13:2 16:19
27:20,21 28:2,3
28:10 29:25 38:3
39:25 41:7,11,13
47:10,11 49:5
51:2 52:9
**topless** 27:12,17
**Tower** 1:22 2:4
**track** 10:10,15,19
31:18
**traffic** 52:5
**trained** 7:13
**training** 7:15,15,17
**transaction** 27:16
43:11
**transactions** 19:22
19:24,24 30:3
**transcript** 58:20,22
60:7
**TRCP** 59:19 60:1
**Treasure** 30:6
**Treasures** 1:7 8:17
8:23 9:3,12,15,20
9:21 10:22 12:17
12:19 13:19 14:2
17:2 20:13 21:11
24:11 25:23 26:14
27:11 29:4,6,17
29:22,22 30:5,13
30:17,21 31:7
34:18,21 35:19
38:14 45:9,18
46:3 48:21 49:17
49:24 50:3 51:5
53:13 58:7
**treated** 44:4,5
**trial** 1:10 4:17
58:10
**trick** 18:11
**Trish** 17:11
**Trisha** 13:14 23
15:17 58:3
**Trophy** 1:9 11:23
21:20,21 30:2
34:25 58:9

**true** 35:15 38:4
57:1 58:21
**truth** 4:23 13:16
52:9
**trying** 13:14
**turn** 11:17 47:16
**Turner** 1:3 14:23
15:18 17:11 58:3
**two** 6:8 7:23 30:12
32:17
**type** 4:24 5:15,16
7:4 48:3
**typically** 46:21
**typing** 5:5

**U**

**uh-huh** 5:7 33:17
**Underneath** 35:14
**understand** 5:21,22
22:11,21,23 25:5
29:11 55:2
**understanding**
23:6,9 38:6
**Understood** 40:24
**UNITED** 1:1 58:1
**unlawful** 22:12,18
38:13 39:15 45:19
**unsure** 27:3
**use** 45:4
**usual** 20:12

**V**

**V** 1:6 58:6
**Van** 2:9,9 3:3,4 4:5
4:12,18,19 17:24
18:10 20:24 22:21
23:5,21 27:8 29:3
29:16 31:2 35:4,7
36:9 37:10 40:22
41:2 42:24 44:11
44:16,19 45:14,23
46:8 47:2,6,13
48:9,12 51:24
52:7,12,20 54:25
55:3,4,10 59:5,11
60:5
**versus** 24:17 26:17
**violate** 29:9
**violated** 29:7
**violating** 29:18

**violation** 52:5
**violations** 30:7

**W**

**wage** 10:23 18:7,17
18:20,21 19:2
22:3 24:20 29:5,8
29:9,18,23 30:7
**wait** 38:17
**waiter** 10:9
**waitress** 10:10,12
10:13,15 14:21
15:8 31:14,17,17
31:18,22,24 41:3
42:12 43:12 46:17
49:18
**waitresses** 9:21
10:19 25:20 26:10
38:16 42:1,5,9,14
42:17 43:4,16
44:2,5 46:15,22
47:4 49:12
**waitress's** 43:19
**walk** 31:25 32:14
32:22 33:19,22
34:2 35:1
**walked** 31:8,11,14
31:22,23
**walks** 31:21
**want** 4:10 15:19,23
15:24 16:2 49:4
51:3 54:23
**wanted** 40:24
**wasn't** 30:16 33:8
39:8 40:22
**was/was** 60:2
**way** 14:4 23:16
24:2 30:9 42:4
44:4 45:18
**Wayne** 4:9
**week** 11:6 53:21
55:1,5
**went** 38:23 49:3
**weren't** 36:17 42:4
**West** 1:23 2:4,10
**We'll** 55:12
**we're** 4:15 5:2
33:21
**we've** 22:4 44:23

