Oral Deposition of:

# Ms. Kimberly Elizabeth McCray

**Case:** Laura McKnight

vs.

D. Houston, Inc. et al.

**Date Taken:** May 18, 2010

Q & A Reporting, Inc.

Phone: (713) 467-7900

Fax: (713) 467-7911

Email: office@qareporting.net

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| LAURA McKNIGHT, TRISHA TURNER, ANDREW BAKER, RACHAEL FREEDMAN, KIMBERLY McCRAY, and MARGO MORENO, | : : : : : : |
| Plaintiffs, | : : |
| VS. | : CIVIL ACTION NO. H-09-3345 : |
| D. HOUSTON, INC., d/b/a Treasures, A.H.D. HOUSTON, INC., d/b/a Centerfolds, D.N.W. HOUSTON, INC., d/b/a GOLD CUP, D. RANKIN, INC., d/b/a TROPHY CLUB, D WG FM, INC., d/b/a SPLENDOR, W.L. YORK, INC., d/b/a COVER GIRLS, and, in their individual capacities, ALI DAVARI and HASSAN DAVARI, | : : : : : : : : : : JURY TRIAL DEMANDED : : : : |
| Defendants. | : |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
ORAL DEPOSITION OF
KIMBERLY ELIZABETH McCRAY
MAY 18, 2010
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION of KIMBERLY ELIZABETH McCRAY, produced as a witness at the instance of the Defendants, and duly sworn, was taken in the above-styled and numbered cause on May 18, 2010, from 9:10 a.m. to 10:13 a.m., before Kerrienne L. Bond, CSR in and for the State of Texas, recorded by machine shorthand, at the offices of Shellist Lazarz, L.L.P., 3D/International Tower, 1900 West Loop South, Suite 1910, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto; that the deposition shall be read and signed before any notary public.

Page 2

```
                    APPEARANCES

FOR THE PLAINTIFFS:
    MR. MARTIN A. SHELLIST
    SHELLIST LAZARZ
    3D/International Tower
    1900 West Loop South, Suite 1910
    Houston, Texas  77027
    (713) 621-2277
    (713) 621-0993 (FAX)

FOR THE DEFENDANTS:

    MR. ALBERT T. VAN HUFF
    MONSHAUGEN & VAN HUFF, P.C.
    1225 North Loop West, Suite 640
    Houston, Texas  77008
    (713) 880-2992
    (713) 880-5297 (FAX)
```

Page 3
EXAMINATION INDEX

WITNESS: KIMBERLY ELIZABETH McCRAY
EXAMINATION                                PAGE
    By Mr. Van Huff............................4
    By Mr. Shellist............................44

WITNESS CORRECTIONS AND SIGNATURE................51

REPORTER'S CERTIFICATION.........................53

EXHIBIT INDEX
                                           PAGE
McCRAY EXHIBIT NO. 1.............................35
    Document entitled "Tipping"

Page 4

 1    MR. SHELLIST: And we'll do just the same
 2  stipulations as previous depositions.
 3    MR. VAN HUFF: Sure.  We stipulate that
 4  we're going to do the deposition in accordance with the
 5  Federal Rules of Civil Procedure.
 6    KIMBERLY ELIZABETH McCRAY,
 7  having been first duly sworn, testified as follows:
 8                   E X A M I N A T I O N
 9  BY MR. VAN HUFF:
10    Q.  Ms. McCray, would you please state your full
11  name for the record?
12    A.  Kimberly Elizabeth McCray.
13    Q.  Have you ever given a deposition before?
14    A.  No.
15    Q.  A few things about the deposition in general.
16  There's a court reporter here who has sworn you in, and
17  your answers to my questions today are testimony --
18    A.  Uh-huh.
19    Q.  -- just as though we were in front of -- down
20  at the federal courthouse in front of the judge and the
21  jury.
22    A.  Okay.
23    Q.  So you're under penalty of perjury to tell the
24  truth.
25    A.  Okay.

