Page 26

you needed to pay $15,000 for credit card chargebacks?
A. Yes, sir.
Q. Correct?
A. Correct.
Q. Who told you that?
A. The management, as well as David Davari.
Q. Okay. Which managers?
A. Bill, Joe, John.
Q. They collectively all told you that you need to pony up $15,000?
A. The owners put out lists of employees' names and the totals that they owed in order to keep their jobs and gave them to management.
Q. Was the $15,000 all based on one chargeback or multiple chargebacks?
A. As far as I know, it was multiple chargebacks; but I was never shown.
Q. Prior to that incident, were you ever required to pay for credit card chargebacks?
A. No, sir.
Q. When did they tell you that you needed to come up with 15 grand to pay for credit card chargebacks?
A. While I was working at Centerfolds. That's why they fired me from there.
Q. So you were working at Treasures for seven

Page 27

years?
A. Uh-huh.
Q. And then so why did you move to Centerfolds in June of '08?
A. They suspended me for supposed chargebacks, so I went to Centerfolds to work.
Q. Okay. Now, hold on. When you say they suspended you for chargebacks, they suspended you because you had chargebacks?
A. Supposedly, I owed money for chargebacks.
Q. Did they ever give you a number?
A. No.
Q. Who suspended you?
A. It was John Tovar.
Q. And what did John tell you, exactly?
A. He said that I owed money for chargebacks and that I had to sit at the meeting and speak with the owner about it if I wanted to work there ever again.
Q. Okay. And also that you were suspended?
A. Yes. And I was suspended for about nine months. I worked -- right after I got suspended, I worked at Centerfolds for a couple of months. He fired me or whatever, and for six months --
Q. He fired you at Centerfolds?
A. He fired me at Centerfolds.

Page 28

Q. Who's "he"?
A. Pardon me. David Davari fired me from Centerfolds. Supposedly, I owed money.
Q. From your employment at Centerfolds or from Treasures?
A. I owed money from my employment at Treasures.
Q. And then you paid $9,750, correct?
A. I did.
Q. At which time, they permitted you to go back to work at Treasures --
A. Yes.
Q. -- correct? In August of '08, correct?
A. Yes.
Q. And the amount of money that you had to pay was $9,750, correct?
A. The agreement was $15,000. I paid $9,750.
Q. And did that take care of the whole problem?
A. No. As soon as I paid that money back, he fired me a couple weeks later.
Q. From Treasures?
A. Yes, sir.
Q. Now, did you pay the money before you went back to work at Treasures?
A. I paid it while I was working there. So I paid it within three months, so divide that by three. I

Page 29

paid it within three months, working there.
Q. At Treasures?
A. At Treasures.
Q. The second time?
A. The second time.
Q. So who did you talk to about going to work for Treasures the second time?
A. Joe. Manager Joe.
Q. And?
A. And David Davari.
Q. Okay. And tell me about your conversation with them. Because at that point, you hadn't paid back any money for chargebacks, correct?
A. Correct. Not prior to working there the second time, not yet.
Q. Okay. So what was the arrangement?
A. The arrangement was that I just make payments as I could to David Davari and/or the management until I paid off the 15 grand.
Q. Okay. And was it your understanding that the 15 grand was for -- or the $15,000 was for one tab or multiple tabs that were charged back?
A. My understanding was for supposed multiple chargebacks.
Q. Okay. Do you know why they would suspend you

from working at Treasures and then allow you to work at Centerfolds?

A. He didn't necessarily allow me to work at Centerfolds. When the payroll checks came through is when he realized that I was employed at Centerfolds, and that's when he cut me off from working at Centerfolds. So he necessarily didn't know until payroll came around and he saw.

Q. When you went to work for Centerfolds, did you go over there and fill out a job application?

A. Yes, sir.

Q. So it wasn't a matter of being transferred? You went over there as though you were a new employee, which you were at Centerfolds, and filled out an application and had an interview. And did you --

A. (Nodding head up and down).

Q. Yes?

A. Yes, sir, that's correct.

Q. Did you tell them at that time that you had all that experience working as a waitress at Treasures?

A. Yes, sir. I believe that's how it got back to him, word of mouth and payroll.

Q. And that's all fair enough. I'm just trying to figure out how it all happened.

A. That's correct.

Q. Because it's sort of a mystery to me. All right?

A. Okay.

Q. At least until you fill me in.

A. Sure.

Q. Okay. So prior to being told that you owed this just lump-sum amount for credit card chargebacks over the course of the six years of your employment at Treasures, it's my understanding that you were never asked to repay for credit card chargebacks?

