IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| LAURA McKNIGHT, TRISHA TURNER, ANDREW BAKER, RACHAEL FREEDMAN, KIMBERLY McCRAY, and MARGO MORENO, | ) ) ) ) ) |
| Plaintiffs, | ) ) ) Civil No. |
| v. | ) H-09-3345 ) |
| D. HOUSTON, INC., D/B/A TREASURES, A.H.D. HOUSTON, INC., D/B/A CENTERFOLDS, D.N.W. HOUSTON, INC., D/B/A GOLD CUP, D. RANKIN, INC., D/B/A TROPHY CLUB, D WG FM, INC., D/B/A SPLENDOR, W.L. YORK, INC., D/B/A COVER GIRLS, and in their individual capacities, ALI DAVARI and HASSAN DAVARI, | ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

DEPOSITION OF MARGO MORENO

Avondale, Arizona

May 14, 2010

Prepared by:

CINDY MAHONEY, RPR, RMR
Certified Court Reporter
Certificate No. 50680

Page 2

```
 1      THE DEPOSITION OF MARGO MORENO
 2   commenced at 11:46 a.m. on May 14, 2010, at the
 3   Hilton Garden Inn, 11460 West Hilton Way,
 4   Avondale, Arizona, before Cindy Mahoney, RPR,
 5   RMR, Arizona Certified Court Reporter No. 50680.
 6
     APPEARANCES (by telephone):
 7
        For the Plaintiffs:
 8         SHELLIST & LAZARZ, LLP
           By: Martin A. Shellist, Esq.
 9             3D/International Building
               1900 West Loop South
10             Suite 1910
               Houston, Texas 77027
11             713-362-2277
12      For the Defendants:
           MONSHAUGEN & VAN HUFF, P.C.
13         By: Albert T. Van Huff, Esq.
               1225 North Loop West
14             Suite 640
               Houston, Texas 77008
15             713-880-2992
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              INDEX
 2   WITNESS:                           PAGE
 3   MARGO MORENO
 4      Examination by Mr. Van Huff       4
 5      Examination by Mr. Shellist      51
 6
                    * * *
 7
 8
 ...
25
```

Page 4

```
11:05:57  1              MARGO MORENO,
11:05:57  2      the witness herein, being first duly sworn,
11:05:57  3          was examined and testified as follows:
11:48:10  4          MR. VAN HUFF:  First, Mr. Shellist and
11:48:11  5   I are going to stipulate that we're taking this
11:48:13  6   deposition in accordance with the Federal Rules
11:48:15  7   of Civil Procedure.
11:48:17  8          MR. SHELLIST:  That's correct.  So
11:48:20  9   stipulated.
11:48:20 10                 EXAMINATION
11:48:22 11      Q   BY MR. VAN HUFF:  Ms. Moreno, would
11:48:24 12   you state your full name for the record, please?
11:48:26 13      A   Margo Ina Moreno.
11:48:29 14      Q   And what's your current address,
11:48:30 15   ma'am?
11:48:35 16      A   My current address is 13015 West Santa
11:48:39 17   Fe Boulevard, Number 1120, Avondale, Arizona,
11:48:41 18   85392.
11:48:45 19      Q   Okay.  I got your Arizona driver's
11:48:52 20   license as Delta 06699313.  Is that correct?
11:48:53 21      A   Yes, sir.
11:48:54 22      Q   And you're currently employed as a
11:48:55 23   cashier?
11:48:55 24      A   Yes, sir.
11:48:58 25      Q   Where are you employed?
```

Page 5

```
11:49:00  1      A   At Full Circle Auto Wash.
11:49:03  2      Q   Okay.  So you're basically a cashier
11:49:05  3   at a car wash?
11:49:05  4      A   Uh-huh.
11:49:06  5      Q   All right.  How long have you been
11:49:08  6   there in Arizona?
11:49:11  7      A   Since April of '09.
11:49:12  8      Q   Okay.  Have you ever given a
11:49:13  9   deposition before?
11:49:15 10      A   Yes, I have.
11:49:19 11      Q   How many times?
11:49:20 12      A   Once.
11:49:23 13      Q   And what was that case about?
11:49:26 14      A   It was in the '80s when I was 16 years
11:49:28 15   old in reference to a car accident.
11:49:31 16      Q   Was that here in Harris County?
11:49:35 17      A   No.  No, it was in Nueces County.
11:49:38 18      Q   Okay.  Nueces County, that's Corpus
11:49:39 19   Christi; right?
11:49:39 20      A   Yes.
11:49:43 21      Q   And were you a plaintiff in that case
11:49:46 22   or a witness or a defendant?
11:49:50 23      A   I was a plaintiff.
11:49:51 24      Q   And that was the only deposition that
11:49:53 25   you've ever given?
```

