Page 30

```
12:17:43  1    times within the time frame from -- of when I
12:17:45  2    was employed from 2004 to 2010, no.
12:17:47  3         Q   Are you also not sure about how much
12:17:49  4    money that caused you --
12:17:50  5         A   Correct.
12:17:53  6         Q   Let me rephrase that.
12:17:55  7         So you're also not sure about how much
12:17:59  8    money that cost you; correct?
12:18:02  9         A   Yes.
12:18:07 10         Q   Okay. So we covered five different
12:18:09 11    topics so far.
12:18:14 12         And those topics have been that you
12:18:21 13    don't think you were paid minimum wage. You are
12:18:26 14    complaining about paying a 10 percent tip out to
12:18:33 15    managers. You're complaining about the 5
12:18:39 16    percent charge against your credit card tips.
12:18:43 17    You're complaining about tabs that were
12:18:51 18    disputed. And we've talked about the issue of
12:18:53 19    walked tabs.
12:18:58 20         Other than those five issues, is there
12:19:02 21    anything else about the employment practices at
12:19:05 22    Treasures that you're complaining about in your
12:19:10 23    lawsuit?
12:19:12 24         A   At this time, that would be -- those
12:19:13 25    would be it.
```

Page 31

```
12:19:19  1         Q   Okay. All right. Now, there may be
12:19:22  2    some pauses here for a little while because I
12:19:24  3    need to flip through some paperwork. I don't
12:19:26  4    want you to think that I disappeared on you.
12:19:27  5    Okay?
12:19:28  6         A   Okay.
12:19:59  7         Q   There's an allegation in your petition
12:20:02  8    that the six clubs that are named as defendants
12:20:07  9    are joint employers.
12:20:08 10         What facts do you know of personally
12:20:13 11    in support of that contention?
12:20:16 12         A   When I was first employed with the
12:20:22 13    club, that was what I was told. The Davaris
12:20:27 14    owned Treasures and various other clubs, all of
12:20:30 15    the clubs which are mentioned in this lawsuit.
12:20:33 16         I also -- the time frame out of this
12:20:36 17    lawsuit when I worked at Trophy was also aware
12:20:43 18    that -- and was told the Davaris owned Trophy.
12:20:46 19    During the time I was employed at Treasures, at
12:20:52 20    any time you could go onto the Internet to a --
12:20:56 21    one of their Web sites, and it was pretty much
12:20:59 22    evident they were all linked together. You can
12:21:05 23    go on it now. It's the same format for pretty
12:21:07 24    much all of them.
12:21:08 25         At my time when I was employed at
```

Page 32

```
12:21:11  1    Treasures, you could pick up the Houston Press.
12:21:13  2    In the back of the Houston Press, which was a
12:21:17  3    weekly newspaper magazine with sorts of
12:21:22  4    advertisement of all things going on in Houston,
12:21:26  5    towards the back where the gentlemen's clubs and
12:21:28  6    the -- they had one -- all these clubs that are
12:21:31  7    mentioned in the lawsuit had one full page of
12:21:33  8    ads taken out.
12:21:36  9         Q   Okay. Anything else?
12:21:36 10         A   Nope.
12:21:38 11         Q   All right. Now, another allegation
12:21:42 12    that you've made has to do with something called
12:21:45 13    single integrated business enterprise. It's
12:21:47 14    basically something that's similar to joint
12:21:48 15    employers.
12:21:50 16         And in your interrogatory answers, you
12:21:53 17    give basically the same answer to the question
12:21:55 18    about facts that support joint employers, facts
12:22:00 19    that support single business enterprise. So
12:22:02 20    I'll agree with you that in your mind you think
12:22:05 21    that the facts we just went over regarding joint
12:22:07 22    employers also support your allegation for
12:22:10 23    single integrated business enterprise.
12:22:12 24         Are there any additional facts that
12:22:16 25    you're aware of in support of that single
```

Page 33

```
12:22:19  1    integrated business enterprise claim?
12:22:25  2         A   Yes. I also want to point out if --
12:22:28  3    for an address change on a paycheck, which I
12:22:31  4    attempted several times because in the times I
12:22:38  5    was employed there, I moved four times. Wanting
12:22:40  6    to change the address, I would have to contact
12:22:43  7    someone at Gold Cup who was in charge of, I
12:22:46  8    guess, paperwork, bookkeeping, things of that
12:22:46  9    nature.
12:22:49 10         Q   Are you sure it was Gold Cup and not
12:22:50 11    Centerfolds?
12:22:54 12         A   I was told Gold Cup.
12:22:56 13         Q   I mean, did you actually go to Gold
12:22:56 14    Cup?
12:23:02 15         A   I never went. Never went. I can say
12:23:05 16    from -- just from experiences from other people
12:23:07 17    when they went, you could never find them. So
12:23:10 18    I -- it would have been a waste of my time to go
12:23:12 19    and sit and wait.
12:23:16 20         Q   And I'm just -- with regard to your
12:23:20 21    experience specifically, you were talking about
12:23:23 22    submitting a change of address form.
12:23:24 23         What would you finally do to get it
12:23:26 24    submitted?
12:23:27 25         A   Never did.
```

