IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| LAURA MCKNIGHT, *et al.*, § | |
| § | |
| Plaintiffs, § | |
| § | |
| VS. § | Civil Action No. H-09-3345 |
| § | |
| D. HOUSTON, INC., d/b/a TREASURES, § | |
| *et al.*, § | |
| § | |
| Defendants. § | |

### DEFENDANTS' EXPEDITED MOTION FOR PROTECTIVE ORDER

TO THE HONORABLE LEE H. ROSENTHAL, UNITED STATES DISTRICT JUDGE:

Defendants Treasures, Centerfolds, Gold Cup, Trophy Club, Splendor, Cover Girls, and, in their individual capacities, Ali Davari and Hassan Davari, file this expedited motion for protective order.

### A. Background

On November 18, 2010, the court entered a memorandum and order granting plaintiffs' motion for conditional certification and issuance of notice to potential class members as to bartenders and servers who worked at Treasures and Centerfolds from October 15, 2007 until the present. *See* Memorandum and Order (Doc. 46). The memorandum and order requires Treasures and Centerfolds to provide plaintiffs with the contact information for the members of the class by December 31, 2010 and also requires the parties to submit a proposed notice for the court to review. *Id.* Treasures and Centerfolds are in the process of gathering the contact information of the members of the class and the parties are in the process of negotiating the language of a proposed notice.

Plaintiffs' counsel has indicated that he intends to contact potential opt-in plaintiffs

other than by mailing them the court-approved notice, ostensibly because these individuals are fact witnesses.  *See* Emails, attached as Exhibit 1.  Defendants object to this use of the contact information and file this motion for a protective order that will preclude contact by plaintiffs or their attorneys with potential opt-in plaintiffs other than the mailing of the court-approved notice.

Additional factual support of this motion for protective order is the following deposition testimony of plaintiff McKnight, which demonstrates that improper solicitation of potential plaintiffs in this case may have already occurred.[1]

Deposition testimony of Laura McKnight:

Q. (by Al Van Huff, attorney for defendants) Earlier today, I took the deposition of Andrew Baker who is one of the other plaintiffs in this case and during his deposition, he and I talked about a telephone conversation that you had with him approximately a year ago wherein you informed him about this lawsuit.  Do you remember that telephone conversation?

A. (by Laura McKnight, plaintiff) I remember having a telephone conversation with him, yes.

Q. What did y'all talk about on your telephone conversation?

A. I informed him that I had spoken with my lawyer and – Basically I told him that I had spoken with Mr. Shellist and I had decided that, you know, the practices that were happening at the club were illegal and that I was pursuing a lawsuit.

Q. What else did the conversation consist of?

A. I asked him how his family was.

Q. With regard to the lawsuit.

A. It was a year ago.  That's pretty much all I remember.

---

[1] *See* Texas Penal Code Section 38.12, entitled "Barratry and Solicitation of Professional Employment," attached as Exhibit 2.

Q. Okay. I imagine you probably gave him your lawyer's contact information?

A. Yes.

Q. Okay. Is there anything else?

A. Not that I can recall.

Q. Do you know who Trish – Trisha Turner is?

A. Yes.

...

Q. What about Ms. Turner?

A. Also the same besides the fact that I met one time in the office with her to meet Mr. Shellist and she's my Facebook friend. So it's all personal.

...

Q. When did you first talk to Trisha Turner about this lawsuit?

A. It was probably right after the time that I initially spoke to Mr. Shellist.

Q. Did you contact Ms. Turner in the same manner that you contacted Mr. Baker regarding the lawsuit?

A. No, I did not. It was my last day of employment at Treasures, and I spoke with her about it because she had come in as a patron.

Q. I see. What did you guys talk about in connection with the lawsuit at that time?

A. That was last April. Okay. I just told her that I was pursuing the lawsuit and I gave her Mr. Shellist's information and don't remember anything further.

...

Q. And Rachel Freedman, do you know her?

A. Vaguely. I mean, I worked with her. People told her if I saw her I'd remember her. But I was given her number to contact her and let her know about the lawsuit.

Q. Who gave you her number?

A. I can't remember if it was – I don't remember if it was one of the other plaintiffs or if it was a current employee.

Q. What prompted you to call these other people to get them involved in the lawsuit?

A. These were all of my coworkers who basically were experiencing the same exact thing that I was experiencing on a nightly basis when we would go to work and I wanted to let them know that basically what we were dealing with was against the law and I just wanted to let them know that I was pursuing a lawsuit against it.

