# Oral Deposition of:

# Ms. Laura McKnight

**Case:** Laura McKnight

vs.

D. Houston, Inc. et al.

**Date Taken:** May 11, 2010

**Q & A Reporting, Inc.**

**Phone: (713) 467-7900**

**Fax: (713) 467-7911**

**Email: office@qareporting.net**

Case 4:09-cv-03345 Document 47-3 Filed on 12/02/10 in TXSD Page 2 of 4

Page 10

A. No.
Q. Earlier today, I took the deposition of Andrew Baker who is one of the other plaintiffs in this case and during his deposition, he and I talked about a telephone conversation that you had with him approximately a year ago wherein you informed him about this lawsuit. Do you remember that telephone conversation?
A. I remember having a telephone conversation with him, yes.
Q. What did y'all talk about on your telephone conversation?
A. I informed him that I had spoken with my lawyer and --
MR. SHELLIST: Now be careful -- and I know, Al, you would give this instruction anyway but you can say whatever you guys chatted about but be careful that -- neither Al nor I want you to trample upon any of the attorney-client communications. So, if you and I talked about something, that's one thing but whatever you and Andy talked about, whatever you recall, I'm happy for you to tell that to Al, okay?
THE WITNESS: Okay.
A. Basically I told him that I had spoken with Mr. Shellist and I had decided that, you know, the practices that were happening at the club were illegal and

Page 11

that I was pursuing a lawsuit.
Q. (By Mr. Van Huff) What else did the conversation consist of?
A. I asked him how his family was.
Q. With regard to the lawsuit.
A. It was a year ago. That's pretty much all I can remember.
Q. Okay. I imagine you probably gave him your lawyer's contact information?
A. Yes.
Q. Okay. Is there anything else?
A. Not that I can recall.
Q. Do you know who Trish -- Trisha Turner is?
A. Yes.
Q. Have you had any -- let me back up.
Have you had any other conversations with Mr. Baker about this lawsuit?
A. This morning I text him to ask him what the name of our old manager was. I remembered his first name. I did not recall his last name.
Q. Who was it?
A. John Tovar.
Q. Okay.
A. And I asked him how he was doing.
Q. Okay. Between the initial telephone conversation

Page 12

and the text you just mentioned, did you have any other conversations with Mr. Baker about this lawsuit?
A. There was a confidential communications between my lawyer and all of us that I replied to, but I don't think I'm able to talk with you about that.
Q. Okay. I did not ask you about conversations or communications with your lawyer. I'm asking you about communications or communications between you and Mr. Baker.
A. Right. And those occurred like when you "reply-all" kind of thing. So, those would technically be conversations if I replied "all" and Andy received that communication but it also went to my lawyer.
Q. Okay. And so, I guess what you're saying is you had some conversations that were basically in the context of a conference-type conversation between all the plaintiffs and your lawyer?
A. Yes.
Q. Essentially I guess that would be what you're saying.
Any other conversations other than that with Mr. Baker regarding the lawsuit?
A. Not that I can recall.
Q. What about Ms. Turner?
A. Also the same besides the fact that I met one

Page 13

time in the office with her to meet with Mr. Shellist and she's my Facebook friend. So, it's all personal.
Q. Facebook. Have y'all ever communicated on Facebook about this lawsuit?
A. No.
Q. Are you Facebook friends with any of the other plaintiffs?
A. Margo I think. I'm not sure. I have like 500 people that are my friends. I can't really recall. I'm pretty sure Margo but I'm not sure about the rest of them but we don't talk about Treasures. We've moved on from that.
Q. You don't talk about it anymore?
A. On Facebook or?
Q. You said that you had moved on from that --
A. No.
Q. So, y'all discussed it at some point on Facebook?
A. No. I'm saying we've moved. In other words we're no longer employed by Treasures. We've moved on with our lives.
Q. I see.
A. And so any conversations that we've had beyond meeting with Mr. Shellist would be of a personal nature.
Q. And just so that you know in the process of me asking you questions about your communications with the

other plaintiffs, I'm not trying to get into whatever else y'all talk about other than the stuff that has to do with this lawsuit.
A. Okay.
Q. Now -- and your employment with Treasures.
When you were employed with Treasures, did you ever have any Facebook communications with any other employees of Treasures?
A. While I was employed, no. I just recently got on Facebook.
Q. Have you had any e-mail communications with any of the other plaintiffs regarding Treasures?
A. The plaintiffs, no. It would be the same as with Andy, just, you know, reply-all communication and maybe a generalized question that Marty would ask us and I'd respond and maybe they would respond further but, I mean, as far as the times, the dates what we talked about, I don't know and if it was -- if it involved Mr. Shellist, I can't talk to you about that.
Q. What's your e-mail address?
A. I prefer not to give that. That's my husband and my e-mail address.
Q. Well --
MR. VAN HUFF: Mr. Shellist.
MR. SHELLIST: I'll talk to her at a break

and I'll see and then if we need to fuss about it, I'll let you know but I'll write that down as a note for Ms. McKnight and I to chat about.
Q. (By Mr. Van Huff) Who is your e-mail service provider, if you know what that means?
A. I don't understand why that's important.
Q. Okay. So, is that another question that you're not going to answer?
MR. SHELLIST: If you're not comfortable answering, you can tell him you're not going to answer it. You and I can discuss it at a break.
THE WITNESS: Okay.
A. I prefer not to answer.
Q. (By Mr. Van Huff) Okay. Other than Facebook are you on any other social networking sites?
A. No.
Q. When did you first talk to Trisha Turner about this lawsuit?
A. It was probably right after the time that I initially spoke with Mr. Shellist.
Q. Did you contact Ms. Turner in the same manner that you contacted Mr. Baker regarding the lawsuit?
A. No, I did not. It was my last day of employment at Treasures, and I spoke with her about it because she had come in as a patron.