**WG** 1:9 58:9
**whatsoever** 51:23
**white** 47:2,5
**withheld** 28:20
  50:1
**witness** 1:16 3:5
  9:8 44:18 46:8
  50:16 52:18 55:11
  55:12 56:1 58:19
  58:21,23,24
**wondering** 18:12
**words** 29:8
**work** 6:18,24 11:5
  11:14 12:16,18
  13:17,22,25 14:6
  21:11 36:23 38:9
**worked** 6:21 12:23
  13:5,19 14:2,9,9
  16:15 17:13 20:9
  21:2,15,18,20,21
  21:22,23 26:6
  35:18 36:18 37:2
  42:2 45:6,9 51:5
  52:22
**working** 9:2 12:19
  28:15 52:13 53:10
  53:12
**wouldn't** 17:20
  32:8,10,11 36:12
  39:6 41:14 51:18
**W.L** 1:10 58:10

**X**

**X** 57:5

**Y**

**yeah** 5:18,23 9:23
  13:13 15:8 17:23
  18:19 20:25 21:19
  22:23 25:1 32:18
  32:20 38:21 42:9
  43:3 45:1 47:14
  54:3 55:6
**year** 15:14 16:3,16
  33:10,11,18,19,22
  51:4
**years** 11:19,20
  29:21 30:12,16
  41:6
**YORK** 1:10 58:10

**y'all** 16:4 17:13
  42:4 55:4

**$**

**$200** 33:22
**$25** 32:23
**$30** 11:1 20:17
  24:25 32:18
**$5** 48:19 49:13
  50:17
**$5,000** 38:22
**$500** 47:18

**0**

**07** 9:4

**1**

**1** 3:10 33:22 35:4,6
  35:8 52:24 59:5
**10:09** 1:19 4:6
**100** 20:19
**10220** 60:19
**11** 1:15 58:15
**11th** 1:18
**11:16** 44:15
**11:36** 44:15
**11:40** 46:13
**11:48** 52:21
**11:52** 1:19 55:15
**11247890** 6:16
**12-31-2011** 59:25
  60:16
**1225** 2:10
**13** 31:3,4
**15** 34:12 46:23
**150** 19:9
**175** 19:9
**178** 6:13
**1900** 1:23 2:4
**1910** 1:23 2:4
**1995** 8:19 28:8 37:1
**1999** 11:13,15 14:7
  35:18 37:1,5

**2**

**2** 3:2 9:9 52:25 53:1
**2.13** 24:15,17,24
  26:11,17 42:5
**2.17** 19:5
**20** 40:18 44:12

**200** 2:15
**2000** 11:12,15
**2005** 12:6,7,11
  13:23 20:10 30:4
  35:1
**2006** 8:19,22 9:3
**2007** 8:24 9:3,5
  13:20 35:18
**2008** 45:6
**2010** 1:15,19 58:15
  58:23 59:2,21
  60:2,11
**203** 59:19 60:1
**203.3** 60:9
**22** 60:19
**22530** 53:9
**24** 44:23
**24028183** 60:7
**2405** 2:15
**25** 32:18 59:5
**25-dollar** 48:14
**28** 44:24
**281-748-7786** 53:6

**3**

**3** 9:10
**3D/International**
  1:22 2:4
**35** 3:10

**4**

**4** 50:8,12
**402** 60:21
**46** 3:4
**467-7900** 60:20
**467-7911** 60:21

**5**

**5** 3:3 22:9,12,17
  28:20 37:10,12,17
  37:19 39:14 42:25
  50:1,9,12,13
  52:15
**5-dollar** 49:9,23
  50:22 51:7,18
**52** 3:4
**56** 3:5
**565** 6:13
**58** 3:6

**6**

**640** 2:10

**7**

**713** 60:20,21
**713.621.0993** 2:6
**713.621.2277** 2:5
**713.880.2992** 2:11
**713.880.5297** 2:11
**77008** 2:10
**77024** 60:20
**77027** 1:23 2:5,15
**77449** 53:9
**77450** 6:14
**7847** 59:24 60:15

**8**

**8** 59:6
**85** 20:1

**9**

**90** 20:1,1
**95** 14:4
**99** 11:18 14:4,5