Page 5

 1    Q.  The court reporter is going to type everything
 2  that we say, all of my questions and all of your
 3  answers; so it's important that we not talk over one
 4  another.
 5         In normal conversation, you can usually
 6  anticipate the end of someone's sentence before they
 7  even finish it and then start talking back to them,
 8  right --
 9    A.  Uh-huh.
10    Q.  -- in normal conversation?  It's not quite
11  like that today, because I need to finish my answer --
12  excuse me -- finish my question so she can get it in the
13  record; and then you need to do a short pause, and then
14  answer.
15         The reason you need to do a short pause
16  is so that if your attorney has an objection, he can
17  make it before you start to talk.
18    A.  Okay.
19    Q.  Another issue has to do with "yes" or "no"
20  answers.  If the answer to a question is "yes" or "no,"
21  you need to go ahead and vocalize that answer rather
22  than going "uh-huh" or "huh-uh" or nodding or shaking
23  your head, because the court reporter can't take that
24  down very well.
25    A.  Okay.

Page 6

1  Q. And finally, if you don't understand a
2  question or you don't understand a term that I'm using,
3  just let me know, and I can explain it to you or we can
4  rephrase it or we can do whatever we need to do to make
5  sure you understand the question.
6       I don't anticipate there will be very
7  many complicated questions today that you're not going
8  to understand. But the reason that I'm telling you this
9  is that if you do not indicate to me that you don't
10 understand a question, we're going to assume later on
11 that you understood it and hold you to your answer.
12 Okay?
13 A. Okay.
14 Q. Now, I'm just going to go over some
15 identification information. It says here in your
16 interrogatory answers that you reside at 6706 Apple
17 Valley Lane, Houston, Texas 77069; is that correct?
18 A. That's correct.
19 Q. And January 4, 1983, is your date of birth?
20 A. Yes.
21 Q. And your Texas driver's license number is
22 01463058?
23 A. Yes.
24 Q. All right. How are you currently employed?
25 A. Macaroni Grill.

Page 7

1  Q. What do you do there?
2  A. I'm a server.
3  Q. In connection with your job as a server at
4  Macaroni Grill, do they withhold a portion of your
5  credit card tips?
6  A. No, I don't believe so.
7  Q. How long have you been at Macaroni Grill?
8  A. Oh, about a week.
9  Q. Where were you employed before Macaroni Grill?
10 A. I need to think. I haven't -- since that -- I
11 guess -- you have to forgive me. I haven't worked in a
12 year since then. I think that it was the St. James --
13 Q. Okay.
14 A. -- on Rankin.
15 Q. How were you employed at the St. James?
16 A. I was a waitress, as well.
17 Q. Approximately how long did you work there?
18 A. Four months.
19 Q. Other than the St. James and other than the
20 defendants in this case, what other gentlemen's club or
21 topless clubs have you worked for?
22 A. Rick's.
23 Q. When was that?
24 A. That was in '09. I don't know the exact
25 month.

Page 8

1  Q. And was that as a waitress?
2  A. Yes, sir.
3  Q. Any others?
4  A. No, sir.
5  Q. I think on your employment application, it
6  said you worked at Caligula at some point?
7  A. Oh, yes, sir. That was a long time ago. I
8  don't recall the exact time or how long I worked there.
9  It was just a short period.
10 Q. Were you a waitress there?
11 A. Yes, I was a waitress there.
12 Q. Was that back when Jerry Payne owned Caligula?
13 A. I believe so. I'm not exactly sure who the
14 owner was at the time. But I -- so I guess I'll say I'm
15 not sure about that.
16 Q. Okay. I see in your interrogatory answers
17 that among the defendants in this case, you state that
18 you worked for Treasures; and you also state that you've
19 worked for Centerfolds, correct?
20 A. Yes.
21 Q. Have you ever been employed or worked at Gold
22 Cup?
23 A. No.
24 Q. Have you ever been employed by or worked at
25 Trophy Club?