A. That is correct.

Q. What about walked tabs?

A. Well --

MR. SHELLIST: Object to the form of the question, but you can answer it.

Q. (BY MR. VAN HUFF) I'll rephrase the question.

A. Thank you.

Q. Is a part of your claim against Treasures that you were unlawfully required to cover the cost of walked tabs?

A. Yes.

Q. Okay. Please explain that claim to me.

A. As far as a credit card-walked tab goes -- I'm trying to word it the right way. Cash-walked tabs, I was responsible for, if it was cash.

Q. Okay.

A. Credit card-walked tabs, the managers would charge the credit card for drinks regardless of the person being there or signing. The dances and the tip we were responsible for not getting, basically.

Q. Okay. So if somebody walked a credit card tab, the management would actually charge the credit card, but dancers wouldn't get the dances from the dance ticket and the waitresses wouldn't get a tip, correct?

A. Right. Correct.

Q. And you experienced that during your employment at Treasures, correct?

A. Yes.

Q. Did you also experience that during your employment with Centerfolds?

A. No.

Q. Likewise, the issue of credit card chargebacks related to Treasures but not Centerfolds, correct?

A. Yes. Related to Treasures, not Centerfolds, correct.

Q. With regard to Treasures and based on your experience, not other people's or what you've heard, please explain the fact basis of this claim that you were required to tip managers 10 percent.

A. Well, the fact basis that I'm aware of is that

when we were trained as waitresses, we were told to tip out managers 10 percent of our nightly earnings, as well as managers would wait at the front door and sit in a chair and wait for their tip-out.

Q. Who trained you?

A. John Tovar was the supervising manager, and a fellow waitress actually trained me. I don't recall who, exactly.

Q. And this was back in '01?

A. Roughly, yes.

Q. Okay. And is it your claim that the 10 percent tipping of managers went on during your entire employment with Treasures?

A. Yes, correct.

Q. And that it also happened at Centerfolds?

A. Correct.

Q. Are you aware that there's a written policy regarding tipping of managers that you signed which states that the tipping of managers is voluntary?

A. I'm not completely aware of a policy such as that, but if there's one --

MR. SHELLIST: No, no. He's asking you if you're aware you signed something. Make sure you focus on his question.

A. I'm not aware -- I'm not completely aware if I

signed something or not.
Q. (BY MR. VAN HUFF) Do you acknowledge that it was, in fact, the formal policy of Treasures that tipping of managers was voluntary?
A. Uh-huh.
Q. Correct?
A. I am -- I am not completely sure how to answer that question. I --
THE WITNESS: Can you help me on this one?
MR. SHELLIST: Make sure you understand his question.
THE WITNESS: Right.
MR. SHELLIST: Answer it the best you can.
THE WITNESS: Okay.
MR. SHELLIST: I can't answer for you.
THE WITNESS: I understand.
MR. SHELLIST: But make sure you understand it. If you do, answer it; if you don't, he'll rephrase it.
A. Okay. I'm not 100 percent positive on the answer to that question.
Q. (BY MR. VAN HUFF) So you neither agree to it nor dispute it, correct?

MR. SHELLIST: Object to the form.
A. I don't know.
Q. (BY MR. VAN HUFF) Okay.
(Marked McCray Exhibit No. 1.)
Q. (BY MR. VAN HUFF) I'm going to hand you a document that I've marked as Exhibit 1. Do you acknowledge that's your signature on that document?
A. That appears to be my signature, yes.
Q. Okay. And do you further acknowledge that that document states that the tipping of managers is voluntary and not mandatory at Treasures?
A. I acknowledge that's what this paper says, but that's not how it was ran [sic] in the club.
Q. So is it your claim that Treasures would actually deduct 10 percent from your tips and give it to managers internally?
A. No, that's not correct.
Q. Okay. Instead, you would calculate and take 10 percent out of your own tips and hand it to managers?
A. That is correct.
Q. With regard to Treasures, other than the 5 percent credit card withholding that we talked about, the -- that lump-sum credit card chargeback issue that we talked about, the 10 percent of your tips being paid to managers that we talked about, is there anything else