Page 6

```
11:49:54  1     A  Yes, sir.
11:50:00  2     Q  And have you ever been a plaintiff or
11:50:02  3  a defendant in any other lawsuit other than the
11:50:06  4  one that we're here today on?
11:50:08  5     A  No, sir.
11:50:14  6     Q  Have you ever been arrested?
11:50:15  7     A  Yes.
11:50:16  8     Q  When was the first time you were
11:50:19  9  arrested?
11:50:22 10     A  In -- in the '90s for a speeding
11:50:25 11  ticket that had turned into a warrant.
11:50:28 12     Q  Okay.  Anything other than that?
11:50:32 13     A  And one time I got ticketed for -- and
11:50:37 14  taken in, and I was sentenced to a wet reckless.
11:50:42 15  It was, I guess, in California and it was for
11:50:45 16  driving recklessly with alcohol involved.
11:50:49 17     Q  Okay.  And did you have to spend any
11:50:50 18  time in jail for that or what happened?
11:50:52 19     A  Yes.  Overnight.  I got an attorney,
11:50:55 20  and those were the final -- that was the final
11:50:57 21  conclusion.  What he got me was a wet reckless.
11:51:00 22     Q  Okay.  Anything else?
11:51:00 23     A  No.
11:51:02 24     Q  All right.  And as to the lawsuits,
11:51:05 25  have you ever gone through a divorce proceeding?
```

Page 7

```
11:51:05  1     A  No, sir.
11:51:08  2     Q  Okay.  How about a bankruptcy?
11:51:09  3     A  No, sir.
11:51:14  4     Q  Okay.  All right.  Well, now that
11:51:16  5  we've got some of those initial questions out of
11:51:18  6  the way, we're just going to move right into the
11:51:19  7  lawsuit.  Okay?
11:51:20  8     A  Okay.
11:51:23  9     Q  Now, I'm looking at some interrogatory
11:51:28 10  answers here.  And it says here that you were
11:51:35 11  employed as a waitress at Treasures from
11:51:39 12  approximately June 5 -- excuse me, June of 2005
11:51:43 13  through March of 2009.  Is that correct?
11:51:48 14     A  No.  It is June of 2004 to March of
11:51:49 15  2009.
11:51:55 16     Q  And I'm just going to assume that that
11:51:58 17  was a mistake on your lawyer's part.  Okay?
11:51:59 18     A  Okay.
11:52:01 19     Q  As far as the interrogatory answer
11:52:02 20  goes.
11:52:06 21        Okay.  It says here that you were paid
11:52:09 22  2.13 an hour plus tips; is that correct?
11:52:10 23     A  Yes.
11:52:12 24     Q  Were you ever paid in any other manner
11:52:16 25  other than that 2.13 per hour plus tips?
```

Page 8

```
11:52:16  1     A  No.
11:52:18  2     Q  At least while you were employed at
11:52:19  3  Treasures?
11:52:20  4     A  No, sir.
11:52:23  5     Q  Now, I gather from your interrogatory
11:52:27  6  answer that you have never worked at
11:52:28  7  Centerfolds; is that correct?
11:52:28  8     A  Correct.
11:52:30  9     Q  That you've never worked at Gold Cup;
11:52:31 10  is that correct?
11:52:32 11     A  Correct.
11:52:34 12     Q  You've never worked at Trophy Club,
11:52:37 13  Splendor, or Cover Girls; correct?
11:52:41 14     A  I did work at Trophy in -- I'm not
11:52:43 15  exactly sure when.  It could have been the end
11:52:45 16  of 2003 and the beginning of 2004, in between
11:52:48 17  there.
11:52:52 18     Q  For how long?
11:52:55 19     A  Just a few months.
11:52:58 20     Q  Is that as a waitress?
11:52:58 21     A  Yes.
11:53:00 22     Q  That would have been over five years
11:53:02 23  ago; right?
11:53:02 24     A  Yes.
11:53:10 25     Q  Okay.  You never worked at Splendor?
```

Page 9

```
11:53:10  1     A  No.
11:53:11  2     Q  Correct?
11:53:11  3     A  Correct.
11:53:13  4     Q  You never worked at Cover Girls;
11:53:14  5  correct?
11:53:15  6     A  Correct.
11:53:20  7     Q  So you worked at Treasures from June
11:53:23  8  2004 to March of 2009, approximately, as a
11:53:24  9  cocktail waitress?
11:53:24 10     A  Those were --
11:53:27 11     Q  And you also worked for a brief period
11:53:32 12  at Trophy Club back in 2003 or 2004 for a few
11:53:32 13  months?
11:53:33 14     A  Correct.
11:53:33 15     Q  Correct?
11:53:33 16     A  Yes.
11:53:36 17     Q  Other than that, you didn't work for
11:53:37 18  any of the other defendants; correct?
11:53:40 19     A  Correct.
11:53:48 20     Q  Now, in your lawsuit you've alleged
11:53:52 21  that Treasures treated you improperly with
11:53:54 22  regard to the way that you were compensated for
11:53:56 23  your work.  You understand that?
11:53:59 24     A  Could you further explain?
11:54:00 25     Q  You filed a lawsuit against Treasures;
```