Page 34

```
12:23:30  1      Q  Okay.
12:23:35  2      A  There were also times when these
12:23:39  3   females -- I can't recall names who they called
12:23:42  4   their bookkeepers, which I know I was told it
12:23:45  5   was constantly a different person.  They
12:23:49  6   couldn't keep the same person.  Sometimes would
12:23:52  7   be at Treasures from a certain time frame during
12:23:57  8   the day.  However, I lived 45 minutes away.  So
12:24:00  9   that was out of my -- it was too much out of my
12:24:04 10   way.  By the time I came on for my evening
12:24:05 11   shift, they were gone.
12:24:55 12      Q  Okay.  Why did you stop working for
12:24:55 13   Treasures?
12:25:13 14      A  I moved out of state.
12:25:23 15      Q  Are you claiming that Treasures
12:25:27 16   required you to pay for drinks that you spilled?
12:25:27 17      A  Correct.
12:25:32 18      Q  Tell me about that, please.
12:25:36 19      A  My -- prior -- at the beginning of my
12:25:41 20   employment, it wasn't fully required.  There
12:25:43 21   were these things which the managers handed out
12:25:47 22   which were called spill tickets.  If you
12:25:50 23   purchased a drink at the bar from the bank that
12:25:51 24   you took out at the beginning of your shift or
12:25:55 25   during your shift, and say I could not find the
```

Page 35

```
12:25:57  1   customer, if he decided, you know, all of a
12:26:01  2   sudden he had to leave or forgot or moved, I
12:26:03  3   went looking for him, I could go get a spill
12:26:05  4   ticket to pay for the --
12:26:06  5      Q  Ms. Moreno?
12:26:06  6      A  Uh-huh.
12:26:09  7      Q  What I'm trying to ask you about right
12:26:11  8   now aren't the missing customer -- isn't about
12:26:14  9   the missing customers.  It's about if you
12:26:16 10   accidentally spilled a drink.
12:26:18 11      A  Correct.  That's what I'm getting to
12:26:19 12   as far as any -- if -- even if you spilled a
12:26:22 13   drink, we, at the beginning, could get a spill
12:26:26 14   ticket, only a certain amount a night.  The
12:26:30 15   volume in that club was very high.  Sometimes
12:26:32 16   you could only get, say, two to three.  If you
12:26:34 17   spilled a whole tray of drinks when you had
12:26:38 18   large parties, the owners felt that that was
12:26:41 19   being abused, so they stopped that.
12:26:43 20           So any drink that was spilled or
12:26:46 21   accidentally you were bumped into, you were
12:26:50 22   required to purchase another drink with -- I was
12:26:53 23   required to purchase another drink to replace
12:26:55 24   that drink from my bank with my money that I
12:26:56 25   took out from the bar.
```

Page 36

```
12:26:58  1      Q  Were you ever required to pay for
12:27:01  2   glasses that you broke?
12:27:06  3      A  Glasses, no; beverages, yes.  There
12:27:08  4   were beverages in the glass, so we paid --
12:27:10  5      Q  There's two different things.  There's
12:27:12  6   spillage and breakage.  We've just talked about
12:27:15  7   spillage.  Now I'm just asking you if they would
12:27:17  8   ever require you to pay for, like, if you drop a
12:27:19  9   cocktail glass and the stem broke, did you have
12:27:21 10   to pay for the glass?
12:27:23 11      A  That was never a specific point.  You
12:27:25 12   paid for the alcohol in the glass.
12:27:26 13      Q  Okay.
12:27:30 14      A  Is how I was -- or how --
12:27:32 15      Q  Now, how often would it happen that
12:27:34 16   you would be required to pay for a spilled
12:27:37 17   drink?
12:27:39 18      A  Anytime you dropped a drink, someone
12:27:42 19   bumped into, you dropped your tray full of
12:27:42 20   drinks, you dropped --
12:27:44 21      Q  What I'm trying to ask, though, is how
12:27:48 22   many times would you actually have to pay?
12:27:51 23      A  All the time you spilled a drink or
12:27:54 24   dropped a tray of drinks is when we were
12:27:58 25   required to repurchase that beverage to give to
```