Q. Kimberly McCray, when was your first conversation with her about the lawsuit?

A. It was around the time that I contacted Rachel because I was also given her phone number.

Q. Do you remember who gave you her phone number?

A. I don't remember.

Q. And finally, Margaret – excuse me – Margo Moreno.

A. It was around the same time.

Q. Back in April of '09?

A. Yes.

Q. And how did you contact Margo?

A. I called her.

Q. You already had her phone number?

A. I had to get it from – I don't remember if it was one of the plaintiffs or another coworker that still worked there.

Q. So, it could have been that you contacted former coworkers of yours at Treasures to get telephone numbers for other employees?

A. Yes. I spoke with a lot of my coworkers that were still currently employed that did not want to leave the company and did not want to pursue the lawsuit because they were fearful of retaliation. So, either they gave me contact numbers of people that they knew would be interested that no longer worked there or people that were planning on leaving that would be interested.

Deposition Transcript of Laura McKnight, pages 10 -18, attached as Exhibit 3.

The record in this case demonstrates that after the aforementioned individuals were

solicited by plaintiff McKnight to contact her attorney regarding this case, the individuals were listed as party-plaintiffs in the original complaint and then submitted declarations in support of class certification which were proven false by subsequent deposition testimony. *See* Defendants' Response to Plaintiffs' Motion for Notice to Class Members, page 2, fn. 1; pages 14 - 15 (Doc. 34).

Specifically, the declarations of both Turner and Baker state that they would have to wait up to 60 or 90 days to get their tips on larger credit cards, yet they both testified that they received all of their tips at the end of every shift. *Id*. The declaration of Turner states that she was required to pay back tips on credit card charge backs, yet she testified that was never required to pay back tips on a credit card charge back. *Id*. The declarations of Moreno and Freedman state that they often had to wait to get paid their tips on larger credit card charges, yet they testified that they were always paid their tips either at the end of their shifts or the next day if the club ran out of cash due to the high volume of credit card transactions and associated tips that needed to be liquidated. *Id.* The declaration of McKnight states that she often had to wait to get her tips on larger credit card charges and that she was required to pay back tips on charged off credit cards by bringing cash in an envelope and giving it to "Morris," yet she testified that she was never required to pay the club back for tips on a charged back tab and that there were only three instances that she did not receive her tips in cash on credit card tabs at the end of her shift and that on each of these occasions she was subsequently paid the tips in cash. *Id.*

The dynamic between the unlawful solicitations to join the suit and the subsequent substantial inconsistencies between the declarations that were filed in support of the motion for notice to class members and the deposition testimony of the plaintiffs suggests

5

some level of impropriety or inaccuracy with regard to the pre-suit solicitations and communications that occurred in this case. Defendants are therefore justifiably concerned that ex parte communications between plaintiffs or plaintiffs' counsel and potential opt-in plaintiffs other than the court-approved notice are inappropriate and should be restricted by the court.

### B. Argument & Authorities

The Supreme Court has recognized that, "[b]ecause of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and the parties." *Gulf Oil Co. v. Brenard*, 452 U.S. 89, 101, 101 S.Ct. 2193, 68 L.Ed.2d. 693 (1981). This same duty was found applicable to collective actions in *Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 171, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989). In *Hoffmann-La Roche*, the Court emphasized that the benefits of the collective action form of litigation "depend on employees receiving accurate and timely notice concerning the pendency of the collective action, so that they can make informed decisions about whether to participate." 493 U.S. at 170, 110 S.Ct. 482. However, the plaintiffs' right to transmit mailings after certification and the issuance of court-approved notice is not without limitation. *See Jackson v. Papa John's USA, Inc.*, 2009 WL 650181, *2 (N.D.Oh. March 10, 2009) (once "[the c]ourt has approved of a communication to potential opt-in class members," "[o]ther communications from [the parties] during the pendency of the notice period may cause confusion or undermine the authority of the court-approved communication"); *Ruggles v. WellPoint, Inc.*, 591 F.Supp.2d 150, 164 (N.D.N.Y. 2008) ("to

bring order and efficiency to the notice process, the court-controlled mechanism should trump any attorney driven notice and resolve any post-conditional certification notice in favor of the court's controlled process;" "[f]ailure to limit notification to a single process would be dissonant with the intent of the FLSA statute that the court play a significant role in prescribing the terms and conditions of communications from the named plaintiffs to the potential class members ... on whose behalf the collective action was commenced").