Q. I see. What did you guys talk about in connection with the lawsuit at that time?
A. That was last April.
MR. SHELLIST: If you remember, tell him everything you remember. If you don't, just be fair with him and tell him you don't remember.
A. Okay. I just told her that I was pursuing the lawsuit and I gave her Mr. Shellist's information and I don't remember anything further.
Q. (By Mr. Van Huff) What other communications have you had with her since then regarding this lawsuit other than communications that had to do with your lawyer?
A. That would be it.
Q. When was the last time you spoke with her?
A. I can't recall. I think it was the last time we met at the office.
MR. SHELLIST: If you remember, let him know. If you don't --
A. Yeah. I mean, that was the last date that I know of.
Q. (By Mr. Van Huff) And Rachel Freedman, do you know her?
A. Vaguely. I mean, I worked with her. People told her if I saw her I'd remember her. But I was given her number to contact her and let her know about the lawsuit.

Q. Who gave you her number?
A. I can't remember if it was -- I don't remember if it was one of the other plaintiffs or if it was a current employee.
Q. What prompted you to call these other people to get them involved in the lawsuit?
A. These were all of my coworkers who basically were experiencing the same exact thing that I was experiencing on a nightly basis when we would go to work and I wanted to let them know that basically what we were dealing with was against the law and I just wanted to let them know that I was pursuing a lawsuit against it.
Q. Kimberly McCray, when was your first conversation with her about the lawsuit?
A. It was around the time that I contacted Rachel because I was also given her phone number.
Q. Do you remember who gave you the phone number?
A. I don't remember.
Q. And finally, Margaret -- excuse me -- Margo Moreno?
A. It was around that same time.
Q. Back in April of '09?
A. Yes.
Q. And how did you contact Margo?
A. I called her.

Q. You already had her telephone number?
A. I had to get it from -- I don't remember if it was one of the plaintiffs or another coworker that still worked there.
Q. So, it could have been that you contacted former coworkers of yours at Treasures to get telephone numbers for other employees?
A. Yes. I spoke with a lot of my coworkers that were still currently employed that did not want to leave the company and did not want to pursue the lawsuit because they were fearful of retaliation. So, either they gave me contact numbers of people that they knew would be interested that no longer worked there or people that were planning on leaving that would be interested.
Q. And how is it that you -- that your employment with Treasures ceased?
A. I decided that I did not want to work for them anymore, so, I quit.
Q. On average how many hours a week did you work at Treasures as a waitress during your employment there?
A. It varied anywhere from one shift and I can recall working seven shifts in a week. It just depended.
Q. And how long was a shift usually about?
A. It depended on the day. Some days we were open until 2:00 in the morning. Some days we were open until

4:00 in the morning and generally the days that we were opening till 4:00 in the morning, I stayed till 4:00 in the morning.
Q. Okay. What was the range in hours of the shifts?
A. 6:30 to 2:00 or 6:30 to 4:30.
Q. Did you clock in?
A. I did clock in, but I wasn't always paid for the hours that I was worked -- that I worked.
Q. Did you clock in for all the hours that you worked?
A. Yes. However, where the timecards were located was public access. Basically it was a swinging door with glass on it and that's where the patrons were at. There was many a time where my timecard would be gone and I wouldn't know what had happened to it and there was no way of, you know, locating it and/or submitting new hours and when I did submit new hours, there were times that I was not reimbursed.
Q. Okay. So, there were some issues with lost timecards?
A. Yes.
Q. And approximately how many hours worth of pay were you not compensated for due to lost timecards?
A. I don't know.
Q. Was it less than 24 hours of time, or was it 2000

hour's worth of time? If you just can give me a range so we have some idea of what we're talking about, it would be helpful.
A. Once every few months, you know, I would notice that the hours that I worked didn't match -- did not match what I had actually worked and as far as contacting the woman that was in charge of payroll, she did not return phone calls. She did not answer phone calls. Any communication that I would give to my manager to give to her because she was officed out of Centerfolds, I never knew where it went.
Q. Did you document any of this?
A. Yes. I wrote letters and gave them to the managers.
Q. Did you retain copies of those letters?
A. No.
Q. Well, on the occasions that this would happen, how many hours would you be shorted in a pay period?
A. I don't know. That was seven year's worth of employment, and it just got to the point where I knew nobody was going to fix it. So, I just stopped worrying about it.
Q. So, sitting here today, you don't know how many hours you were shorted?
A. No, I don't.

Q. Okay. Where are you currently employed?
A. I'd rather not disclose that information.
MR. SHELLIST: We'll mark that down; but I can tell you based on our prior discussions that if you want that information, the judge will have to ask us to give that to you. I just don't feel it's relevant to anything. So, I make a formal objection as to the form of the question. I know we can chat about it if we need to later.
Q. (By Mr. Van Huff) One of the allegations that you've made in your lawsuit is that these six clubs are joint employers. Are you aware of that?
A. Yes. Because it's true.
Q. Okay.
MR. VAN HUFF: Object to the portion that was nonresponsive.
Q. (By Mr. Van Huff) On what facts do you base that allegation?
A. When I was first given my employee orientation by John Tovar which was the manager that I asked Andy about his last name, he told me that Treasures and Splendor and Gold Cup and all the clubs, they're the same clubs. They're owned by the same owners; and, so, coming from his mouth, that was true. Also, during the Super Bowl when it came to Houston, we ran out of paperwork that we run our