Page 9

1  A. No, I have not.
2  Q. Have you ever been employed by or worked at
3  Splendor?
4  A. No.
5  Q. Have you ever been employed by or worked at
6  Cover Girls?
7  A. No.
8  Q. As far as Treasures, your interrogatory answer
9  states that you worked there from approximately December
10 of '01 to June '09 as a cocktail waitress; is that
11 correct?
12 A. That's correct.
13 Q. And it also says that you worked at
14 Centerfolds from approximately June of '09 to August of
15 '09; is that correct?
16 A. That's correct. I'm not exactly sure about
17 the exact time; but it's roughly in that time span, I
18 would say.
19 Q. Okay. So you only worked for Centerfolds for
20 a period of approximately two months?
21 A. Yes.
22 Q. Why did you leave Centerfolds?
23 A. I left Centerfolds because the owners put a
24 note to the managers that I could not work at
25 Centerfolds until I settled my supposed chargebacks at

Page 10

```
 1   Treasures. So --
 2      Q.  Okay.
 3      A.  Yeah.
 4      Q.  Have you ever been a plaintiff in a lawsuit
 5   before?
 6      A.  No, sir.
 7      Q.  Have you ever been a defendant in a lawsuit
 8   before?
 9      A.  No, sir.
10      Q.  Have you ever been a party to a bankruptcy
11   proceeding before?
12      A.  No, sir.
13      Q.  Have you ever been involved in a divorce
14   proceeding before?
15      A.  No, sir.
16      Q.  Have you ever been arrested before?
17      A.  Yes, sir.
18      Q.  How many times?
19      A.  I believe that it was one time.
20      Q.  What was that for?
21      A.  It was for -- I got caught stealing a bracelet
22   at Foley's when I was 18.
23      Q.  Do you recall approximately what year that
24   was?
25      A.  I'd have to say that it was in 2001,
```

Page 11

```
 1   beginning -- right when I turned 18.
 2      Q.  Did you graduate from high school in about
 3   2000 or so?
 4      A.  I got my GED.
 5      Q.  Okay.  Was the Foley's arrest in Harris
 6   County?
 7      A.  Yes, it was.
 8      Q.  And what was the outcome of that case?
 9      A.  I had a year of probation, 50 hours of
10   community service, and they assigned me to jail for a
11   day.
12      Q.  And did you get time served for the day in
13   jail?
14      A.  It wasn't me going to jail.  It was a program
15   for young teens where they take you through a jail and
16   show you where you don't want to be.  So I don't
17   necessarily think I got time served for that.  That was
18   a part of my punishment.
19      Q.  Okay.  Now, did you -- do you recall that you
20   entered a plea of guilty to that case?
21      A.  I believe so.  It was supposed to be deferred
22   adjudication is all I know.  So I'm pretty sure I pled
23   guilty.  I had a lawyer.
24      Q.  And so your -- is it your understanding the
25   type of probation you were on was a type of probation
```

Page 12

```
 1   called deferred adjudication?
 2      A.  From my understanding, yes.
 3      Q.  And that's the only time that you've ever been
 4   arrested?
 5      A.  Uh-huh.
 6      Q.  Yes?
 7      A.  Yes, sir.  No, I have to correct myself.  I
 8   apologize.  I think about four years ago, I had a
 9   speeding ticket and it was delinquent and they took me
10   in for a couple of hours.
11      Q.  Okay.  Anything else?
12      A.  No, that's it.
13      Q.  How did you first hear about this lawsuit?
14      A.  Well, Rachael Freedman, whom I worked with,
15   told me about it and had Laura call me.
16      Q.  Okay.  Are you on Facebook?
17      A.  Yes.  I don't keep up with it, but yes.
18      Q.  Are you Facebook friends with any of the other
19   plaintiffs in this case?
20      A.  I don't believe so.
21      Q.  Margo Moreno?
22      A.  No.
23      Q.  Laura McKnight?
24      A.  No.
25      Q.  Rachael Freedman?
```

Page 13

```
 1      A.  Huh-uh.
 2      Q.  No?
 3      A.  No, sir.  Sorry about that.
 4      Q.  That's okay.  Trisha Turner?
 5      A.  Trisha Turner, no.  I actually just have a
 6   Facebook thing, but I really don't even go on it or keep
 7   up at all.
 8      Q.  Okay.  The reason I'm asking is some of the
 9   other people are Facebook friends.
10      A.  Sure.
11      Q.  So I'm trying to find out if you're involved
12   in that, too.
13      A.  No, sir.
14      Q.  I don't have a Facebook account at all, so
15   it's sort of a big mystery to me about what even goes
16   on.
17      A.  It's just extra work to keep up with it.
18      Q.  Now, we talked about that you were employed by
19   Treasures, and you were also employed by Centerfolds.
20      A.  Uh-huh.  Yes, sir.
21      Q.  When you worked at Centerfolds, were you being
22   paid under Centerfolds' payroll?
23      A.  Yes, sir.
24      Q.  So you weren't working at Centerfolds and
25   getting paid by Treasures?
```