about your employment with Treasures that you are complaining about in your lawsuit?
A. No, sir.
Q. With regard to Centerfolds, we've got the credit card -- 5 percent credit card withholding issue we talked about, the tipping of managers issue that we talked about. Are there any other issues with regard to your employment with Centerfolds that you are claiming were unlawful in connection with your lawsuit?
A. No, sir.
Q. One of the claims in your lawsuit is that the six clubs, the six defendants that are named in the case, are joint employers. What facts are you aware of in support of that contention?
A. Well, you know, they advertise on the Internet as Jackpot Clubs. The management from Centerfolds and Treasures would, you know, help each other out.
Q. Okay.
A. And go, you know, here and there. And from what I'm aware, they were ran [sic] the same way.
Q. Okay. And that's based on your experience as being employed by both Treasures and Centerfolds, correct?
A. Correct.
Q. Other than what people told you, do you

acknowledge that you don't have any personal knowledge of any of the policies or procedures that go on at Gold Cup?
A. I do acknowledge that.
Q. And the same thing for Trophy Club, Splendor, and Cover Girls?
A. Correct.
Q. Now, there's another allegation that you make in your lawsuit, and it has to do with this theory called single integrated business enterprise. Okay?
A. (Nodding head up and down).
Q. Basically, that these businesses, the way that they conduct their business is such that they should all be viewed as one enterprise, in a nutshell. Okay?
A. Uh-huh.
Q. Now, I understand that the things you just mentioned with regard to a joint employer would also be things that you would probably say would support your claim that they're a single integrated business enterprise, correct?
A. Correct.
Q. Are there any additional things that go to the single integrated business enterprise that you didn't mention when we were talking about joint employers?
A. The only thing is that they use the same

bookkeeper for Centerfolds and Treasures.
Q. Okay.
A. So Glenda.
Q. Glenda with a "G"?
A. Yes, sir.
Q. Okay. Anything else?
A. No, sir, nothing else.
Q. You state in your lawsuit that any cost to Treasures or Centerfolds due to credit card charges was covered by fees collected by those clubs from dancers.
A. I'm not exactly sure what you're asking me.
Q. Okay. Well, that 5 percent --
A. Right.
Q. -- that's deducted from your credit card tips.
A. Right.
Q. One of the allegations that's made in your lawsuit -- and I don't know if this is an allegation that comes from you or it's an allegation that comes from the other plaintiffs, because there's five other plaintiffs. Okay? But one of the allegations is that any credit card processing charge that the club is charged by the processing company, that that's already covered by the -- by money that's collected from dancers. That's an allegation that's made in your lawsuit. Do you know of any facts in support of that

allegation, sitting here today?
A. Okay. I'm going to -- I'm not understanding you completely. What you're asking me is that the 5 percent credit card charge is covered by the moneys that they collected from the dancers?
Q. That's what you say in your lawsuit.
A. Okay. Well, the $25 dances was [sic] paid back by dancers to the club. That's all I know. I can't answer your question completely, because I'm not completely sure --
Q. Okay.
A. -- what you're asking me, totally.
Q. Fair enough. Sitting here today, how much money are you claiming that Treasures and Centerfolds owes you in damages?
A. I'm not sure what the law is. But whatever the law says I can have, as far as the 5 percent, and as well as the $9,750 that I paid back.
Q. Okay. In your interrogatory answer, it says here that you were arrested for DUI in 1999?
A. Yes, I was. I failed to mention that, yes. I was a minor.
Q. Okay. What happened?
A. Basically, I was having troubles with my family life, so --

Q. No, no, no.
A. Okay. You're saying in that particular instance, why I was arrested?
Q. Yes. Now, let me back up. I asked a very poor question. Okay?
A. Okay.
Q. The way I phrased that wasn't very good.
A. Sure.
Q. So you were arrested for a DUI in 1999?
A. Yes.
Q. What was the outcome of that case?
A. Just a fine. That was it --
Q. Did you --
A. -- I believe.
Q. Did you plead guilty and pay a fine and that was it?
A. I believe so, yes, sir.
Q. Okay. Was that in Harris County?
A. No. That was in Spartanburg, South Carolina.
Q. Okay. What -- have you gotten any other DWI's or DUI's?
A. No, sir.
Q. We're almost done.
A. That's okay.
Q. Right now I'm looking at your declaration that