3 (Pages 6 to 9)

Page 10

```
11:54:01  1  correct?
11:54:02  2     A  Right.
11:54:05  3     Q  And why have you sued Treasures?
11:54:07  4     A  I'm not understanding. That wasn't
11:54:09  5  part of your question. Can you repeat the
11:54:10  6  beginning again?
11:54:12  7     Q  I'm asking a different question now.
11:54:15  8  Why did you sue Treasures?
11:54:19  9     A  For illegal -- the way we were paid,
11:54:25 10  for tip out, just practices that were unfair and
11:54:26 11  not right.
11:54:35 12     Q  Okay. So what exactly -- is it fair
11:54:36 13  to say there are several practices that you
11:54:39 14  think were unfair and not right or unlawful?
11:54:40 15     A  Correct.
11:54:42 16     Q  If we were going to look at them one
11:54:45 17  at a time, what is your first complaint?
11:54:49 18     A  The 2.13 an hour, the management tip
11:54:49 19  out --
11:54:52 20     Q  Okay. Well, hold on. We need to go
11:54:53 21  through them one at a time. Okay?
11:54:53 22     A  Okay.
11:54:57 23     Q  So the first one is 2.13 per hour.
11:54:59 24  You have an issue with that. The second one is
11:55:02 25  you have an issue with manager tip out. Okay.
```

Page 11

```
11:55:05  1  Now, you have a third one.
11:55:09  2     A  No.
11:55:11  3     Q  Okay. What is it about the 2.13 per
11:55:14  4  hour that you think was unlawful?
11:55:17  5     A  As far as when I did my research on
11:55:22  6  the FSLA that that wasn't proper, and also being
11:55:25  7  just further informed.
11:55:28  8     Q  Okay. That the 2.13 an hour wasn't
11:55:29  9  enough money?
11:55:31 10     A  It's not minimum wage.
11:55:35 11     Q  Okay. Did you receive tips in
11:55:38 12  addition to the 2.13 an hour?
11:55:38 13     A  Yes, sir.
11:55:40 14     Q  Now, was the amount of tips that you
11:55:46 15  collected, if you add that onto the 2.13 an
11:55:48 16  hour, would that have put you above minimum
11:55:49 17  wage?
11:55:52 18     A  It would depend on the day. I can't
11:55:53 19  be specific on that.
11:55:56 20     Q  How many hours would you work per
11:56:01 21  shift, approximately?
11:56:02 22     A  Eight or more.
11:56:06 23     Q  All right. And how much money in tips
11:56:08 24  would you usually make during a shift?
11:56:09 25     A  It would depend.
```

Page 12

```
11:56:12  1     Q  What was the range?
11:56:15  2     A  The range could be I walk out of there
11:56:18  3  with zero dollars ranging anywhere to sometimes
11:56:25  4  over a thousand dollars.
11:56:28  5     Q  Okay. And how many shifts would you
11:56:31  6  work per week?
11:56:35  7     A  Anywhere from -- it could be from two
11:56:40  8  to every day, seven days a week.
11:56:49  9     Q  Did you like your job at Treasures?
11:56:50 10     A  Could you be more specific?
11:56:52 11     Q  Just generally speaking, were you
11:56:56 12  happy working there or did you dislike it?
11:57:00 13     A  It was a job that I held that I
11:57:03 14  worked. I can't say I liked it or disliked it.
11:57:05 15     Q  Just a job?
11:57:05 16     A  Correct.
11:57:09 17     Q  Okay. Do you know Laura McKnight?
11:57:10 18     A  Yes, I do.
11:57:15 19     Q  And did you originally hear about this
11:57:16 20  lawsuit through Laura?
11:57:18 21     A  Yes, I did.
11:57:23 22     Q  And how long ago was that?
11:57:29 23     A  That was -- I would say that was a
11:57:30 24  year ago.
11:57:32 25     Q  All right. Did she call you on the
```