Page 37

```
12:27:59  1   the customer with the bank -- with our money
12:28:01  2   that we got from the bank from the bar.
12:28:04  3      Q  I understand that.
12:28:05  4           So is it true that that would only
12:28:07  5   happen a couple times a year?
12:28:09  6      A  A couple times a year?  It could
12:28:12  7   happen on a nightly basis.
12:28:16  8      Q  Well, how often did it actually happen
12:28:17  9   to you?
12:28:18 10      A  I can't be specific on a number.
12:28:21 11      Q  So you're not sure?
12:28:23 12      A  On a specific number, no.  I was
12:28:27 13   employed there from June of 2004 to March of
12:28:29 14   2010.  So on a specific number of spilled
12:28:32 15   beverages, no, sir, I can't give an accurate
12:28:32 16   count.
12:28:35 17      Q  On average how much money in tips
12:28:37 18   would you say that you would make per shift?
12:28:47 19      A  On average -- on average -- I could
12:28:49 20   give you a weekly average.
12:28:51 21      Q  Okay.
12:28:52 22      A  Which is anywhere from -- I mean,
12:28:55 23   average, it's a wide average.  But it could be
12:28:58 24   anywhere from -- they ranged from almost a
12:29:02 25   thousand dollars to 2,500, sometimes 3,000.
```

Page 38

```
12:29:04  1    That was average, depending. So 1 to 3 thousand
12:29:05  2  a week.
12:29:11  3        Q  And how many hours would you be
12:29:14  4  working per week?
12:29:16  5        A  That varies. We really didn't -- I
12:29:18  6  really didn't have a set schedule.
12:29:20  7        Q  Do you know what the -- if you could
12:29:23  8  give me a range like you just did for the tips,
12:29:25  9  that would be good.
12:29:28 10        A  A range.
12:29:32 11        Q  Like maybe six hours to 48 hours or
12:29:35 12  something like that?
12:29:47 13        A  One second. 40 to 50 hours, if not
12:29:53 14  more at times.
12:30:09 15        Q  Is there anything about your
12:30:16 16  employment at Treasures that you're claiming was
12:30:19 17  unlawful in connection with this lawsuit that we
12:30:22 18  haven't already talked about?
12:30:23 19        A  I'm sorry. Repeat that question.
12:30:26 20        Q  Is there anything else that you claim
12:30:28 21  Treasures did to you that was unlawful that we
12:30:33 22  haven't already talked about.
12:30:36 23           I'm thinking we covered everything you
12:30:37 24  mentioned in your interrogatory.
12:30:39 25        A  I think so, yes. I was trying to
```

Page 39

```
12:30:41  1  think in my head. I think so, yes.
12:30:44  2        Q  Okay. We're almost through. Okay?
12:30:45  3        A  Okay.
12:30:58  4        Q  Or would you rather me start all over
12:31:00  5  again at the beginning?
12:31:04  6        A  It's all up to you.
12:31:10  7        Q  That was supposed to be funny.
12:31:16  8        A  I said that with a smile on my face.
12:31:18  9        Q  Okay. I'm taking a minute here just
12:31:20 10  to look at your declaration that you filed or
12:31:25 11  you signed that was filed with a motion for
12:31:41 12  notice to class members.
12:31:59 13           For the time period October 2006 to
12:32:03 14  March of 2009, do you have any personal
12:32:07 15  knowledge -- and what I mean by that is
12:32:08 16  knowledge other than what other people told
12:32:13 17  you -- of the employment practices at
12:32:15 18  Centerfolds.
12:32:19 19        A  No knowledge to the practices at
12:32:20 20  Centerfolds, no.
12:32:23 21        Q  Okay. Now, same question but for Gold
12:32:24 22  Cup?
12:32:25 23        A  No.
12:32:27 24        Q  Same question but for Trophy Club?
12:32:28 25        A  No.
```

Page 40

```
12:32:30  1        Q  Same question but for Splendor?
12:32:31  2        A  No.
12:32:34  3        Q  Same question but this time for Cover
12:32:34  4  Girls?
12:32:36  5        A  No.
12:32:59  6        Q  In this declaration it says, We often
12:33:02  7  had to wait to get paid our tips on larger
12:33:07  8  credit card charges.
12:33:08  9           Did that ever happen to you
12:33:09 10  personally?
12:33:10 11        A  Yes.
12:33:14 12        Q  How often?
12:33:18 13        A  Again, I can't be specific on how
12:33:24 14  often. Going back, it would just depend on the
12:33:26 15  table, the amount of customers on that one tab,
12:33:31 16  the manager on duty, the entertainers at that
12:33:34 17  table, the amount of the tab.
12:33:38 18           There were no specific set rules or
12:33:43 19  anything as far as when a large tab was held.
12:33:47 20  It just basically depended -- each tab was its
12:33:51 21  own, and it was just -- each one, you know,
12:33:53 22  according to whatever the manager, whoever you
12:33:56 23  went to sign it with, felt at that time. He
12:34:00 24  made the decision or the call if he felt it
12:34:01 25  should be held or not.
```