Defendants acknowledge that "[a]n order limiting communications between parties and potential [collective] members should be based on a clear record and specific findings that reflect the weighing of the need for a limitation and the potential interference with the rights of the parties." *Gulf Oil Co.*, 452 U.S. at 102, 101 S.Ct. 2193. The *Gulf Oil* Court noted that the potential abuses associated with collective actions include, "heightened susceptibilities of nonparty class members to solicitation amounting to barratry as well as the increased opportunities of parties and counsel to 'drum up' participation in the proceeding." *Id*. at 101, n. 12. To address such abuses, district courts possess both the duty and authority to limit unapproved communications. *Id*. Courts are afforded this power because they have a "responsibility to avoid the 'stirring up' of litigation through unwarranted solicitation." *Hall v. Burk*, No. Civ. 3:01-cv-2487, 2002 WL 413901 at *3 (N.D.Tex. March 11, 2002).

It is in this vein that courts have found that plaintiffs' pre-certification communications may constitute the improper solicitation of putative class members. See *Hamm v. TBC Corp.*, 597 F.Supp.2d 1338, 1440 (S.D.Fla.), *aff'd by* 345 F.App'x 406 (11th Cir. 2009 (upholding sanctions imposed on counsel for improperly soliciting individuals to join a FLSA suit). To the extent that the court permits any soliciting communications with

the prospective collective class, such communications should be part of the collective action certification process and approved by the court in advance. *Doe v. Advanced Textile Corp.*, 214 F.3d 1058, 1063 (9th Cir. 2000) (holding that plaintiff must file a motion seeking prior court approval before sending FLSA opt-in notice to potential plaintiffs); *In re McKesson HBOC, Inc. Secs. Litig.*, 126 F.Supp.2d 1239 (N.D.Cal. 2000) (stating, "The court is particularly troubled by the distribution of a 'notice' not authorized by the court"); *see also Impervious Paint Indus., Inc. v. Ashland Oil,* 508 F.Supp. 720, 722 (W.D.Ky. 1981) (ruling that ex parte contact constitutes unethical solicitation of clients if purposes or predicable effect is to influence an individual's participation in class).

Accordingly, the solicitation of potential class members to join this litigation is prohibited, and the court retains authority to prevent these types, or any other types, of unapproved communications.

In the present case, there is specific evidence that plaintiff McKnight's ex parte communications with the other named plaintiffs prior to filing of this lawsuit were solicitations which led to the inclusion of them as named plaintiffs and the subsequent factually inaccurate declarations regarding the basis of their claims against the defendants. Under these circumstances, any prejudice or impact on plaintiffs' rights as a result of the protective order requested will be minimal in light of the fact that there will be a court-approved notice to potential class members that plaintiffs and plaintiffs' counsel will be authorized to send. Plaintiffs' attempt to label the potential opt-in class members as fact witnesses in order to gain unfettered access to them is clearly an attempt circumvent the requirement that all communications between plaintiffs and the potential opt-in class members be supervised and approved by the court. The true reason that plaintiffs want

unfettered access to the potential opt-in plaintiffs is to drum up participation in this proceeding, a course of action that is prohibited by relevant law. Additionally, it is illogical and counter-intuitive to require a court-approved notice and then allow the plaintiffs or their attorney to also contact the potential class members other than by mailing the court-approved notice.

## C. Conclusion

Based upon the foregoing, defendants ask the court to issue a protective order prohibiting plaintiffs and plaintiffs' attorneys from utilizing the contact information of the class members in this case for any purpose other than the mailing of the court-approved notice. Alternatively, defendants ask the court to issue a protective order requiring plaintiff and plaintiffs' attorney to obtain specific approval from the court for any mailings, emails, phone calls or communications with potential opt-in plaintiffs other than the court-approved notice.

## D. Prayer

WHEREFORE, defendants pray that the court grant this motion and for all other relief to which they are entitled.

Respectfully submitted,

**MONSHAUGEN & VAN HUFF, P.C.**

By: /s/ Albert T. Van Huff
ALBERT T. VAN HUFF
Texas Bar No. 24028183
Southern District No. 26968
1225 North Loop West, Suite 640
Houston, Texas  77008
Tel. (713) 880-2992
Fax (713) 880-5297

ATTORNEY FOR DEFENDANTS

CO-COUNSEL:

LAUREN M. SERPER
**LAW OFFICES OF LAUREN M. SERPER, P.C.**
Texas Bar No. 18032100
Southern District No. 7334
3405 Edloe, Suite 200
Houston, Texas 77027
Tel. (713) 278-9398
Fax (713) 785-0808

## Certificate of Conference

I hereby certify that I have conferred with the attorney for plaintiffs and he is opposed to this motion.

/s/ Albert T. Van Huff
ALBERT T. VAN HUFF

## Certificate of Service

The undersigned hereby certifies that a true and correct copy of the foregoing document was forwarded to counsel for the parties via electronic filing on the 2nd day of December, 2010.

/s/ Albert T. Van Huff
ALBERT T. VAN HUFF