Page 14

1  A.  No, sir.
2  Q.  I guess that statement would be correct.  I'm
3  correct in saying that when you worked at Centerfolds,
4  you were not being paid by Treasures, correct?
5  A.  Correct, yes.
6  Q.  You said that you heard about this lawsuit
7  initially from both Rachael Freedman and Laura McKnight,
8  correct?
9  A.  Correct.
10 Q.  And when Rachael Freedman told you about it,
11 what did she say to you?  And by the way, I'm going to
12 ask you some questions about your conversations with
13 other people regarding this lawsuit.
14 A.  Uh-huh.
15 Q.  Laura McKnight and Rachael Freedman, for
16 example.  When I'm asking you these questions, it's not
17 my intent to get into anything that you've talked about
18 with your lawyer --
19 A.  Sure.
20 Q.  -- because you and your lawyer have
21 attorney-client privilege.  And I'm just mentioning that
22 because I don't want you to just like all of a sudden
23 start talking about a conversation with you and your
24 lawyer.  Okay?
25 A.  Sure.

Page 15

1  Q.  So Rachael Freedman, when she first told you
2  about the lawsuit, what did she say exactly?
3  A.  I don't know exactly the exact conversation;
4  but in general idea, she was telling me how some people
5  were coming together to form a lawsuit about the
6  5 percent credit card charges, and as well for me, the
7  money I paid back for supposed chargebacks.
8  Q.  Okay.  Was that all she said to you?
9  A.  For the most part, that was the general idea,
10 the 5 percent and then any chargebacks that I had.
11 Q.  Okay.  And then I suppose she gave you the
12 phone number for Mr. Shellist?
13 A.  Yes.  I just want to go back for one second.
14 And also the manager tip-outs, tipping out of all of our
15 stuff.
16 Q.  Okay.  So did she talk to you about that?
17 A.  Yes.  We've all talked about it.  It was an
18 issue, as well.
19 Q.  Okay.  We're going to get into all that in
20 greater detail later.
21 A.  Okay.
22 Q.  So I'm not trying to trick you into skipping
23 things.
24 A.  That's okay.
25 Q.  Okay.  And you also say you heard from Laura

Page 16

1  McKnight?
2  A.  Yes, sir.
3  Q.  And what did Laura McKnight say to you?
4  A.  The same kind of general ideas:  The 5 percent
5  charges, manager tip-outs.  She also said she was fired
6  for supposedly being overweight.
7  Q.  Was she overweight?
8  A.  I don't even know what she looks like.  I
9  don't know if I've met her or not.
10 Q.  In your interrogatory answers, you indicate
11 that when you were employed by Treasures and when you
12 were employed by Centerfolds, that you were employed by
13 both as a waitress, correct?
14 A.  Yes, sir.
15 Q.  So you were never employed by either of those
16 entities as a bartender, correct?
17 A.  No, sir.
18 Q.  Yes?  Correct?
19 A.  Correct, yes.  I was not a bartender.  You are
20 correct.
21 Q.  It's a little different when we have the
22 record than a regular conversation.
23 A.  I understand.
24 Q.  I don't always talk like this.
25 A.  That's okay.  Me neither.

Page 17

1  Q.  All right.  So without regard to other
2  people's claims in this lawsuit --
3  A.  Uh-huh.
4  Q.  -- just with regard to you --
5  A.  Uh-huh.
6  Q.  -- what are your claims, as you perceive them,
7  against Treasures in connection with this case?
8  A.  Okay.  Well, I believe that the 5 percent
9  charges for every credit card tab that they charged me
10 out of my money, I don't believe that that was fair.
11 Q.  Okay.  And let me explain something.  What
12 we're going to do is, I think that you have multiple
13 issues that we're about to talk about.
14 A.  Sure.
15 Q.  So I'm going to make a list.  Then we'll go
16 back, and we'll talk about each one in more detail.  And
17 then we'll make sure, after we do that, that you don't
18 have any others, that something doesn't occur to you
19 during our conversation.  Okay?
20 A.  Okay.
21 Q.  So the first one is the 5 percent credit card
22 withholding?
23 A.  Uh-huh.  Yes, sir.
24 Q.  And then the second one has to do with credit
25 card chargebacks?