you made in support of a motion that was filed in this case. Do you recognize this?
A. Yes.
Q. And it's a declaration dated May 5th, 2010. Do you agree with me? It's on the second page.
A. I didn't hear what you said. It was 2000 and --
Q. That the declaration was made May 2010.
A. Correct, yes.
Q. We've identified it, I think, sufficiently for my purposes. I'm not going to make it an exhibit, but I want to ask you a few questions about statements you make in here, okay? And once we finish talking about this declaration, I think we're going to be able to wrap everything up.
A. Okay.
Q. If you would look on the second page, it says here in the third paragraph from the top: "As for how waitresses and bartenders got paid, we often had to wait to get paid our tips on larger credit card charges."
Can you please explain that to me what the factual basis is for that statement in this declaration?
A. If it was a large credit card tip and the owner felt there was some kind of liability or an

instance where the customer might dispute it, he would hold the money for a period of time he felt necessary.

Q. Okay. Now, without regard to what happened to other people and what you heard from other folks, other bartenders and waitresses, just with regard to you, how many times did that happen to you during your employment at Treasures?

A. I would say a minimum of five.

Q. Okay. And that's during the entire seven-year period that you worked at Treasures?

A. A minimum of five. Maybe more, but I'm not absolutely certain.

Q. Okay. And it says here that it was on larger credit card charges, correct?

A. Yes, sir.

Q. Now, on these charges where you might have to wait to get paid, are you claiming that you were ever not paid for any of them?

A. There were two instances that I was not paid at all.

Q. And is that because the credit cards were later disputed?

A. I was -- that's what I was told. Supposedly, the credit card was disputed. But I've never been showed proof of any --

Q. And were those all prior to 2007?

A. I have to believe so. I'm not absolutely certain of that.

Q. But you think they may have been?

A. They may have been, yes.

Q. When you said "we often had to wait to get paid," would that sometimes happen because the club would run out of cash on hand?

A. That was not an issue, for the most part.

Q. Okay. Either at Treasures or at Centerfolds?

A. Correct.

Q. Now, you only worked at Centerfolds for a short period of time.

A. True.

Q. Did you ever have to wait to get paid on a credit card charge during your time at Centerfolds?

A. No.

Q. Other than this issue you talked about with regard to the $9,750, did you ever have to bring cash in an envelope and give it to David Davari?

A. Yes.

Q. Why? Were you told to do that?

A. I was told to do that in order to pay back the balance that we agreed upon.

Q. Other than the $9,750?

A. Other than the $9,750, I do not believe I brought in cash in an envelope, other than the $9,750.

Q. Okay.

MR. VAN HUFF: Pass the witness.

MR. SHELLIST: I just have a couple of questions for you, Kim.

EXAMINATION

BY MR. SHELLIST:

Q. Number one: How much of a $25 credit card lap dance charge went to the house?

A. $5 each dance.

Q. Okay. And to your knowledge, what was that $5 taken by the house for?

A. My knowledge is a processing fee, I was told.

Q. You were told by whom?

A. Management, trainers, and other fellow employees.

Q. Okay.

A. And the owners.

Q. Okay. Which owners?

A. David Davari is who I dealt with.

Q. Okay. On the issue of -- on the issue of this written policy that was Exhibit 1, the one that Mr. Van Huff showed you that you allegedly signed, setting aside what was in writing, what is your

statement under oath today about what the practice was at the clubs regarding tipping out managers?

MR. VAN HUFF: Objection; vague and overbroad.

Q. (BY MR. SHELLIST) Go ahead. You can answer.

A. Go ahead? Basically, we were trained to know we needed to tip the manager every night. And also the managers, such as Bill or Joe, would stand or sit by the front door, collecting tip-outs from each waitress.

Q. Okay. And you personally observed other waitresses giving money to the managers at the end of the night?

A. Yes, every waitress.

Q. Did you have to tip managers at Centerfolds?

A. Yes, I did.

Q. Now, having worked at both -- having worked at both Centerfolds and Treasures, is it your testimony that with respect to the policies and procedures, the clubs ran identically?