Page 13

```
11:57:32  1  telephone?
11:57:32  2     A  She did.
11:57:36  3     Q  What did she say to you exactly?
11:57:39  4     A  In reference to this lawsuit that she
11:57:43  5  was pursuing and if I would like to join in.
11:57:45  6     Q  Okay. And then you said sure and
11:57:47  7  asked her for the number of the lawyer
11:57:48  8  basically?
11:57:50  9     A  Proceeded to ask a few more questions
11:57:55 10  and agreed with where she was going with it. I
11:57:57 11  had never looked into it. Then I did a little
11:57:58 12  research. And yes, then I contacted the
11:57:59 13  attorney.
11:58:02 14     Q  Okay. Was that the last time you've
11:58:05 15  spoken with Ms. McKnight?
11:58:09 16     A  I spoke with her a few other times.
11:58:11 17  Nothing in reference pretty much to the lawsuit,
11:58:16 18  in reference to just chitchatting, pretty much.
11:58:19 19     Q  Are you Facebook friends?
11:58:21 20     A  Yeah. I don't speak to her, though,
11:58:24 21  on Facebook really. I barely get on Facebook.
11:58:26 22     Q  Have you ever communicated with her on
11:58:28 23  Facebook?
11:58:29 24     A  Maybe once or twice.
11:58:34 25     Q  Do you recall what it was about?
```

## Page 14

11:58:35  1   A  I can't recall at this moment.
11:58:41  2   Q  Okay. Another person I need to ask
11:58:44  3  you about is Trisha Turner. She's another
11:58:45  4  plaintiff in this case.
11:58:46  5      Do you know Ms. Turner?
11:58:47  6   A  Yes, I do.
11:58:50  7   Q  Have Ms. Turner and you ever talked
11:58:52  8  about this lawsuit?
11:58:53  9   A  No, sir.
11:58:56 10   Q  All right. How about Mr. Baker?
11:58:57 11   A  No.
11:59:00 12   Q  And by the way, in asking this
11:59:02 13  question, I'm not trying to inquire into
11:59:06 14  anything that you talked about to your lawyer.
11:59:07 15  I just wanted to mention that because I don't
11:59:10 16  want you to accidentally start talking to me
11:59:12 17  about things that you and your lawyer talked
11:59:12 18  about. Okay?
11:59:13 19   A  Okay.
11:59:16 20   Q  What about Ms. Freedman, Rachael
11:59:17 21  Freedman?
11:59:17 22   A  No, sir.
11:59:19 23   Q  When was the last time -- have you
11:59:22 24  ever spoken to her?
11:59:25 25   A  No. And she worked at Treasures.

## Page 15

11:59:29  1   Q  So you've never spoke with her about
11:59:29  2  this lawsuit?
11:59:30  3   A  No, sir.
11:59:32  4   Q  What about Kimberly McCray?
11:59:33  5   A  No.
11:59:38  6   Q  The only one left is you, so I don't
11:59:40  7  need to ask you that question.
11:59:43  8      That was me trying to be funny.
11:59:47  9   A  Oh. I chuckled.
11:59:50 10   Q  So all right. So you think that the
11:59:52 11  2.13 an hour was inappropriate.
11:59:56 12      You also talked about manager tip outs
11:59:57 13  that you weren't happy with?
11:59:57 14   A  Correct.
12:00:01 15   Q  Okay. Now, just assume that I know
12:00:04 16  nothing about the details with regard to your
12:00:08 17  issues with manager tip out, and please tell me
12:00:11 18  all about it.
12:00:13 19   A  We were required to tip out. Mainly
12:00:17 20  what we made, the majority of our tips were on
12:00:20 21  credit card. They signed off on our credit card
12:00:25 22  tabs after a tab was closed, so they were fully
12:00:27 23  aware of the amount of our tips.
12:00:30 24      There was always more than one manager
12:00:35 25  on the floor on a nightly shift. To be

## Page 16

12:00:39  1  specific, there was two or three. They all
12:00:42  2  spoke, so they basically kept mental notes of
12:00:44  3  the amount of our tabs.
12:00:46  4      So towards the end of our night if you
12:00:49  5  totaled up, we went to them with 10 tabs at a
12:00:53  6  total of $100 in tips each, we were required to
12:00:57  7  tip out to them 10 percent.
12:00:59  8   Q  Okay. Did you ever complain about
12:01:02  9  this to David Davari or George Davari?
12:01:03 10   A  No, sir.
12:01:05 11   Q  Do you acknowledge that you signed a
12:01:08 12  form when you were first hired by Treasures that
12:01:11 13  said tipping the managers was purely
12:01:12 14  voluntarily?
12:01:15 15   A  That I do not recall; however --
12:01:17 16   Q  If they had a form in your personnel
12:01:20 17  file with your signature on it, would you
12:01:21 18  dispute that you signed that form?
12:01:23 19   A  No, I do not dispute that I signed it.
12:01:27 20  If I -- it sounds like something that could be
12:01:29 21  that was in there that I signed. I'm not
12:01:32 22  disputing that whatsoever. However, the paper
12:01:35 23  is not what was consistent with the practices at
12:01:36 24  Treasures.
12:01:39 25   Q  Okay. Fair enough.