Page 41

```
12:34:04  1        Q  Would you eventually get paid the tip
12:34:07  2  if it wasn't disputed?
12:34:09  3        A  Yes.
12:34:15  4        Q  How long would it usually take?
12:34:17  5        A  It could take anywhere from a couple
12:34:20  6  weeks to a month if not longer at times.
12:34:24  7        Q  Okay. Other than Trophy Club and
12:34:26  8  Treasures, have you worked at any other topless
12:34:28  9  clubs or gentlemen's clubs?
12:34:30 10        A  Yes.
12:34:31 11        Q  When was -- where was the first club
12:34:34 12  you worked for?
12:34:36 13        A  The Palace Gentlemen's Club.
12:34:37 14        Q  Where's that?
12:34:39 15        A  Corpus Christi, Texas.
12:34:43 16        Q  And the next one?
12:34:47 17        A  The Palace in San Antonio, Texas.
12:34:52 18        Q  Okay. And the next one?
12:34:55 19        A  St. James in Houston, Texas.
12:34:58 20        Q  Okay. The next one?
12:35:00 21        A  Trophy Club in Houston, Texas.
12:35:02 22        Q  Okay. And then just go ahead and tell
12:35:04 23  me about the rest of them.
12:35:04 24        A  And Treasures.
12:35:05 25        Q  That's it?
```

Page 42

12:35:05  1    A  Uh-huh.
12:35:27  2    Q  Did you ever have to pay any cash to
12:35:30  3  Morris?
12:35:34  4    A  I never did. Are you -- can you be
12:35:35  5  more specific? What type of money are you
12:35:37  6  referring to pay Morris?
12:35:42  7    Q  Did you ever have to pay Morris cash
12:35:48  8  to -- as part of a disputed credit card tab?
12:35:50  9    A  I specifically always wanted to give
12:35:54 10  it to David directly, or I would put it in the
12:35:55 11  white envelope cash.
12:35:57 12       And we were told if he was not in --
12:36:00 13  sometimes he did not come in until later -- we
12:36:01 14  would slide it under the -- I would slide it
12:36:06 15  under the office door with my name and the
12:36:08 16  amount of money in the envelope.
12:36:10 17       I would never leave it with Morris, I
12:36:13 18  would never leave it with the front door, nor
12:36:19 19  would I give it to a manager.
12:36:35 20    Q  It says here something about -- in
12:36:37 21  your declaration it says here something about
12:36:41 22  minimum $300 installments. Do you know what
12:36:42 23  that's all about?
12:36:45 24    A  Yes. Anytime there were disputed
12:36:52 25  tabs, I was made aware that the minimum amount

Page 43

12:36:53  1  required -- being that the amount of disputed
12:36:58  2  tabs more often than not were larger amounts, a
12:37:01  3  minimum payment required to David was 300. He
12:37:04  4  would accept nothing less than 300 minimum per
12:37:11  5  payment per tab.
12:37:16  6    Q  It says here about you getting
12:37:19  7  suspended for not paying $169.
12:37:20  8    A  Correct. One of my disputed tabs
12:37:23  9  which I wrote down from a spreadsheet that I had
12:37:27 10  on a table tent of one spreadsheet that was
12:37:30 11  going around at once that I had three disputed
12:37:34 12  tabs on. It was a payment of 169 that I was
12:37:39 13  required to pay back in tip. Being that the
12:37:44 14  minimum he required was 300, I assumed I could
12:37:48 15  not pay and get away because he required minimum
12:37:51 16  300. It was 169 I owed.
12:37:54 17       As is evident to that, not paying it
12:37:58 18  in a so-called timely manner to David, timely
12:38:00 19  manner never being specified, I was suspended
12:38:04 20  but told I was being suspended because of my
12:38:08 21  weight. But it was in the same phone call of I
12:38:12 22  needed to pay back my 169 before I came back in
12:38:14 23  addition to losing weight.
12:38:16 24    Q  What did they tell you about losing
12:38:18 25  weight?