Page 18

1   A.  Yes, sir.  Correct.
2   Q.  And then third, you said something about
3  managers earlier.
4   A.  Yes.
5   Q.  Sharing tips with managers?
6   A.  We were supposed to tip the managers every
7  night, 10 percent.
8   Q.  So tipping managers?
9   A.  Uh-huh.
10  Q.  And so just with regard to your employment at
11 Treasures, we've got these three items.  Just for now,
12 is there anything else you can think of to add to our
13 list?
14  A.  No, sir.
15  Q.  Okay.  Now, what are your issues with
16 Centerfolds?
17  A.  Well, Centerfolds ran the same way pretty much
18 as Treasures, the 5 percent.  I didn't have any
19 chargebacks at Centerfolds.  It was --
20  Q.  Okay.  So one is the 5 percent credit card
21 withholding.  You say you had no chargebacks or
22 chargeback issues at Centerfolds, correct?
23  A.  No, sir.  Correct.
24  Q.  And what other issues with Centerfolds?
25  A.  The tipping of managers, 10 percent.

Page 19

1   Q.  Okay.  Anything else?
2   A.  No, sir.
3   Q.  Okay.  Please explain to me your claim
4  regarding the 5 percent credit card withholding that you
5  perceive as unlawful.
6       MR. SHELLIST:  Object to the form of the
7  question.
8       But, I mean, you can answer it.  He's not
9  asking you for legal analysis.
10      THE WITNESS:  Uh-huh.
11      MR. SHELLIST:  I believe it's just
12 fact-based; and with that instruction, you can go ahead
13 and answer the question.
14  A.  Can you -- can you repeat that question for
15 me, please?
16  Q.  (BY MR. VAN HUFF)  Okay.  I take it that you
17 claim that during your employment with Treasures and
18 with Centerfolds, that each of these clubs was
19 withholding 5 percent of your credit card tips.
20  A.  Correct.
21  Q.  Yes?
22  A.  Yes.
23  Q.  And you perceive that as unlawful?  Yes?
24  A.  I do believe that is unlawful and/or unfair.
25  Q.  Okay.  And what's the basis for that belief?

Page 20

1   A.  Well, I don't know.
2   Q.  Okay.  Do you think it's unlawful for them to
3  withhold any amount?
4   A.  Well, as far as I'm aware, they are charged,
5  you know, 1 to 1 1/2 percent legitimately.  So I think
6  that it is unfair to be charging employees 5 percent for
7  every single credit card charge.
8   Q.  Okay.  So because the credit card processing
9  fee is -- you perceive that to be between 1 and
10 2 percent.  Do you have an issue with the fact that they
11 were charging you at all, or just that they were
12 charging you too much?
13  A.  I have to say -- I would have to say that,
14 one, they were charging too much; and, two, I don't
15 think it was fair to charge the employees for every
16 single credit card charge when it doesn't cost the club
17 5 percent to process every credit card.
18  Q.  Okay.  Fair enough.
19  A.  Okay.
20  Q.  And I'm thinking -- I understand that the
21 legal basis for your claim is your lawyer's job.  Okay?
22 And so I'm just asking you for the factual basis of your
23 claim.
24  A.  Sure.
25  Q.  Did anyone ever tell you what the 5 percent

Page 21

1  was for, or why they deducted 5 percent?
2   A.  I was just told that it was the, quote,
3  processing fee for the credit card companies.
4   Q.  Okay.  All right.  With regard to the credit
5  card chargebacks at Treasures, please explain to me the
6  fact basis for your claim that you were being held
7  responsible for credit card chargebacks.
8   A.  Well, the fact that I know I was being charged
9  for credit card chargebacks is -- I was forced to pay
10 back $9,750 in order to keep my, you know, eight-year
11 job there.  And then I was fired directly, maybe a month
12 after I paid that money to them, with no receipts.
13  Q.  Now, did you have to pay -- so you're claiming
14 that you had to pay $9,750 for credit card chargebacks?
15  A.  Yes, sir.  The original agreement, he wanted
16 me to pay $15,000 back; but after I paid the $9,750, he
17 decided he was just going to fire me.  So that's just
18 how it went.
19  Q.  From Centerfolds or from Treasures?
20  A.  From Treasures.  Up until then, I hadn't had
21 any kind of these kind of chargeback problems because
22 was there eight years.
23  Q.  So you got fired at Treasures and then went
24 and got other employment at Centerfolds?
25  A.  The Centerfolds --