A. Yes, I agree.

Q. Were you ever aware of a manager that used to work at Centerfolds that came to work at Treasures?

A. Yes.

Q. Who?

A. That was Joe.

Q. Okay. And were you ever aware of managers that would work at Centerfolds or Treasures when the management needs arose?
A. Yes.
Q. Or arose. When you said "Jackpot Clubs," what does that mean?
A. I assume that it means one large company running these five branches of strip clubs.
Q. No. Meaning is it -- where did you see that name written?
A. I've seen it on their Web site on the Internet where they advertise.
Q. Okay. And on that advertisement, you're saying they would advertise all of their clubs?
A. It is on the Web page all of the clubs.
Q. Okay. And the name "Jackpot Clubs" is on there?
A. Yes, it is.
Q. To your knowledge -- I mean, if you don't know, that's fine -- but is "Jackpot" the name of a company, or is that just some word they're using?
A. I'm not 100 percent sure.
Q. No, if you don't know, that's okay.
A. Yeah.
Q. And then as far as the walked tabs or

chargebacks, I believe you testified that during the brief period of time you worked at Centerfolds, you did not have to pay for a walked tab or a chargeback. Is that true?
A. That's true.
Q. But to your knowledge, if a customer had walked a tab at Centerfolds -- let's say they sat down to get some drinks, you went back to the bar to get the drinks, and then they left -- would you have to pay if that happened?
MR. VAN HUFF: Objection; calls for speculation.
A. Well, they did give spill tickets, but then they stopped them. So at that point, I would have to pay for it, the spill tickets --
Q. (BY MR. SHELLIST) I'm not talking about spills.
A. Okay. So if you walked out at Centerfolds, would I be responsible to pay for it? Yes, if it was a cash tab.
Q. Right.
A. Yes.
Q. Okay.
A. If it was a cash tab.
Q. Right. That was true at Treasures or

Centerfolds.
A. Correct, yes.
Q. I didn't hear the word "spillage" come up when you guys were chatting. Did you ever have to pay for drinks that you spilled off of your tray?
A. Yes.
Q. Okay. You also mentioned the word "spill ticket."
A. Sure.
Q. At some point, I'm assuming there was a policy where the company would issue spill tickets to the waitresses that could be used if there was spillage?
A. Yes, correct.
Q. And at some point, did that change?
A. It did.
Q. Okay. And do you recall when it changed?
A. No.
Q. Okay. Was it later in your employment or earlier in your employment?
A. Later.
Q. Okay. Do you have any knowledge about why the spill tickets were stopped being issued by the clubs?
A. Yes. They were being abused by the managers.
Q. Okay. And where did you hear that from?
A. The managers.

Q. Okay.
A. And my fellow employees.
Q. Okay. Which specific managers do you recall telling you that the spill tickets were being abused by them and, therefore, they weren't going to be used anymore?
A. Bill, Joe, John, and Slim.
Q. Okay. Did you see any other waitresses bringing envelopes of cash to give to the managers or the owner at Treasures?
A. Yes.
Q. Was there a list that was circulated that involved what moneys were allegedly owed to the club by the waitresses for chargebacks?
A. Yes, there was a list.
Q. And who, to your knowledge, distributed the list?
A. David Davari created it.
Q. Okay. And then how would you see it? Who would give it to you?
A. The managers would have a copy of their own.
Q. Okay. And how long was the list? I mean, on average. I'm assuming you saw it on occasion, but how many names were on it?
A. Oh, I would have to estimate if this were a

piece of notebook paper, you know, it would be filled, the front page. 15, 20 people approximately.
Q. Okay.
A. Approximately.
Q. And how often would this list be circulated? Daily? Weekly? Monthly?
A. Sure. Weekly for a period of time.
Q. And would the names change on it as people paid money back?
A. The list would change. People would pay off, or they'd add people to the list.
Q. Okay.
MR. SHELLIST: All right. I'll reserve any further questions until the time of trial.
MR. VAN HUFF: I will, too.
THE REPORTER: Read and sign?
MR. SHELLIST: Yes, please.
(The deposition concluded at 10:13 a.m.)

WITNESS CORRECTIONS AND SIGNATURE

Please indicate changes on this sheet of paper, giving the change, page number, line number and reason for the change. Please sign each page of changes.

PAGE/LINE CORRECTION REASON FOR CHANGE

____________________________________

KIMBERLY ELIZABETH McCRAY

SIGNATURE OF WITNESS

I, KIMBERLY ELIZABETH McCRAY, solemnly swear or affirm under the pains and penalties of perjury that the foregoing pages contain a true and correct transcript of the testimony given by me at the time and place stated with the corrections, if any, and the reasons therefor noted on the foregoing correction page(s), and that I am signing this before a Notary Public.