## Page 17

12:01:40  1      Are there any other employment
12:01:42  2  practices at Treasures that you're complaining
12:01:46  3  about in connection with your lawsuit?
12:01:48  4   A  The taking out of the 5 percent of our
12:01:50  5  credit card tips as well.
12:01:52  6   Q  Okay. And by the way, do you have any
12:01:54  7  papers in front of you right now that you're
12:01:55  8  referring to?
12:01:55  9   A  No, sir.
12:01:59 10   Q  Okay. What is it about the 5 percent
12:02:01 11  of your credit card tips that you think was
12:02:03 12  unlawful?
12:02:06 13   A  That was money we earned. We were
12:02:10 14  never spoken to when we began employment -- or
12:02:13 15  when I began employment of them taking out any
12:02:15 16  sort of money. It was, again, a practice that
12:02:20 17  was just pretty much done without any consent.
12:02:22 18  I don't remember signing a form on that either.
12:02:27 19   Q  Okay. So it's your position that --
12:02:29 20  well, what is it about the fact they were taking
12:02:35 21  out 5 percent of your credit card tips that you
12:02:37 22  specific -- other than the fact that they didn't
12:02:38 23  tell you about it when you were hired and you
12:02:42 24  didn't sign a form, what is it about them taking
12:02:45 25  out 5 percent that you think is unlawful?

a697f5b9-0c99-4bbb-b44d-19cc5f31454f

Page 18

12:02:47  1   A  That that was money that was paid to
12:02:49  2   us, not to the club.
12:02:51  3   Q  Okay.  So basically it's your position
12:02:54  4   that the club didn't have any right to take 5
12:02:55  5   percent out of your credit card bill?
12:02:56  6   A  Correct.
12:02:58  7   Q  Okay.  Are there any other employment
12:03:01  8   practices that you're complaining about in your
12:03:03  9   lawsuit or that you have personal knowledge of
12:03:05 10   because it happened to you, not because someone
12:03:08 11   else told you about it?
12:03:11 12   A  Paying back credit card tabs that were
12:03:18 13   disputed, money that they said that we owed them
12:03:21 14   for if a tab was disputed that we were shown no
12:03:24 15   proof of, we were just told you owe this money
12:03:27 16   and we'd have to give it back.
12:03:29 17   Q  Okay.  So you're talking about credit
12:03:31 18   card chargebacks?
12:03:34 19   A  Chargebacks were really -- that word
12:03:38 20   was never thrown around.  The word was always
12:03:40 21   tab disputes.  You had a tab dispute.  This is
12:03:43 22   the amount of the tab.  This was your tip.  You
12:03:46 23   had to pay your tip back because the tab was
12:03:46 24   disputed.
12:03:49 25   Q  Okay.  Now, for the purposes of our

Page 19

12:03:52  1   conversation right now, when I say -- when we
12:03:55  2   refer to credit card chargebacks, that's going
12:04:00  3   to mean and include disputed tabs.  Okay?
12:04:00  4   A  Okay.
12:04:03  5   Q  Because in your lawsuit -- the lawsuit
12:04:06  6   talks about a couple different things.  It talks
12:04:10  7   about credit card chargebacks, and it also talks
12:04:14  8   about walked tabs.  And those are the two
12:04:16  9   categories that I need to talk to you about,
12:04:18 10   things that people have complained about in this
12:04:18 11   lawsuit.
12:04:20 12   A  I'm sorry.  You said chargebacks and
12:04:24 13   what was the other word you used?
12:04:31 14   Q  Walked tabs?
12:04:31 15   A  Oh, walked.  Okay.
12:04:32 16   Q  So if a guy walked out of the club
12:04:33 17   before he could pay his tab.
12:04:34 18   A  Correct.  Okay.
12:04:40 19   Q  So you said a moment ago we were
12:04:42 20   talking about credit card chargebacks.  Now let
12:04:45 21   me ask you this.
12:04:49 22       Typically during -- at the end of the
12:04:55 23   shift, were you paid all of the tips that you
12:05:01 24   earned that shift in cash at that time?
12:05:03 25   A  That would depend on the evening.