Page 44

12:38:20  1    A  The phone call went, you need to pay
12:38:22  2  this 169 before you come back, but take some
12:38:26  3  time off and drop some weight. We're looking at
12:38:29  4  you on camera, and you look like you're
12:38:30  5  overweight.
12:38:34  6    Q  So how long were you off work when
12:38:37  7  that happened?
12:38:39  8    A  Not specifically sure. It could have
12:38:51  9  been anywhere from two weeks to a month.
12:39:00 10    Q  Did you actually lose weight during
12:39:05 11  that period?
12:39:06 12    A  Not specifically sure. I may have
12:39:09 13  dropped a couple of pounds. I'm by no means
12:39:14 14  overweight. I'm five-one. One pound or two
12:39:18 15  makes a huge difference.
12:39:32 16    Q  I'm looking at some documents that
12:39:35 17  your attorney produced that were all clipped to
12:39:36 18  a piece of paper with your name on it.
12:39:37 19    A  Okay.
12:39:39 20    Q  You probably don't have any of these
12:39:40 21  documents there, do you?
12:39:41 22    A  I don't have any.
12:39:44 23    Q  Okay. Well, I'm just going to
12:39:48 24  describe a couple of them to you and ask you a
12:39:48 25  few questions. Okay?

Page 45

12:39:49  1    A  Okay.
12:39:51  2    Q  They're not going to be very specific
12:39:51  3  questions.
12:39:51  4    A  Okay.
12:39:54  5    Q  One of the things I'm looking at is
12:39:58  6  dated February 7 of 2008. Up at the top it says
12:40:02  7  money owed from the previous night. Got your
12:40:04  8  name as a waitress, it's got Abel as the
12:40:06  9  bartender, Joe and Ted as the managers, and it's
12:40:10 10  got a tab number and an amount of $610.
12:40:12 11       So I'm thinking this is one of those
12:40:14 12  vouchers we were talking about?
12:40:17 13    A  Correct. Is that a copy or an
12:40:19 14  original?
12:40:21 15    Q  All I have are photocopies.
12:40:24 16    A  Okay. Yes, it sounds like the form
12:40:28 17  that was required to fill out when we -- when I
12:40:30 18  was told the club ran out of money to pay my
12:40:31 19  tabs at the end of the night.
12:40:34 20    Q  Okay. I see another one here that's
12:40:38 21  the exact same thing, but it's May 7, '08. And
12:40:42 22  it's for about $1,815?
12:40:44 23    A  Correct. Yes, sometimes there were
12:40:46 24  multiple tabs on there depending -- I could have
12:40:50 25  one tab to as many -- as many tabs as I was

### Page 46

```
12:40:54  1   capable of handling in that one night -- in any
12:40:58  2   given night. And yes, I did. I somehow had
12:41:00  3   some of those in my possession. So that is
12:41:02  4   probably what you're looking at.
12:41:03  5        Q  There are a few more of them, And I'm
12:41:06  6   not going to go through them one by one. But
12:41:10  7   these were produced to me by your lawyer.
12:41:12  8        Assuming that your lawyer gave me all
12:41:17  9   of the slips like this that you guys have, I
12:41:19 10   guess this -- is this the extent of the evidence
12:41:21 11   you have regarding the tabs that you weren't
12:41:23 12   paid at the end of a shift?
12:41:25 13        A  Correct. Those are a few that I have.
12:41:28 14   Somehow I managed to remain and keep those in my
12:41:32 15   possession. Because basically I was required to
12:41:35 16   hand that in when I got paid.
12:41:39 17        Q  Okay. So -- so you're saying that
12:41:41 18   there were more instances than what we have
12:41:44 19   here, but these are the only ones that you have?
12:41:45 20        A  Correct. Absolutely correct.
12:41:51 21        Q  Okay. I see some payroll -- some pay
12:41:53 22   stubs here, and those are kind of -- they
12:41:54 23   explain themselves; right?
12:41:55 24        A  Correct.
12:41:58 25        Q  Pay stubs; right?
```

### Page 47

```
12:41:59  1        A  Yes.
12:42:19  2        Q  I also have some what look to be tab
12:42:24  3   sheets that have signatures on them and indicate
12:42:27  4   numbers of dances and the amount of money for
12:42:33  5   beverages, those full size 8 and a half by 11
12:42:36  6   tip sheets, and dancer tip authorization
12:42:42  7   vouchers. There are quite a few of these.
12:42:46  8        There's a number -- McKnight document
12:42:52  9   number 60 to McKnight document number 116. So
12:42:58 10   I've got 56 examples of tab sheets and signed
12:43:00 11   dance authorizations.
12:43:02 12        Are these just documents that you
12:43:04 13   happened to keep in your possession --
12:43:05 14        A  Yes.
12:43:06 15        Q  -- during your employment with
12:43:06 16   Treasures?
12:43:08 17        A  Yes. Those are documents -- I
12:43:10 18   produced everything I had in my possession that
12:43:12 19   was important to this case.
12:43:16 20        Q  Okay. Now, do you recall anything
12:43:21 21   about these tab sheets and dance vouchers,
12:43:26 22   anything about them specifically that I should
12:43:29 23   know about with regard to their particular
12:43:32 24   relevance to this case?
12:43:35 25        A  The $5 charge per dance on those
```