Page 22

1   MR. SHELLIST: He's asking you a "yes" or
2   "no" question --
3   THE WITNESS: Yes.
4   MR. SHELLIST: -- so just focus on that.
5   A. Yeah, okay. I apologize. Could you repeat
6   that one more time for me.
7   Q. (BY MR. VAN HUFF) So am I to understand that
8   you got fired from your job as a waitress at Treasures
9   for whatever reason --
10  A. Right.
11  Q. -- and then you turned around and got a job
12  working for Centerfolds?
13  A. No. I worked at Centerfolds in between my
14  Treasures employment, because they suspended me for the
15  money I supposedly owed. So, no, it wasn't after. It
16  was in between.
17  Q. Well, the dates we talked about were such that
18  you worked at Treasures --
19  A. Uh-huh.
20  Q. -- and you stopped working at Treasures and
21  you starting working at Centerfolds?
22  A. And then back to Treasures.
23  Q. Oh, and then back to Treasures?
24  A. Yes, sir. It was in between.
25  Q. I see.

Page 23

1   A. Uh-huh.
2   Q. And the reason that I'm confused about that is
3   because that's not what it says in your interrogatory
4   answer.
5   A. Okay.
6   Q. Which isn't that big of a deal, as we take
7   these depositions to clear up things about people's
8   interrogatory answers. Okay?
9   A. Sure.
10  Q. And you also didn't mention that to me earlier
11  when we talked about dates, so I will write "wrong" next
12  to this paragraph. And then we've got -- I acknowledge
13  that it's our common understanding that we're talking
14  about approximate dates. Okay?
15  A. Yes, sir. Correct.
16  Q. Approximately December of '01 to June of
17  '09 --
18  A. Yes.
19  Q. -- Treasures?
20  A. (Nodding head up and down).
21  Q. June of '09 to August of '09, Centerfolds?
22  A. Yes.
23  Q. And then back to Treasures?
24  A. Yes.
25  Q. Okay.

Page 24

1   A. I went back to Treasures for three months.
2   Q. Did you go right from Centerfolds back to
3   Treasures?
4   A. Yes. That is when I agreed to pay the
5   15 grand. I went back.
6   Q. Okay. So August of '09, back at Treasures.
7   A. Yes.
8   Q. Until when?
9   A. It was roughly three months, so --
10  Q. August, September, October?
11  A. Uh-huh, yes.
12  Q. Of '09, approximately?
13  A. Approximately, yes.
14  Q. Are you sure it was '09 and not '08?
15  A. I'm not 100 percent sure. It's kind of cloudy
16  to me.
17  Q. Okay. Well --
18  A. Because I'm not really sure.
19  Q. That's okay. I think I can help you sort it
20  out.
21  A. Okay.
22  Q. Right now, it is May of 2010. Now, you said
23  that you have been working just for a short period of
24  time at St. James.
25  A. Uh-huh. Yes, sir, correct.

Page 25

1   Q. And prior to St. James, you didn't work for a
2   year?
3   A. Well, actually, prior to Macaroni Grill.
4   Right now, I haven't worked in a year.
5   Q. Excuse me. Okay. So right now as we stand in
6   May of 2010, you work at Macaroni Grill; and you've only
7   worked there a short amount of time?
8   A. Correct.
9   Q. And before that, you didn't work for
10  approximately a year?
11  A. Correct.
12  Q. All right. So that would take you back to
13  about May of '09?
14  A. Uh-huh. Okay. So I'd have to say it would
15  be '08, then.
16  Q. Okay. So all these dates we've talked about
17  as far as Centerfolds would have been June '08 to August
18  of '08, correct?
19  A. Yes.
20  Q. And Treasures was December of '01 to June of
21  '08 and then August of '08 to October of '08, correct?
22  A. Yes, correct. Thank you.
23  Q. You're welcome.
24      So am I to understand that at some point,
25  someone told you during your employment with Treasures