____________________________

KIMBERLY ELIZABETH McCRAY

STATE OF T E X A S *
COUNTY OF _________ *

SUBSCRIBED AND SWORN TO BEFORE ME BY KIMBERLY ELIZABETH McCRAY on this, the ____ day of _____________, 2010.

____________________________

Notary Public, State of Texas

My Commission Expires: ____________________

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

LAURA McKNIGHT, TRISHA :
TURNER, ANDREW BAKER, :
RACHAEL FREEDMAN, :
KIMBERLY ELIZABETH :
McCRAY, and MARGO :
MORENO, :
:
Plaintiffs, :
: CIVIL ACTION NO. H-09-3345
VS. :
:
D. HOUSTON, INC., d/b/a :
Treasures, A.H.D. :
HOUSTON, INC., d/b/a :
Centerfolds, D.N.W. :
HOUSTON, INC., d/b/a :
GOLD CUP, D. RANKIN, :
INC., d/b/a TROPHY CLUB, :
D WG FM, INC., d/b/a :
SPLENDOR, W.L. YORK, : JURY TRIAL DEMANDED
INC., d/b/a COVER GIRLS, :
and, in their individual :
capacities, ALI DAVARI :
and HASSAN DAVARI, :
:
Defendants.

*******************************************************

THE STATE OF TEXAS :
COUNTY OF HARRIS :

I, KERRIENNE L. BOND, a Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, KIMBERLY ELIZABETH McCRAY, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given

by the witness;

That the deposition transcript was submitted on ______________, 2010, to the witness, or to the attorney for the witness, for examination, signature, and return to me by ____________________, 2010;

That the amount of time used by each party at the deposition is as follows:

MR. MARTIN A. SHELLIST - 00:08
MR. ALBERT T. VAN HUFF - 00:55

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, on this, the 24th day of May, 2010.

_________________________________
KERRIENNE L. BOND, CSR
Certification No.: 8537
Expiration Date: 12-31-10
Q & A Reporting, Inc.
10220 Memorial Drive, Suite 22
Houston, Texas 77024
Firm Registration No. 402
(713) 467-7943

**A**

**able** 41:14
**above-styled** 1:20
**absolutely** 42:12 43:2
**abused** 48:23 49:4
**account** 13:14
**acknowledge** 23:12 34:2 35:7,9,12 37:1,4
**action** 1:7 53:7 54:12,14
**add** 18:12 50:11
**additional** 37:22
**adjudication** 11:22 12:1
**advertise** 36:15 46:12,14
**advertisement** 46:13
**affirm** 52:4
**ago** 8:7 12:8
**agree** 34:24 41:5 45:20
**agreed** 24:4 43:24
**agreement** 21:15 28:16
**ahead** 5:21 19:12 45:5,6
**ALBERT** 2:9 54:9
**ALI** 1:14 53:14
**allegation** 37:8 38:17,18,24 39:1
**allegations** 38:16 38:20
**allegedly** 44:24 49:13
**allow** 30:1,3
**amount** 20:3 25:7 28:14 31:7 54:6
**analysis** 19:9
**ANDREW** 1:4 53:4
**and/or** 19:24 29:18
**answer** 5:11,14,20 5:21 6:11 9:8 19:8,13 23:4 31:15 34:7,14,17 34:20,23 39:9,19 45:5
**answers** 4:17 5:3 5:20 6:16 8:16 16:10 23:8
**anticipate** 5:6 6:6
**anymore** 49:6
**apologize** 12:8 22:5
**appears** 35:8
**Apple** 6:16
**application** 8:5 30:10,15
**approximate** 23:14
**approximately** 7:17 9:9,14,20 10:23 23:16 24:12 24:13 25:10 50:2 50:4
**arose** 46:3,5
**arrangement** 29:16 29:17
**arrest** 11:5
**arrested** 10:16 12:4 39:20 40:3,9
**aside** 44:25
**asked** 31:10 40:4
**asking** 13:8 14:16 19:9 20:22 22:1 33:22 38:11 39:3 39:12
**assigned** 11:10
**assume** 6:10 46:7
**assuming** 48:10 49:23
**attached** 1:24
**attorney** 5:16 54:3
**attorneys** 54:12
**attorney-client** 14:21
**August** 9:14 23:21 24:6,10 25:17,21 28:12
**average** 49:23
**aware** 20:4 32:25 33:17,20,23,25,25 36:13,20 45:21 46:1
**A.H.D** 1:9 53:9
**a.m** 1:21,21 50:18