Page 20

12:05:06  1   Sometimes we were.  Sometimes we were told they
12:05:10  2   ran out of money.  Sometimes we were not because
12:05:15  3   of any instance that the manager may have
12:05:18  4   thought -- or thought upon it himself that he
12:05:23  5   was going to hold this tab for whatever reason
12:05:26  6   he felt.  So we wouldn't get paid out on that or
12:05:28  7   if they ran out of money.
12:05:33  8   Q  Okay.  And, Ms. Moreno, in answering
12:05:36  9   that question you were using the word "we."
12:05:39 10   A  I meant we as waitresses as a whole,
12:05:42 11   not we specifically anyone.  I'll change it to
12:05:46 12   I.  But this was a practice with the entire wait
12:05:46 13   staff.
12:05:48 14   Q  Okay.  I understand.  I want to make
12:05:51 15   sure that as I'm asking you these questions that
12:05:53 16   you understand that I'm asking you specifically
12:05:56 17   about things that happened to you and not to
12:05:56 18   other people.  Okay?
12:05:58 19   A  Correct.  And I will say I.
12:05:59 20   Q  I understand that your position is
12:06:02 21   that it was the policy -- or that it was applied
12:06:06 22   equally to everyone else.  I acknowledge that's
12:06:07 23   your position.
12:06:10 24       So I'm not trying to trick you or
12:06:12 25   anything into saying otherwise, but I just want

Page 21

12:06:15  1   to know about the things that happened to you
12:06:16  2   personally.  Okay?
12:06:18  3   A  Correct.  Every statement that I made
12:06:21  4   with we, I can change it to I.  Because I stand
12:06:23  5   behind all that because I was --
12:06:25  6   Q  Ms. Moreno, that's fine.  We don't
12:06:26  7   have to go through it all.
12:06:27  8   A  Okay.
12:06:33  9   Q  So you say sometimes the club would
12:06:34 10   run out of money.  Do you mean that sometimes
12:06:36 11   the club would run out of cash on hand because
12:06:40 12   it had to pay out a high level or a high amount
12:06:42 13   of tips on all the credit card tabs that were
12:06:44 14   run in a particular night?
12:06:45 15   A  Correct.  That is what --
12:06:48 16   Q  When that happened, were you given a
12:06:50 17   voucher that you would come and redeem the
12:06:51 18   following day?
12:06:55 19   A  There was a form we filled out stating
12:06:59 20   the tab -- excuse me.  There was a form I filled
12:07:04 21   out with the tab number, the bartender who was
12:07:09 22   running the tab, my name, the managers on duty,
12:07:13 23   all the bartenders on duty as well, and the
12:07:15 24   amount of the tab.
12:07:21 25   Q  Okay.  Now, during the period of

Page 22

12:07:25 1 October of 2006 until the end of your employment
12:07:32 2 in March of 2009, how many times did you have to
12:07:35 3 go through that procedure?
12:07:38 4     A  I cannot be specific on that number,
12:07:41 5 but I will say it's definitely more than 10
12:07:44 6 times, if not 20 or more.
12:07:47 7     Q  Okay. Is it safe to say that it was
12:07:50 8 less than 30 times?
12:07:52 9     A  I couldn't give you a specific number,
12:07:54 10 but there were many times.
12:08:03 11     Q  Okay. Would the frequency be about
12:08:06 12 once a month or so?
12:08:08 13     A  I couldn't be specific on that. It
12:08:11 14 would depend on the time of year. It would
12:08:14 15 depend on the week. It would depend on
12:08:18 16 conventions in town, if we were busy or not
12:08:19 17 busy.
12:08:22 18     Q  Okay. Are you claiming that you
12:08:25 19 suffered any economic damages as a result of
12:08:26 20 that?
12:08:28 21     A  Possibly at times I could have.
12:08:30 22     Q  How?
12:08:32 23     A  If I was going into work knowing I was
12:08:37 24 going in to make my earned tips and walk out
12:08:41 25 with zero dollars; if I was going into work that

Page 23

12:08:44 1 evening to make money per se to pay a bill that
12:08:46 2 was due the next day, yes, that would have
12:08:48 3 affected me.
12:08:50 4     Q  Okay. But you're not claiming that
12:08:54 5 you were never paid on those vouchers, are you?
12:08:56 6     A  No. I was paid on all of them.
12:09:00 7     Q  Okay. And how soon after the night
12:09:04 8 that you worked were you paid?
12:09:05 9     A  That would depend. Sometimes I could
12:09:10 10 try to go in on the beginning of my shift and
12:09:14 11 try to get that money back. Sometimes I had to
12:09:16 12 wait some time during the shift or sometimes it
12:09:18 13 wouldn't be until that next evening when I was
12:09:22 14 getting paid out on my tips from that evening.
12:09:24 15     Q  Did you ever complain to George or
12:09:26 16 David Davari about that?
12:09:27 17     A  No, sir.
12:09:30 18     Q  Okay. And the nights when you were
12:09:35 19 not paid any tips and given a voucher, is that
12:09:36 20 why you've stated before that sometimes you
12:09:40 21 would receive zero tips on a shift?
12:09:42 22     A  No, sir. Sometimes going in, you
12:09:46 23 would -- I wouldn't make -- I might not have had
12:09:51 24 any tips -- or credit card tabs per se or make
12:09:55 25 any tips. There was over, on some nights, 40 to