### Page 48

```
12:43:41  1   dancer -- are you talking about the -- the
12:43:43  2   dancers form of payment, how she was paid on a
12:43:44  3   credit card tab?
12:43:46  4        Q  Well, I'm thinking that it's probably
12:43:50  5   your position factually that if dancers were
12:43:51  6   paid cash for a dance, that they would usually
12:43:56  7   charge $20, but if they were going to pay for a
12:43:59  8   dance on a credit card, it was in increments of
12:44:06  9   $25 and the house retained $5 of every dance or
12:44:07 10   20 percent; is that right?
12:44:09 11        A  Yes, $5 of every dance.
12:44:14 12        Q  All right. So you have made that
12:44:17 13   allegation in your petition, and I understand
12:44:20 14   that that's your position in this case.
12:44:23 15        So other than that, is there anything
12:44:25 16   else in particular about these dance
12:44:31 17   authorizations or credit card charge sheets that
12:44:35 18   are particularly relevant to your claims?
12:44:36 19        A  As --
12:44:38 20        Q  Anything that stands out in your mind?
12:44:40 21        I'm not trying to trap you or anything
12:44:44 22   or say, well, she didn't say this or that. I
12:44:46 23   just -- you produced 56 tab sheets to me. I'm
12:44:49 24   just wondering if, other than what they say on
12:44:50 25   the face of them, is there anything else I
```

### Page 49

```
12:44:52  1   should know about them?
12:44:54  2        A  Basically to the best of my knowledge,
12:44:57  3   the tabs that were produced were produced for
12:44:58  4   the reason of showing on there where the
12:45:02  5   bartender at the end of my shift when I was
12:45:06  6   being paid out my money, the 5 percent deduction
12:45:09  7   that was taken from each tab, each tip.
12:45:11  8        Q  The 5 percent that was taken to pay
12:45:14  9   the credit card tip -- or the -- the 5 percent
12:45:18 10   that the house charged you for your credit card
12:45:18 11   tips?
12:45:18 12        A  Correct.
12:45:38 13        Q  Did you report your cash tips to the
12:45:38 14   club?
12:45:42 15        A  To the club? No. The majority of
12:45:47 16   tips that I would make there were credit card.
12:45:50 17        Q  I see here in 2006 you made
12:45:54 18   approximately $15,000 in wages and credit card
12:45:58 19   tips; 2007 approximately $60,000 in wages and
12:46:02 20   credit card tips; in 2008, approximately $65,000
12:46:06 21   in wages and credit card tips.
12:46:07 22        Does that sound about right to you?
12:46:08 23        A  Uh-huh.
12:46:14 24        Q  Now, if you were working 40 to 50
12:46:17 25   hours per week and you were making between 50
```

13 (Pages 46 to 49)

**Page 50**

```
12:46:19  1  and $60,000 per year, that's clearly more than
12:46:21  2  minimum wage, isn't it?
12:46:23  3      A  I don't have a calculator in front of
12:46:28  4  me to do that math. I cannot be specific on
12:46:29  5  that amount.
12:46:42  6      Q  Finally, towards the end of your
12:46:44  7  production documents there's something here that
12:46:51  8  looks like a table tent, some handwriting on
12:46:54  9  it -- a table tent with some handwriting?
12:46:54 10      A  Yes.
12:46:57 11      Q  And one of the things it says is tip,
12:47:02 12  169.50. Then it's got some other numbers.
12:47:03 13          Is this the document you were talking
12:47:06 14  about earlier when you said table tent?
12:47:07 15      A  Correct. That is the document that I
12:47:11 16  was speaking of earlier that I said I wrote down
12:47:14 17  at one particular instance when there was a
12:47:19 18  spreadsheet going around of disputed tabs. I
12:47:23 19  quickly looked at it, jotted down my information
12:47:25 20  as much as I could, grabbed that table tent from
12:47:27 21  my tray, and jotted it down.
12:47:29 22      Q  Okay. And there's a -- and then
12:47:31 23  there's a document right after that that just
12:47:34 24  looks like a blank page with your handwriting on
12:47:37 25  it. But your handwriting is kind of in the same
```