**B**

**back** 5:7 8:12 15:7 15:13 17:16 21:10 21:16 22:22,23 23:23 24:1,2,5,6 25:12 28:9,18,23 29:12,22 30:21 33:9 39:8,18 40:4 43:23 47:8 50:9
**BAKER** 1:4 53:4
**balance** 43:24
**bankruptcy** 10:10
**bar** 47:8
**bartender** 16:16,19
**bartenders** 41:19 42:5
**based** 26:14 32:21 36:21
**basically** 32:5 37:12 39:24 45:6
**basis** 19:25 20:21 20:22 21:6 32:23 32:25 41:22
**beginning** 11:1
**belief** 19:25
**believe** 7:6 8:13 10:19 11:21 12:20 17:8,10 19:11,24 30:21 40:14,17 43:2 44:1 47:1
**best** 34:14
**big** 13:15 23:6
**Bill** 26:8 45:8 49:7
**birth** 6:19
**Bond** 1:21 53:20 54:19
**bookkeeper** 38:1
**bracelet** 10:21
**branches** 46:8
**brief** 47:2
**bring** 43:19
**bringing** 49:9
**brought** 44:2
**business** 37:10,13 37:19,23
**businesses** 37:12

**C**

**C** 2:1
**calculate** 35:18
**Caligula** 8:6,12
**call** 12:15
**called** 12:1 37:10
**calls** 47:11
**capacities** 1:14 53:14
**card** 7:5 15:6 17:9 17:21,25 18:20 19:4,19 20:7,8,16 20:17 21:3,5,7,9 21:14 26:1,19,22 31:7,10 32:3,6,8 32:17 35:22,23 36:5,5 38:9,14,21 39:4 41:20,24 42:14,24 43:16 44:9
**cards** 42:21
**card-walked** 31:23 32:2
**care** 28:17
**Carolina** 40:19
**case** 7:20 8:17 11:8 11:20 12:19 17:7 36:13 40:11 41:2
**cash** 31:25 43:8,19 44:2 47:20,24 49:9
**Cash-walked** 31:24
**caught** 10:21
**cause** 1:21
**Centerfolds** 1:10 8:19 9:14,19,22 9:23,25 13:19,21 13:22,24 14:3 16:12 18:16,17,19 18:22,24 19:18 21:19,24,25 22:12 22:13,21 23:21 24:2 25:17 26:23 27:3,6,22,24,25 28:3,4 30:2,4,5,6 30:9,14 32:15,18 32:19 33:15 36:4 36:8,16,22 38:1,9 39:14 43:10,12,16 45:14,17,22 46:2 47:2,7,18 48:1 53:10
**certain** 42:12 43:3
**Certification** 3:7 54:20
**Certified** 53:20
**certify** 53:21 54:10
**chair** 33:4
**change** 48:14 50:8 50:10 51:2,3,4
**changed** 48:16
**changes** 51:2,3
**charge** 20:7,15,16 32:3,7 38:21 39:4 43:16 44:10
**chargeback** 18:22 21:21 26:14 35:23 47:3
**chargebacks** 9:25 15:7,10 17:25 18:19,21 21:5,7,9 21:14 26:1,15,16 26:19,22 27:5,8,9 27:10,16 29:13,24 31:7,10 32:17 47:1 49:14
**charged** 17:9 20:4 21:8 29:22 38:22
**charges** 15:6 16:5 17:9 38:9 41:20 42:14,16
**charging** 20:6,11 20:12,14
**chatting** 48:4
**checks** 30:4
**circulated** 49:12 50:5
**Civil** 1:7,23 4:5 53:7
**claim** 19:3,17 20:21 20:23 21:6 31:18 31:22 32:23 33:11 35:14 37:19
**claiming** 21:13 36:8 39:14 42:17
**claims** 17:2,6 36:11
**clear** 23:7
**cloudy** 24:15
**club** 1:11 7:20 8:25 20:16 35:13 37:5 38:21 39:8 43:7