Page 24

12:09:57 1 45 waitresses a shift.
12:09:59 2     Q  So you're saying on some nights you'd
12:10:01 3 go in and you wouldn't even serve anybody?
12:10:02 4     A  Correct.
12:10:07 5     Q  How often would that happen?
12:10:09 6     A  Not very often, but it has happened.
12:10:11 7     Q  I mean, would you say that it only
12:10:15 8 happened a few times? Honestly?
12:10:20 9     A  What time specific range are you --
12:10:22 10     Q  How many times would it happen to you
12:10:26 11 per year that you would go into work and work an
12:10:28 12 entire shift and not serve a single customer?
12:10:31 13     A  A handful of times.
12:10:32 14     Q  Per year?
12:10:32 15     A  Yes.
12:10:36 16     Q  Now, if it was that slow or there were
12:10:38 17 that many waitresses, would the club send you
12:10:39 18 home?
12:10:42 19     A  No, they wouldn't send us home. We
12:10:48 20 had the -- or I had the -- the opportunity we
12:10:50 21 could ask to go home. That's not necessarily
12:10:54 22 saying that they would always allow me to go
12:11:01 23 home because to be specific, some of the
12:11:04 24 managers specifically said there's something out
12:11:06 25 there wanting us to stay -- wanting me to stay

Page 25

12:11:10 1 because if I made money, they made money because
12:11:13 2 we were required -- I was required to tip out.
12:11:20 3     Q  Okay. Other than the issue with the
12:11:26 4 vouchers that we just talked about?
12:11:26 5     A  Yes.
12:11:26 6     Q  When I say voucher, I'm talking about
12:11:28 7 that form that you would have to fill out if the
12:11:30 8 club ran out of cash?
12:11:31 9     A  Correct.
12:11:34 10     Q  Other than that, setting aside the 5
12:11:37 11 percent credit card -- the 5 percent that was
12:11:42 12 taken out of your credit card tips, is it fair
12:11:46 13 to say that you would routinely receive all of
12:11:49 14 your cash tips at the end of your shift for that
12:11:49 15 shift?
12:11:53 16     A  Yes.
12:12:00 17     Q  All right. Now, you mentioned before
12:12:07 18 something about disputed tabs, credit card -- or
12:12:11 19 as I refer to them, credit card chargebacks;
12:12:11 20 correct?
12:12:11 21     A  Correct.
12:12:15 22     Q  Okay. So those were basically just
12:12:17 23 credit card tabs that, for whatever reason, the
12:12:19 24 club was not able to liquidate -- or that it was
12:12:22 25 not able to collect later on? Is that your

Page 26

| Time | Line | Text |
|---|---|---|
| 12:12:25 | 1 | understanding of what that means? |
| 12:12:27 | 2 | A  My understanding was it was a disputed |
| 12:12:34 | 3 | tab. We were either told about it or shown a -- |
| 12:12:37 | 4 | some sort of spreadsheet with our name, date, |
| 12:12:39 | 5 | pretty much the entire information of the tab, |
| 12:12:42 | 6 | our tip amount and what was required to be paid |
| 12:12:42 | 7 | back. |
| 12:12:47 | 8 | Q  Okay. And how often would this |
| 12:12:49 | 9 | happen? |
| 12:12:54 | 10 | A  There was -- there was times when it |
| 12:12:59 | 11 | was very high. They were running -- it was |
| 12:13:02 | 12 | something going on that there was many of them. |
| 12:13:06 | 13 | Sometimes it would stop for a while and start up |
| 12:13:08 | 14 | again. |
| 12:13:11 | 15 | Q  When there was a disputed tab, what |
| 12:13:13 | 16 | are you claiming would happen to you? |
| 12:13:16 | 17 | A  We were required to pay back the money |
| 12:13:27 | 18 | we earned from our tip to David and show no |
| 12:13:29 | 19 | proof. We were basically told this tab was |
| 12:13:31 | 20 | disputed, this is the amount of the tip you owe, |
| 12:13:33 | 21 | and you need to pay it back. |
| 12:13:35 | 22 | Q  Okay. Do you have any documentary |
| 12:13:37 | 23 | evidence in support of that? |
| 12:13:40 | 24 | A  No. Every time I asked for any sort |
| 12:13:45 | 25 | of proof of payment, I was never given any. |