**Page 51**

```
12:47:40  1  area as the area of the credit -- of the table
12:47:41  2  tent.
12:47:42  3          Is that the back of the table tent?
12:47:44  4      A  Probably, yes. Correct. Because the
12:47:46  5  back of the table tent, if you unfold it, it was
12:47:50  6  completely blank.
12:47:54  7      Q  Okay. We're just about to wrap up.
12:47:57  8          Is there anything in regards to your
12:48:00  9  lawsuit and the claims you're making against
12:48:06 10  Treasures that we haven't talked about today, to
12:48:09 11  the best of your knowledge?
12:48:10 12      A  I think we've covered it, to the best
12:48:12 13  of my knowledge at this moment.
12:48:15 14      Q  Okay. All right. Well, thank you
12:48:19 15  very much for your cooperation. It's a little
12:48:21 16  awkward doing these over the telephone. And I
12:48:24 17  really appreciate your patience, and I
12:48:26 18  appreciate your friendly demeanor.
12:48:27 19          I'm going to go ahead and pass the
12:48:32 20  witness to Mr. Shellist.
12:48:33 21               EXAMINATION
12:48:35 22      Q  BY MR. SHELLIST:  Margo, this is Marty
12:48:38 23  Shellist. I just have a couple of quick
12:48:39 24  questions for you. Okay?
12:48:39 25      A  Sure.
```

**Page 52**

```
12:48:43  1      Q  When you said that there was a
12:48:45  2  spreadsheet for the disputed tabs, who would
12:48:49  3  pass that around?
12:48:53  4      A  It was actually retrieved from the
12:48:58  5  cash cage where Morris is stationed every
12:49:04  6  evening. It's not something that was actually
12:49:06  7  supposed to be spread around. Somehow it
12:49:10  8  managed to get out, and I was witness to it and
12:49:13  9  recorded that information. As I -- as I
12:49:13 10  stated --
12:49:14 11      Q  Do you know who created the
12:49:16 12  spreadsheet?
12:49:17 13      A  I don't know. I cannot specifically
12:49:21 14  say who created it. But it was a spreadsheet
12:49:30 15  with various, you know, tab disputes. As is
12:49:32 16  evident, you can, I think, on the table tent
12:49:34 17  somewhere, you know, there were -- it was
12:49:35 18  hundreds of them.
12:49:38 19          I might have written down -- I can't
12:49:41 20  remember -- 124, 148. That was the line it was
12:49:43 21  on because the spreadsheet was numerous and very
12:49:46 22  thick. I was trying to keep track of where I
12:49:47 23  was on it when I was writing down this
12:49:48 24  information.
12:49:51 25      Q  Okay. But my question is simply: Do
```

**Page 53**

```
12:49:52  1  you know who wrote it? And your answer was you
12:49:55  2  don't know who created it?
12:49:56  3      A  No. To the best of my knowledge, it
12:49:58  4  came from David.
12:50:00  5      Q  Okay. That's fine. And it was
12:50:02  6  maintained in Morris's area?
12:50:02  7      A  Correct.
12:50:06  8      Q  Okay. And in your experience working
12:50:12  9  at Treasures, was the policy for waitresses to
12:50:14 10  pay back chargebacks, did that apply to all
12:50:15 11  waitresses?
12:50:16 12      A  Yes.
12:50:18 13      Q  Okay. And then when you talked with
12:50:21 14  Mr. Van Huff about the policy of the spillage,
12:50:24 15  whether at one point there were some tickets,
12:50:26 16  limited tickets, and other times there was just
12:50:31 17  you had to pay if you spilled drinks, did that
12:50:33 18  policy apply evenly to all waitresses at
12:50:36 19  Treasures in your experience working there?
12:50:39 20      A  In my experience, if it applied to
12:50:42 21  everyone all evenly, I will have to say no.
12:50:44 22      Q  What do you mean by that if it applied
12:50:47 23  evenly?
12:50:48 24      A  Isn't that what you said?
12:50:49 25      Q  No, no, no.
```

Page 54

```
12:50:52  1        My question is simply this: Were
12:50:55  2   there some waitresses who never ever had to pay
12:50:57  3   spillage and there were some who did, or if you
12:51:00  4   carried a tray of drinks out into the floor and
12:51:04  5   spilled them, you had to go back and pay for a
12:51:05  6   new round of drinks; is that right?
12:51:08  7        A  Yes. I specifically did. To the best
12:51:12  8   of my knowledge as far as the other ones, I know
12:51:14  9   others did. I can't be certain and say some
12:51:21 10   did, some didn't. I specifically had to pay any
12:51:24 11   spills or accidents of drinks lost out of my
12:51:26 12   bank, out of my money that I took out to
12:51:28 13   repurchase those drinks, yes.
12:51:34 14        Q  Okay. And when you talk about walked
12:51:40 15   tabs, was the walked tab policy at Treasures --
12:51:42 16   in your experience, did that apply to all the
12:51:44 17   waitresses?
12:51:48 18        A  I can't be certain on saying if that
12:51:50 19   applied to all of them or not. It applied to
12:51:50 20   me.
12:51:53 21        Q  Well, what I guess I mean, though, I'm
12:51:54 22   just saying in your experience did you see it
12:51:56 23   occurring to other waitresses?
12:51:57 24        A  Oh, did I see it occurring to other
12:51:58 25   waitresses? Yes.
```