Page 27

| Time | Line | Text |
|---|---|---|
| 12:13:47 | 1 | Q  Yet you continued to work there? |
| 12:13:48 | 2 | A  Yes. |
| 12:13:52 | 3 | Q  Now, what was the range of money that |
| 12:13:55 | 4 | you would have to pay on those disputed tabs as |
| 12:13:59 | 5 | far as the tip amount that you claim you were |
| 12:14:02 | 6 | required to pay to Mr. Davari in cash? |
| 12:14:03 | 7 | A  I'm sorry. Can you repeat that |
| 12:14:03 | 8 | question? |
| 12:14:05 | 9 | Q  Yeah. What was the range of -- what |
| 12:14:11 | 10 | was the range of the amount of the tips that you |
| 12:14:15 | 11 | claim you were required to pay to Mr. Davari |
| 12:14:18 | 12 | when a tab was disputed? |
| 12:14:21 | 13 | For example, was it, you know, $5 to |
| 12:14:25 | 14 | $50, you know, $5 to a thousand dollars, the |
| 12:14:28 | 15 | range of the tips on the tabs? |
| 12:14:32 | 16 | A  My lowest range that I recall is $169 |
| 12:14:35 | 17 | on up. |
| 12:14:38 | 18 | Q  On up to what? |
| 12:14:52 | 19 | A  Anywhere from five to $800. |
| 12:14:54 | 20 | Q  During your employment with Treasures, |
| 12:14:56 | 21 | approximately how much money are you claiming |
| 12:14:58 | 22 | that you had to pay to Mr. Davari in connection |
| 12:15:00 | 23 | with these disputed tabs? |
| 12:15:03 | 24 | A  That, I do not recall. I cannot be |
| 12:15:05 | 25 | specific on that amount. |

Page 28

| Time | Line | Text |
|---|---|---|
| 12:15:07 | 1 | Q  Okay. Well, when we go to trial on |
| 12:15:09 | 2 | this case, how much money are you going to be |
| 12:15:11 | 3 | asking the jury to award you in connection with |
| 12:15:12 | 4 | that? |
| 12:15:14 | 5 | A  Right now I cannot be specific on that |
| 12:15:15 | 6 | amount. |
| 12:15:18 | 7 | Q  I'm not trying to be difficult with |
| 12:15:23 | 8 | you here, Ms. Moreno. But it's fairly important |
| 12:15:25 | 9 | that we at least get some sort of range |
| 12:15:26 | 10 | established as far as what damages you're |
| 12:15:29 | 11 | seeking in this lawsuit because this is the only |
| 12:15:31 | 12 | time I'm going to be able to ask you questions |
| 12:15:32 | 13 | about it. Okay? |
| 12:15:33 | 14 | A  Okay. But I specifically cannot give |
| 12:15:36 | 15 | you an amount at this time. |
| 12:15:39 | 16 | Q  Okay. So at this time you do not know |
| 12:15:42 | 17 | how much money you're claiming in damages for |
| 12:15:44 | 18 | disputed tabs? |
| 12:15:46 | 19 | A  No, sir. |
| 12:15:47 | 20 | Q  Correct? |
| 12:15:47 | 21 | A  Correct. |
| 12:15:57 | 22 | Q  Ms. Moreno, by the way, I don't always |
| 12:15:59 | 23 | use that term correct in my day-to-day |
| 12:16:03 | 24 | vernacular, but sometimes it's difficult for the |
| 12:16:06 | 25 | written record when people say yes or no to a |

Page 29

| Time | Line | Text |
|---|---|---|
| 12:16:08 | 1 | question and it actually means the opposite of |
| 12:16:09 | 2 | what they meant it to mean. I'm just mentioning |
| 12:16:09 | 3 | that to you so you don't think I'm trying to -- |
| 12:16:45 | 4 | I'm going to move on to walked tabs. |
| 12:16:46 | 5 | Okay? |
| 12:16:47 | 6 | A  Okay. |
| 12:16:51 | 7 | Q  So are you claiming in your lawsuit |
| 12:16:54 | 8 | that you were affected by walked tabs? |
| 12:16:54 | 9 | A  Yes. |
| 12:16:56 | 10 | Q  Okay. And how were you affected by |
| 12:17:00 | 11 | walked tabs? |
| 12:17:02 | 12 | A  If at any point on any given night you |
| 12:17:05 | 13 | couldn't find -- I -- if I could not find the |
| 12:17:08 | 14 | owner of the credit card and the tab sheet that |
| 12:17:12 | 15 | I was in charge of, if he was nowhere in the |
| 12:17:13 | 16 | club, I was in charge of paying those drinks |
| 12:17:18 | 17 | back. |
| 12:17:23 | 18 | Q  How often would that happen? |
| 12:17:27 | 19 | A  I can't be specific. It happened. |
| 12:17:28 | 20 | Sometimes they would just forget. Sometimes |
| 12:17:30 | 21 | they would walk out. Sometimes it would be |
| 12:17:32 | 22 | intentional. |
| 12:17:35 | 23 | Q  Okay. But you said you're not sure |
| 12:17:37 | 24 | how often it happened? |
| 12:17:40 | 25 | A  I can't give you a specific number of |

8 (Pages 26 to 29)

a697f5b9-0c99-4bbb-b44d-19cc5f31454f