Page 55

```
12:52:02  1        Q  That's what I'm saying is, in your
12:52:04  2   experience working at Treasures, did you see
12:52:08  3   other waitresses paying for spilled drinks?
12:52:10  4        A  Okay. Yes. I'm sorry. I guess I was
12:52:13  5   misunderstanding your question. Yes, I did.
12:52:14  6   Yes, I did witness that.
12:52:23  7        Q  Okay. Then finally, did you -- this
12:52:28  8   $5 that the house got off of each of the credit
12:52:35  9   card dances, do you know what that $5 was for?
12:52:37 10        A  I can't be specific as to say what it
12:52:41 11   was for -- was for. From hearsay I heard
12:52:44 12   throughout my employment time at the club it was
12:52:48 13   for a numerous amount of reasons. The main one
12:52:53 14   that I always heard over and over was for any
12:52:56 15   disputed tabs or to cover any -- to cover any
12:53:02 16   money basically. I guess pretty much like for
12:53:03 17   any disputed tabs.
12:53:07 18        MR. SHELLIST: Object to the hearsay.
12:53:08 19        Q  BY MR. SHELLIST: And who did you hear
12:53:10 20   that from?
12:53:15 21        A  Waitresses, management, bartenders.
12:53:17 22        Q  Which management would you have heard
12:53:19 23   that from?
12:53:21 24        A  Which management? I cannot be
12:53:24 25   specific as to a certain event or time or person
```

Page 56

```
12:53:25  1   that I heard that from.
12:53:29  2        Q  Meaning, for example, there's Bill,
12:53:33  3   Slim, Joe, these fellows. Would you have heard
12:53:36  4   it from each of them at different times or
12:53:39  5   not -- and if you didn't, that's fine. I don't
12:53:41  6   need an exact date and a month.
12:53:42  7        I just wonder when you say management,
12:53:45  8   who are you generally talking about?
12:53:47  9        A  All managers in general, yes, even
12:53:50 10   going back to John Tovar, who was the manager in
12:53:52 11   charge when I started my employment there at
12:53:53 12   Treasures.
12:54:01 13        MR. SHELLIST: Okay. I don't have any
12:54:03 14   questions of you further today. We'll reserve
12:54:08 15   any other questions until the time of trial.
12:54:08 16        MR. VAN HUFF: I don't have any
12:54:12 17   additional questions either. Thanks again,
12:54:13 18   Ms. Moreno.
12:54:16 19        THE WITNESS: You're welcome.
12:55:11 20        (The deposition concluded at
12:55:11 21   12:54 p.m.)
12:55:11 22
12:55:11 23
12:55:11 24                         _____
                                    MARGO MORENO
         25
```

Page 57

```
12:55  1   STATE OF ARIZONA   )
           COUNTY OF MARICOPA )
12:55  2        Be it known that the foregoing deposition was
12:55  3   taken by me pursuant to stipulation of counsel; that I
12:55  4   was then and there a Certified Court Reporter in the
12:55  5   State of Arizona, and by virtue thereof authorized to
12:55  6   administer an oath; that the witness before testifying
12:55  7   was duly sworn by me to testify to the whole truth;
12:55  8   pursuant to request, notification was provided that
12:55  9   the deposition is available for review and signature;
12:55 10   that the questions propounded by counsel and the
12:55 11   answers of the witness thereto were taken down by me
12:55 12   in shorthand and thereafter transcribed into
12:55 13   typewriting under my direction; that the foregoing
12:55 14   pages are a full, true, and accurate transcript of all
12:55 15   the proceedings had upon the taking of said
12:55 16   deposition, all done to the best of my skill and
12:55 17   ability.
12:55 18        I FURTHER CERTIFY that I am in no way related
12:55 19   to nor employed by any parties hereto; nor am I in any
12:55 20   way interested in the outcome thereof.
12:55 21        Dated at Phoenix, Arizona, this _____ day of
12:55 22   _____, 2010.
12:55 23
12:55 24                         _____
                                 CINDY MAHONEY, RMR, No. 50680
12:55 25
```

15 (Pages 54 to 57)